IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

2008 MAR -7 P 3: 24

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

DORINE BARRANCO, et al., )
)
Plaintiffs, )
)
)
v. )   CIVIL ACTION NO.: 1:08-CV-164
)
)
AXA EQUITABLE LIFE INSURANCE )
COMPANY, f/k/a THE EQUITABLE LIFE )
ASSURANCE SOCIETY OF THE UNITED )
STATES, AXA DISTRIBUTORS, )
LLC, and AXA ADVISORS, LLC., F/K/A )
EQ FINANCIAL CONSULTANTS, INC., )
)
Defendants. )

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that on this date, Defendants AXA Equitable Life Insurance

Company ("AXA Equitable"), AXA Distributors, LLC ("AXA Distributors") and AXA

Advisors, LLC ("AXA Advisors" and, together with AXA Equitable and AXA Distributors, the

"Defendants"), by their undersigned counsel, file this Notice of Removal pursuant to 28 U.S.C.

§§ 1441(b) and 1446, *et seq.*, removing this matter from the Circuit Court of Houston County,

Alabama to the United States District Court for the Middle District of Alabama.  This Court has

original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 and supplemental jurisdiction

over this matter pursuant to 28 U.S.C. § 1367 because there is complete diversity of citizenship

between Plaintiffs and the Defendants and the amount in controversy exceeds the sum of

$75,000, exclusive of interest and costs as to one or more of the Plaintiffs.  In support of this

Notice of Removal, Defendants state as follows:

1.        On or about January 31, 2008, Plaintiffs Dorine Barranco, Rhoda S. Boone,

Gerald C. Caputo, Marjorie L. Caputo, Howard R. Dunn, Charles B. Emmett, Kathryn M. Foster,

Peggy Shannon Hall, Peggy June Johnson, Earl D. Matthews, Jo Anne Merritt, Frank Miller,

Jeanette K. Parker, Kevin M. Patton, Billie S. Rivenbark, Linda Cheri Kelly-Sherer, Tommy E.

Smith, Tony R. Spivey, Ladonna B. Spivey, Gerald F. Trammell, Ashley Hiatt Wiggins, James

Zandy Williams, Sandra Williams, and Lynda Wirtzfeld ("Plaintiffs") commenced a civil action

by filing a complaint in the Circuit Court of Houston County, Alabama, captioned *Dorine*

*Barranco, et al. v. AXA Equitable Life Insurance Company, et al.*, Civil Action No. 2008-

900041.00 (the "Complaint").  Plaintiffs bring this action to recover civil monetary damages for

alleged fraudulent misrepresentations made by the Defendants in connection with Plaintiffs'

purchases of variable annuity contracts issued by AXA Equitable.  The Complaint asserts five

common-law claims based upon state law: Count One (Fraud); Count Two (Suppression); Count

Three (Negligent Training and Supervision); Count Four (Breach of Contract); and Count Five

(Conversion).

  2.  A true and correct copy of all process and pleadings as served upon Defendants

is attached hereto as Exhibit A and is incorporated herein by reference in accordance with 28

U.S.C. § 1446(a).

  3.  The Complaint is the initial pleading setting forth the claims upon which this

action is based.  AXA Distributors received a copy of the Summons and the Complaint through

service on February 8, 2008.  AXA Equitable and AXA Advisors received a copy of the

Summons and the Complaint through service on February 11, 2008.

  4.  This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b), as it is

filed within 30 days of receipt of the Complaint through service of process by the first served

Defendant.  *Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344,  119 S. Ct.

1322 (1999).

5.      AXA Equitable, AXA Advisors and AXA Distributors are the only properly served and existing Defendants. All Defendants join in this Notice of Removal.

## I.      COMPLETE DIVERSITY OF CITIZENSHIP EXISTS

6.      Pursuant to 28 U.S.C. § 1441(b), an action shall be "removable ... if none of the parties in interest properly joined and served as defendants is a citizen of the state in which such action is brought."

7.      Upon information and belief, Plaintiffs Rhoda S. Boone, Ashley Hiatt Wiggins, Linda Cheri Kelly-Sherer, Jo Anne Merritt, Howard W. Dunn, Charles B. Emmett, Peggy Shannon Hall, Peggy June Johnson, Frank Miller, Kevin M. Patton, James Zandy Williams and Sandra Williams are citizens and residents of Houston County, Alabama. *See* Complaint at ¶ 1.

8.      Upon information and belief, Plaintiffs Gerald F. Trammell and Kathryn M. Foster are citizens and residents of Henry County, Alabama. *See* Complaint at ¶ 2.

9.      Upon information and belief, Plaintiffs Dorine Barranco, Billie S. Rivenbark, Tony R. Spivey, LaDonna B. Spivey, Earl D. Matthews, Gerald C. Caputo and Marjorie L. Caputo are citizens and residents of Dale County, Alabama. *See* Complaint at ¶ 3.

10.     Upon information and belief, Tommy E. Smith is a citizen and resident of Coffee County, Alabama. *See* Complaint at ¶ 4.

11.     Upon information and belief, Jeanette K. Parker is a citizen and resident of Barbour County, Alabama. *See* Complaint at ¶ 5.

12.     Upon information and belief, Lynda Wirtzfeld is a citizen and resident of Canyon County, Idaho. *See* Complaint at ¶ 6.

13.     AXA Equitable is a New York corporation with its principal place of business in New York. Pursuant to 28 U.S.C. §1332(c)(1), AXA Equitable is a citizen of the State of

New York.  As a result, AXA Equitable is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama or the State of Idaho within the meaning of the Acts of Congress relating to the removal of causes.

14.    AXA Distributors is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business in New York.  Pursuant to 28 U.S.C. §1332(c)(1), AXA Distributors is a citizen of the State of New York.  As a result, AXA Distributors is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama or the State of Idaho within the meaning of the Acts of Congress relating to the removal of causes.

15.    AXA Advisors is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business in New York.  Pursuant to 28 U.S.C. §1332(c)(1), AXA Advisors is a citizen of the State of New York.  As a result, AXA Advisors is not now, and was not at the time of the filing of the Complaint, a citizen or resident of the State of Alabama or the State of Idaho within the meaning of the Acts of Congress relating to the removal of causes.

## II.    THE AMOUNT-IN-CONTROVERSY REQUIREMENT IS SATISFIED

16.    Plaintiffs' Complaint asserts various contract and tort claims and seeks unspecified compensatory damages and punitive damages in an amount to be determined by jury. *See* "Wherefore" clause following ¶ 48 of Plaintiffs' Complaint.  For seven of the twenty-four plaintiffs, paragraph 10 of the Complaint alleges that damages are less than $75,000, with no specification of the level of damages.[1]  However, paragraph 10 of the Complaint essentially is an admission that the remaining Plaintiffs' claims, though also unspecified, exceed $75,000.

---

[1] Notably, although Complaint states that seven plaintiffs have less than $75,000 in damages, even these seven do not disclaim an intent to seek further damages, nor to accept further damages if awarded.  Under Alabama law, it is

17.    Defendants deny the allegations of Plaintiffs' Complaint and deny that their conduct in connection with Plaintiffs' investments is actionable.    Nonetheless, in evaluating whether diversity jurisdiction exists for the purposes of removal, the Court need only look to what amount is "in controversy." *See* 28 U.S.C. § 1332.

18.    In order to meet the $75,000 jurisdictional threshold in a case with an unspecified claim for damages, Defendants need show only that "the amount in controversy more likely than not exceeds the [now $75,000] jurisdictional requirement." *Tapscott v. MS Dealer Service*, 77 F.3d 1353, 1357 (11th Cir. 1996), overruled on other grounds by *Office Depot v. Cohen*, 204 F.3d 1069 (11th Cir. 2000); *Kilpatrick v. Martin K. Eby Construction Co., Inc.*, 708 F. Supp. 1241, 1242-43 (N.D. Ala. 1989) (holding that the "amount in controversy requirement has been met" even though "the State Court complaint does not demand judgment of a specified dollar amount").    In this case, Defendants can remove to federal court if they can show, by a preponderance of the evidence, facts supporting jurisdiction. *Tapscott*, 77 F.3d at 1357.    A lower burden of proof is warranted where damages are unspecified, such as in the instant case, because the plaintiff in such a case has provided no estimate of damages to which a court may defer. *Id.*

19.    In this case, the face of the Complaint makes abundantly clear that the amount-in-controversy requirement is satisfied with regard to at least seventeen of the twenty-four plaintiffs.    While the Complaint alleges that seven of the twenty-four Plaintiffs each have damages of less than $75,000, this allegation does not deprive the Court of jurisdiction.    If at least one of the Plaintiffs meets the amount-in-controversy requirement, this Court has supplemental jurisdiction over the remaining Plaintiffs' claims. *See Exxon Mobil Corp. v.*

---

clear that a plaintiff may recover an amount at trial greater than the *ad damnum* in the Complaint. *Breland v. Ford*, 693 So. 2d 393, 397 (Ala. 1996).

*Allapattah Services, Inc.*, 545 U.S. 546, 549 (2005) (holding that where all of the other jurisdictional requirements for removal are met, supplemental jurisdiction applies to remaining plaintiffs' claims in a case where at least one plaintiff satisfies the amount-in-controversy requirement, even if the other claims are for less than the jurisdictional amount); 28 U.S.C. § 1367.

20.     Plaintiffs allege "that the damages of the following Plaintiffs are each less than $75,000, including interest, costs, attorney fees, and any legally legitimate claim of punitive damages: Billie S. Rivenbark, Linda C. Kelly-Sherer, Gerald Caputo, Marjorie Caputo, Ashley Hiatt Wiggins, Tommy Smith, Earl D. Matthews." Complaint at ¶ 10. Paragraph 10 of the Complaint readily demonstrates that Plaintiffs' counsel have carefully examined the value of each of the Plaintiffs' claims. Not only have counsel considered the potential that each claim will generate compensatory and punitive damages, but counsel also have considered the potential that the claims will generate interest, costs and attorney fees. Indisputably, paragraph 10 demonstrates that after careful evaluation, Plaintiffs' counsel have determined that seven of the Plaintiffs have claims for less than $75,000.

21.     Paragraph 10 speaks loudly and clearly as to Plaintiffs' counsel's evaluation of the remaining seventeen Plaintiffs claims, as well. In determining that seven of their clients have claims for less than $75,000, counsel necessarily considered the value of the other seventeen Plaintiffs' claims. The only logical conclusion that can be drawn from the deliberate exclusion of the remaining Plaintiffs from paragraph 10 is that Plaintiffs' counsel determined that their claims exceed $75,000. It is facially apparent through the disclaimer as to only seven of the claims, and the nature of the fraud claims and potential for punitive damages, mental anguish damages, attorneys fees and cost, that more than $75,000 is in controversy as to these claims. *Cf.*

6

*Sanderson v. Daimler Chrysler Motor Corp.*, No. 07-0559, slip op. at 2 (S.D. Ala. 2007) (complaint alone, although silent as to the amount of damages claimed, held sufficient to satisfy amount in controversy requirement solely by nature of the claims asserted).

22.      Beyond the necessary implication of paragraph 10 of the Complaint, and by way of an example, the claims of Plaintiff James Williams, who was excluded from paragraph 10, clearly exceed $75,000. According to the Complaint, Defendants allegedly misrepresented that the Plaintiffs were guaranteed to receive a return of their principal investment, plus a guaranteed investment return of 5% or 6% (compounded annually) after seven to ten years. *See* Complaint at ¶¶ 13, 29. Plaintiffs claim damages based on the argument that they were not informed that they "could lose money on their investment" and "did not earn either the applicable 5% or 6% interest on their investments." Complaint at ¶¶ 26, 29. These allegations, combined with Plaintiffs' claims for punitive damages, mental anguish, and statutory interest and attorney's fees pursuant to Alabama Code § 8-6-19, conclusively demonstrate that Williams' claims satisfy the amount-in-controversy requirement. *See* Complaint at ¶¶ 50-52, and paragraph immediately thereafter beginning with "Wherefore."

23.      Standing alone, Williams' claims for damages under the Alabama Securities Act, codified at Alabama Code § 8-6-19, conclusively meet the amount in controversy requirement. If Williams were to prevail on his claims for damages under the Alabama Securities Act, the statute would allow him to recover his principal investment plus 6% interest, compounded annually, in addition to court costs and attorney's fees. *See* Alabama Code § 8-6-19(a) (entitling a plaintiff to "bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees"). Williams' principal investment, compounded annually at a rate of 6%, has a

current value of $59,292.47. As demonstrated by the annuity contracts entered into between Williams and AXA Equitable, Williams invested $30,000 in AXA Equitable variable annuity contract no. 098685395 on November 27, 1998.[2] *See* Affidavit of Sidney Smith at ¶¶ 3-4, attached hereto as Exhibit B. In addition, Williams invested another $5,095.12 in AXA Equitable variable annuity contract no. 098688104 on February 23, 1999. *See* Exhibit B at ¶¶ 5-6. Compounded annually at 6%, these investments would have earned a total of $24,197.35 in interest over the past 9 years. Accordingly, the combination of Williams' principal investment of $35,095.12 plus interest of $24,197.35 totals $59,292.47.

24.     If Williams were to prevail on his Alabama Securities Act claim, in addition to receiving damages consistent with his principal investment plus 6% interest, the statute also would authorize an award of "court costs and reasonable attorneys' fees." *See* Alabama Code § 8-6-19(a). Attorneys' fees and costs under the Alabama Securities Act, while certainly limited to being reasonable, could exceed the amount of Williams' compensatory damages, but in any event, would certainly bring a total award above $75,000 if he prevailed. *See, e.g., Morgan Keegan & Co., Inc. v. Cunningham*, 918 So.2d 897, 901 (Ala. 2005) (attached hereto as Exhibit C) (reversing punitive damage award but upholding award of attorneys' fees and expenses under Alabama Securities Act in the amount of $46,766.53, on compensatory award of only $10,000); *see also Cherry v. Raymond James & Assoc.*, Case No. 05-03030, NASD Dispute Resolution, Arbitration Award dated October 26, 2006 (attached hereto as Exhibit D) (arbitration award of

---

[2] This Court's consideration of James Williams' contracts in connection with this Notice of Removal is consistent with the 11th Circuit Court of Appeals' decision in *Lowery v. Ala. Power Co.*, 483 F.3d 1184 (11th Cir. 2007). As *Lowery* makes clear, courts may look to evidence beyond the removing documents in determining the amount-in-controversy, and may specifically look to contract provisions between the plaintiff and defendant in connection with that determination. *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1214, n. 66 (11th Cir. 2007) ("Moreover, there are some exceptions to the rule that the court is limited to considering the removing documents. A defendant would be free to introduce evidence regarding damages arising from a source such as a contract provision whether or not the defendant received the contract from the plaintiff."); *see Kennedy v. Fleetwood Enterprises, Inc.*, No. 1:07-cv-728, slip op. at 3 (M.D. Ala. 2007) (considering "excerpts from the contract between Plaintiffs and Defendants" in determining whether the amount-in-controversy requirement is satisfied).

8

$151,280.05 in attorneys' fees and costs in favor of seven investors under Florida Securities Act based on purchase of various variable annuities, including the AXA Equitable Accumulator, amounting to $21,611.44 in attorneys' fees and costs awarded per claimant). Even an award of 30% of Williams' compensatory damage claim of $59,292.47, would render attorneys' fees of $17,787.74 and a total of compensatory damages plus attorney's fees of $77,080.21.

25.     Combined with a minimum compensatory damage award of $59,292.47, plus attorneys' fees and costs pursuant to the Alabama Securities Act, Williams' claims for mental anguish and punitive damages clearly satisfy the amount in controversy requirement. *See Kennedy v. Fleetwood Enterprises, Inc.*, No. 1:07-cv-728, slip op. at 3 (M.D. Ala. 2007) (aggregating claims for mental anguish, compensatory and punitive damages in order to satisfy amount in controversy requirement); *Holley Equipment Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th Cir. 1987) ("When determining the jurisdictional amount in diversity cases, punitive damages must be considered, unless it is apparent to a legal certainty that such cannot be recovered.") (citations omitted); *Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943) (claims for compensatory and punitive damages should be aggregated to determine jurisdictional amount in controversy).

26.     In cases such as this one, where plaintiffs make unspecified claims for damages, including mental anguish, compensatory and punitive damages and attorneys' fees, an examination of the amount of damages awarded in similar cases is proper. *See Kennedy v. Fleetwood Enterprises, Inc.*, No. 1:07-cv-728, slip op. at 3 (M.D. Ala. 2007). An examination of similar cases alleging fraud in the sale of securities reveals multiple awards of compensatory and punitive damages and attorneys' fees well in excess of $75,000 -- indeed, these cases illustrate that punitive damages alone may well exceed $75,000. *See, e.g. Davis v. Prudential Securities,*

*Inc.*, 59 F. 3d 1186, 1187 (11ᵗʰ Cir. 1995) (holding that district court properly confirmed arbitrator's award of $300,000 in punitive damages where Plaintiff received compensatory damages of $483,684 on claims for fraud, breach of fiduciary duty, negligence, and violations of the Federal Securities Laws and Florida Securities Act on grounds that securities firm sold Plaintiff speculative investments despite his desire for low risk investments); *Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 767 F. 2d 1498, 1500 (11ᵗʰ Cir. 1985) (affirming jury verdict of $46,675 in compensatory damages and a total of $315,000 in punitive damages against brokerage firm and its broker, and upholding award of $54,320 in attorney's fees under the Florida Securities Act where plaintiffs alleged violations of federal and state securities laws, breach of fiduciary duty and gross negligence in connection with the handling of their securities accounts); *Silverberg v. Paine, Webber, Jackson & Curtis*, 710 F. 2d 678, 681 (11ᵗʰ Cir. 1983) (affirming jury verdict of $530,000 in compensatory damages and $75,000 in punitive damages against brokerage firm and its broker on claims of violation of federal securities laws and the Florida Securities Act, common law fraud, negligence, breach of fiduciary duty and negligent supervision relating to the purchase of securities by the plaintiff); *Am. Pioneer Life Ins. Co. v. Sandlin*, 470 So. 2d 657 (Ala. 1985) (upholding trial court's award of $100,000 in compensatory damages and $3,000,000 in punitive damages against insurance companies on claims involving fraud in the sale of an annuity where plaintiff invested a total of $24,000 in the annuity at issue, and agent's misrepresentations included the statement that Plaintiff could withdraw his principal investment plus interest at any time); *see also Adams v. Securities America, Inc.*, No. 06-2509 c/w 06-3024, slip op. at 2 (E.D. La. Sept. 12, 2006) (attached as Exhibit E) (granting investors' motion to confirm arbitration award against brokerage firm for compensatory and punitive

damages, attorney's fees, costs and interest in separate amounts for each plaintiff ranging from $144,112 to $1,364,205 based on claims of fraud in the sale of variable annuities).

27.    Further, in Alabama, when a plaintiff seeks recovery against an insurance company and asks for punitive damages, the recovery, if the plaintiff prevails, may very well exceed the jurisdictional amount. *Bolling v. Union Nat'l Life Ins. Co.*, 900 F. Supp. 400, 405 (M.D. Ala. 1995); *Davis v. Franklin Life Ins. Co.*, 71 F. Supp. 2d 1197, 1200 (M.D. Ala. 1999); *accord, McDuffie v. Franklin Life Insurance* Co., Civil Action No. 99-D-1023-N at 14-15 (M.D. Ala. March 6, 2000); *Wilder v. Franklin Life Insurance Co.*, Civil Action No. 99-D-1037-E at 15-16 (M.D. Ala. March 27, 2000); *Goree v. Franklin Life Insurance Co.*, Civil Action No. 99-D-986-N at 16-17 (M.D. Ala. April 24, 2000); *Saunders v. Franklin Life Insurance Co.*, Civil Action No. 99-D-1077-S at 17-18 (M.D. Ala. April 27, 2000); *Smith v. Franklin Life Insurance Co.*, Civil Action No. 99-D-1081-S at 30-32 (M.D. Ala. June 30, 2000) (attached as Exhibit F).

28.    Moreover, Plaintiffs' claims for mental anguish, physical suffering, annoyance and inconvenience conclusively demonstrate that the amount in controversy has been met. *See, e.g. SouthTrust Bank v. Donely*, 925 So. 2d 934, 937, n. 5 (Ala. 2005) (jury's award of mental anguish damages of $25,000 not contested on appeal in case involving refusal to redeem certificates of deposit). In Alabama, when plaintiffs prevail on claims for mental anguish, their recovery may easily exceed the $75,000 jurisdictional threshold based on mental anguish damages alone. *See National Ins. Ass'n. v. Sockwell,* 829 So. 2d 111, 135 (Ala. 2002) (affirming award of approximately $161,000 in mental anguish damages based on insurer's denial of claims for underinsured motorist benefits); *see also Slack v. Stream*, No. 1060007, 2008 WL 162618 at *16 (Ala. Jan. 18, 2008) (mental anguish damages of $200,000 not excessive); *Cochran v. Ward*, 935 So.2d 1169, 1176 (Ala. 2006) ("it is not unusual for juries to award compensatory

11

damages for mental anguish at or above" $275,000); *George H. Lanier Mem. Hosp. v. Andrews*, 901 So.2d 714, 725-26 (Ala. 2004) (jury verdict awarding $100,000 in damages for mental anguish to each plaintiff held not excessive); *Wal-Mart Stores, Inc. v. Goodman*, 789 So.2d 166, 182 (Ala. 2000) (while high, award of $200,000 in mental anguish damages not excessive); *Orkin Exterminating Co., Inc. v. Jeter*, 832 So.2d 25, 39 (Ala. 2001) (mental anguish damage award remitted to $200,000); *Prudential-Ballard Realty Co. v. Weatherly*, 792 So. 2d. 1045, 1050 (Ala. 2000) (upholding jury award of $250,000 in compensatory damages, of which approximately $200,000 was to compensate for mental anguish); *Crown Life Ins. Co. v. Smith*, 657 So.2d 821, 825 (Ala. 1994) (award of mental anguish damages remitted from $2,000,000 to $250,000).

29.    It is therefore clear that Williams' claims for damages, aggregating his claims under the Alabama Securities Act, his claims for compensatory and punitive damages and mental anguish, undisputedly exceed the jurisdictional minimum. Likewise, it is readily deducible from Plaintiffs' allegations in the Complaint that Plaintiffs Dorine Barranco, Rhoda S. Boone, Howard R. Dunn, Charles B. Emmett, Kathryn M. Foster, Peggy Shannon Hall, Peggy June Johnson, Jo Anne Merritt, Frank Miller, Jeanette K. Parker, Kevin M. Patton, Tony R. Spivey, Ladonna B. Spivey, Gerald F. Trammell, Sandra Williams, and Lynda Wirtzfeld each have claims exceeding the $75,000 jurisdictional requirement as well. *See Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001) ("When the complaint does not claim a specific amount of damages, removal from state court is proper if it is facially apparent from the complaint that the amount in controversy exceeds the jurisdictional requirement."); *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1211 (11th Cir. 2007) ("If the jurisdictional amount is either stated clearly on the face of the documents before the court, or readily deducible from them, then the court has jurisdiction.").

30.     As stated *supra* at par. 19, where at least <u>one</u> named plaintiff satisfies the amount-in-controversy requirement, a district court has supplemental jurisdiction over the remaining plaintiffs' claims under 28 U.S.C. § 1367. *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 549 (2005); 28 U.S.C. § 1367(a) ("in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."); *see Eufaula Drugs, Inc. v. Tmesys, Inc.*, 432 F. Supp. 2d 1240, 1245 (M.D. Ala. 2006) (supplemental jurisdiction is proper where court has "original jurisdiction over at least one claim of one plaintiff"). Here, Plaintiffs tacitly admit that seventeen Plaintiffs have the requisite amount in controversy, but if there were any doubt, the foregoing illustration of how Plaintiff James Williams' claims clearly meet the amount-in-controversy requirement is sufficient to establish that this Court has original jurisdiction over his claims, and therefore has supplemental jurisdiction over the claims of the remaining Plaintiffs.

31.     In summary, based upon the admission in the Complaint that only seven of the twenty-four Plaintiffs have damages less than $75,000, and because it is readily deducible based upon the allegations of the Complaint and the contracts incorporated by reference that one or more Plaintiffs has placed more than $75,000 in controversy, this Court has jurisdiction over one or more of the Plaintiffs based upon 28 U.S.C. 1332, and supplemental jurisdiction over the remaining Plaintiffs pursuant to 28 U.S.C. 1367.

## III.    THE OTHER PREREQUISITES FOR REMOVAL HAVE BEEN SATISFIED

32.    Venue is proper in this district under 28 U.S.C. §1446(a), because this district and division embrace the place in which the removed action has been pending and because a substantial part of the events giving rise to Plaintiffs' claims allegedly occurred in this district.

33.    Pursuant to 28 U.S.C. §1446(d), promptly after Defendants file this Notice, written notice of the filing will be given to Plaintiffs.

34.    Pursuant to 28 U.S.C. §1446(d), a true and correct copy of this Notice of Removal will be filed with the Clerk of the Circuit Court of Houston County, Alabama, promptly after Defendants file this Notice.

WHEREFORE, DEFENDANTS AXA Equitable Life Insurance Company, AXA Distributors, LLC and AXA Advisors, LLC hereby remove this action from the Circuit Court of Houston County, Alabama, to the United States District Court for Middle District of Alabama, Southern Division, and request that this Court enter such further orders as may be necessary and appropriate.

A. Inge Selden III (SEL003)
John N. Bolus (BOL022)
Andrea Morgan Greene (GRE102)

Attorneys for Defendants
AXA Equitable Life Insurance Company and
AXA Distributors, LLC and AXA Advisors, LLC

14

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2602
(205) 254-1000

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Notice of Removal has been served upon the following listed persons by placing a copy of the same in the United States mail, first-class postage prepaid and properly addressed as follows:

Andrew P. Campbell
Caroline Smith Gidiere
Campbell, Gidiere, Lee, Sinclair & Willaims, PC
2100-A SouthBridge Parkway, Suite 450
Birmingham, Alabama 35209

on this the 7th day of March, 2008.

OF COUNSEL

16

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET<br>CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>**38-CV-200**<br>Date of Filing:<br>01/31/2008 | ELECTRONICALLY FILED<br>1/31/2008 5:56 PM<br>CV-2008-900041.00<br>CIRCUIT COURT OF<br>HOUSTON COUNTY, ALABAMA<br>CARLA H. WOODALL, CLERK |

## GENERAL INFORMATION

### IN THE CIRCUIT OF HOUSTON COUNTY, ALABAMA
### DORINE BARRANCO ET AL v. AXA EQUITABLE LIFE INS. COMPANY ET AL

**First Plaintiff:** ☐ Business ☑ Individual ☐ Government ☐ Other

**First Defendant:** ☑ Business ☐ Individual ☐ Government ☐ Other

### NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonnes
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**

- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS  (cont'd)**

- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP-Contempt of Court
- ☐ CONT-Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND- Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD-Eviction Appeal/Unlawfyul Detainer
- ☐ FORJ-Foreign Judgment
- ☐ FORF-Fruits of Crime Forfeiture
- ☐ MSHC-Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB-Protection From Abuse
- ☐ FELA-Railroad/Seaman (FELA)
- ☐ RPRO-Real Property
- ☐ WTEG-Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP-Workers' Compensation
- ☑ CVXX-Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ INITIAL FILING   A ☐ APPEAL FROM DISTRICT COURT   O ☐ OTHER

R ☐ REMANDED   T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT _____

**HAS JURY TRIAL BEEN DEMANDED?** ☑ Yes ☐ No

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:** SMI209   1/31/2008 5:54:36 PM   /s CAROLINE GIDIERE

**MEDIATION REQUESTED:** ☐ Yes ☐ No ☑ Undecided

**DEFENDANT'S EXHIBIT**

CASE NO.

EXHIBIT NO. A

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>38-CV-2008-900041.00 |
|---|---|---|

### IN THE CIVIL COURT OF HOUSTON, ALABAMA
### DORINE BARRANCO ET AL v. AXA EQUITABLE LIFE INS. COMPANY ET AL

AXA EQUITABLE LIFE INS. COMPANY, 1290 AVE OF THE AMERICAS 4TH FLOOR, NEW YORK NY, 10101

**NOTICE TO** _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY CAROLINE GIDIERE _____

WHOSE ADDRESS IS 2100A SOUTHBRIDGE PKWY, STE. 450, BIRMINGHAM AL, 35209 _____

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of    DORINE BARRANCO _____
   pursuant to the Alabama Rules of the Civil Procedure

| 1/31/2008 5:56:09 PM | /s CARLA H. WOODALL | |
|---|---|---|
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested   /s CAROLINE GIDIERE _____

                               Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

| _____ | _____ |
|---|---|
| Date | Server's Signature |

| State of Alabama<br>Unified Judicial System<br><br>Form C-34  Rev 6/88 | **SUMMONS**<br>**- CIVIL -** | **Case Number:**<br>38-CV-2008-900041.00 |
|---|---|---|

**IN THE CIVIL COURT OF HOUSTON, ALABAMA**
**DORINE BARRANCO ET AL v. AXA EQUITABLE LIFE INS. COMPANY ET AL**

NOTICE TO   AXA DISTRIBUTORS LLC, 1290 AVE. OF THE AMERICAS 7TH FLOOR, NEW YORK NY, 10104
_____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY CAROLINE GIDIERE
_____

WHOSE ADDRESS IS 2100A SOUTHBRIDGE PKWY, STE. 450, BIRMINGHAM AL, 35209
_____

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of   DORINE BARRANCO
   pursuant to the Alabama Rules of the Civil Procedure

| 1/31/2008 5:56:09 PM | /s CARLA H. WOODALL | |
|---|---|---|
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested   /s CAROLINE GIDIERE
                                        Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____                _____
Date                                   Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | **SUMMONS**<br>**- CIVIL -** | **Case Number:**<br>38-CV-2008-900041.00 |
|---|---|---|

### IN THE CIVIL COURT OF HOUSTON, ALABAMA
### DORINE BARRANCO ET AL v. AXA EQUITABLE LIFE INS. COMPANY ET AL

AXA ADVISORS, LLC, 1290 AVE. OF THE AMERICAS 12TH FLOOR, NEW YORK NY, 10104

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY CAROLINE GIDIERE

WHOSE ADDRESS IS 2100A SOUTHBRIDGE PKWY, STE. 450, BIRMINGHAM AL, 35209

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of      DORINE BARRANCO
   pursuant to the Alabama Rules of the Civil Procedure

| 1/31/2008 5:56:09 PM | /s CARLA H. WOODALL | |
|---|---|---|
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested      /s CAROLINE GIDIERE
                                          Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____              _____
Date                                  Server's Signature



ELECTRONICALLY FILED
1/31/2008 5:56 PM
CV-2008-900041.00
CIRCUIT COURT OF
HOUSTON COUNTY, ALABAMA
CARLA H. WOODALL, CLERK

## IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

DORINE BARRANCO,
RHODA S. BOONE,
GERALD C. CAPUTO,
MARJORIE L. CAPUTO,
HOWARD R. DUNN,
CHARLES B. EMMETT,
KATHRYN M. FOSTER,
PEGGY SHANNON HALL,
PEGGY JUNE JOHNSON,
EARL D. MATTHEWS,
JO ANNE MERRITT,
FRANK MILLER,
JEANETTE K. PARKER,
KEVIN M. PATTON,
BILLIE S. RIVENBARK,
LINDA CHERI KELLY-SHERER,
TOMMY E. SMITH,
TONY R. SPIVEY,
LADONNA B. SPIVEY,
GERALD F. TRAMMELL,
ASHLEY HIATT WIGGINS,
JAMES ZANDY WILLIAMS,
SANDRA WILLIAMS,
LYNDA WIRTZFELD,

Plaintiffs,

v.                                                          CV 2007-___

AXA EQUITABLE LIFE INSURANCE COMPANY,
f/k/a THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES, AXA
DISTRIBUTORS, LLC, f/k/a
EQUITABLE DISTRIBUTORS, LLC, and AXA
ADVISORS, LLC, f/k/a EQ FINANCIAL
CONSULTANTS, INC.

Defendants.

## COMPLAINT

1.      Plaintiffs, Rhoda S. Boone, Ashley Hiatt Wiggins, Linda Cheri Kelly-Sherer, Jo Anne Merritt, Howard W. Dunn, Charles B. Emmett, Peggy Shannon Hall, Peggy June Johnson, Frank Miller, Kevin M. Patton, James Zandy Williams, and Sandra Williams, are individuals over the age of nineteen (19) who reside in Houston County, Alabama.

2.      Plaintiffs, Gerald F. Trammell and Kathryn M. Foster are individuals over the age of nineteen (19) who reside in Henry County, Alabama.

3.      Dorine Barranco, Billie S. Rivenbark, Tony R. Spivey, LaDonna B. Spivey, Earl D. Matthews, Gerald C. Caputo, and Marjorie L. Caputo, are individuals over the age of nineteen (19) who reside in Dale County, Alabama.

4.      Tommy E. Smith is an individual over the age of nineteen (19) who resides in Coffee County, Alabama.

5.      Jeanette K. Parker is an individual over the age of nineteen (19) who resides in Barbour County, Alabama.

6.      Lynda Wirtzfeld is an individual over the age of nineteen (19) who resides in Canyon County, Idaho.

7.      AXA Equitable Life Insurance Company f/k/a Equitable Life

2

Assurance Society of the United States (hereinafter "Equitable Life") is a foreign corporation authorized to do business in the State of Alabama and doing business by agent in Houston County, Alabama, at all times relevant to this Complaint. Equitable Life is a stock life insurance company that is among the largest life insurance companies in the United States. Equitable Life is a wholly owned subsidiary of The Equitable Companies Incorporated.

8.     AXA Distributors, LLC f/k/a Equitable Distributers, LLC., (hereinafter "EDL") and AXA Advisors, LLC f/k/a EQ Financial Consultants, Inc. (hereinafter "EQF") are foreign corporations authorized to do business in the State of Alabama and doing business by agent in Houston County, Alabama, at all times relevant to this Complaint. EDL and EQF are wholly owned subsidiaries of Equitable Life and have responsibility for sales and marketing functions for the Certificates issued by Equitable Life. EDL and EQF are also the distributors for Equitable Life annuity products, such as the Accumulator[sm], with its baseBUILDER® and Income Manager® options. EDL and EQF are a broker-dealers registered with the Securities and Exchange Commission.

9.     FICTITIOUS DEFENDANTS "A". "B", and "C", whether singular or plural, are those persons, firms, corporations, or other entities whose wrongful conduct caused or contributed to cause the injuries and damages to the Plaintiffs;

FICTITIOUS DEFENDANTS "D", "E", and "F", whether singular or plural, is the entity which, concerning the occasions made the basis of this suit, was the principal of any of the named or above-described fictitious party Defendants at the time of these occasions; and FICTITIOUS DEFENDANTS "G", "H", and "I", whether singular or plural, is the entity which is the successor-in-interest of any of the named or above-described fictitious party Defendants. The wrongdoing of these fictitious parties as set forth herein proximately caused damage to Plaintiffs. Plaintiffs aver that the identities of the FICTITIOUS DEFENDANTS are otherwise unknown to them at this time, their identities as proper parties Defendants are not known to Plaintiffs at this time, and their true names will be substituted by amendment when ascertained.

10.    Plaintiffs aver that the damages of the following Plaintiffs are each less than $75,000, including interest, costs, attorney fees, and any legally legitimate claim of punitive damages:

> Billie S. Rivenbark
> Linda C. Kelly-Sherer
> Gerald Caputo
> Marjorie Caputo
> Ashley Hiatt Wiggins
> Tommy Smith
> Earl D. Matthews

11.    Plaintiffs do not allege any federal claims. Plaintiffs" claims and

4

remedies lie exclusively under Alabama law.

12.     Plaintiffs' claims are joined under Rule 20 of the *Alabama Rules of Civil Procedure.* Joinder is appropriate because Plaintiffs' claims arise out of or relate to two series of transactions and occurrences and present common questions of law and/or fact.

13.     Beginning in 1998, agents of Defendants made representations to Plaintiffs that Plaintiffs could purchase a seven or ten year investment from Defendants which had a guaranteed rate of interest of either 5% or 6%, if held to maturity, but that the return could be greater if the stock market out-performed this minimum guaranteed rate. Defendants represented to Plaintiffs that the 5% or 6% (as the case may be) interest rate would be compounded annually if held to maturity. Defendants represented to Plaintiffs that Plaintiffs would receive "the best of both worlds" since they were guaranteed a 5% or 6% return even if the stock market were to decline.

14.     Plaintiffs made clear that, while the minimum guaranteed rate of return was attractive, they needed access to their monies after maturity and were, therefore, not interested in the annuity aspect of the investment. Defendants represented to Plaintiffs that there was 90% liquidity on the investment if held to maturity and reassured Plaintiffs that they could take a 90% lump sum pay out of

5

their investment without penalty at the conclusion of the seven or ten year maturity period.

15.    Defendants suppressed and concealed from Plaintiffs that there was no guaranteed interest rate associated with this variable annuity product but instead involved risk, including possible loss of principal; that Plaintiffs could not have complete access to their investment after their seven or ten year liquidity period.

16.    Defendants failed to provide Plaintiffs with a prospectus providing complete, meaningful disclosures of the investment, including its options, risks, fees, expenses, and method of assuring a 90% lump sum pay out without penalty at the close of the maturity period.

17.    In reliance upon the representations of Defendants Plaintiffs transferred monies, including, for some Plaintiffs, monies from IRAs.

18.    After investing their monies with Defendants, Plaintiffs received statements regarding their investments. On numerous occasions, Plaintiffs questioned one or more Defendants regarding their accounts. On each such occasion, Defendants reassured Plaintiffs that the amounts shown on the statements did not accurately reflect the value of their investments.

19.    Plaintiffs have discovered within two years prior to the filing of this lawsuit that:

6

(a)     Plaintiffs were not guaranteed a 5% or 6% (as the case may be) return on their investments;

(b)     Plaintiffs would not have 90% access to their investments after seven or ten years, or at maturity;

(c)     Plaintiffs were required to annuitize their entire investment and thus could only receive a portion of their investments.

## COUNT ONE
## FRAUD

20.    Plaintiffs reallege all allegations of this Complaint.

21.    From 1998 through 2000, Defendants, through its/their agents, servants, and employees, made one or more of the following misrepresentations of material fact to Plaintiffs:

(a)     That Plaintiffs were guaranteed a return on their investment after either seven or ten years of either 5% or a 6% (the guaranteed minimum interest rate);

(b)     That after seven or ten years (the applicable period to maturity), Plaintiffs would have access to 90% of their investment plus guaranteed interest (at a minimum) and could cash it in for a lump sum payment without penalty if so desired; and

(c)     That this investment provided the "best of both worlds."

7

22.    The above representations were false, and Defendants knew they were false; or the Defendants recklessly misrepresented the facts without true knowledge thereof; or Defendants misrepresented the facts by mistake but did so with the intention that Plaintiff should rely upon them.

23.    In reliance on those representations, Plaintiffs invested monies with Defendants.

24.    Defendants authorized, ratified, and/or condoned the acts of its employees or agents, including Holman or the acts of Holman and others, were calculated to or did benefit said Defendants.

25.    Plaintiffs aver that Defendants engaged in a fraudulent scheme whereby investors, including the Plaintiffs, were duped into investing in Defendants' variable annuity. Through common misrepresentation, Defendants deceitfully tricked Plaintiffs and others into purchasing annuities. Plaintiffs were prevented from learning about their investments because Defendants purposefully and fraudulently withheld such information and purposefully and fraudulently responded falsely to Plaintiffs' inquiries.

26.    As a proximate consequence of Defendants' fraud and misrepresentations, Plaintiffs were injured and damaged as follows:

(a)    Plaintiffs have paid monies for an investment which was

8

not what they bargained for;

(b)    Plaintiffs did not earn either the applicable 5% or 6%
interest on their investments;

(c)    Plaintiffs cannot cash out their investments after either
the seven or ten year period for maturity;

(d)    Plaintiffs' investments have not performed as represented
by Defendants;

(e)    Plaintiffs have lost the opportunity to make alternative
investments with their funds;

(f)    Plaintiffs have suffered anxiety, worry, mental anguish
and emotional distress, inconvenience, embarrassment, humiliation
and other incidental damages; and

(g)    Plaintiffs will incur expenses necessitated by the filing of
this lawsuit.

27.    Defendants consciously or deliberately engaged in oppression, fraud,
wantonness, or malice with regard to Plaintiffs, thereby entitling Plaintiffs to
punitive damages from these Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants for
damages, including actual and punitive, in such a sum as a jury shall reasonably

9

assess, in an amount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

## COUNT TWO
## SUPPRESSION

28.    Plaintiffs reallege all allegations of this Complaint.

29.    At the foresaid times and places, Defendants fraudulently failed to disclose to Plaintiffs and suppressed from the Plaintiffs the following material misrepresentations:

        (a)    That Plaintiffs could lose money on their investment;

        (b)    That Plaintiffs were not guaranteed the applicable rate of return, either 5% or 6%.

        (c)    That Plaintiffs would not have access to 90% of their investments without penalty after seven or ten years, or the applicable rate of interest; and

        (d)    That Plaintiffs should have been provided with a prospectus regarding all aspects of their investments either before or at the time of sale, which document was not provided to Plaintiffs;

30.    Plaintiffs acted as a result of the non-disclosure/suppression and/or fraudulent concealment and purchased the investment product of the Defendants.

31.    As a proximate consequence, Plaintiffs were injured and damaged as

10

set forth above.

32.    Defendants consciously or deliberately engaged in suppression, fraud, wantonness, or malice with regard to Plaintiffs, thereby entitling Plaintiffs to punitive damages from these Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, in an amount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

## COUNT THREE
## NEGLIGENT TRAINING AND SUPERVISION

33.    Plaintiffs reallege all allegations of this Complaint.

34.    Plaintiffs allege that agents, servants, and/or employees of Defendants negligently, wantonly, and/or willfully failed to adequately regulate, audit, supervise and/or monitor the activities of their agents and that Defendants negligently failed to detect and/or deter the misrepresentations of their agents.

35.    Defendants knew of should have known of the misrepresentations of their agents.

36.    Defendants impliedly authorized or ratified the conduct of their agents, and the acts of their agents were calculated to or did benefit Defendants.

37.    As a result of Defendants' actions, the Plaintiffs were injured and

11

damaged as alleged above.

38.     Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to Plaintiffs, thereby depriving Plaintiffs of legal rights and entitling Plaintiffs to punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, in an amount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

## COUNT FOUR
## BREACH OF CONTRACT

39.     Plaintiffs reallege all previous allegations contained in this Complaint.

40.     Plaintiffs aver that under the terms of their contracts, Plaintiffs were to receive an investment product with a guaranteed return of either 5% of 6% compounded annually after either seven or ten years.

41.     Plaintiffs aver that under the terms of their contracts, Plaintiffs were to have 90% access to a lump sum pay out of their investment, including the 5% or 6% guaranteed return compounded annually, without penalty after seven or ten years.

42.     Plaintiffs allege that Defendants breached their contracts with Plaintiffs in that they did not provide Plaintiffs with the product they bargained for.

12

43.   As a proximate consequence of Defendants' breach of contract, Plaintiffs have been damaged as set forth above.

44.   Plaintiffs allege that the contractual duty owed Plaintiffs by Defendants is so related with matters of mental concern or apprehensiveness or with feelings of Plaintiffs, that a breach of that duty reasonably resulted in mental anguish to Plaintiffs and that Plaintiffs are entitled to recover for such mental anguish, physical suffering, annoyance, and inconvenience.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, including actual and punitive, in such a sum as a jury shall reasonably assess, in an amount exceeding the jurisdictional minimum of this Court, plus interest and all costs of this proceeding.

## COUNT FIVE
## CONVERSION

45.   Plaintiffs reallege all allegations of this Complaint.

46.   Plaintiffs aver that Defendants converted monies from Plaintiffs' accounts.

47.   Plaintiffs further aver that such conversion was wanton, willful, and/or malicious.

48.   As a proximate result of the aforementioned wrongful conduct of

13

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, interest, court costs, and attorney's fees, and any other damages provided under Alabama Code § 8-6-19, in such a sum as a jury shall reasonably assess, including interest and all costs of these proceedings, in an amount exceeding the jurisdictional minimum of this Court.

Respectfully submitted,

_____
One of the Attorneys for Plaintiffs

OF COUNSEL:
Andrew P. Campbell (CAM006)
Caroline Smith Gidiere (SMI209)
CAMPBELL, GIDIERE, LEE
SINCLAIR & WILLIAMS, PC
2100-A SouthBridge Parkway, Suite 450
Birmingham, AL 35209
(205) 803-0051 phone
(205) 803-0053 fax
acampbell@cgl-law.com
cgidiere@cgl-law.com

## JURY DEMAND

Plaintiffs hereby request trial by struck jury in this cause of action on all claims so triable.

_____
OF COUNSEL

15

<u>**PLEASE SERVE THE FOLLOWING DEFENDANTS**</u>
<u>**BY CERTIFIED MAIL:**</u>

**AXA EQUITABLE LIFE INSURANCE COMPANY**
**f/k/a THE EQUITABLE LIFE ASSURANCE SOCIETY**
**OF THE UNITED STATES**
1290 Avenue of the Americas, 4th Floor
New York, NY 10104


**AXA DISTRIBUTORS, LLC, f/k/a**
**EQUITABLE DISTRIBUTORS, LLC**
1290 Avenue of the Americas, 7th Floor
New York, NY 10104

**AXA ADVISORS, LLC, f/k/a**
**EQ FINANCIAL CONSULTANTS, INC.**
1290 Avenue of the Americas, 12th Floor
New York, NY  10104

16



**AlaFile E-Notice**

38-CV-2008-900041.00

Judge: DENNY L. HOLLOWAY

To:  CAMPBELL ANDREW P
     acampbell@cgl-law.com

---

# NOTICE OF SERVICE

---

### IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

**DORINE BARRANCO ET AL V. AXA EQUITABLE LIFE INS. COMPANY ET AL**
**38-CV-2008-900041.00**

The following matter was served on 2/8/2008

**D002 AXA DISTRIBUTORS LLC**

**CERTIFIED MAIL**

**CARLA H. WOODALL**
**CIRCUIT COURT CLERK**
HOUSTON COUNTY, ALABAMA
114 NORTH OATES STREET
DOTHAN, AL 36302

334-677-4859



**AlaFile E-Notice**

38-CV-2008-900041.00

Judge: DENNY L. HOLLOWAY

To:  CAMPBELL ANDREW P
acampbell@cgl-law.com

---

# NOTICE OF SERVICE

---

### IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

**DORINE BARRANCO ET AL V. AXA EQUITABLE LIFE INS. COMPANY ET AL
38-CV-2008-900041.00**

The following matter was served on 2/11/2008

**D001 AXA EQUITABLE LIFE INS. COMP
CERTIFIED MAIL**

**CARLA H. WOODALL
CIRCUIT COURT CLERK
HOUSTON COUNTY, ALABAMA
114 NORTH OATES STREET
DOTHAN, AL 36302**

334-677-4859



**AlaFile E-Notice**

38-CV-2008-900041.00

Judge: DENNY L. HOLLOWAY

To:  CAMPBELL ANDREW P
    acampbell@cgl-law.com

# NOTICE OF SERVICE

### IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA

### DORINE BARRANCO ET AL V. AXA EQUITABLE LIFE INS. COMPANY ET AL
### 38-CV-2008-900041.00

The following matter was served on 2/11/2008

**D003 AXA ADVISORS, LLC**

**CERTIFIED MAIL**

**CARLA H. WOODALL**
**CIRCUIT COURT CLERK**
HOUSTON COUNTY, ALABAMA
114 NORTH OATES STREET
DOTHAN, AL 36302

334-677-4859

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

```
DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.        B
```

DORINE BARRANCO, et al.,          )
                                   )
                Plaintiffs,        )
                                   )
v.                                 )          CIVIL ACTION NO.: 1:08-CV-164-TFM
                                   )
AXA EQUITABLE LIFE INSURANCE       )
COMPANY, f/k/a THE EQUITABLE LIFE  )
ASSURANCE SOCIETY OF THE UNITED    )
STATES, AXA DISTRIBUTORS,          )
LLC, and AXA ADVISORS, LLC., F/K/A )
EQ FINANCIAL CONSULTANTS, INC.,    )
                                   )
                Defendants.        )


STATE OF NEW YORK          )
                           )
COUNTY OF NEW YORK         )


Comes now Sidney Smith, who, upon being duly sworn, does depose and say as follows:

1.      My name is Sidney Smith.  I am competent to make this affidavit, and I have personal knowledge of the facts stated below.

2.      I am currently employed by AXA Equitable Life Insurance Company, f/k/a The Equitable Life Assurance Society of the United States ("AXA Equitable") as Vice President of Annuity Marketing and Development, and have been employed by AXA Equitable in various capacities for over 30 years.  In my role as Vice President of Annuity Marketing and Development, I have access to and have reviewed business records disclosing the information herein.

3.    James Williams purchased an AXA Equitable variable annuity on November 27, 1998.  The contract number is 098685395.  A true and correct copy of AXA Equitable contract number 098685395 is attached hereto as Exhibit 1.

4.    James Williams invested a total of $30,000 in AXA Equitable contract number 098685395.  *See* Exhibit 1 at data page 2.

5.    James Williams purchased a second AXA Equitable variable annuity on February 23, 1999.  The contract number is 098688104.  A true and correct copy of AXA Equitable contract number 098688104 is attached hereto as Exhibit 2.

6.    James Williams invested a total of $5,095.12 in AXA Equitable contract number 098688104.  *See* Exhibit 2 at data page 2.

7.    James Williams has not made any withdrawals from either of the two annuities referenced herein.

FURTHER AFFIANT SAITH NOT.


Executed on this the _____ day of March, 2008.

Sidney Smith


Sworn to before me this the _____ day of March 2008.

Notary Public
My commission expires:

JOHN GREGA
Notary Public - State of New York
NO. 01GR4895168
Qualified in New York County
My Commission Expires May 26, 20__



# Accumulator (NQ)

Ansley E Whatley, III
ProEquities Inc
200 Grove Park Lane
Ste 100
Dothan, AL  36305

**Owner:**             **James Zandy Williams/Sandra Williams**
**Annuitant:**         **James Zandy Williams**
**Certificate Number:** **98 685 395**

**Product:**           **Accumulator (NQ)**
**State:**             **Alabama**



DEFENDANT'S EXHIBIT

CASE NO.

EXHIBIT NO. B-1



**AXA
DISTRIBUTORS, LLC**

November 27, 1998

Ansley E Whatley, III
ProEquities Inc
200 Grove Park Lane
Ste 100
Dothan, AL  36305

Dear Ansley E Whatley, III:

I would like to take this opportunity to thank you for recently placing an Equitable Accumulator$^{SM}$ Certificate for James Zandy Williams/Sandra Williams with The Equitable Life Assurance Society. At AXA Distributors, LLC, we are committed to providing you with the support you and your clients deserve, and look forward to building a longstanding relationship with you.

Enclosed please find a package of information for James Zandy Williams/Sandra Williams. Included is a welcome letter, your client's Accumulator Certificate and a personalized summary that highlights important information. Please review this package with your client and provide the kit to them for record keeping purposes.

We have also included a summary sheet for your files. This summary contains important information regarding this particular client and Certificate.

We at AXA Distributors appreciate your continued support and look forward to working with you in the future. We're always ready to answer your questions . . . give you a quote or a hypothetical illustration . . . provide you with marketing materials . . . help you in any way we can. When you need us, just contact your AXA Distributors' Regional Vice President or call our Sales Desk at 1-888-517-9900.

Again, thank you for the business.

Sincerely,

Jeffrey L. McGregor
President of AXA Distributors, LLC

EDIU-97-76(6/98)

# Equitable accumulator<sup>SM</sup>
# Broker Summary Sheet

| | |
|---|---|
| **Owner:** | James Zandy Williams/Sandra Williams |
| **Annuitant:** | James Zandy Williams |
| **Successor Owner/Annuitant:** | Not Applicable |
| **Beneficiary(ies):** | James Z Williams Jr/Leesa R Fryer |
| **Initial Contribution:** | $30,000.00 |
| **Contract Date:** | November 27, 1998 |
| **Certificate Number:** | 98 685 395 |
| **Certificate Type:** | Accumulator (NQ) |
| **baseBUILDER® Elected:**<br>    **Income Benefit**<br>    **Death Benefit** | <br>6% Roll Up to Age 80<br>6% Roll Up to Age 80 |
| **Investment Funds:** | EQ/Money Market Fund<br>Multimanager  High Yield Fund<br>EQ/AllianceBernsteinCommon Stock Fund          $12,000.00<br>Multimanager  Aggressive Equity Fund<br>EQ/AllianceBernsteinSmall Cap Growth Fund<br>AXA Moderate Allocation Fund<br>EQ/Small Company Index Fund<br>EQ/JPMorgan Core Bond Fund<br>EQ/AllianceBernsteinValue Fund<br>Multimanager Small Cap Value Fund<br>EQ/MFS Research Fund                                    $9,000.00<br>MarketPLUS Large Cap Growth Fund<br>EQ/Van Kampen Emerging Markets Equity Fund<br>EQ/JPMorgan Value Opportunities Fund<br>EQ/Capital Guardian Growth Fund                  $9,000.00<br>EQ/BlackRock International Value Fund |
| **Guaranteed Fixed Interest**<br>    **Accounts:** | February 15, 1999<br>February 15, 2000<br>February 15, 2001<br>February 15, 2002<br>February 15, 2003<br>February 15, 2004<br>February 15, 2005<br>February 15, 2006<br>February 15, 2007<br>February 15, 2008 |



**EQUITABLE**
*Member of the Global* AXA *Group*

November 27, 1998

James Zandy Williams/Sandra Williams
PO BOX 52
COWARTS AL   36321

James Zandy Williams/Sandra Williams:

We are pleased to welcome you to the Equitable Life Assurance Society of the United States.  At Equitable, our aim is to help you achieve your retirement savings and income goals. Enclosed is the Equitable Accumulator$^{SM}$ Certificate along with a summary of its key features and benefits.

Your financial concerns are very important to us. Feel free to contact our customer service help line if you have any questions about your Accumulator Certificate. Our customer representatives can be reached at 1-800-789-7771, Monday through Friday during normal business hours.

If you would like additional information about the Accumulator distribution options, including our Income Manager® payout annuities, your registered representative can help you choose a strategy that best suits your retirement income goals.

The enclosed folder contains the Certificate, investment allocations and your personalized summary. Please be sure to review these important documents.  You may also wish to keep your statements and transaction records here for easy reference.

Once again, welcome. We look forward to serving you in the future.


Sincerely,

Anthony Calcaterra
Vice President

EDI-97-80

# <u>a</u>ccumulator<sup>SM</sup>

# CERTIFICATE SUMMARY

James Zandy Williams
*Annuitant*

James Zandy Williams/Sandra Williams
*Owner*

Not Applicable
*Successor Owner/Annuitant*

James Z Williams Jr/Leesa R Fryer
*Beneficiary*

Accumulator (NQ)
*Certificate Type*

| November 27, 1998 | $30,000.00 | 98 685 395 |
|:---:|:---:|:---:|
| **Contract Date** | **Initial Contribution** | **Certificate Number** |

> **Your Accumulator<sup>SM</sup> is a combination fixed and variable deferred annuity designed to provide for the accumulation of retirement savings and for income at a future date. Earnings generally accumulate on a tax-deferred basis until withdrawn or when distributions become payable. Withdrawals may be taxable and prior to age 59 ½ may also be subject to an additional 10% Federal income tax penalty.**

This summary provides information regarding your initial investment allocations and highlights some of your annuity's key features and benefits. It is intended to provide only a brief overview of your Certificate and therefore does not represent all of the terms and conditions that apply under your Certificate.



**EQUITABLE**

*Member of the Global* AXA *Group*

The Equitable Life Assurance Society of the United States, New York, NY 10104

Equitable is a wholly owned subsidiary of The Equitable Companies Incorporated (EQ).
AXA-UAP, an insurance holding company, is EQ's largest shareholder.
Neither EQ nor AXA-UAP has responsibility for the insurance obligations of Equitable.

# baseBUILDER® BENEFITS

## YOUR baseBUILDER® INCOME BENEFIT

The baseBUILDER Income Benefit provides a minimum amount of guaranteed lifetime income through the application of the Annuity Account Value to an Income Manager® *(Life Annuity with a Period Certain)* payout annuity. As a result, regardless of how the Investment Funds perform, on the 7th and later Contract Date anniversary, you can convert your Equitable Accumulator into a guaranteed minimum amount of annual income for life (certain age restrictions apply).

Equitable calculates the baseBUILDER Income Benefit by compounding your contributions, less any withdrawals, at 6% annually* (until the Annuitant's age 80) and applying that amount to annuity purchase factors guaranteed when the Equitable Accumulator is issued. The Guaranteed Minimum Income Benefit does not provide an Annuity Account Value or guarantee investment performance. It is based on conservative actuarial factors; the level of income that is guaranteed may be less than would otherwise be provided by application of your Annuity Account Value using current annuity purchase factors. It should be regarded as a safety net.

You may exercise the Guaranteed Minimum Income Benefit within the 30-day period following each of the Contract Date anniversaries, beginning with the 7th Contract Date anniversary but not earlier than the Annuitant's age 60 nor later than the Annuitant's age 83. The table below shows the **minimum** amount of guaranteed lifetime income **you** would receive if you exercise this benefit on any one of the Contract Date anniversaries shown. **Income levels are based on your initial contribution of $30,000.00 for all allocations to the Investment Funds and Guaranteed Fixed Interest Accounts and assume no withdrawals or additional contributions.**

*\* Contributions allocated to the EQ/Money Market Fund (other than for Special Dollar Cost Averaging) and the Guaranteed Fixed Interest Accounts are compounded at 4% annually for this purpose.*

### YOUR GUARANTEED MINIMUM INCOME BENEFIT*
### ANNUAL INCOME PAYABLE FOR LIFE WITH 10-YEAR PERIOD CERTAIN*

*If Elected on Contract Date Anniversary*

| Year 1-6 | Year 7 | Year 10 | Year 15 | Year 20 |
|----------|--------|---------|---------|---------|
| N/A | $2,766.06 | $3,735.71 | $5,647.50 | $8,293.73 |

*\*The period certain may be shorter for later election years*

## YOUR baseBUILDER® DEATH BENEFIT

Should the Annuitant die prior to your receiving annuity benefits, your named beneficiary will be paid a death benefit. The death benefit is equal to the Annuity Account Value in the Investment Funds and Guaranteed Fixed Interest Accounts, or if greater, the Guaranteed Minimum Death Benefit. Thus, no matter how the Investment Funds perform, your beneficiaries are guaranteed to receive at least a return of the amount of money invested (less any amounts withdrawn) compounded at 6% annually* until the Annuitant's age 80. The table below shows the **minimum** amount of the death benefit your named beneficiary would receive if the Annuitant were to die at the end of the Contract Years illustrated. **Your death benefit levels are based on your initial contribution of $30,000.00 for all allocations to the Investment Funds and Guaranteed Fixed Interest Accounts and assume no withdrawals or additional contributions.**

*\* Contributions allocated to the EQ/Money Market Fund (other than for Special Dollar Cost Averaging) and the Guaranteed Fixed Interest Accounts are compounded at 4% annually for this purpose.*

# baseBUILDER® BENEFITS

## YOUR GUARANTEED MINIMUM DEATH BENEFIT

*On Contract Date Anniversaries*

| Year 1 | Year 7 | Year 10 | Year 15 | Year 20 |
|---|---|---|---|---|
| $31,800.00 | $45,123.31 | $53,751.17 | $71,942.67 | $90,840.47 |

## IMPACT OF WITHDRAWALS ON baseBUILDER® BENEFITS

Please be aware that taking withdrawals from your Annuity Account Value will reduce the amount of the guaranteed benefits described above. Please remember that withdrawals may be taxable and prior to age 59 ½ may also be subject to an additional 10% Federal income tax penalty. Withdrawals may also be subject to a withdrawal charge and/or a positive or negative market value adjustment on contributions to the Guaranteed Fixed Interest Rate Accounts.

IM-97-67

# INVESTMENT ALLOCATIONS

## YOUR INVESTMENT FUNDS

You have made the following allocations to the Investment Funds. You may change your allocations at any time. To learn the daily unit values for each of the available funds, call 800/789-7771.

| INVESTMENT FUNDS | |
|---|---|
| **Investment Fund** | **Amount Allocated** |
| EQ/Money Market Fund | |
| Multimanager High Yield Fund | |
| EQ/AllianceBernsteinCommon Stock Fund | $12,000.00 |
| Multimanager Aggressive Equity Fund | |
| EQ/AllianceBernsteinSmall Cap Growth Fund | |
| AXA Moderate Allocation Fund | |
| EQ/Small Company Index Fund | |
| EQ/JPMorgan Core Bond Fund | |
| EQ/AllianceBernsteinValue Fund | |
| Multimanager Small Cap Value Fund | |
| EQ/MFS Research Fund | $9,000.00 |
| MarketPLUS Large Cap Growth Fund | |
| EQ/Van Kampen Emerging Markets Equity Fund | |
| EQ/JPMorgan Value Opportunities Fund | |
| EQ/Capital Guardian Growth Fund | $9,000.00 |
| EQ/BlackRock International Value Fund | |

IM-97-67

# INVESTMENT ALLOCATIONS

## YOUR GUARANTEED FIXED INTEREST ACCOUNTS

If you invested in the Guaranteed Fixed Interest Account, you may change your allocations at any time. Call 800/789-7771 for a recording of guaranteed rates applicable to the Guaranteed Fixed Interest Accounts. Please note that any withdrawals (including transfers, surrender and deductions) from a Guaranteed Fixed Interest Account prior to its expiration date may result in a positive or negative market value adjustment, as well as a withdrawal charge and a 10% Federal income tax penalty for withdrawals prior to age 59 ½.

| GUARANTEED FIXED INTEREST ACCOUNTS | | |
|---|---|---|
| **Expiration Date** | **Guaranteed Interest Rate** | **Amount Allocated** |
| February 15, 1999 | | |
| February 15, 2000 | | |
| February 15, 2001 | | |
| February 15, 2002 | | |
| February 15, 2003 | | |
| February 15, 2004 | | |
| February 15, 2005 | | |
| February 15, 2006 | | |
| February 15, 2007 | | |
| February 15, 2008 | | |

IM-97-67

# SERVICES WE PROVIDE

## DOLLAR COST AVERAGING*

Through a systematic approach to investing, commonly referred to as Dollar Cost Averaging, you can gradually invest in the market and may actually reduce your average cost over time. The Equitable Accumulator$^{SM}$ offers a special 12-month Dollar Cost Averaging program that is available at issue, as well as a longer program available at any time.

*Dollar Cost Averaging can neither guarantee a profit nor prevent a loss. Because it involves continuous investment in securities regardless of fluctuating price levels of such securities, you should consider your financial ability to continue to invest through periods of low prices before participating in this program.*

## TRANSFERS AMONG ACCOUNTS

Because market conditions and/or your personal circumstances may change over time, we've made it easy for you to modify your investments. You may transfer among Investment Funds and Guaranteed Fixed Interest Accounts and between such Funds and Accounts at any time — without an investment charge and without tax penalty. However, transfers from the Guaranteed Fixed Interest Accounts may result in a positive or negative market value adjustment. Call 800/789-7771 to make a change or for assistance from our customer service representatives. Please have your Certificate number available.

## OPTIONS AT EXPIRATION DATE OF GUARANTEED FIXED INTEREST ACCOUNTS

If you invested in the Guaranteed Fixed Interest Account, each one will reach its expiration date on February 15 in the year shown in the Investment Allocations page. You will be notified on or before December 31st prior to its expiration date. At that time you may transfer the value at expiration into any Guaranteed Fixed Interest Account we are then offering, or into the Investment Funds. You may also choose to withdraw all or part of the value at expiration (subject to any withdrawal charges and tax charges and/or penalties that may apply). If we have not received your election as of the expiration date, the value at expiration will be transferred into the Guaranteed Fixed Interest Account with the next earliest expiration date.

## AUTOMATIC INVESTMENT PLAN

You have the ability to systematically invest in the Accumulator from your bank accounts. The minimum amount for systematic investing is $100 monthly or $300 quarterly.

## REPORTS YOU WILL RECEIVE

**Confirmation Notices.** Each time you make a contribution, transfer assets or take a withdrawal, we will mail you a confirmation of the transaction.

**Quarterly Statements.** You will receive a statement at the end of each calendar quarter which summarizes all transactions since the last statement.

**Annual Statement.** Just after your Contract Date anniversary, you will receive an annual statement summarizing all policy activity, changes in investment performance for the year, as well as your current Annuity Account Value.

**Semi-Annual Reports On Investment Funds.** You will receive these reports every 6 months, for the periods ending June 30 and December 31.

### YOUR REGISTERED REPRESENTATIVE

Ansley E Whatley, III
(334) 677-9700

Accumulator$^{SM}$ is a service mark, and Income Manager® and baseBUILDER® are registered service marks
of The Equitable Life Assurance Society of the United States.
The Accumulator is issued by The Equitable Life Assurance Society of the United States
and distributed by AXA Distributors, LLC

IM-97-67

**Owner:**                James Zandy Williams/Sandra Williams
**Annuitant:**           James Zandy Williams
**Certificate Number:**   98 685 395
**Contract Date:**       November 27, 1998

## CERTIFICATE

Processing Office:  Income Management Group, P.O. Box 1547,
Secaucus, New Jersey 07096-1547

This is the Certificate which is issued under the terms of the Contract defined in Section 1.09.  This Certificate is issued in return for the application for coverage under the Contract and the Contributions to be made to us under the Contract.

In this Certificate, "we", "our" and "us" mean Equitable. "You" and "your" mean the Owner.

We will provide the benefits and other rights pursuant to the terms of this Certificate.

**TEN DAYS TO CANCEL** - Not later than ten days after you receive this Certificate, you may return it to us.  We will cancel it and refund any Contribution made to us, plus or minus any investment gain or loss which applies to the Investment Funds of the Separate Account from the date such Contribution was allocated to such Fund to the date of cancellation.

**New York,**
**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer           Senior Vice President, Secretary and Associate General Counsel

**THE PORTION OF ANNUITY ACCOUNT VALUE HELD IN THE SEPARATE ACCOUNT MAY INCREASE OR DECREASE IN VALUE (SEE PART II OF THIS CERTIFICATE).**

No. 94ICB

## TABLE OF CONTENTS

<u>Page</u>

DATA

| | | | |
|---|---|---|---|
| Part I | - | DEFINITIONS | 3 |
| Part II | - | INVESTMENT OPTIONS | 6 |
| Part III | - | CONTRIBUTIONS AND ALLOCATIONS | 10 |
| Part IV | - | TRANSFERS AMONG INVESTMENT OPTIONS | 11 |
| Part V | - | WITHDRAWALS AND TERMINATION | 12 |
| Part VI | - | DEATH BENEFITS | 13 |
| Part VII | - | ANNUITY BENEFITS | 14 |
| Part VIII | - | CHARGES | 17 |
| Part IX | - | GENERAL PROVISIONS | 19 |

TABLE OF GUARANTEED ANNUITY PAYMENTS                          21

No. 94ICB                                                    Page 2

*Equitable Accumulator (NQ)*

## DATA

**PART A** -- This part lists your personal data.

**Owner:**      James Zandy Williams/Sandra Williams

**Annuitant:**   James Zandy Williams                    Age: 61      Sex: Male

**Contract:  Group Annuity Contract No. AC 6725**

**Certificate Number:**       98 685 395

**Endorsements Attached:**  Minimum Income Benefit Endorsement
Endorsement Applicable to Non-Qualified Certificates
Endorsement Applicable to Market Value Adjustment Terms
Rider to Endorsement Applicable to Market Value
Adjustment Terms

**Issue Date:**              November 27, 1998

**Contract Date:**           November 27, 1998

**Annuity Commencement Date:**    November 27, 2027

**The maximum maturity age is age 90 -- see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which
follows the Annuitant's 90th birthday.

**Guaranteed Benefits:**   Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (6% Roll Up to Age 80)

**Beneficiary:**  James Z Williams Jr/Leesa R Fryer

No. 94ICB                              Data page 1            (1/98)

DATA Pages (cont'd)

**PART B - -This part describes certain provisions of your Certificate.**

**Initial Contribution Received (see Section 3.02):**        $30,000.00

**Investment Options available (see Part II); your allocation is also shown.**

| **Investment Options** | **Allocation (see Section 3.01)** |
|---|---|
| • EQ/Money Market Fund | |
| • Multimanager High Yield Fund | |
| • EQ/AllianceBernsteinCommon Stock Fund | $12,000.00 |
| • Multimanager Aggressive Equity Fund | |
| • EQ/AllianceBernsteinSmall Cap Growth Fund | |
| • AXA Moderate Allocation Fund | |
| • EQ/Small Company Index Fund | |
| • EQ/JPMorgan Core Bond Fund | |
| • EQ/AllianceBernsteinValue Fund | |
| • Multimanager Small Cap Value Fund | |
| • EQ/MFS Research Fund | $9,000.00 |
| • MarketPLUS Large Cap Growth Fund | |
| • EQ/Van Kampen Emerging Markets Equity Fund | |
| • EQ/JPMorgan Value Opportunities Fund | |
| • EQ/Capital Guardian Growth Fund | $9,000.00 |
| • EQ/BlackRock International Value Fund | |

- **Guarantee Periods (Class I)**
  **Expiration Date and Guaranteed Rate**
  February 15, 1999
  February 15, 2000
  February 15, 2001
  February 15, 2002
  February 15, 2003
  February 15, 2004
  February 15, 2005
  February 15, 2006
  February 15, 2007
  February 15, 2008

|  | **Total:** | $30,000.00 |
|---|---|---|

Investment Options shown are Investment Funds of our Separate Account No. 49 and Guarantee Periods shown are in the Guaranteed Period Account. See Endorsement Applicable to Market Value Adjustment Terms.

**"Types" of Investment Options (see Section 4.02):**  Not applicable

**Guaranteed Interest Account (see Section 2.01):**  Not available under this Certificate

**DATA Pages (cont'd)**

**Business Day (see Section 1.05):** A Business Day for this Certificate will mean generally any day on which the New York Stock Exchange is open for trading.

**Processing Dates (see Section 1.20):** A Processing Date is each Contract Date anniversary.

**Availability of Investment Options (see Section 2.04):** (See Data pages, Part C; Allocation Restrictions)

**Allocation of Contributions (see Section 3.01):** Except as indicated below, your initial and any subsequent Contributions are allocated according to your instructions.

If you selected Principal Assurance a portion of your initial Contribution is allocated by us to a Guarantee Period you have selected. The remaining portion of your initial Contribution is allocated to the Investment Funds according to your instructions. Any subsequent Contributions will be allocated according to your instructions. (See Data pages, Part C; Allocation Restrictions)

**Contribution Limits (see Section 3.02):** Initial Contribution minimum: $5,000. Subsequent Contribution minimum: $1,000. Subsequent Contributions can be made at any time up until the Annuitant attains age 84. We may refuse to accept any Contribution if the sum of all Contributions under all accumulation Certificateswith the same Annuitant would then total more than $1,500,000. We reserve the right to limit aggregate Contributions made after the first Contract Year to 150% of first year Contributions. We may also refuse to accept any Contribution if the sum of all Contributions under all Equitable Life annuity accumulation certificates/contracts that you own would then total more than $2,500,000.

**Transfer Rules (see Section 4.02):** Transfers among the Investment Options may be made at any time during the Contract Year.

**Allocation of Withdrawals (see Section 5.01):** Lump Sum Withdrawals - You must provide withdrawal instructions indicating from which Investment Options the Lump Sum Withdrawal and any withdrawal charge will be taken; Systematic Withdrawals - Unless you specify otherwise, Systematic Withdrawals will be withdrawn on a pro rata basis from your Annuity Account Value in the Investment Funds. If there is insufficient value or no value in the Investment Funds, any additional amount required or the total amount of the withdrawal, as applicable, will be withdrawn from the Guarantee Periods in order of the earliest Expiration Date(s) first.

**Withdrawal Restrictions (see Section 5.01):** Systematic Withdrawals - May not start sooner than 28 days after issue of this Certificate. You may elect to receive Systematic Withdrawals on a monthly, quarterly or annual basis subject to a maximum of 1.2% monthly, 3.6% quarterly and 15.0% annually of the Annuity Account Value as of the Transaction Date.

**Minimum Withdrawal Amount (see Section 5.01):** Lump Sum Withdrawals minimum - $1,000; Systematic Withdrawals minimum - $250.

**DATA Pages (cont'd)**

**Minimum Amount of Annuity Account Value After a Withdrawal (see Section 5.02):** Requests for a withdrawal must be for either (a) 90% or less of the Cash Value or (b) 100% of the Cash Value (surrender of the Certificate).

We will **not** exercise our rights, described in Sections 5.02(b) and 5.02(c), to terminate the Certificate.

**Death Benefit Amount (see Section 6.01):**

The death benefit is equal to the Annuity Account Value or, if greater, the Guaranteed Minimum Death Benefit defined below.

*Guaranteed Minimum Death Benefit*
*6% Roll Up to Age 80* - On the Contract Date, the Guaranteed Minimum Death Benefit is equal to the initial Contribution. Thereafter, the Guaranteed Minimum Death Benefit is credited with interest at 6% (4% for amounts in the Alliance Money Market Fund and the Guarantee Periods) on each Contract Date anniversary through the Annuitant's age 80 (or at the Annuitant's death, if earlier), and 0% thereafter, and is adjusted for any subsequent Contributions and withdrawals.

Your current Guaranteed Minimum Death Benefit will be reduced on a dollar-for-dollar basis as long as the sum of your withdrawals in any Contract Year is 6% or less of the beginning of Contract Year Guaranteed Minimum Death Benefit. Once a withdrawal is made that causes cumulative withdrawals in a Contract Year to exceed 6% of the beginning of Contract Year Guaranteed Minimum Death Benefit, that withdrawal and any subsequent withdrawals in that Contract Year will cause a pro rata reduction to occur.

**Normal Form of Annuity (see Section 7.04):**  Life Annuity 10 Year Period Certain

**Amount of Annuity Benefit (see Section 7.05):**  The amount applied to provide the Annuity Benefit will be (1) the Annuity Account Value for any life annuity form or (2) the Cash Value for any period certain only annuity form except that if the period certain is more than five years the amount applied will be no less than 95% of the Annuity Account Value.

**Interest Rate to be Applied in Adjusting for Misstatement of Age or Sex (see Section 7.06):** 6% per year

**Minimum Amount to be Applied to an Annuity (see Section 7.06):**  $2,000, as well as minimum of $20 for initial monthly annuity payment.

**DATA Pages (cont'd)**

**Guaranteed Minimum Income Benefit (see Section 7.08):** You may apply your Annuity Account Value during the period of time indicated below to purchase a minimum amount of guaranteed lifetime income under our Income Manager *(Life Annuity with a Period Certain)* payout annuity certificate. The Income Manager *(Life Annuity with a Period Certain)* payout annuity certificate provides payments during a period certain with payments continuing for life thereafter.

The period certain is based on the Annuitant's age at the time the Income Manager *(Life Annuity with a Period Certain)* is elected. The period certain is 10 years for Annuitant ages 60 through 80; 9 years for Annuitant age 81; 8 years for Annuitant age 82; and 7 years for Annuitant age 83.

The Guaranteed Minimum Income Benefit is available only if it is exercised within 30 days following the 7th or later Contract Date anniversary under this Certificate. However, it may not be exercised earlier than the Annuitant's age 60, nor later than the Annuitant's age 83.

On the Transaction Date that you exercise your Guaranteed Minimum Income Benefit, the lifetime income that will be provided under the Income Manager *(Life Annuity with a Period Certain)* will be the greater of (i) your Guaranteed Minimum Income Benefit, and (ii) the amount of income that would be provided by application of your Annuity Account Value as of the Transaction Date at our then current annuity purchase factors.

*Guaranteed Minimum Income Benefit Benefit Base* - The Guaranteed Minimum Income Benefit benefit base is equal to the initial Contribution on the Contract Date. Thereafter, the Guaranteed Minimum Income Benefit benefit base is credited with interest at 6% (4% for amounts in the Alliance Money Market Fund and Guarantee Periods) on each Contract Date anniversary through the Annuitant's age 80, and 0% thereafter, and is adjusted for any subsequent Contributions and withdrawals. The Guaranteed Minimum Income Benefit benefit base will also be reduced by any withdrawal charge remaining on the Transaction Date that you exercise your Guaranteed Minimum Income Benefit.

Your Guaranteed Minimum Income Benefit benefit base is applied to guaranteed minimum annuity purchase factors to determine the Guaranteed Minimum Income Benefit. The guaranteed minimum annuity purchase factors are based on (i) interest at 2.5% if the Guaranteed Minimum Income Benefit is exercised within 30 days following a Contract Date anniversary in years 7 through 9 and at 3% if exercised within 30 days following the 10th or later Contract Date anniversary and (ii) mortality tables that assume increasing longevity. See the attached table.

Your Guaranteed Minimum Income Benefit benefit base does not create an Annuity Account Value or a Cash Value and is used solely for purposes of calculating your Guaranteed Minimum Income Benefit.

**DATA Pages (cont'd)**

Your current Guaranteed Minimum Income Benefit benefit base will be reduced on a dollar-for-dollar basis as long as the sum of your withdrawals in any Contract Year is 6% or less of the beginning of Contract Year Guaranteed Minimum Death Benefit (described above). Once a withdrawal is made that causes cumulative withdrawals in a Contract Year to exceed 6% of the beginning of Contract Year Guaranteed Minimum Death Benefit, that withdrawal and any subsequent withdrawals in that Contract Year will cause a pro rata reduction to occur.

**Withdrawal Charges (see Section 8.01):** A withdrawal charge will be imposed as a percentage of each Contribution made to the extent that a withdrawal exceeds the Free Corridor Amount as discussed in Section 8.01 or, if the Certificate is surrendered to receive the Cash Value. We determine the withdrawal charge separately for each Contribution in accordance with the table below.

| Contract Year | Current and Maximum Percentage of Contributions |
|---|---|
| 1 | 7.00% |
| 2 | 6.00% |
| 3 | 5.00% |
| 4 | 4.00% |
| 5 | 3.00% |
| 6 | 2.00% |
| 7 | 1.00% |
| 8 and later | 0.00% |

The applicable withdrawal charge percentage is determined by the Contract Year in which the withdrawal is made or the Certificate is surrendered, beginning with "Contract Year 1" with respect to each Contribution withdrawn or surrendered. For purposes of the table, for each Contribution, the Contract Year in which we receive that Contribution is "Contract Year 1."

Withdrawal charges will be deducted from the Investment Options from which each withdrawal is made in proportion to the amount being withdrawn from each Investment Option.

**Free Corridor Amount (see Section 8.01):** 15% of Annuity Account Value at the beginning of the Contract Year minus any amount previously withdrawn during the Contract Year. Amounts withdrawn up to the Free Corridor Amount will not be deemed a withdrawal of Contributions.

Withdrawals in excess of the Free Corridor Amount will be deemed withdrawals of Contributions in the order in which they were made (that is, the first-in, first-out basis will apply).

The Free Corridor Amount does not apply when calculating the withdrawal charge applicable upon a surrender.

**DATA Pages (cont'd)**

**Charges Deducted from Annuity Account Value (see Section 8.02):**

(a)    Combined Guaranteed Minimum Income Benefit and Guaranteed Minimum Death Benefit Charge: For providing the Combined Guaranteed Minimum Income Benefit and Guaranteed Minimum Death Benefit we will deduct annually on each Processing Date an amount equal to 0.30% of the Guaranteed Minimum Income Benefit benefit base (described above) in effect on such Processing Date. 0.30% is the maximum we will charge.

(b)    Charges for State Premium and Other Applicable Taxes: A charge for applicable taxes, such as state or local premium taxes generally will be deducted from the amount applied to provide an Annuity Benefit under Section 7.02. In certain states, however, we may deduct the charge from Contributions rather than at the Annuity Commencement Date.

The above charges will be deducted from the Annuity Account Value in the Investment Funds on a pro rata basis. If there is insufficient value in the Investment Funds, all or a portion of the charges will be deducted from the Annuity Account Value with respect to the Guarantee Periods in order of the earliest Expiration Date(s) first.

**Number of Free Transfers (see Section 8.03):** Unlimited

**Daily Separate Account Charges (see Section 8.04):**

Mortality and Expense Risks Charge:

| | |
|---|---|
| Current and Maximum | Annual rate of 1.10% (equivalent to a daily rate of 0.003032%). |

Administration Charge:

| | |
|---|---|
| Current and Maximum | Annual rate of 0.25% (equivalent to a daily rate of 0.000692%). We reserve the right to increase this charge to an annual rate of 0.35%. |

No. 94ICB                    Data page 7        (1/98)

DATA Pages (cont'd)

**PART C -- This part lists the terms which apply to the Endorsement Applicable to Market Value Adjustment Terms (MVA Endorsement).**

**Allocation Restrictions (see Section 3.01):** If the Annuitant is age 76 or older, allocations may be made only to Guarantee Periods with maturities of five years or less; however, in no event may allocations be made to Guarantee Periods with maturities beyond the February 15th immediately following the Annuity Commencement Date.

**Transfers at Expiration Date (see item 1 of MVA Endorsement):** If no election is made with respect to amounts in the Guaranteed Period Account as of the Expiration Date, such amounts will be transferred into the Guarantee Period with the earliest Expiration Date.

**Market Value Adjustment (MVA) on Transfers and Withdrawals (see item 2 of MVA Endorsement):** The MVA (positive or negative) resulting from a withdrawal or transfer of a portion of the amount in a Guarantee Period will be a percentage of the MVA that would be applicable upon a withdrawal of all of the Annuity Account Value from a Guarantee Period. This percentage is determined by (i) dividing the amount of the withdrawal or transfer from the Guarantee Period by (ii) the Annuity Account Value in such Guarantee Period prior to the withdrawal or transfer.

**Transfer Rules (see Section 4.02):** Transfers may not be made to a Guarantee Period maturing in the current calendar year. Guarantee Periods to which transfers may be made are limited based on the attained age of the Annuitant (see Allocation Restrictions above).

**MVA Formula (see item 3 of MVA Endorsement):** The Guaranteed Rate for new allocations to a Guarantee Period is the rate we have in effect for this purpose even if new allocations to that Guarantee Period would not be accepted at the time. This rate will not be less than 3%.

The current rate percentage we use in item (c) of the formula is 0.00%. For purposes of calculating the MVA only, we reserve the right to add up to 0.25% to such current rate percentage.

**Separate Account (see item 5 of MVA Endorsement):** The portion of the assets of Separate Account No. 46 equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct.

**DATA Pages (cont'd)**

**Guaranteed Minimum Income Benefit**
**Table of Guaranteed Minimum Annuity**
**Purchase Factors**
**For Initial Level Annual Income**
**Single Life - Male**

| Election Age | Purchase Factors on Contract Date Anniversaries 7 to 9 | Purchase Factors on Contract Date Anniversaries 10 and later |
|---|---|---|
| 60 | 5.12% | 5.47% |
| 61 | 5.22 | 5.58 |
| 62 | 5.34 | 5.69 |
| 63 | 5.45 | 5.81 |
| 64 | 5.58 | 5.93 |
| 65 | 5.70 | 6.06 |
| 66 | 5.84 | 6.19 |
| 67 | 5.98 | 6.33 |
| 68 | 6.13 | 6.48 |
| 69 | 6.28 | 6.63 |
| 70 | 6.44 | 6.79 |
| 71 | 6.60 | 6.95 |
| 72 | 6.77 | 7.12 |
| 73 | 6.95 | 7.29 |
| 74 | 7.13 | 7.47 |
| 75 | 7.32 | 7.66 |
| 76 | 7.51 | 7.85 |
| 77 | 7.72 | 8.05 |
| 78 | 7.92 | 8.26 |
| 79 | 8.14 | 8.47 |
| 80 | 8.36 | 8.69 |
| 81 | 8.80 | 9.13 |
| 82 | 9.30 | 9.63 |
| 83 | 9.85 | 10.19 |

| | |
|---|---|
| Interest Basis: | 2.5% on Contract Date anniversaries 7 through 9 and 3% on Contract Date anniversaries 10 and later Non-participating |
| Mortality: | 1983 Individual Annuity Mortality Table ''a'' for Male projected with modified Scale G. |

Factors required for annuity forms not shown in the above table will be calculated by us on the same actuarial basis.

No. 94ICB                                    Data page 9            (1/98)

# PART I - DEFINITIONS

## SECTION 1.01  ANNUITANT

''Annuitant'' means the individual shown as such in the Data pages, or any successor Annuitant.

## SECTION 1.02  ANNUITY ACCOUNT VALUE

''Annuity Account Value'' means the sum of the amounts held for you in the Investment Options.

## SECTION 1.03  ANNUITY BENEFIT

''Annuity Benefit'' means a benefit payable by us as described in Part VII.

## SECTION 1.04  ANNUITY COMMENCEMENT DATE

''Annuity Commencement Date'' means the date on which annuity payments are to commence as described in Section 7.03.  Such date is the date shown in the Data pages and is subject to change as described in Section 7.03.

## SECTION 1.05  BUSINESS DAY

A ''Business Day'' is any day on which we are open and the New York Stock Exchange is open for trading, or any other day specified in the Data pages.  Our Business Day ends at 4:00 p.m., Eastern time, or such other time as we state in writing to you.

## SECTION 1.06  CASH VALUE

''Cash Value'' means an amount equal to the Annuity Account Value, less any charges that apply as described in Part VIII and any charges that may apply as described in any applicable Endorsement(s).

## SECTION 1.07  CERTIFICATE

''Certificate'' means this certificate including the Data pages and any endorsement(s).  It is a summary of the Contract terms which affect you.

## SECTION 1.08  CODE

''Code'' means the Internal Revenue Code of 1986, as amended at any time, or any corresponding provisions of prior or subsequent United States revenue laws.

## SECTION 1.09  CONTRACT

''Contract'' means the Group Annuity Contract named in the Data pages.  A copy of the contract is on file with us.  You may ask to see it at any reasonable time.

**SECTION 1.10  CONTRACT DATE**

''Contract Date'' means the earlier of (a) the date on which the Annuitant is enrolled under the Contract according to our enrollment procedures and (b) the date of enrollment under a prior Contract.  Such date is shown in the Data pages.

**SECTION 1.11  CONTRACT YEAR**

''Contract Year'' means the twelve month period starting on (i) the Contract Date and (ii) each anniversary of the Contract Date, unless we agree to another period.

**SECTION 1.12  CONTRIBUTION**

''Contribution'' means a payment made to us under the Contract.  See Section 3.01.

**SECTION 1.13  EMPLOYER**

''Employer'' means, if applicable, an employer as defined in an endorsement hereto.

**SECTION 1.14  GUARANTEED INTEREST RATE**

''Guaranteed Interest Rate'' means the effective annual rate(s) at which interest accrues on amounts in the Guaranteed Interest Account.

**SECTION 1.15  INVESTMENT FUND**

''Investment Fund'' means a sub-fund of a Separate Account.  An Investment Fund may invest its assets in a separate class (or series) of shares of a specified trust or investment company where each class (or series) represents a separate portfolio in such trust or investment company.

**SECTION 1.16  INVESTMENT OPTION**

''Investment Option'' means the Guaranteed Interest Account, a Separate Account, or an Investment Fund of a Separate Account or, if described in an Endorsement hereto, each Guarantee Period in the Guaranteed Period Account (Separate Account No. 46).

**SECTION 1.17  OWNER**

''Owner'' means the person or entity shown as such in the Data pages, or any successor owner.

**SECTION 1.18  PLAN**

''Plan'' means, if applicable, the annuity program sponsored by the Employer and as may be defined in an endorsement hereto.

**SECTION 1.19  PRIOR CONTRACT**

''Prior Contract'' means another contract or certificate issued by us and from which the Owner and we have agreed to transfer amounts to this Contract.

**SECTION 1.20  PROCESSING DATE**

''Processing Date'' means the day(s) we deduct charges from the Annuity Account Value.  The Data pages show how often a Processing Date will occur.

**SECTION 1.21  PROCESSING OFFICE**

''Processing Office'' means the Equitable administrative office shown on the cover page of this Certificate, or such other location we may state upon written notice to you.

**SECTION 1.22  SEPARATE ACCOUNT**

''Separate Account'' means any of the Separate Accounts (except our Separate Account No. 46) described or referred to in Sections 2.02 and 2.05.

**SECTION 1.23  TRANSACTION DATE**

The Transaction Date is the Business Day we receive at the Processing Office a Contribution or a transaction request providing the information we need.  Transaction requests must be in a form acceptable to us.

## PART II - INVESTMENT OPTIONS

### SECTION 2.01 GUARANTEED INTEREST ACCOUNT

Any amount held in the Guaranteed Interest Account becomes part of our general assets, which support the guarantees of the Contract and other contracts.

The amount in such Account at any time is equal to:

- · all amounts that have been allocated or transferred to such Account, plus

- · the amount of any interest credited, less

- · all amounts that have been withdrawn (including charges) or transferred from such Account.

We will credit the amount held in such Account with interest at effective annual rates that we set. We will also set a minimum Guaranteed Interest Rate that will remain in effect through a stated twelve-month period or a calendar year. The Data pages show the initial Rate(s) to apply.

We guarantee that any rate so set after your Contract Date will never be less than the minimum rate shown in the Data pages.

### SECTION 2.02 SEPARATE ACCOUNT

We have established the Separate Account(s) and maintain such Account(s) in accordance with the laws of New York State. Income, realized and unrealized gains and losses from the assets of the Separate Account(s) are credited to or charged against it without regard to our other income, gains or losses. Assets are placed in the Separate Account(s) to support the Contract and other variable annuity contracts and certificates. Assets may be placed in the Separate Account(s) for other purposes, but not to support contracts or policies other than variable annuities and variable life insurance.

The Data pages set forth the Separate Account(s). A Separate Account may be subdivided into Investment Funds.

The assets of a Separate Account are our property. The portion of such assets equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct. We may transfer assets of a Separate Account in excess of the reserves and other liabilities with respect to such Account to another Separate Account or to our general account.

We may, at our discretion, invest Separate Account assets in any investment permitted by applicable law. We may rely conclusively on the opinion of counsel (including counsel in our employ) as to what investments we may make as law permits.

## SECTION 2.03  SEPARATE ACCOUNT ACCUMULATION UNITS AND UNIT VALUES

The amount you have in an Investment Fund at any time is equal to the number of Accumulation Units you have in that Fund multiplied by the Fund's Accumulation Unit Value at that time. ''Accumulation Unit'' means a unit which is purchased in a Separate Account. ''Accumulation Unit Value'' means the dollar value of each Accumulation unit in a Separate Account on a given date. (If Investment Funds apply as described in Section 2.02, then the terms of this Section 2.03 apply separately to each Fund, unless otherwise stated.)

Amounts allocated or transferred to a Separate Account are used to purchase Accumulation Units of that Account.  Units are redeemed when amounts are deducted, transferred or withdrawn.

The number of Accumulation Units you have in a Separate Account at any time is equal to the number of Accumulation Units purchased minus the number of Units redeemed in that Account up to that time. The number of Accumulation Units purchased or redeemed in a transaction is equal to the dollar amount of the transaction divided by the Account's Accumulation Unit Value for that Transaction Date.

We determine Accumulation Unit Values for each Separate Account for each Valuation Period.  A ''Valuation Period'' is each Business Day together with any consecutive preceding non-business days. For example, for each Monday which is a Business Day, the preceding Saturday and Sunday will be included to equal a three-day Valuation Period.

Unless the following paragraph applies, the Accumulation Unit Value for a Separate Account for any Valuation Period is equal to the Accumulation Unit Value for the immediately preceding Valuation Period multiplied by the ratio of values ''(i) '' and ''(ii) ''. Value ''(i) '' is the value of the Separate Account at the close of business at the end of the current Valuation Period, before any amounts are allocated to or withdrawn from the Separate Account in that Period.  Value ''(ii)'' is the value of the Separate Account at the close of business at the end of the preceding Valuation Period, after all allocations and withdrawals were made for that Period.  For this purpose, ''value of the Separate Account'' means the market value or, where there is no readily available market, the fair value of the assets allocated to the Separate Account, as determined in accordance with our rules, accepted accounting practices, and applicable laws and regulations.

To the extent the Separate Account invests in Investment Funds, and the assets of the Funds are invested in a class or series of shares of a specified trust or investment company, the Accumulation Unit Value of an Investment Fund for any Valuation Period is equal to the Accumulation Unit Value for that Fund on the immediately preceding Valuation Period multiplied by the Net Investment Factor for that Fund for the current Valuation Period.  The Net Investment Factor for a Valuation Period is (a) divided by (b) minus (c), where

    (a)    is the value of the Investment Fund's shares of the related portfolio of the specified trust or investment company at the end of the Valuation Period (before taking into account any amounts allocated to or withdrawn from the Investment Fund for the Valuation Period and after deduction of investment advisory fees and direct operating expenses of the specified trust or investment company; for this purpose, we use the share value reported to us by the specified trust or investment company);

(b)    is the value of the Investment Fund's shares of the related portfolio of the specified trust or investment company at the end of the preceding Valuation Period (taking into account any amounts allocated or withdrawn for that Valuation Period);

(c)    is the daily Separate Account charges (see Section 8.04) for the expenses and risks of the Contract, times the number of calendar days in the Valuation Period, plus any charge for taxes or amounts set aside as a reserve for taxes.

## SECTION 2.04  AVAILABILITY OF INVESTMENT OPTIONS

Section 3.01 describes how Contributions are allocated among Investment Options based on your election.  Your election is subject to the following:

(a)    If the Contributions are made pursuant to the terms of a Plan, then Investment Options available may be subject to the terms of such Plan, as reported to us by the Owner.

(b)    We have the right to limit the number of Options which you may elect.

The Data pages list which Options are available as of the Contract Date.

## SECTION 2.05  CHANGES WITH RESPECT TO SEPARATE ACCOUNT

In addition to the right reserved pursuant to subsection (b) of Section 2.04, we have the right, subject to compliance with applicable law, including approval of Certificate owners if required:

(a)    to add Investment Funds (or sub-funds of Investment Funds) to, or to remove Investment Funds (or sub-funds) from, the Separate Account, or to add other separate accounts;

(b)    to combine any two or more Investment Funds or sub-funds thereof;

(c)    to transfer the assets we determine to be the share of the class of contracts to which the Contract belongs from any Investment Fund to another Investment Fund;

(d)    to operate the Separate Account or any Investment Fund as a management investment company under the Investment Company Act of 1940, in which case charges and expenses that otherwise would be assessed against an underlying mutual fund would be assessed against the Separate Account;

(e)    to operate the Separate Account or any Investment Fund as a unit investment trust under the Investment Company Act of 1940;

(f)    to deregister the Separate Account under the Investment Company Act of 1940, provided that such action conforms with the requirements of applicable law;

(g)    to restrict or eliminate any voting rights as to the Separate Account;

(h)    to cause one or more Investment Funds to invest some or all of their assets in one or more other trusts or investment companies.

If the exercise of these rights results in a material change in the underlying investment of a Separate Account, you will be notified of such exercise, as required by law.

A Separate Account or Investment Fund which may be added by us as described above may be one with respect to which (i) there may be periods during which Contributions may be restricted pursuant to the maturity terms of such Account or Fund, (ii) amounts therein may be automatically liquidated pursuant to the investment policy of the Account, and (iii) investments therein may mature. We will have the right to reallocate amounts arising from liquidation or maturity according to your allocation instructions then in effect unless you specify other instructions with respect to such amounts. If no such allocation instructions have been made, the reallocation will be made to a designated Investment Option, or to the next established Account or Fund of the same type as described in this paragraph, if applicable, as specified in the Data pages.

## PART III - CONTRIBUTIONS AND ALLOCATIONS

### SECTION 3.01 CONTRIBUTIONS, ALLOCATIONS

You elect which Investment Options will be available under the Certificate subject to the terms of Section 2.04. Once this election is made, you may allocate Contributions to, or transfer among, only these Options. You may add or subtract Options by sending us a written request, but we have the right to decline your request.

You also elect how to allocate Contributions among the Options chosen. If you are not the Annuitant, you may delegate to the Annuitant authority to allocate Contributions. You need not allocate Contributions to each Option you have chosen. You may change the allocation election at any time by sending us the proper form. Allocation percentages must be in whole numbers (no fractions) and must equal 100%.

Each Contribution is allocated (after deduction of any charges that may apply) in accordance with the allocation election in effect on the Transaction Date. Contributions made to a Separate Account purchase Accumulation Units in that Account, using the Accumulation Unit Value for that Transaction Date.

### SECTION 3.02  LIMITS ON CONTRIBUTIONS

We have the right not to accept any Contribution which is less than the amount shown in the Data pages. The Data pages indicate other minimum and maximum Contribution requirements which may apply. We also have the right, upon advance notice to you, to:

    (a)    change such requirements to apply to Contributions made after the date of such change, and

    (b)    discontinue acceptance of Contributions under the Contract with respect to all Owners or with respect to all Owners to whom the same type of Certificate applies.

## PART IV - TRANSFERS AMONG INVESTMENT OPTIONS

### SECTION 4.01  TRANSFER REQUESTS

You may request to transfer all or part of the amount held in an Investment Option to one or more of the other Options.  The request must be in a form we accept.  All transfers will be made on the Transaction Date.  Transfers are subject to the terms of Section 4.02 and to our rules in effect at the time of transfer.  With respect to a Separate Account, the transfers will be made at the Accumulation Unit Value for that Transaction Date.

### SECTION 4.02  TRANSFER RULES

The transfer rules which apply are described in the Data pages.  A transfer request will not be accepted if it involves less than the minimum amount, if any, stated in the Data pages (unless the Annuity Account Value is less than such amount).  We have the right to change our transfer rules.  Any change will be made upon advance notice to you.

The Investment Funds may consist of funds which are classified as ''Type A'' Investment Options or ''Type B'' Investment Options or any other type which may be specified in the Data pages, as we designate in our discretion for purposes of the transfer rules described in the Data pages.  The Data pages specify whether such Investment Options are designated Type A or Type B or another type as well as the minimum or maximum limits on transfers which apply.

## PART V - WITHDRAWALS AND TERMINATION

### SECTION 5.01  WITHDRAWALS

Unless otherwise stated in the Data pages, you may request, pursuant to our procedures then in effect, a withdrawal from the Investment Options before the Annuity Commencement Date and while the Annuitant is alive.  The request must be in a form we accept.

On the Transaction Date, we will pay the amount of the withdrawal requested or, if less, the Cash Value. The amount to be paid plus any Withdrawal Charge which applies (see Section 8.01) will be withdrawn on a pro-rata basis from the amounts held for you in the Investment Options, unless you elect otherwise and unless otherwise stated in the Data pages.

We will not accept a withdrawal request if it involves less than the minimum amount, if any, stated in the Data pages.  Further conditions or restrictions may apply if stated in the Data pages or in an endorsement hereto.

### SECTION 5.02  TERMINATION

This Certificate will terminate if one or more of the following events occurs, unless otherwise specified in the Data pages:

(a)     If a withdrawal made under Section 5.01 would result in an Annuity Account Value of an amount less than the minimum amount stated in the Data pages, we will so advise you and have the right to pay you such Value.  In that case this Certificate will be terminated.

(b)     Before the Annuity Commencement Date, we have the right to pay the Cash Value and terminate this Certificate if no Contributions are made during the last three completed Contract Years, and the Annuity Account Value is less than the amount described in item (a) above.

(c)     We also have the right to terminate this Certificate if no Contributions have been made within 120 days of the Contract Date.

## PART VI - DEATH BENEFITS

### SECTION 6.01  DEATH BENEFIT

Upon receipt of due proof that the Annuitant has died before the Annuity Commencement Date, we will pay a death benefit to the beneficiary named under Section 6.02.  Payment may be subject to the terms of Section 6.02 and any special rules which may apply as described in any endorsement hereto.

The amount of the death benefit is described in the Data pages.

The death benefit will be paid as an Annuity Benefit or in a single sum, as described in Section 6.02.

### SECTION 6.02  BENEFICIARY

You give us the name of the beneficiary who is to receive any death benefit payable on the Annuitant's death.  You may change the beneficiary from time to time during the Annuitant's lifetime and while coverage under the Contract is in force.  Any such change must be made in writing in a  form we accept. A change will, upon receipt at the Processing Office, take effect as of the date the written form is executed, whether or not you are living on the date of receipt.  We will not be liable as to any payments we made before we receive any such change.

You may name one or more persons to be primary beneficiary on the Annuitant's death and one or more other persons to be successor beneficiary if the primary beneficiary dies before the Annuitant.  Unless you direct otherwise, if you have named two or more persons as beneficiary, the beneficiary will be the named person or persons who survive the Annuitant and payments will be made to such persons in equal shares or to the survivor.

Any part of a death benefit payable as described in Section 6.01 for which there is no named beneficiary living at the Annuitant's death will be payable in a single sum to the Annuitant's surviving children.  The payments will be made in equal shares, or should none survive or should there be none, then to the Annuitant's estate.

If you so elect in writing, any amount that would otherwise be payable to a beneficiary in a single sum may be applied to provide an Annuity Benefit, on the form of annuity elected by you, subject to our rules then in effect.  If at the Annuitant's death there is no election in effect, the beneficiary may make such an election.  In the absence of any election by either you or the beneficiary, we will pay the death benefit in a single sum.

Any naming of a beneficiary is subject to the terms of the Plan, if one applies, including any terms requiring spousal consent.

## PART VII ANNUITY BENEFITS

### SECTION 7.01  ANNUITY BENEFIT

Payments under an Annuity Benefit will be made monthly.  You may elect instead to have the Annuity Benefit paid at other intervals, such as every three months, six months, or twelve months, instead of monthly, subject to our rules at the time of your election or as otherwise stated in the Data pages or any endorsement hereto.  This election may be made at the time the Annuity Benefit form as described in Section 7.02 is elected.  In that event, all references in this Certificate to monthly payments will, with respect to the Annuity Benefit  to which the election applies, be deemed to mean payments at the frequency elected.

### SECTION 7.02  ELECTION OF ANNUITY BENEFITS

As of the Annuity Commencement Date, provided the Annuitant is then living, the Annuity Account Value will be applied to provide the Normal Form of Annuity Benefit (described below).  However, you may instead elect (i) to have the Cash Value paid in a single sum, (ii) to apply the Annuity Account Value or Cash Value, whichever applies pursuant to the first paragraph of Section 7.05, to provide an Annuity Benefit of any form offered by us or one of our subsidiary life insurance companies , or (iii) to apply the Cash Value to provide any other form of benefit payment we offer, subject to our rules then in effect and applicable laws and regulations.  At the time an Annuity Benefit is purchased, we will issue a supplementary contract which reflects the Annuity Benefit terms.

We will provide notice and election forms to you not more than six months before the Annuity Commencement Date.

We will have the right to require you to furnish any information we need to provide an Annuity Benefit.  We will be fully protected in relying on such information and need not inquire as to its accuracy or completeness.

### SECTION 7.03 COMMENCEMENT OF ANNUITY BENEFITS

Before the Annuity Commencement Date, you may elect to change such Date to any date after your election is filed (other than the 29th, 30th, or 31st of any month).  You must do this in writing.  The change will not take effect until your written election is received and accepted by us at our Processing Office.

However, no Annuity Commencement Date will be later than the first day of the month which follows the date the Annuitant attains the ''maximum maturity age'' or, if later, the tenth anniversary of the Contract Date.  The current maximum maturity age is shown in the Data pages,  but may be changed by us in conformance with applicable law.

### SECTION 7.04 ANNUITY BENEFIT FORMS

The ''Normal Form'' of Annuity Benefit is an Annuity Benefit payable on the Life-Period Certain Annuity Form described below, unless another Form is to apply pursuant to the terms of the Plan, if applicable, the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any other law that applies.  The Data pages will state the Normal Form which applies.  We

may offer other annuity forms as available from us or from one of our affiliated or subsidiary life insurance companies. Such a form may, for example, include the Joint and Survivor Life Annuity Form which provides monthly payments while either of two persons upon whose lives such payments depend is living. The monthly amount to be continued when only one of the persons is living will be equal to a percentage, as elected, of the monthly amount that was paid while both were living.

The Life-Period Certain Annuity is an annuity payable during the lifetime of the person upon whose life the payments depend, but with 10 years of payments guaranteed (10 years certain period). That is, if the original payee dies before the certain period has ended, payments will continue to the beneficiary named to receive such payments for the balance of the certain period.

## SECTION 7.05 AMOUNT OF ANNUITY BENEFITS

If you elect pursuant to Section 7.02 to have an Annuity Benefit paid in lieu of the Cash Value, the amount applied to provide the Annuity Benefit will, unless otherwise stated in the Data pages or required by applicable laws or regulations, be (i) the Annuity Account Value if the annuity form elected provides payments for a person's remaining lifetime or (ii) the Cash Value if the annuity form elected does not provide such lifetime payments.

The amount applied to provide an Annuity Benefit may be reduced by a charge for any taxes which apply on annuity purchase payments. If we have previously deducted charges for taxes from Contributions, we will not again deduct charges for the same taxes before an Annuity Benefit is provided. The balance will be used to purchase the Annuity Benefit on the basis of either (i) the Tables of Guaranteed Annuity Payments or (ii) our then current individual annuity rates, whichever rates would provide a larger benefit with respect to the payee.

## SECTION 7.06 CONDITIONS

We may require proof acceptable to us that the person on whose life a benefit payment is based is alive when each payment is due. We will require proof of the age of any such person on whose life an Annuity Benefit is based.

If a benefit was based on information that is later found not to be correct, such benefit will be adjusted on the basis of the correct information. The adjustment will be made in the number or amount of the benefit payments, or any amount used to provide the benefit, or any combination. Overpayments by us will be charged against future payments. Underpayments will be added to future payments. Our liability is limited to the correct information and the actual amounts used to provide the benefits.

If the age (or sex, if applicable as stated in the Tables of Guaranteed Annuity Payments) of any person upon whose life an Annuity Benefit depends has been misstated, any benefits will be those which would have been purchased at the correct age (or sex). Any overpayments or underpayments made by us will be charged or credited with interest at (a) the rate shown in the Data pages or (b) the then current Guaranteed Interest Rate; we will choose which rate will apply on a uniform basis for like Certificates. Such interest will be deducted from or added to future payments.

If we receive acceptable proof that (i) a payee entitled to receive any payment under the terms of the Contract is physically or mentally incompetent to receive such payment or a minor, (ii) another person or an institution is then maintaining or has custody of such payee, and (iii) no guardian, committee, or other representative of the estate of such payee has been appointed, we may make the payments to such

other person or institution.  In the case of a minor, the payments will not exceed $200, or such other amount as may be shown in the Data pages.  We will have no further liability with respect to the payments so made.

If the amount to be applied hereunder is less than the minimum amount stated in the Data pages, we may pay the amount to the payee in a single sum instead of applying it under the annuity form elected.

## SECTION 7.07  CHANGES

We have the right, upon advance notice to you, to change at any time after the fifth anniversary of the Contract's register date and at intervals of not less than five years, the actuarial basis used in the Tables of Guaranteed Annuity Payments.  However, no such change will apply to (a) any Annuity Benefit provided before the change or (b) Contributions made before such change which are applied to provide an Annuity Benefit.

# PART VIII - CHARGES

## SECTION 8.01 WITHDRAWAL CHARGES

The amount of the Withdrawal Charge is stated in the Data pages. We have the right to change the Charge shown in the Data pages with respect to future Contributions, subject to any maximum stated in the Data pages. We will give you notice of any change.

If specified in the Data pages, a ''Free Corridor Amount'' will apply as follows:

''Free Corridor Amount'' means an amount equal to the percentage, stated in the Data pages, of the Annuity Account Value, minus the total of all prior withdrawals (and associated Withdrawal Charges) made as described in Section 5.01 in the current Contract Year. We have the right to change the Free Corridor Amount, but it will always be a percentage between 0% and 30% if so provided in the Data pages.

If the amount of a withdrawal made under Part V is more than the Free Corridor Amount (defined above), we will (a) first withdraw from the Investment Options, on the basis described in Section 5.01, an amount equal to the Free Corridor Amount, and (b) then withdraw from the Investment Options an amount equal to the excess of the amount requested over the Free Corridor Amount, plus a Withdrawal Charge if one applies.

For purposes of this Section, amounts withdrawn up to the Free Corridor Amount will not be deemed a withdrawal of any Contributions. We have the right to carry forward the Free Corridor Amount into a future Contract Year, if not used in any Year, if so stated in the Data pages.

Any withdrawals in excess of the Free Corridor Amount will be deemed withdrawals of Contributions in the reverse order in which they were made. That is, Contributions will be withdrawn on a last-in, first-out basis unless the Data pages state that a first-in, first-out basis will apply.

In addition, the Annuitant's years of participation under the Prior Contract, if applicable, will be included for purposes of determining the Withdrawal Charge, if so specified in the Data pages in accordance with our rules then in effect.

If specified in the Data pages we have the right to reduce or waive the Withdrawal Charge upon such events as stated in the Data pages. Moreover, the Withdrawal Charge will be reduced if needed in order to comply with any applicable state or federal law.

## SECTION 8.02 ADMINISTRATIVE AND OTHER CHARGES DEDUCTED FROM ANNUITY ACCOUNT VALUE

As of each Processing Date, we will deduct Administrative Charges or other Charges related to the administration and/or distribution of this Certificate from the Annuity Account Value. Such Charges are shown in the Data pages.

If specified in the Data pages, the Charges will be deducted in full or prorated for the Contract Year, or portion thereof, in which the Contract Date occurs or in which the Annuity Account Value is withdrawn

or applied to provide an Annuity Benefit or death benefit. If so, the Charges will be deducted when withdrawn or so applied.

The amount of any such Charge will in no event exceed any maximum amount shown in the Data pages, subject to any maximum amount permitted under any applicable law.

We have the right to change the amount of the Charges with respect to future Contributions. We will give you advance notice of any such change.

## SECTION 8.03  TRANSFER CHARGES

We have the right to impose a charge with respect to any transfer among Investment Options after the number of free transfers, shown in the Data pages, made on behalf of an Annuitant. The amount of such charge will be set forth in a notice from us to you and will in no event exceed any maximum amount stated in the Data pages.

## SECTION 8.04  DAILY SEPARATE ACCOUNT CHARGE

Assets of the Investment Funds will be subject to a daily asset charge. This daily asset charge is for mortality risk, expenses and expense risk that we assume, as well as for financial accounting and death benefits if specified in the Data pages. The charge will be made pursuant to item (c) of "Net Investment Factor" as defined in Section 2.03. Such charge will be applied after any deductions to provide for taxes. It will be at a rate not to exceed the maximum annual rate stated in the Data pages. We have the right to charge less on a current basis; the actual charge to apply, for at least the first Contract Year, is also stated in the Data pages.

## SECTION 8.05  CHANGES

In addition to our right to reduce or waive charges as described in this Part VIII, we have the right, upon advance notice to you, to increase the amount of any charge stated in the Data pages, subject to (a) any maximum amount provided in this Part VIII or the Data pages and (b) with respect to Withdrawal Charges and Administrative or Other Charges deducted from the Annuity Account Value, the application of any increase only to Contributions made after the date of the change.

## PART IX - GENERAL PROVISIONS

### SECTION 9.01  CONTRACT

The Contract is the entire contract between the parties.  It will govern with respect to our rights and obligations.

The Contract may not be changed, nor may any of our rights or rules be waived, except in writing and by our authorized officer.  In addition to the rights of change reserved by us as provided in this Certificate, the Contract may be changed by amendment or replacement upon agreement between the Contract Holder and us without the consent of any other person provided that any such change does not reduce any Annuity Benefit provided before such change and provided that no rights, privileges or benefits under the Contract and this Certificate with respect to Contributions made hereunder prior to the effective date of such change may be adversely affected by an amendment without the consent of the Contract Holder and each Certificate Owner.

### SECTION 9.02  STATUTORY COMPLIANCE

We have the right to change the Contract without the consent of any other person in order to comply with any laws and regulations that apply.  Such right will include, but not be limited to, the right to conform the Contract to reflect changes in the Code, in Treasury regulations or published rulings of the Internal Revenue Service, ERISA, and in Department of Labor regulations.

The benefits and values available under the Contract will not be less than the minimum benefits required by any state law that applies.

### SECTION 9.03  DEFERMENT

The use of proceeds to provide a payment of a death benefit and payment of any portion of the Annuity Account Value (less any Withdrawal Charge that applies) will be made within seven days after the Transaction Date.  Payments or use of proceeds from the Investment Funds can be deferred for any period during which (1) the New York Stock Exchange is closed or trading is restricted, (2) sales of securities or determination of the fair value of an Investment Fund's assets is not reasonably practicable because of an emergency, or (3) the Securities and Exchange Commission, by order, permits us to defer payment in order to protect persons with interests in the Investment Funds.  We can defer payment or transfer of any portion of the Annuity Account Value in the Guaranteed Interest Account for up to six months while you are living.

### SECTION 9.04  REPORTS AND NOTICES

At least once each year until the Annuity Commencement Date, we will send you a report showing:

      (a)    the dollar amount in the Guaranteed Interest Account;

      (b)    the total number of Accumulation Units in each Separate Account or Investment Fund;

      (c)    the Accumulation Unit Value;

(d)   the dollar amount in each Separate Account or Investment Fund;

(e)   the Cash Value; and

(f)   the amount of the death benefit.

The terms which require us to send you a report as described above or any written notice as described in any other Section will be satisfied by our mailing any such report or notice to your last known address as shown in our records.

All written notices sent to us will not be effective until received at the Processing Office.  Your Certificate Number should be included in all correspondence.

## SECTION 9.05 ASSIGNMENTS, NONTRANSFERABILITY, NONFORFEITABILITY

No amounts payable under the Contract to a payee other than you may be assigned by that payee unless permitted herein, nor will they be subject to the claims of creditors or to legal process, except to the extent permitted by law.  Other restrictions may apply if stated in any endorsement hereto.

## SECTION 9.06 MANNER OF PAYMENT

We will pay all amounts hereunder by check (in United States dollars) or, if so agreed by you and us, by wire transfer.  All amounts payable by you must be paid by check payable to us (in United States dollars) or by any other method acceptable to us.

No. 94ICB                                              Page 20

## TABLE OF GUARANTEED ANNUITY PAYMENTS

**Amount of Annuity Benefit payable monthly on the Life Annuity Form with Ten Years Certain provided by application of $1,000.**

| Monthly Income Ages | Males | Females | Age | Monthly Income Males | Females |
|---|---|---|---|---|---|
| 60 | 4.12 | 3.70 | 76 | 5.95 | 5.26 |
| 61 | 4.20 | 3.76 | 77 | 6.10 | 5.40 |
| 62 | 4.29 | 3.83 | 78 | 6.25 | 5.55 |
| 63 | 4.38 | 3.90 | 79 | 6.40 | 5.70 |
| 64 | 4.48 | 3.98 | 80 | 6.56 | 5.85 |
| 65 | 4.58 | 4.06 | 81 | 6.72 | 6.01 |
| 66 | 4.68 | 4.14 | 82 | 6.88 | 6.18 |
| 67 | 4.79 | 4.23 | 83 | 7.04 | 6.34 |
| 68 | 4.90 | 4.32 | 84 | 7.20 | 6.51 |
| 69 | 5.02 | 4.42 | 85 | 7.36 | 6.67 |
| 70 | 5.14 | 4.52 | 86 | 7.51 | 6.84 |
| 71 | 5.26 | 4.63 | 87 | 7.67 | 7.00 |
| 72 | 5.39 | 4.75 | 88 | 7.81 | 7.16 |
| 73 | 5.52 | 4.87 | 89 | 7.96 | 7.32 |
| 74 | 5.66 | 4.99 | 90 | 8.09 | 7.47 |
| 75 | 5.80 | 5.12 | | | |

The amount of income provided under an Annuity Benefit payable on the Life Annuity form with Ten Years Certain is based on 2.5% interest and the 1983 Individual Annuity Mortality Table ''a'' projected with modified Scale ''G''.

Amounts required for ages or for annuity forms not shown in the above Table or for other annuity forms will be calculated by us on the same actuarial basis.

If a variable annuity form is available from us and elected pursuant to Section 7.02, then the amounts required will be calculated by us based on the 1983 Individual Annuity Mortality Table ''a'' projected with modified Scale ''G'' and a modified two year age setback and on an Assumed Base Rate of Net Investment Return of 5.0%.

No. 94ICB

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Effective immediately, Contract Form No. 1050-94IC and the Certificates issued under the Contract is amended as follows:

The following new section is added at the end of **PART VII - ANNUITY BENEFITS**:

**SECTION 7.08  MINIMUM INCOME BENEFIT**

If so specified in the Data pages, when the Annuity Account Value is applied to a plan of income payments (described therein) during the period of time specified in the Data pages, such payments will not be less than an amount described in the Data pages.  The provisions of this Section do not affect or reduce your right to elect an Annuity Benefit as described above in Section 7.02.

**New York,**

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer                Senior Vice President, Secretary and Associate General Counsel

No. 96ENGMIBIC

**ENDORSEMENT**
**APPLICABLE TO NON-QUALIFIED**
**CERTIFICATES**

This Endorsement applies only to the Owner of a Non-Qualified Certificate.

1.     **Contributions (Section 3.01):**

   We have the right not to accept any Contribution which is less than the amount(s) stated in the Data pages.

2.     **Owner Death Distribution Rules (Section 6.01):**

   Upon the death of you, as Owner, before the Annuity Commencement Date:

   (a)     If you are both the Owner and the Annuitant, we will pay the death benefit described in Section 6.01. Any part of a death benefit for which there is no named beneficiary living at your death will be payable in a single sum to your children who survive you in equal shares, or should none survive, then to your estate.

   Under the following circumstances, the death benefit described in Section 6.01 of the Certificate will not be paid at your death before the Annuity Commencement Date and the coverage under the Contract will continue with your surviving spouse as Successor Annuitant and Owner:

   (i)     you are married at your death;

   (ii)     the person named as death beneficiary under Section 6.02 of the Certificate is your surviving spouse; and

   (iii)     you have additionally requested that your spouse become ''Successor Annuitant and Owner'' of your Certificate if your spouse survives you.

   (b)     If you are not the Annuitant, the named beneficiary will succeed as Owner. The entire amount in the Investment Options (after any Withdrawal Charge) must be fully paid within five years after your death, or payments must begin within one year after your death as a life annuity or installment option for a period of not longer than the life expectancy of the named beneficiary. If you have not elected a form of payment as described in Section 6.02, we will make a single sum payment to the beneficiary on the fifth anniversary of your death. Subject to our rules at the time of payment, the beneficiary may elect to apply such a single sum payment to a new non-qualified annuity contract to be owned by the beneficiary. Instead of a single sum payment, the beneficiary may elect to receive an Annuity Benefit or a payout option which satisfies the terms of Section 72(s) of the Code and our rules at the time. However, if the named beneficiary is your spouse, full payment of amounts under the Certificate must be made not later than five years after the spouse's death.

No. 94ENNQI

If payments under an Annuity Benefit had begun before your death, such payments will continue to be made pursuant to the terms of such Benefit.

If the Annuitant dies before the entire amount under the Certificate is paid, we will pay the death benefit as described in Section 6.01.

(c)    Unless you direct otherwise, the named beneficiary will also be the person who succeeds as Owner on your death while the Annuitant is alive as described in Section 6.02. You may change any beneficiary or successor Owner from time to time during the Annuitant's lifetime and while the Certificate is in force, as described in item (a) above.

(d)    If you are not the Annuitant, you may name another person to be the successor Owner and to receive the amounts to be paid under (b) above. You may also name another person to be successor Owner if the first choice as successor Owner dies before you. If you have so named two or more persons to succeed as Owner and more than one survive, they will share equally unless you direct otherwise. If no person named as beneficiary to receive the death benefit survives the Annuitant, we will pay the death benefit in a single sum to you. In the event of your death after the Annuitant, but before we pay such death benefit, the benefit will be payable in a single sum to the children who survive you, in equal shares, or should none survive, to your estate.

If you die before the Annuity Commencement Date while the Annuitant is still living, and if no person named as successor Owner is living at the Owner's death, the beneficiary will be deemed to be, in this order, (i) your surviving spouse, (ii) the Annuitant, (iii) the children who survive you, in equal shares, or (iv) your estate.

**3.    Assignments (Section 9.05):**

Notwithstanding the terms of Section 9.05, you may assign the Certificate and the rights described therein before the Annuity Commencement Date. We will not be bound by an assignment unless we have received it and it is in writing. Your rights and those of any other persons referred to in the Certificate and this Endorsement will be subject to the assignment. We assume no responsibility for the validity of any assignment.

No. 94ENNQI

## ENDORSEMENT
## APPLICABLE TO MARKET VALUE ADJUSTMENT TERMS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**The terms of this Endorsement contain a market value adjustment ("MVA") formula which may result in adjustments, positive or negative, in benefits. An MVA will not apply upon transfer to a new Guarantee Period or other Investment Option on the Expiration Date or pursuant to item 1 below.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    **Guaranteed Period Account**

We will specify one or more Guarantee Periods in the Guaranteed Period Account. For each such Guarantee Period, we guarantee to credit an interest rate (called the Guaranteed Rate). Interest will be credited daily to amounts in the Guaranteed Period Account. The duration of each Guarantee Period provided at any time and the Guaranteed Rate that applies to each Period will be furnished by us upon request. The Guarantee Period(s) and the Rate for each such Period you initially elect are shown in the Data pages.

You may elect one or more Guarantee Period(s), according to our rules then in effect. Contributions and transfers to be made to the Guaranteed Period Account as described in Section 3.01 will be allocated to the Guarantee Period(s) according to your election. Contributions and transfers into the Guaranteed Period Account will receive the Guaranteed Rate applicable to the elected Guarantee Period as of the Business Day we receive your Contribution or transfer request at our Processing Office. The amount held with respect to a given Guarantee Period is called the Guaranteed Period Amount which reflects Contributions and transfers made to the Guaranteed Period Account, plus interest at the Guaranteed Rate(s), minus any withdrawals, transfers and charges, if any, deducted from the Guaranteed Period Account.

The last day of a Guarantee Period is the Expiration Date. We will notify you at least 15 but not more than 45 days before the Expiration Date of each Period. You may elect one of the following three options effective at the Expiration Date, none of which will result in a market value adjustment:

(a)    to transfer the Guaranteed Period Amount into a Guarantee Period of any duration which we then offer;

(b)    to transfer the Guaranteed Period Amount to another Investment Option;

(c)    to make a withdrawal of the Guaranteed Period Amount (subject to any Withdrawal Charges which apply pursuant to Section 8.01).

No. 94ENMVAI

If no election is made on or prior to the Expiration Date, the Guaranteed Period Amount (without any market value adjustment) will be transferred into the Investment Option described in the Data pages. During the 30 days following the Expiration Date, the full Guaranteed Period Amount (less any withdrawals or transfers made or charges deducted during such 30 day period) may be transferred into a new Guarantee Period or other Investment Option. In no event may you elect a Guarantee Period which extends beyond the Annuity Commencement Date.

The "Guaranteed Period Account" is our Separate Account No. 46 that we use to account for amounts allocated to Guarantee Periods under this Certificate. All amounts allocated to a Guarantee Period, whether Contributions or transfers, become part of the Guaranteed Period Account.

2.    **Transfers, Withdrawals, Death and Annuity Benefits**

If you request, other than as described in item 1 above, a transfer to another Investment Option as described in Section 4.01 or a withdrawal as described in Section 5.01, any such transfer or withdrawal from a Guaranteed Period Amount will be subject to a market value adjustment described below. For this purpose, the Annuity Account Value in Separate Account No. 46 will be after the market value adjustment. The market value adjustment will be in addition to any charges which apply as described in Section 8.01.

In addition, amounts applied from a Guaranteed Period Amount to provide a death benefit as described in Section 6.01, an annuity as described in Section 7.02, or any other annuity form offered by us, will be subject to a market value adjustment, unless otherwise provided in the Data pages.

Payment or transfers from the Guaranteed Period Account may be deferred for up to six months while you are living.

3.    **Market Value Adjustment**

The market value adjustment with respect to each Guarantee Period that applies to you is determined as follows:

(a)    We determine the Guaranteed Period Amount that will be payable on the Expiration Date, using the Guaranteed Rate for such Guarantee Period.

(b)    We determine the period remaining in your Guarantee Period (based on the Business Day we receive your transaction request at our Processing Office or effective date for such determination) and convert it to fractional years based on a 365 day year. For example, three years and 12 days becomes 3.0329.

No. 94ENMVAI

(c)     We determine the current Guaranteed Rate which applies to new Contributions, for the same class of Certificates as yours, under a Guarantee Period with the same Expiration Date as your Guarantee Period. We add to such current Rate a percentage which is no greater than that shown in the Data pages.

(d)     We determine the present value of the Guaranteed Period Amount payable at the Expiration Date, using the period determined in (b) and the rate determined in (c).

(e)     We subtract the current Guaranteed Period Amount from the result in (d). The result is the Market Value Adjustment, which may be positive or negative, applicable to such Guarantee Period.

If we are not offering a Guarantee Period to which the ''current Guaranteed Rate'' would apply, we will use the Rate at the closest Expiration Date. If we are no longer offering new Guarantee Periods, we will use a procedure for determining such current Rate that is stated in the Data pages or which we will develop and file with insurance supervisory official of the appropriate jurisdiction.

## 4.     Reports and Notices

We will report the values under this Endorsement with the reports sent out as described in Section 9.04. Such report will include the Guaranteed Period Amount, market value adjustment, and Annuity Account Value in Separate Account No. 46.

No. 94ENMVAI

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Effective immediately, Equitable hereby amends the **Endorsement Applicable to Market Value Adjustment Terms** Form No. 94ENMVAI as follows:

The following new section is added at the end of the Endorsement after **Item 4 Reports and Notices**:

5.     **Separate Account**

We have established Separate Account No. 46 and maintain it in accordance with the laws of New York State. Income, realized and unrealized gains and losses from the assets of the Separate Account are credited to or charged against it without regard to our other income, gains or losses. Assets are placed in this Separate Account to support the Certificate and other annuity contracts and certificates. The assets of a separate account are our property. If so stated in the Data pages, the portion of such assets equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct. We may transfer assets of a separate account, including assets of the Guaranteed Period Account, in excess of the reserves and other contract liabilities with respect to such account to another separate account or to our general account.

**New York,**

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer          Senior Vice President, Secretary and Associate General Counsel

No. 96ENMVAI

**AXA EQUITABLE LIFE INSURANCE COMPANY**

## NAME CHANGE ENDORSEMENT

**Effective Date: September 7, 2004**

This endorsement is made part of the policy, contract or certificate as of its Effective Date. It should be attached to and kept with the policy, contract or certificate.

Wherever the name of The Equitable Life Assurance Society of the United States or the Equitable appears in the policy, contract or certificate, the name AXA Equitable Life Insurance Company is hereby substituted.

In all other respects, the terms and provisions of the policy, contract or certificate remain unchanged and in full force and effect.

Christopher M. Condron
Chairman, President and
Chief Executive Officer

Pauline Sherman
Senior Vice President,
Secretary and Associate
General Counsel

2003AXA-ELAS

1290 Avenue of the Americas, New York, New York 10104

# Accumulator (IRA)

Ansley E Whatley, III
ProEquities Inc
200 Grove Park Lane
Ste 100
Dothan, AL  36305

**Owner:**              **James Zandy Williams**
**Annuitant:**          **James Zandy Williams**
**Certificate Number:** **98 688 104**

**Product:**            **Accumulator (IRA)**
**State:**              **Alabama**



DEFENDANT'S EXHIBIT
CASE NO.
EXHIBIT NO. B-2

 **AXA**
**DISTRIBUTORS, LLC**

February 23, 1999

Ansley E Whatley, III
ProEquities Inc
200 Grove Park Lane
Ste 100
Dothan, AL  36305

Dear Ansley E Whatley, III:

I would like to take this opportunity to thank you for recently placing an Equitable Accumulator$^{SM}$ Certificate for James Zandy Williams with The Equitable Life Assurance Society of the United States (Equitable).  At AXA Distributors, LLC, we are committed to providing you with the support you and your clients deserve, and look forward to building a longstanding relationship with you.

Enclosed please find a package of information for James Zandy Williams.  Included is a welcome letter, your client's Accumulator Certificate and a personalized summary that highlights important information. Please review this package with your client and provide the kit to them for record keeping purposes.

We have also included a summary sheet for your files. This summary contains important information regarding this particular client and Certificate.

We at AXA Distributors appreciate your continued support and look forward to working with you in the future. We're always ready to answer your questions . . . give you a quote or a hypothetical illustration . . . provide you with marketing materials . . . help you in any way we can. When you need us, just contact your AXA Distributors' Regional Vice President or call our Sales Desk at 1-888-517-9900.

Again, thank you for the business.

Sincerely,

Jeffrey L. McGregor
President of AXA Distributors, LLC

EDIU-97-76 (rev. 9/99)

# Equitable accumulator<sup>SM</sup>

# Financial Professional Summary Sheet

| | |
|---|---|
| **Owner:** | **James Zandy Williams** |
| **Annuitant:** | **James Zandy Williams** |
| **Beneficiary(ies):** | **Sandra Williams** |
| **Initial Contribution:** | **$5,095.12** |
| **Contract Date:** | **February 23, 1999** |
| **Certificate Number:** | **98 688 104** |
| **Certificate Type:** | **Accumulator (IRA)** |
| **baseBUILDER® Elected:**<br>  **Income Benefit**<br>  **Death Benefit** | **6% Roll Up to Age 80**<br><br>**6% Roll Up to Age 80** |
| **Investment Funds:** | EQ/Money Market Fund<br>Multimanager High Yield Fund<br>EQ/AllianceBernsteinCommon Stock Fund     $2,038.05<br>Multimanager Aggressive Equity Fund<br>EQ/AllianceBernsteinSmall Cap Growth Fund<br>EQ/AllianceBernsteinLarge Cap Growth Fund<br>EQ/Technology Fund<br>EQ/Equity 500 Index Fund<br>EQ/Small Company Index Fund<br>EQ/Capital Guardian U.S. Equity Fund<br>EQ/Capital Guardian Research Fund<br>MarketPLUS International Core Fund<br>EQ/JPMorgan Core Bond Fund<br>EQ/AllianceBernsteinValue Fund<br>Multimanager Small Cap Value Fund<br>MarketPLUS Large Cap Core Fund<br>EQ/MFS Research Fund     $1,528.53<br>MarketPLUS Large Cap Growth Fund<br>EQ/Van Kampen Emerging Markets Equity Fund<br>EQ/JPMorgan Value Opportunities Fund<br>EQ/Capital Guardian Growth Fund     $1,528.54<br>EQ/BlackRock International Value Fund<br>MarketPLUS Mid Cap Value Fund<br>EQ/FI Mid Cap Fund<br>EQ/Janus Large Cap Growth Fund |
| **Guaranteed Fixed Interest**<br>  **Accounts:** | February 15, 2000<br>February 15, 2001<br>February 15, 2002<br>February 15, 2003<br>February 15, 2004<br>February 15, 2005<br>February 15, 2006<br>February 15, 2007<br>February 15, 2008<br>February 15, 2009 |

 **EQUITABLE**

February 23, 1999

James Zandy Williams
PO BOX 52
COWARTS AL  36321

Dear James Zandy Williams:

We are pleased to welcome you to The Equitable Life Assurance Society of the United States (Equitable).  At Equitable, our aim is to help you achieve your retirement savings and income goals. Enclosed is the Equitable Accumulator$^{SM}$ Certificate along with a summary of its key features and benefits.

Your financial concerns are very important to us. Feel free to contact our customer service help line if you have any questions about your Accumulator Certificate. Our customer representatives can be reached at 1-800-789-7771, Monday through Friday during normal business hours.

If you would like additional information about the Accumulator distribution options, including our Income Manager® payout annuities, your financial professional can help you choose a strategy that best suits your retirement income goals.

The enclosed folder contains the Certificate, investment allocations and your personalized summary. Please be sure to review these important documents.  You may also wish to keep your statements and transaction records here for easy reference.

Once again, welcome. We look forward to serving you in the future.

Sincerely,

*Q Calcaterra*

Anthony Calcaterra
Vice President

EDI-97-80 (rev. 9/99)

# <u>a</u>ccumulator<sup>SM</sup>

# CERTIFICATE SUMMARY

James Zandy Williams
*Annuitant*

James Zandy Williams
*Owner*

Not Applicable
*Successor Owner/Annuitant*

Sandra Williams
*Beneficiary*

Accumulator (IRA)
*Certificate Type*

| February 23, 1999 | $5,095.12 | 98 688 104 |
|:---:|:---:|:---:|
| *Contract Date* | *Initial Contribution* | *Certificate Number* |

> Your Accumulator<sup>SM</sup> is a combination fixed and variable deferred annuity designed to provide for the accumulation of retirement savings and for income at a future date. Earnings generally accumulate on a tax-deferred basis until withdrawn or when distributions become payable.  Withdrawals may be taxable and prior to age 59 ½ may also be subject to an additional 10% Federal income tax penalty.

This summary provides information regarding your initial investment allocations and highlights some of your annuity's key features and benefits.  It is intended to provide only a brief overview of your Certificate and therefore does not represent all of the terms and conditions that apply under your Certificate.

 EQUITABLE

The Equitable Life Assurance Society of the United States, New York, NY  10104

# baseBUILDER® BENEFITS

## YOUR baseBUILDER® INCOME BENEFIT

The baseBUILDER Income Benefit provides a minimum amount of guaranteed lifetime income through the application of the Annuity Account Value to an Income Manager® *(Life Annuity with a Period Certain)* payout annuity. As a result, regardless of how the Investment Funds perform, on the 7th and later Contract Date anniversary, you can convert your Equitable Accumulator into a guaranteed minimum amount of annual income for life (certain age restrictions apply).

Equitable calculates the baseBUILDER Income Benefit by compounding your contributions, less any withdrawal's, at 6% annually* (until the Annuitant's age 80) and applying that amount to annuity purchase factors guaranteed when the Equitable Accumulator is issued. The Guaranteed Minimum Income Benefit does not provide an Annuity Account Value or guarantee investment performance. It is based on conservative actuarial factors; the level of income that is guaranteed may be less than would otherwise be provided by application of your Annuity Account Value using current annuity purchase factors. It should be regarded as a safety net.

You may exercise the Guaranteed Minimum Income Benefit within the 30-day period following each of the Contract Date anniversaries, beginning with the 7th Contract Date anniversary but not earlier than the Annuitant's age 60 nor later than the Annuitant's age 83. The table below shows the **minimum** amount of guaranteed lifetime income **you** would receive if you exercise this benefit on any one of the Contract Date anniversaries shown. **Income levels are based on your initial contribution of $5,095.12 for all allocations to the Investment Funds and Guaranteed Fixed Interest Accounts and assume no withdrawals or additional contributions.**

*\* Contributions allocated to the EQ/Money Market Fund (other than for Special Dollar Cost Averaging) and the Guaranteed Fixed Interest Accounts are compounded at 3% annually for this purpose.*

## YOUR GUARANTEED MINIMUM INCOME BENEFIT*
## ANNUAL INCOME PAYABLE FOR LIFE WITH 10-YEAR PERIOD CERTAIN*

*If Elected on Contract Date Anniversary*

| Year 1-6 | Year 7 | Year 10 | Year 15 | Year 20 |
|----------|--------|---------|---------|---------|
| N/A | $469.78 | $634.46 | $975.04 | $1,473.38 |

*\*The period certain may be shorter for later election years*

## YOUR baseBUILDER® DEATH BENEFIT

Should the Annuitant die prior to your receiving annuity benefits, your named beneficiary will be paid a death benefit. The death benefit is equal to the Annuity Account Value in the Investment Funds and Guaranteed Fixed Interest Accounts, or if greater, the Guaranteed Minimum Death Benefit. Thus, no matter how the Investment Funds perform, your beneficiaries are guaranteed to receive at least a return of the amount of money invested (less any amounts withdrawn) compounded at 6% annually* until the Annuitant's age 80. The table below shows the **minimum** amount of the death benefit your named beneficiary would receive if the Annuitant were to die at the end of the Contract Years illustrated. **Your death benefit levels are based on your initial contribution of $5,095.12 for all allocations to the Investment Funds and Guaranteed Fixed Interest Accounts and assume no withdrawals or additional contributions.**

*\* Contributions allocated to the EQ/Money Market Fund (other than for Special Dollar Cost Averaging), and the Guaranteed Fixed Interest Accounts are compounded at 3% annually for this purpose.*

IM-97-67

# baseBUILDER® BENEFITS

## YOUR GUARANTEED MINIMUM DEATH BENEFIT

*On Contract Date Anniversaries*

| Year 1 | Year 7 | Year 10 | Year 15 | Year 20 |
|---|---|---|---|---|
| $5,400.83 | $7,663.62 | $9,128.95 | $12,218.55 | $15,428.10 |

## IMPACT OF WITHDRAWALS ON baseBUILDER® BENEFITS

Please be aware that taking withdrawals from your Annuity Account Value will reduce the amount of the guaranteed benefits described above. Please remember that withdrawals may be taxable and prior to age 59 ½ may also be subject to an additional 10% Federal income tax penalty. Withdrawals may also be subject to a positive or negative market value adjustment on contributions to the Guaranteed Fixed Interest Accounts.

IM-97-67

# INVESTMENT ALLOCATIONS

## YOUR INVESTMENT FUNDS

You have made the following allocations to the Investment Funds. You may change your allocations at any time. To learn the daily unit values for each of the available funds, call 800/789-7771.

| INVESTMENT FUNDS | |
| --- | --- |
| **Investment Fund** | **Amount Allocated** |
| EQ/Money Market Fund | |
| Multimanager High Yield Fund | |
| EQ/AllianceBernsteinCommon Stock Fund | $2,038.05 |
| Multimanager Aggressive Equity Fund | |
| EQ/AllianceBernsteinSmall Cap Growth Fund | |
| EQ/AllianceBernsteinLarge Cap Growth Fund | |
| EQ/Technology Fund | |
| EQ/Equity 500 Index Fund | |
| EQ/Small Company Index Fund | |
| EQ/Capital Guardian U.S. Equity Fund | |
| EQ/Capital Guardian Research Fund | |
| MarketPLUS International Core Fund | |
| EQ/JPMorgan Core Bond Fund | |
| EQ/AllianceBernsteinValue Fund | |
| Multimanager Small Cap Value Fund | |
| MarketPLUS Large Cap Core Fund | |
| EQ/MFS Research Fund | $1,528.53 |
| MarketPLUS Large Cap Growth Fund | |
| EQ/Van Kampen Emerging Markets Equity Fund | |
| EQ/JPMorgan Value Opportunities Fund | |
| EQ/Capital Guardian Growth Fund | $1,528.54 |
| EQ/BlackRock International Value Fund | |
| MarketPLUS Mid Cap Value Fund | |
| EQ/FI Mid Cap Fund | |
| EQ/Janus Large Cap Growth Fund | |

IM-97-67

# INVESTMENT ALLOCATIONS

## YOUR GUARANTEED FIXED INTEREST ACCOUNTS

If you invested in the Guaranteed Fixed Interest Account, you may change your allocations at any time. Call 800/789-7771 for a recording of guaranteed rates applicable to the Guaranteed Fixed Interest Accounts. Please note that any withdrawals (including transfers, surrender and deductions) from a Guaranteed Fixed Interest Account prior to its expiration date may result in a positive or negative market value adjustment, as well as a 10% Federal income tax penalty for withdrawals prior to age 59 ½.

| GUARANTEED FIXED INTEREST ACCOUNTS | | |
|---|---|---|
| **Expiration Date** | **Guaranteed Interest Rate** | **Amount Allocated** |
| February 15, 2000 | | |
| February 15, 2001 | | |
| February 15, 2002 | | |
| February 15, 2003 | | |
| February 15, 2004 | | |
| February 15, 2005 | | |
| February 15, 2006 | | |
| February 15, 2007 | | |
| February 15, 2008 | | |
| February 15, 2009 | | |

IM-97-67

# SERVICES WE PROVIDE

### DOLLAR COST AVERAGING*
Through a systematic approach to investing, commonly referred to as Dollar Cost Averaging, you can gradually invest in the market and may actually reduce your average cost over time. The Equitable Accumulator[SM] offers a Dollar Cost Averaging program that is available at issue, as well as a longer program available at any time.

*Dollar cost averaging can neither guarantee a profit nor prevent a loss. Because it involves continuous investment in securities regardless of fluctuating price levels of such securities, you should consider your financial ability to continue to invest through periods of low prices before participating in this program.*

### TRANSFERS AMONG ACCOUNTS
Because market conditions and/or your personal circumstances may change over time, we've made it easy for you to modify your investments. You may transfer among Investment Funds and Guaranteed Fixed Interest Accounts and between such Funds and Accounts at any time — without an investment charge and without tax penalty. However, transfers from the Guaranteed Fixed Interest Accounts may result in a positive or negative market value adjustment. Call 800/789-7771 to make a change or for assistance from our customer service representatives. Please have your Certificate number available.

### OPTIONS AT EXPIRATION DATE OF GUARANTEED FIXED INTEREST ACCOUNTS
If you invested in the Guaranteed Fixed Interest Account, each one will reach its expiration date on February 15 in the year shown in the Investment Allocations page. You will be notified on or before December 31st prior to its expiration date. At that time you may transfer the value at expiration into any Guaranteed Fixed Interest Account we are then offering, or into the Investment Funds. You may also choose to withdraw all or part of the value at expiration (subject to tax charges and/or penalties that may apply). If we have not received your election as of the expiration date, the value at expiration will be transferred into the Guaranteed Fixed Interest Account with the next earliest expiration date.

### AUTOMATIC INVESTMENT PLAN
You have the ability to systematically invest in the Accumulator from your bank accounts. The minimum amount for systematic investing is $100 monthly or $300 quarterly.

### REPORTS YOU WILL RECEIVE
**Confirmation Notices.** Each time you make a contribution, transfer assets or take a withdrawal, we will mail you a confirmation of the transaction.

**Quarterly Statements.** You will receive a statement at the end of each calendar quarter which summarizes all transactions since the last statement.

**Annual Statement.** Just after your Contract Date anniversary, you will receive an annual statement summarizing all policy activity, changes in investment performance for the year, as well as your current Annuity Account Value.

**Semi-Annual Reports On Investment Funds.** You will receive these reports every 6 months, for the periods ending June 30 and December 31.

### ON THE INTERNET
We know you're on the Internet - the newest way to access timely information - and we are, too. At our website (http://www.equitable.com), simply click on EQAccess to set up a password. Then, you'll be able to get current values for your Certificate (and other Equitable policies), including your total account balance, and total units and values for each Investment Fund in your account.

**YOUR FINANCIAL PROFESSIONAL**
Ansley E Whatley, III - (334) 677-9700
Accumulator[SM] is a service mark, and Income Manager® and baseBUILDER® are registered service marks of
The Equitable Life Assurance Society of the United States.
The Accumulator is issued by The Equitable Life Assurance Society of the United States
and distributed by AXA Distributors, LLC New York, NY 10104

| | |
|---|---|
| **Owner:** | James Zandy Williams |
| **Annuitant:** | James Zandy Williams |
| **Certificate Number:** | 98 688 104 |
| **Contract Date:** | February 23, 1999 |

## CERTIFICATE

Processing Office:  Income Management Group, P.O. Box 1547,
Secaucus, New Jersey 07096-1547

This is the Certificate which is issued under the terms of the Contract defined in Section 1.09.  This Certificate is issued in return for the application for coverage under the Contract and the Contributions to be made to us under the Contract.

In this Certificate, "we", "our" and "us" mean Equitable. "You" and "your" mean the Owner.

We will provide the benefits and other rights pursuant to the terms of this Certificate.

**TEN DAYS TO CANCEL -** Not later than ten days after you receive this Certificate, you may return it to us.  We will cancel it and refund any Contribution made to us, plus or minus any investment gain or loss which applies to the Investment Funds of the Separate Account from the date such Contribution was allocated to such Fund to the date of cancellation.

**New York,**
**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer             Senior Vice President, Secretary and Associate General Counsel

**THE PORTION OF ANNUITY ACCOUNT VALUE HELD IN THE SEPARATE ACCOUNT MAY INCREASE OR DECREASE IN VALUE (SEE PART II OF THIS CERTIFICATE).**

No. 94ICB

**TABLE OF CONTENTS**

<u>Page</u>

DATA

| | | | |
|---|---|---|---|
| Part I | - | DEFINITIONS | 3 |
| Part II | - | INVESTMENT OPTIONS | 6 |
| Part III | - | CONTRIBUTIONS AND ALLOCATIONS | 10 |
| Part IV | - | TRANSFERS AMONG INVESTMENT OPTIONS | 11 |
| Part V | - | WITHDRAWALS AND TERMINATION | 12 |
| Part VI | - | DEATH BENEFITS | 13 |
| Part VII | - | ANNUITY BENEFITS | 14 |
| Part VIII | - | CHARGES | 17 |
| Part IX | - | GENERAL PROVISIONS | 19 |

TABLE OF GUARANTEED ANNUITY PAYMENTS                21

No. 94ICB

**ENDORSEMENTS -**

**<u>NOTICE OF TWENTY - DAY RIGHT TO CANCEL</u>-**

This Equitable Certificate has a provision giving you a ten day period (commencing with the date the Certificate is delivered) to cancel the Certificate. We have been told that this Certificate replaces an existing annuity. Therefore, since the decision to replace an existing annuity is an important one, the time period given to cancel this Certificate will be extended to twenty days.

No. 9320FLRCG

*Equitable Accumulator (Rollover) IRA*

## DATA

**PART A** -- **This part lists your personal data.**

**Owner:**      James Zandy Williams

**Annuitant:**   James Zandy Williams                    Age: 61        Sex: Male

**Contract:  Group Annuity Contract No. AC 6727**

**Certificate Number:**              98 688 104

**Endorsements Attached:** Minimum Income Benefit Endorsement
Endorsement Applicable to IRA Certificates
Endorsement Applicable to Market Value Adjustment Terms
Rider to Endorsement Applicable to Market Value
Adjustment Terms

**Issue Date:**                February 23, 1999

**Contract Date:**             February 23, 1999

**Annuity Commencement Date:**      February 23, 2028

**The maximum maturity age is age 90 -- see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which
follows your 90th birthday.

However, if you choose a date later than age 70 1/2, distribution of at least the minimum
payments required must commence by April 1 of the calendar year following the calendar
year in which you attain age 70 1/2 (see item 2 of the Endorsement Applicable to IRA
Certificates).

**Guaranteed Benefits:**    Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (6% Roll Up to Age 80)

**Beneficiary:** Sandra Williams

No. 94ICB                              Data page 1          (5/99)

**DATA Pages (cont'd)**

**PART B -- This part describes certain provisions of your Certificate.**

**Initial Contribution Received (see Section 3.02):**      $5,095.12

**Investment Options available  (see Part II); your allocation is also shown.**

| **Investment Options** | **Allocation (see Section 3.01)** |
|---|---|
| • EQ/Money Market Fund | |
| • Multimanager  High Yield Fund | |
| • EQ/AllianceBernsteinCommon Stock Fund | $2,038.05 |
| • Multimanager  Aggressive Equity Fund | |
| • EQ/AllianceBernsteinSmall Cap Growth Fund | |
| • EQ/AllianceBernsteinLarge Cap Growth Fund | |
| • EQ/Technology Fund | |
| • EQ/Equity 500 Index Fund | |
| • EQ/Small Company Index Fund | |
| • EQ/Capital Guardian U.S. Equity Fund | |
| • EQ/Capital Guardian Research Fund | |
| • MarketPLUS International Core Fund | |
| • EQ/JPMorgan Core Bond Fund | |
| • EQ/AllianceBernsteinValue Fund | |
| • Multimanager Small Cap Value Fund | |
| • MarketPLUS Large Cap Core Fund | |
| • EQ/MFS Research Fund | $1,528.53 |
| • MarketPLUS Large Cap Growth Fund | |
| • EQ/Van Kampen Emerging Markets Equity Fund | |
| • EQ/JPMorgan Value Opportunities Fund | |
| • EQ/BlackRock International Value Fund | |
| • EQ/Capital Guardian Growth Fund | $1,528.54 |
| • MarketPLUS Mid Cap Value Fund | |
| • EQ/FI Mid Cap Fund | |
| • EQ/Janus Large Cap Growth Fund | |

**DATA Pages (cont'd)**

<u>**Allocation (see Section 3.01)**</u>

- **Guarantee Periods (Class I)**
    **Expiration Date and Guaranteed Rate**
    February 15, 2000
    February 15, 2001
    February 15, 2002
    February 15, 2002
    February 15, 2004
    February 15, 2005
    February 15, 2006
    February 15, 2007
    February 15, 2008
    February 15, 2009

|  |  |
|---|---|
| **Total:** | $5,095.12 |

Investment Options shown are Investment Funds of our Separate Account No. 49 and Guarantee Periods shown are in the Guaranteed Period Account.  See Endorsement Applicable to Market Value Adjustment Terms.

**"Types" of Investment Options (see Section 4.02):**  Not applicable

**Guaranteed Interest Account (see Section 2.01):**  Not available under this Certificate

**DATA Pages (cont'd)**

**Business Day (see Section 1.05):**  A Business Day for this Certificate will mean generally any day on which the New York Stock Exchange is open for trading.

**Processing Dates (see Section 1.20):**  A Processing Date is each Contract Date anniversary.

**Availability of Investment Options (see Section 2.04):**  (See Data pages, Part C; Allocation Restrictions)

**Allocation of Contributions (see Section 3.01):** Your initial and any subsequent Contributions are allocated according to your instructions.


**Contribution Limits:**  We will only accept an initial Contribution of at least $5,000 in the form of either a rollover Contribution or a direct custodian-to-custodian transfer from other traditional individual retirement arrangements. Subsequent Contributions may be made in an amount of at least $1,000. Subsequent Contributions may be "regular" IRA Contributions (limited to a maximum of $2,000 a year), rollover Contributions or direct transfers.  Rollover Contributions and direct transfers are not subject to the $2,000 annual limit. Regular IRA Contributions may not be made for the taxable year in which you attain age 70 1/2 and thereafter. Rollover and direct transfer Contributions may be made at any time until you attain age 84.  However, any amount contributed after you attain age 70 1/2 must be net of your minimum distribution for the year in which the rollover or direct transfer Contribution is made (see item 2 Annuity Commencement Date in Endorsement Applicable to IRA Certificates).   We may refuse to accept any Contribution if the sum of all Contributions under all accumulation Certificates with the same Annuitant would then total more than $1,500,000.  We reserve the right to limit aggregate Contributions made after the first Contract Year to 150% of first year Contributions.  We may also refuse to accept any Contribution if the sum of all Contributions under all Equitable Life annuity accumulation certificates/contracts that you own would then total more than $2,500,000.

No. 94ICB                                            Data page 3            (5/99)

**DATA Pages (cont'd)**

**Transfer Rules (see Section 4.02):**  Transfers among the Investment Options may be made at any time during the Contract Year.

**Allocation of Withdrawals (see Section 5.01):**  Lump Sum Withdrawals - You must provide withdrawal instructions indicating from which Investment Options the Lump Sum Withdrawal and any withdrawal charge will be taken; Minimum Distribution Withdrawals - Unless you specify otherwise, Minimum Distribution Withdrawals will be withdrawn on a pro rata basis from your Annuity Account Value in the Investment Funds.  If there is insufficient value or no value in the Investment Funds, any additional amount of the withdrawal required or the total amount of the withdrawal, as applicable, will be withdrawn from the Guarantee Periods in order of the earliest Expiration Date(s) first.

**Withdrawal Restrictions (see Section 5.01):**  Minimum Distribution Withdrawals - May be elected in the year in which you attain age 70 1/2 or at a later date.  Minimum Distribution Withdrawals will be made annually.

**Minimum Withdrawal Amount (see Section 5.01):**  Lump Sum Withdrawals minimum - $1,000; Minimum Distribution Withdrawals minimum - $250.

**Minimum Amount of Annuity Account Value After a Withdrawal (see Section 5.02):**  Requests for a withdrawal must be for either (a) 90% or less of the Cash Value or (b) 100% of the Cash Value (surrender of the Certificate).

We will **not** exercise our rights, described in Sections 5.02(b) and 5.02(c), to terminate the Certificate.

**Death Benefit Amount (see Section 6.01):**

The death benefit is equal to the Annuity Account Value or, if greater, the Guaranteed Minimum Death Benefit defined below.

*Guaranteed Minimum Death Benefit*

*6% Roll Up to Age 80* - On the Contract Date, the Guaranteed Minimum Death Benefit is equal to the initial Contribution.  Thereafter, the Guaranteed Minimum Death Benefit is credited with interest at 6% (3% for amounts in the EQ/Money Market Fund and the Guarantee Periods) on each Day through your age 80 (or at your death, if earlier), and 0% thereafter, and is adjusted for any subsequent Contributions and withdrawals.

**DATA Pages (cont'd)**

Your current Guaranteed Minimum Death Benefit will be reduced on a dollar-for-dollar basis as long as the sum of your withdrawals in any Contract Year is 6% or less of the beginning of Contract Year Guaranteed Minimum Death Benefit. Once a withdrawal is made that causes cumulative withdrawals in a Contract Year to exceed 6% of the beginning of Contract Year Guaranteed Minimum Death Benefit, that withdrawal and any subsequent withdrawals in that Contract Year will cause a pro rata reduction to occur.

**Normal Form of Annuity (see Section 7.04):**  Life Annuity 10 Year Period Certain

**Amount of Annuity Benefit (see Section 7.05):**  The amount applied to provide the Annuity Benefit will be (1) the Annuity Account Value for any life annuity form or (2) the Cash Value for any period certain only annuity form except that if the period certain is more than five years the amount applied will be no less than 95% of the Annuity Account Value.

**Interest Rate to be Applied in Adjusting for Misstatement of Age or Sex (see Section 7.06):**  6% per year

**Minimum Amount to be Applied to an Annuity (see Section 7.06):**  $2,000, as well as minimum of $20 for initial monthly annuity payment.

**Guaranteed Minimum Income Benefit (see Section 7.08):**  You may apply your Annuity Account Value during the period of time indicated below to purchase a minimum amount of guaranteed lifetime income under our Income Manager *(Life Annuity with a Period Certain)* payout annuity certificate. The Income Manager *(Life Annuity with a Period Certain)* payout annuity certificate provides payments during a period certain with payments continuing for life thereafter.

The period certain is based on your age at the time the Income Manager *(Life Annuity with a Period Certain)* is elected.  The period certain is 10 years for ages 60 through 75; 9 years for age 76; 8 years for age 77; and 7 years for ages 78 through 83.

The Guaranteed Minimum Income Benefit is available only if it is exercised within 30 days following the 7th or later Contract Date anniversary under this Certificate.  However, it may not be exercised earlier than your age 60, nor later than age 83.

On the Transaction Date that you exercise your Guaranteed Minimum Income Benefit, the lifetime income that will be provided under the Income Manager *(Life Annuity with a Period Certain)* will be the greater of (i) your Guaranteed Minimum Income Benefit, and (ii) the amount of income that would be provided by application of your Annuity Account Value as of the Transaction Date at our then current annuity purchase factors.

*Guaranteed Minimum Income Benefit Benefit Base* - The Guaranteed Minimum Income Benefit benefit base is equal to the initial Contribution on the Contract Date.  Thereafter, the Guaranteed Minimum Income Benefit benefit base is credited with interest at 6% (3% for amounts in the EQ/Money Market Fund and the Guarantee Periods) on each day through your age 80, and 0% thereafter, and is adjusted for any subsequent Contributions and withdrawals. The Guaranteed Minimum Income Benefit benefit base will also be reduced by any withdrawal charge remaining on the Transaction Date that you exercise your Guaranteed Minimum Income Benefit.

**DATA Pages (cont'd)**

Your Guaranteed Minimum Income Benefit benefit base is applied to guaranteed minimum annuity purchase factors to determine the Guaranteed Minimum Income Benefit. The guaranteed minimum annuity purchase factors are based on (i) interest at 2.5% (ii) mortality tables that assume increasing longevity. See the attached table.

Your Guaranteed Minimum Income Benefit benefit base does not create an Annuity Account Value or a Cash Value and is used solely for purposes of calculating your Guaranteed Minimum Income Benefit.

Your current Guaranteed Minimum Income Benefit benefit base will be reduced on a dollar-for-dollar basis as long as the sum of your withdrawals in any Contract Year is 6% or less of the beginning of Contract Year Guaranteed Minimum Death Benefit (described above). Once a withdrawal is made that causes cumulative withdrawals in a Contract Year to exceed 6% of the beginning of Contract Year Guaranteed Minimum Death Benefit, that withdrawal and any subsequent withdrawals in that Contract Year will cause a pro rata reduction to occur.

**Withdrawal Charges (see Section 8.01):** A withdrawal charge will be imposed as a percentage of each Contribution made to the extent that (i) any withdrawals during a Contract Year exceed the Free Corridor Amount as discussed in Section 8.01 or, (ii) the Certificate is surrendered to receive the Cash Value. We determine the withdrawal charge separately for each Contribution in accordance with the table below.

| Contract Year | Current and Maximum Percentage of Contributions |
|---|---|
| 1 | 7.00% |
| 2 | 6.00% |
| 3 | 5.00% |
| 4 | 4.00% |
| 5 | 3.00% |
| 6 | 2.00% |
| 7 | 1.00% |
| 8 and later | 0.00% |

The applicable withdrawal charge percentage is determined by the Contract Year in which the withdrawal is made or the Certificate is surrendered, beginning with ''Contract Year 1'' with respect to each Contribution withdrawn or surrendered. For purposes of the table, for each Contribution, the Contract Year in which we receive that Contribution is ''Contract Year 1.''

Withdrawal charges will be deducted from the Annuity Account Value in the Investment Options from which each withdrawal is made in proportion to the amount being withdrawn from each Investment Option.

No. 94ICB                                      Data page 6            (5/99)

**DATA Pages (cont'd)**

**Free Corridor Amount (see Section 8.01):**  15% of Annuity Account Value at the beginning of the Contract Year, minus any amount previously withdrawn during the Contract Year.  Amounts withdrawn up to the Free Corridor Amount will not be deemed a withdrawal of Contributions.  In any Contract Year when a Minimum Distribution Withdrawal is the only withdrawal taken, no withdrawal charge will apply.

Lump Sum Withdrawals in excess of the Free Corridor Amount or a Minimum Distribution Withdrawal when added to a Lump Sum Withdrawal previously taken in the same Contract Year, which exceeds the Free Corridor Amount will be deemed withdrawals of Contributions in the order in which they were made (that is, the first-in, first-out basis will apply).

The Free Corridor Amount does not apply when calculating the withdrawal charge applicable upon a surrender.

**No Withdrawal Charges will apply in these events:**

1.  the Annuitant has qualified to receive Social Security disability benefits as certified by the Social Security Administration;

2.  you give us proof that the Annuitant's life expectancy is six months or less (such proof must include, but is not limited to, certification by a licensed physician);

3.  the Annuitant has been confined to a nursing home for more than 90 days as verified by a licensed physician.  A nursing home for this purpose means one which is (i) approved by Medicare as a provider of skilled nursing care service, or (ii) licensed as a skilled nursing home by the state or territory in which it is located (it must be within the United States, Puerto Rico, U. S. Virgin Islands, or Guam) and meets all the following:

    *   its main function is to provide skilled, intermediate or custodial nursing care;
    *   it provides continuous room and board to three or more persons;
    *   it is supervised by a registered nurse or practical nurse;
    *   it keeps daily medical records of each patient;
    *   it controls and records all medications dispensed; and
    *   its primary service is other than to provide housing for residents.

The withdrawal charge will apply with respect to a Contribution if the condition as described above existed at the time the Contribution was remitted or if the condition began within the 12 month period following remittance.

**Charges Deducted from Annuity Account Value (see Section 8.02):**

(a)    Combined Guaranteed Minimum Income Benefit and Guaranteed Minimum Death Benefit Charge:  For providing the Combined Guaranteed Minimum Income Benefit and Guaranteed Minimum Death Benefit we will deduct annually on each Processing Date an amount equal to 0.30% of the Guaranteed Minimum Income Benefit benefit base (described above) in effect on such Processing Date. 0.30% is the maximum we will charge.

**DATA Pages (cont'd)**

(b)     Charges for State Premium and Other Applicable Taxes:  A charge for applicable taxes, such as state or local premium taxes generally will be deducted from the amount applied to provide an Annuity Benefit under Section 7.02.  In certain states, however, we may deduct the charge from Contributions rather than at the Annuity Commencement Date.

The above charges will be deducted from the Annuity Account Value in the Investment Funds on a pro rata basis.  If there is insufficient value in the Investment Funds, all or a portion of the charges will be deducted from the Annuity Account Value with respect to the Guarantee Periods in order of the earliest Expiration Date(s) first.

**Number of Free Transfers (see Section 8.03):**  Unlimited

**Daily Separate Account Charges (see Section 8.04):**

Mortality and Expense Risks Charge:
        Current and Maximum                   Annual rate of 1.10% (equivalent to a daily rate of 0.003032%).

Administration Charge:
        Current and Maximum                   Annual rate of 0.25% (equivalent to a daily rate of 0.000692%). We reserve the right to increase this charge to an annual rate of 0.35%.

DATA Pages (cont'd)

**PART C -- This part lists the terms which apply to the Endorsement Applicable to Market Value Adjustment Terms (MVA Endorsement).**

**Allocation Restrictions (see Section 3.01):** Except as indicated below, if you are age 76 or older, allocations may be made only to Guarantee Periods with maturities of five years or less; however, in no event may allocations be made to Guarantee Periods with maturities beyond the February 15th immediately following the Annuity Commencement Date.

**Transfers at Expiration Date (see item 1 of MVA Endorsement):** If no election is made with respect to amounts in the Guaranteed Period Account as of the Expiration Date, such amounts will be transferred into the Guarantee Period with the earliest Expiration Date.

**Market Value Adjustment (MVA) on Transfers and Withdrawals (see item 2 of MVA Endorsement):** The MVA (positive or negative) resulting from a withdrawal or transfer of a portion of the amount in a Guarantee Period will be a percentage of the MVA that would be applicable upon a withdrawal of all of the Annuity Account Value from a Guarantee Period. This percentage is determined by (i) dividing the amount of the withdrawal or transfer from the Guarantee Period by (ii) the Annuity Account Value in such Guarantee Period prior to the withdrawal or transfer.

**Transfer Rules (see Section 4.02):** Transfers may not be made to a Guarantee Period maturing in the current calendar year. Guarantee Periods to which transfers may be made are limited based on your attained age (see Allocation Restrictions above).

**MVA Formula (see item 3 of MVA Endorsement):** The Guaranteed Rate for new allocations to a Guarantee Period is the rate we have in effect for this purpose even if new allocations to that Guarantee Period would not be accepted at the time. This rate will not be less than 3%.

The current rate percentage we use in item (c) of the formula is 0.00%. For purposes of calculating the MVA only, we reserve the right to add up to 0.25% to such current rate percentage.

**Separate Account (see item 5 of MVA Endorsement):** The portion of the assets of Separate Account No. 46 equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct.

DATA Pages (cont'd)

**Guaranteed Minimum Income Benefit
Table of Guaranteed Minimum Annuity
Purchase Factors
For Initial Level Annual Income
Single Life - Male**

| Election Age | Purchase Factors on Contract Date Anniversaries 7 to 9 | Purchase Factors on Contract Date Anniversaries 10 and later |
|---|---|---|
| 60 | 5.12% | 5.47% |
| 61 | 5.22 | 5.58 |
| 62 | 5.34 | 5.69 |
| 63 | 5.45 | 5.81 |
| 64 | 5.58 | 5.93 |
| 65 | 5.70 | 6.06 |
| 66 | 5.84 | 6.19 |
| 67 | 5.98 | 6.33 |
| 68 | 6.13 | 6.48 |
| 69 | 6.28 | 6.63 |
| 70 | 6.44 | 6.79 |
| 71 | 6.60 | 6.95 |
| 72 | 6.77 | 7.12 |
| 73 | 6.95 | 7.29 |
| 74 | 7.13 | 7.47 |
| 75 | 7.32 | 7.66 |
| 76 | 7.63 | 7.98 |
| 77 | 7.98 | 8.32 |
| 78 | 8.35 | 8.70 |
| 79 | 8.62 | 8.97 |
| 80 | 8.91 | 9.25 |
| 81 | 9.21 | 9.55 |
| 82 | 9.52 | 9.86 |
| 83 | 9.85 | 10.19 |

| | |
|---|---|
| Interest Basis: | 2.5%<br>Non-participating |
| Mortality: | 1983 Individual Annuity Mortality Table ''a'' for Male projected with modified Scale G. |

Factors required for annuity forms not shown in the above table will be calculated by us on the same actuarial basis.

# PART I - DEFINITIONS

## SECTION 1.01  ANNUITANT

"Annuitant" means the individual shown as such in the Data pages, or any successor Annuitant.

## SECTION 1.02  ANNUITY ACCOUNT VALUE

"Annuity Account Value" means the sum of the amounts held for you in the Investment Options.

## SECTION 1.03  ANNUITY BENEFIT

"Annuity Benefit" means a benefit payable by us as described in Part VII.

## SECTION 1.04  ANNUITY COMMENCEMENT DATE

"Annuity Commencement Date" means the date on which annuity payments are to commence as described in Section 7.03.  Such date is the date shown in the Data pages and is subject to change as described in Section 7.03.

## SECTION 1.05  BUSINESS DAY

A "Business Day" is any day on which we are open and the New York Stock Exchange is open for trading, or any other day specified in the Data pages.  Our Business Day ends at 4:00 p.m., Eastern time, or such other time as we state in writing to you.

## SECTION 1.06  CASH VALUE

"Cash Value" means an amount equal to the Annuity Account Value, less any charges that apply as described in Part VIII and any charges that may apply as described in any applicable Endorsement(s).

## SECTION 1.07  CERTIFICATE

"Certificate" means this certificate including the Data pages and any Endorsement(s).  It is a summary of the Contract terms which affect you.

## SECTION 1.08  CODE

"Code" means the Internal Revenue Code of 1986, as amended at any time, or any corresponding provisions of prior or subsequent United States revenue laws.

## SECTION 1.09  CONTRACT

"Contract" means the Group Annuity Contract named in the Data pages.  A copy of the contract is on file with us.  You may ask to see it at any reasonable time.

## SECTION 1.10  CONTRACT DATE

''Contract Date'' means the earlier of (a) the date on which the Annuitant is enrolled under the Contract according to our enrollment procedures and (b) the date of enrollment under a prior Contract.  Such date is shown in the Data pages.

## SECTION 1.11  CONTRACT YEAR

''Contract Year'' means the twelve month period starting on (i) the Contract Date and (ii) each anniversary of the Contract Date, unless we agree to another period.

## SECTION 1.12  CONTRIBUTION

''Contribution'' means a payment made to us under the Contract.  See Section 3.01.

## SECTION 1.13  EMPLOYER

''Employer'' means, if applicable, an employer as defined in an Endorsement hereto.

## SECTION 1.14  GUARANTEED INTEREST RATE

''Guaranteed Interest Rate'' means the effective annual rate(s) at which interest accrues on amounts in the Guaranteed Interest Account.

## SECTION 1.15  INVESTMENT FUND

''Investment Fund'' means a sub-fund of a Separate Account.  An Investment Fund may invest its assets in a separate class (or series) of shares of a specified trust or investment company where each class (or series) represents a separate portfolio in such trust or investment company.

## SECTION 1.16  INVESTMENT OPTION

''Investment Option'' means the Guaranteed Interest Account, a Separate Account, or an Investment Fund of a Separate Account or, if described in an Endorsement hereto, each Guarantee Period in the Guaranteed Period Account (Separate Account No. 46).

## SECTION 1.17  OWNER

''Owner'' means the person or entity shown as such in the Data pages, or any successor owner.

## SECTION 1.18  PLAN

''Plan'' means, if applicable, the annuity program sponsored by the Employer and as may be defined in an Endorsement hereto.

## SECTION 1.19  PRIOR CONTRACT

''Prior Contract'' means another contract or certificate issued by us and from which the Owner and we have agreed to transfer amounts to this Contract.

**SECTION 1.20  PROCESSING DATE**

''Processing Date'' means the day(s) we deduct charges from the Annuity Account Value.  The Data pages show how often a Processing Date will occur.

**SECTION 1.21  PROCESSING OFFICE**

''Processing Office'' means the Equitable administrative office shown on the cover page of this Certificate, or such other location we may state upon written notice to you.

**SECTION 1.22  SEPARATE ACCOUNT**

''Separate Account'' means any of the Separate Accounts (except our Separate Account No. 46) described or referred to in Sections 2.02 and 2.05.

**SECTION 1.23  TRANSACTION DATE**

The ''Transaction Date'' is the Business Day we receive at the Processing Office a Contribution or a transaction request providing the information we need.  Transaction requests must be in a form acceptable to us.

No. 94ICB                                                          Page 5

## PART II - INVESTMENT OPTIONS

### SECTION 2.01 GUARANTEED INTEREST ACCOUNT

Any amount held in the Guaranteed Interest Account becomes part of our general assets, which support the guarantees of the Contract and other contracts.

The amount in such Account at any time is equal to:

- all amounts that have been allocated or transferred to such Account, plus

- the amount of any interest credited, less

- all amounts that have been withdrawn (including charges) or transferred from such Account.

We will credit the amount held in such Account with interest at effective annual rates that we set. We will also set a minimum Guaranteed Interest Rate that will remain in effect through a stated twelve-month period or a calendar year. The Data pages show the initial Rate(s) to apply.

We guarantee that any rate so set after your Contract Date will never be less than the minimum rate shown in the Data pages.

### SECTION 2.02  SEPARATE ACCOUNT

We have established the Separate Account(s) and maintain such Account(s) in accordance with the laws of New York State. Income, realized and unrealized gains and losses from the assets of the Separate Account(s) are credited to or charged against it without regard to our other income, gains or losses. Assets are placed in the Separate Account(s) to support the Contract and other variable annuity contracts and certificates. Assets may be placed in the Separate Account(s) for other purposes, but not to support contracts or policies other than variable annuities and variable life insurance.

The Data pages set forth the Separate Account(s). A Separate Account may be subdivided into Investment Funds.

The assets of a Separate Account are our property. The portion of such assets equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct. We may transfer assets of a Separate Account in excess of the reserves and other liabilities with respect to such Account to another Separate Account or to our general account.

We may, at our discretion, invest Separate Account assets in any investment permitted by applicable law. We may rely conclusively on the opinion of counsel (including counsel in our employ) as to what investments we may make as law permits.

## SECTION 2.03  SEPARATE ACCOUNT ACCUMULATION UNITS AND UNIT VALUES

The amount you have in an Investment Fund at any time is equal to the number of Accumulation Units you have in that Fund multiplied by the Fund's Accumulation Unit Value at that time. ''Accumulation Unit'' means a unit which is purchased in a Separate Account. ''Accumulation Unit Value'' means the dollar value of each Accumulation unit in a Separate Account on a given date. (If Investment Funds apply as described in Section 2.02, then the terms of this Section 2.03 apply separately to each Fund, unless otherwise stated.)

Amounts allocated or transferred to a Separate Account are used to purchase Accumulation Units of that Account.  Units are redeemed when amounts are deducted, transferred or withdrawn.

The number of Accumulation Units you have in a Separate Account at any time is equal to the number of Accumulation Units purchased minus the number of Units redeemed in that Account up to that time. The number of Accumulation Units purchased or redeemed in a transaction is equal to the dollar amount of the transaction divided by the Account's Accumulation Unit Value for that Transaction Date.

We determine Accumulation Unit Values for each Separate Account for each Valuation Period.  A ''Valuation Period'' is each Business Day together with any consecutive preceding non-business days. For example, for each Monday which is a Business Day, the preceding Saturday and Sunday will be included to equal a three-day Valuation Period.

Unless the following paragraph applies, the Accumulation Unit Value for a Separate Account for any Valuation Period is equal to the Accumulation Unit Value for the immediately preceding Valuation Period multiplied by the ratio of values ''(i) '' and ''(ii) ''. Value ''(i) '' is the value of the Separate Account at the close of business at the end of the current Valuation Period, before any amounts are allocated to or withdrawn from the Separate Account in that Period.  Value ''(ii)'' is the value of the Separate Account at the close of business at the end of the preceding Valuation Period, after all allocations and withdrawals were made for that Period.  For this purpose, ''value of the Separate Account'' means the market value or, where there is no readily available market, the fair value of the assets allocated to the Separate Account, as determined in accordance with our rules, accepted accounting practices, and applicable laws and regulations.

To the extent the Separate Account invests in Investment Funds, and the assets of the Funds are invested in a class or series of shares of a specified trust or investment company, the Accumulation Unit Value of an Investment Fund for any Valuation Period is equal to the Accumulation Unit Value for that Fund on the immediately preceding Valuation Period multiplied by the Net Investment Factor for that Fund for the current Valuation Period.  The Net Investment Factor for a Valuation Period is (a) divided by (b) minus (c), where

(a)    is the value of the Investment Fund's shares of the related portfolio of the specified trust or investment company at the end of the Valuation Period (before taking into account any amounts allocated to or withdrawn from the Investment Fund for the Valuation Period and after deduction of investment advisory fees and direct operating expenses of the specified trust or investment company; for this purpose, we use the share value reported to us by the specified trust or investment company);

(b)   is the value of the Investment Fund's shares of the related portfolio of the specified trust or investment company at the end of the preceding Valuation Period (taking into account any amounts allocated or withdrawn for that Valuation Period);

(c)   is the daily Separate Account charges (see Section 8.04) for the expenses and risks of the Contract, times the number of calendar days in the Valuation Period, plus any charge for taxes or amounts set aside as a reserve for taxes.

## SECTION 2.04  AVAILABILITY OF INVESTMENT OPTIONS

Section 3.01 describes how Contributions are allocated among Investment Options based on your election.  Your election is subject to the following:

(a)   If the Contributions are made pursuant to the terms of a Plan, then Investment Options available may be subject to the terms of such Plan, as reported to us by the Owner.

(b)   We have the right to limit the number of Options which you may elect.

The Data pages list which Options are available as of the Contract Date.

## SECTION 2.05  CHANGES WITH RESPECT TO SEPARATE ACCOUNT

In addition to the right reserved pursuant to subsection (b) of Section 2.04, we have the right, subject to compliance with applicable law, including approval of Certificate owners if required:

(a)   to add Investment Funds (or sub-funds of Investment Funds) to, or to remove Investment Funds (or sub-funds) from, the Separate Account, or to add other separate accounts;

(b)   to combine any two or more Investment Funds or sub-funds thereof;

(c)   to transfer the assets we determine to be the share of the class of contracts to which the Contract belongs from any Investment Fund to another Investment Fund;

(d)   to operate the Separate Account or any Investment Fund as a management investment company under the Investment Company Act of 1940, in which case charges and expenses that otherwise would be assessed against an underlying mutual fund would be assessed against the Separate Account;

(e)   to operate the Separate Account or any Investment Fund as a unit investment trust under the Investment Company Act of 1940;

(f)   to deregister the Separate Account under the Investment Company Act of 1940, provided that such action conforms with the requirements of applicable law;

(g)   to restrict or eliminate any voting rights as to the Separate Account;

(h)   to cause one or more Investment Funds to invest some or all of their assets in one or more other trusts or investment companies.

If the exercise of these rights results in a material change in the underlying investment of a Separate Account, you will be notified of such exercise, as required by law.

A Separate Account or Investment Fund which may be added by us as described above may be one with respect to which (i) there may be periods during which Contributions may be restricted pursuant to the maturity terms of such Account or Fund, (ii) amounts therein may be automatically liquidated pursuant to the investment policy of the Account, and (iii) investments therein may mature. We will have the right to reallocate amounts arising from liquidation or maturity according to your allocation instructions then in effect unless you specify other instructions with respect to such amounts. If no such allocation instructions have been made, the reallocation will be made to a designated Investment Option, or to the next established Account or Fund of the same type as described in this paragraph, if applicable, as specified in the Data pages.

## PART III - CONTRIBUTIONS AND ALLOCATIONS

### SECTION 3.01 CONTRIBUTIONS, ALLOCATIONS

You elect which Investment Options will be available under the Certificate subject to the terms of Section 2.04. Once this election is made, you may allocate Contributions to, or transfer among, only these Options. You may add or subtract Options by sending us a written request, but we have the right to decline your request.

You also elect how to allocate Contributions among the Options chosen. If you are not the Annuitant, you may delegate to the Annuitant authority to allocate Contributions. You need not allocate Contributions to each Option you have chosen. You may change the allocation election at any time by sending us the proper form. Allocation percentages must be in whole numbers (no fractions) and must equal 100%.

Each Contribution is allocated (after deduction of any charges that may apply) in accordance with the allocation election in effect on the Transaction Date. Contributions made to a Separate Account purchase Accumulation Units in that Account, using the Accumulation Unit Value for that Transaction Date.

### SECTION 3.02 LIMITS ON CONTRIBUTIONS

We have the right not to accept any Contribution which is less than the amount shown in the Data pages. The Data pages indicate other minimum and maximum Contribution requirements which may apply. We also have the right, upon advance notice to you, to:

(a) change such requirements to apply to Contributions made after the date of such change, and

(b) discontinue acceptance of Contributions under the Contract with respect to all Owners or with respect to all Owners to whom the same type of Certificate applies.

## PART IV - TRANSFERS AMONG INVESTMENT OPTIONS

### SECTION 4.01  TRANSFER REQUESTS

You may request to transfer all or part of the amount held in an Investment Option to one or more of the other Options. The request must be in a form we accept. All transfers will be made on the Transaction Date. Transfers are subject to the terms of Section 4.02 and to our rules in effect at the time of transfer. With respect to a Separate Account, the transfers will be made at the Accumulation Unit Value for that Transaction Date.

### SECTION 4.02  TRANSFER RULES

The transfer rules which apply are described in the Data pages. A transfer request will not be accepted if it involves less than the minimum amount, if any, stated in the Data pages (unless the Annuity Account Value is less than such amount). We have the right to change our transfer rules. Any change will be made upon advance notice to you.

The Investment Funds may consist of funds which are classified as ''Type A'' Investment Options or ''Type B'' Investment Options or any other type which may be specified in the Data pages, as we designate in our discretion for purposes of the transfer rules described in the Data pages. The Data pages specify whether such Investment Options are designated Type A or Type B or another type as well as the minimum or maximum limits on transfers which apply.

No. 94ICB                                                                 Page 11

## PART V - WITHDRAWALS AND TERMINATION

### SECTION 5.01  WITHDRAWALS

Unless otherwise stated in the Data pages, you may request, pursuant to our procedures then in effect, a withdrawal from the Investment Options before the Annuity Commencement Date and while the Annuitant is alive.  The request must be in a form we accept.

On the Transaction Date, we will pay the amount of the withdrawal requested or, if less, the Cash Value. The amount to be paid plus any Withdrawal Charge which applies (see Section 8.01) will be withdrawn on a pro-rata basis from the amounts held for you in the Investment Options, unless you elect otherwise and unless otherwise stated in the Data pages.

We will not accept a withdrawal request if it involves less than the minimum amount, if any, stated in the Data pages.  Further conditions or restrictions may apply if stated in the Data pages or in an Endorsement hereto.

### SECTION 5.02  TERMINATION

This Certificate will terminate if one or more of the following events occurs, unless otherwise specified in the Data pages:

(a)     If a withdrawal made under Section 5.01 would result in an Annuity Account Value of an amount less than the minimum amount stated in the Data pages, we will so advise you and have the right to pay you such Value.  In that case this Certificate will be terminated.

(b)     Before the Annuity Commencement Date, we have the right to pay the Cash Value and terminate this Certificate if no Contributions are made during the last three completed Contract Years, and the Annuity Account Value is less than the amount described in item (a) above.

(c)     We also have the right to terminate this Certificate if no Contributions have been made within 120 days of the Contract Date.

## PART VI - DEATH BENEFITS

### SECTION 6.01  DEATH BENEFIT

Upon receipt of due proof that the Annuitant has died before the Annuity Commencement Date, we will pay a death benefit to the beneficiary named under Section 6.02. Payment may be subject to the terms of Section 6.02 and any special rules which may apply as described in any Endorsement hereto.

The amount of the death benefit is described in the Data pages.

The death benefit will be paid as an Annuity Benefit or in a single sum, as described in Section 6.02.

### SECTION 6.02  BENEFICIARY

You give us the name of the beneficiary who is to receive any death benefit payable on the Annuitant's death. You may change the beneficiary from time to time during the Annuitant's lifetime and while coverage under the Contract is in force. Any such change must be made in writing in a form we accept. A change will, upon receipt at the Processing Office, take effect as of the date the written form is executed, whether or not you are living on the date of receipt. We will not be liable as to any payments we made before we receive any such change.

You may name one or more persons to be primary beneficiary on the Annuitant's death and one or more other persons to be successor beneficiary if the primary beneficiary dies before the Annuitant. Unless you direct otherwise, if you have named two or more persons as beneficiary, the beneficiary will be the named person or persons who survive the Annuitant and payments will be made to such persons in equal shares or to the survivor.

Any part of a death benefit payable as described in Section 6.01 for which there is no named beneficiary living at the Annuitant's death will be payable in a single sum to the Annuitant's surviving children. The payments will be made in equal shares, or should none survive or should there be none, then to the Annuitant's estate.

If you so elect in writing, any amount that would otherwise be payable to a beneficiary in a single sum may be applied to provide an Annuity Benefit, on the form of annuity elected by you, subject to our rules then in effect. If at the Annuitant's death there is no election in effect, the beneficiary may make such an election. In the absence of any election by either you or the beneficiary, we will pay the death benefit in a single sum.

Any naming of a beneficiary is subject to the terms of the Plan, if one applies, including any terms requiring spousal consent.

## PART VII ANNUITY BENEFITS

### SECTION 7.01  ANNUITY BENEFIT

Payments under an Annuity Benefit will be made monthly. You may elect instead to have the Annuity Benefit paid at other intervals, such as every three months, six months, or twelve months, instead of monthly, subject to our rules at the time of your election or as otherwise stated in the Data pages or any Endorsement hereto. This election may be made at the time the Annuity Benefit form as described in Section 7.02 is elected. In that event, all references in this Certificate to monthly payments will, with respect to the Annuity Benefit to which the election applies, be deemed to mean payments at the frequency elected.

### SECTION 7.02  ELECTION OF ANNUITY BENEFITS

As of the Annuity Commencement Date, provided the Annuitant is then living, the Annuity Account Value will be applied to provide the Normal Form of Annuity Benefit (described below). However, you may instead elect (i) to have the Cash Value paid in a single sum, (ii) to apply the Annuity Account Value or Cash Value, whichever applies pursuant to the first paragraph of Section 7.05, to provide an Annuity Benefit of any form offered by us or one of our subsidiary life insurance companies , or (iii) to apply the Cash Value to provide any other form of benefit payment we offer, subject to our rules then in effect and applicable laws and regulations. At the time an Annuity Benefit is purchased, we will issue a supplementary contract which reflects the Annuity Benefit terms.

We will provide notice and election forms to you not more than six months before the Annuity Commencement Date.

We will have the right to require you to furnish any information we need to provide an Annuity Benefit. We will be fully protected in relying on such information and need not inquire as to its accuracy or completeness.

### SECTION 7.03 COMMENCEMENT OF ANNUITY BENEFITS

Before the Annuity Commencement Date, you may elect to change such Date to any date after your election is filed (other than the 29th, 30th, or 31st of any month). You must do this in writing. The change will not take effect until your written election is received and accepted by us at our Processing Office.

However, no Annuity Commencement Date will be later than the first day of the month which follows the date the Annuitant attains the "maximum maturity age" or, if later, the tenth anniversary of the Contract Date. The current maximum maturity age is shown in the Data pages, but may be changed by us in conformance with applicable law.

### SECTION 7.04 ANNUITY BENEFIT FORMS

The "Normal Form" of Annuity Benefit is an Annuity Benefit payable on the Life-Period Certain Annuity Form described below, unless another Form is to apply pursuant to the terms of the Plan, if applicable, the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any other law that applies. The Data pages will state the Normal Form which applies. We

may offer other annuity forms as available from us or from one of our affiliated or subsidiary life insurance companies. Such a form may, for example, include the Joint and Survivor Life Annuity Form which provides monthly payments while either of two persons upon whose lives such payments depend is living. The monthly amount to be continued when only one of the persons is living will be equal to a percentage, as elected, of the monthly amount that was paid while both were living.

The Life-Period Certain Annuity is an annuity payable during the lifetime of the person upon whose life the payments depend, but with 10 years of payments guaranteed (10 years certain period). That is, if the original payee dies before the certain period has ended, payments will continue to the beneficiary named to receive such payments for the balance of the certain period.

## SECTION 7.05 AMOUNT OF ANNUITY BENEFITS

If you elect pursuant to Section 7.02 to have an Annuity Benefit paid in lieu of the Cash Value, the amount applied to provide the Annuity Benefit will, unless otherwise stated in the Data pages or required by applicable laws or regulations, be (i) the Annuity Account Value if the annuity form elected provides payments for a person's remaining lifetime or (ii) the Cash Value if the annuity form elected does not provide such lifetime payments.

The amount applied to provide an Annuity Benefit may be reduced by a charge for any taxes which apply on annuity purchase payments. If we have previously deducted charges for taxes from Contributions, we will not again deduct charges for the same taxes before an Annuity Benefit is provided. The balance will be used to purchase the Annuity Benefit on the basis of either (i) the Tables of Guaranteed Annuity Payments or (ii) our then current individual annuity rates, whichever rates would provide a larger benefit with respect to the payee.

## SECTION 7.06  CONDITIONS

We may require proof acceptable to us that the person on whose life a benefit payment is based is alive when each payment is due. We will require proof of the age of any such person on whose life an Annuity Benefit is based.

If a benefit was based on information that is later found not to be correct, such benefit will be adjusted on the basis of the correct information. The adjustment will be made in the number or amount of the benefit payments, or any amount used to provide the benefit, or any combination. Overpayments by us will be charged against future payments. Underpayments will be added to future payments. Our liability is limited to the correct information and the actual amounts used to provide the benefits.

If the age (or sex, if applicable as stated in the Tables of Guaranteed Annuity Payments) of any person upon whose life an Annuity Benefit depends has been misstated, any benefits will be those which would have been purchased at the correct age (or sex). Any overpayments or underpayments made by us will be charged or credited with interest at (a) the rate shown in the Data pages or (b) the then current Guaranteed Interest Rate; we will choose which rate will apply on a uniform basis for like Certificates. Such interest will be deducted from or added to future payments.

If we receive acceptable proof that (i) a payee entitled to receive any payment under the terms of the Contract is physically or mentally incompetent to receive such payment or a minor, (ii) another person or an institution is then maintaining or has custody of such payee, and (iii) no guardian, committee, or other representative of the estate of such payee has been appointed, we may make the payments to such

other person or institution. In the case of a minor, the payments will not exceed $200, or such other amount as may be shown in the Data pages. We will have no further liability with respect to the payments so made.

If the amount to be applied hereunder is less than the minimum amount stated in the Data pages, we may pay the amount to the payee in a single sum instead of applying it under the annuity form elected.

## SECTION 7.07  CHANGES

We have the right, upon advance notice to you, to change at any time after the fifth anniversary of the Contract's register date and at intervals of not less than five years, the actuarial basis used in the Tables of Guaranteed Annuity Payments. However, no such change will apply to (a) any Annuity Benefit provided before the change or (b) Contributions made before such change which are applied to provide an Annuity Benefit.

# PART VIII - CHARGES

## SECTION 8.01 WITHDRAWAL CHARGES

The amount of the Withdrawal Charge is stated in the Data pages. We have the right to change the Charge shown in the Data pages with respect to future Contributions, subject to any maximum stated in the Data pages. We will give you notice of any change.

If specified in the Data pages, a ''Free Corridor Amount'' will apply as follows:

''Free Corridor Amount'' means an amount equal to the percentage, stated in the Data pages, of the Annuity Account Value, minus the total of all prior withdrawals (and associated Withdrawal Charges) made as described in Section 5.01 in the current Contract Year. We have the right to change the Free Corridor Amount, but it will always be a percentage between 0% and 30% if so provided in the Data pages.

If the amount of a withdrawal made under Part V is more than the Free Corridor Amount (defined above), we will (a) first withdraw from the Investment Options, on the basis described in Section 5.01, an amount equal to the Free Corridor Amount, and (b) then withdraw from the Investment Options an amount equal to the excess of the amount requested over the Free Corridor Amount, plus a Withdrawal Charge if one applies.

For purposes of this Section, amounts withdrawn up to the Free Corridor Amount will not be deemed a withdrawal of any Contributions. We have the right to carry forward the Free Corridor Amount into a future Contract Year, if not used in any Year, if so stated in the Data pages.

Any withdrawals in excess of the Free Corridor Amount will be deemed withdrawals of Contributions in the reverse order in which they were made. That is, Contributions will be withdrawn on a last-in, first-out basis unless the Data pages state that a first-in, first-out basis will apply.

In addition, the Annuitant's years of participation under the Prior Contract, if applicable, will be included for purposes of determining the Withdrawal Charge, if so specified in the Data pages in accordance with our rules then in effect.

If specified in the Data pages we have the right to reduce or waive the Withdrawal Charge upon such events as stated in the Data pages. Moreover, the Withdrawal Charge will be reduced if needed in order to comply with any applicable state or federal law.

## SECTION 8.02  ADMINISTRATIVE AND OTHER CHARGES DEDUCTED FROM ANNUITY ACCOUNT VALUE

As of each Processing Date, we will deduct Administrative Charges or other Charges related to the administration and/or distribution of this Certificate from the Annuity Account Value. Such Charges are shown in the Data pages.

If specified in the Data pages, the Charges will be deducted in full or prorated for the Contract Year, or portion thereof, in which the Contract Date occurs or in which the Annuity Account Value is withdrawn

No. 94ICB                                                               Page 17

or applied to provide an Annuity Benefit or death benefit. If so, the Charges will be deducted when withdrawn or so applied.

The amount of any such Charge will in no event exceed any maximum amount shown in the Data pages, subject to any maximum amount permitted under any applicable law.

We have the right to change the amount of the Charges with respect to future Contributions. We will give you advance notice of any such change.

## SECTION 8.03  TRANSFER CHARGES

We have the right to impose a charge with respect to any transfer among Investment Options after the number of free transfers, shown in the Data pages, made on behalf of an Annuitant. The amount of such charge will be set forth in a notice from us to you and will in no event exceed any maximum amount stated in the Data pages.

## SECTION 8.04  DAILY SEPARATE ACCOUNT CHARGE

Assets of the Investment Funds will be subject to a daily asset charge. This daily asset charge is for mortality risk, expenses and expense risk that we assume, as well as for financial accounting and death benefits if specified in the Data pages. The charge will be made pursuant to item (c) of "Net Investment Factor" as defined in Section 2.03. Such charge will be applied after any deductions to provide for taxes. It will be at a rate not to exceed the maximum annual rate stated in the Data pages. We have the right to charge less on a current basis; the actual charge to apply, for at least the first Contract Year, is also stated in the Data pages.

## SECTION 8.05 CHANGES

In addition to our right to reduce or waive charges as described in this Part VIII, we have the right, upon advance notice to you, to increase the amount of any charge stated in the Data pages, subject to (a) any maximum amount provided in this Part VIII or the Data pages and (b) with respect to Withdrawal Charges and Administrative or Other Charges deducted from the Annuity Account Value, the application of any increase only to Contributions made after the date of the change.

## PART IX - GENERAL PROVISIONS

### SECTION 9.01  CONTRACT

The Contract is the entire contract between the parties.  It will govern with respect to our rights and obligations.

The Contract may not be changed, nor may any of our rights or rules be waived, except in writing and by our authorized officer.  In addition to the rights of change reserved by us as provided in this Certificate, the Contract may be changed by amendment or replacement upon agreement between the Contract Holder and us without the consent of any other person provided that any such change does not reduce any Annuity Benefit provided before such change and provided that no rights, privileges or benefits under the Contract and this Certificate with respect to Contributions made hereunder prior to the effective date of such change may be adversely affected by an amendment without the consent of the Contract Holder and each Certificate Owner.

### SECTION 9.02  STATUTORY COMPLIANCE

We have the right to change the Contract without the consent of any other person in order to comply with any laws and regulations that apply.  Such right will include, but not be limited to, the right to conform the Contract to reflect changes in the Code, in Treasury regulations or published rulings of the Internal Revenue Service, ERISA, and in Department of Labor regulations.

The benefits and values available under the Contract will not be less than the minimum benefits required by any state law that applies.

### SECTION 9.03  DEFERMENT

The use of proceeds to provide a payment of a death benefit and payment of any portion of the Annuity Account Value (less any Withdrawal Charge that applies) will be made within seven days after the Transaction Date.  Payments or use of proceeds from the Investment Funds can be deferred for any period during which (1) the New York Stock Exchange is closed or trading is restricted, (2) sales of securities or determination of the fair value of an Investment Fund's assets is not reasonably practicable because of an emergency, or (3) the Securities and Exchange Commission, by order, permits us to defer payment in order to protect persons with interests in the Investment Funds.  We can defer payment or transfer of any portion of the Annuity Account Value in the Guaranteed Interest Account for up to six months while you are living.

### SECTION 9.04  REPORTS AND NOTICES

At least once each year until the Annuity Commencement Date, we will send you a report showing:

     (a)    the dollar amount in the Guaranteed Interest Account;

     (b)    the total number of Accumulation Units in each Separate Account or Investment Fund;

     (c)    the Accumulation Unit Value;

(d)    the dollar amount in each Separate Account or Investment Fund;

(e)    the Cash Value; and

(f)    the amount of the death benefit.

The terms which require us to send you a report as described above or any written notice as described in any other Section will be satisfied by our mailing any such report or notice to your last known address as shown in our records.

All written notices sent to us will not be effective until received at the Processing Office.  Your Certificate Number should be included in all correspondence.

## SECTION 9.05 ASSIGNMENTS, NONTRANSFERABILITY, NONFORFEITABILITY

No amounts payable under the Contract to a payee other than you may be assigned by that payee unless permitted herein, nor will they be subject to the claims of creditors or to legal process, except to the extent permitted by law.  Other restrictions may apply if stated in any Endorsement hereto.

## SECTION 9.06 MANNER OF PAYMENT

We will pay all amounts hereunder by check (in United States dollars) or, if so agreed by you and us, by wire transfer.  All amounts payable by you must be paid by check payable to us (in United States dollars) or by any other method acceptable to us.

## TABLE OF GUARANTEED ANNUITY PAYMENTS

**Amount of Annuity Benefit payable monthly on the Life Annuity Form with Ten Years Certain provided by application of $1,000.**

| Ages | Monthly Income Males | Females | Age | Monthly Income Males | Females |
|------|-------|---------|-----|-------|---------|
| 60 | 4.12 | 3.70 | 76 | 5.95 | 5.26 |
| 61 | 4.20 | 3.76 | 77 | 6.10 | 5.40 |
| 62 | 4.29 | 3.83 | 78 | 6.25 | 5.55 |
| 63 | 4.38 | 3.90 | 79 | 6.40 | 5.70 |
| 64 | 4.48 | 3.98 | 80 | 6.69 | 5.92 |
| 65 | 4.58 | 4.06 | 81 | 6.86 | 6.09 |
| 66 | 4.68 | 4.14 | 82 | 7.21 | 6.35 |
| 67 | 4.79 | 4.23 | 83 | 7.41 | 6.55 |
| 68 | 4.90 | 4.32 | 84 | 7.81 | 6.86 |
| 69 | 5.02 | 4.42 | 85 | 8.05 | 7.08 |
| 70 | 5.14 | 4.52 | 86 | 8.28 | 7.31 |
| 71 | 5.26 | 4.63 | 87 | 8.80 | 7.70 |
| 72 | 5.39 | 4.75 | 88 | 9.08 | 7.96 |
| 73 | 5.52 | 4.87 | 89 | 9.69 | 8.41 |
| 74 | 5.66 | 4.99 | 90 | 10.01 | 8.70 |
| 75 | 5.80 | 5.12 | | | |

The amount of income provided under an Annuity Benefit payable on the Life Annuity form with Ten Years Certain is based on 2.5% interest and the 1983 Individual Annuity Mortality Table ''a'' projected with modified Scale ''G''.

Amounts required for ages or for annuity forms not shown in the above Table or for other annuity forms will be calculated by us on the same actuarial basis.

If a variable annuity form is available from us and elected pursuant to Section 7.02, then the amounts required will be calculated by us based on the 1983 Individual Annuity Mortality Table ''a'' projected with modified Scale ''G'' and a modified two year age setback and on an Assumed Base Rate of Net Investment Return of 5.0%.

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Effective immediately, Contract Form No. 1050-94IC and the Certificates issued under the Contract is amended as follows:

The following new section is added at the end of **PART VII - ANNUITY BENEFITS**:

**SECTION 7.08  MINIMUM INCOME BENEFIT**

If so specified in the Data pages, when the Annuity Account Value is applied to a plan of income payments (described therein) during the period of time specified in the Data pages, such payments will not be less than an amount described in the Data pages.  The provisions of this Section do not affect or reduce your right to elect an Annuity Benefit as described above in Section 7.02.

**New York,**

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer

Senior Vice President, Secretary and Associate General Counsel

No. 96ENGMIBIC

## ENDORSEMENT APPLICABLE TO IRA CERTIFICATES

As specified in the Data pages, this Certificate is an "IRA Certificate" which is issued as an individual retirement annuity contract which meets the requirements of Section 408(b) of the Code. It is established for the exclusive benefit of you and your beneficiaries, and the terms below change, or are added to, applicable sections of this Certificate. Also, your rights under this Certificate are not forfeitable.

1.    **Owner (Section 1.17):**

You must be both the Owner and the Annuitant.

2.    **Annuity Commencement Date (Section 1.04):**

You may not choose an Annuity Commencement Date later than the maximum maturity age stated in the Data pages. If you choose a Date later than age 70 1/2, you must withdraw at least the minimum payments required under Sections 408(b) and 401(a)(9) of the Code and applicable Treasury regulations. See Section 5.01 of the Certificate (Withdrawals) and Item 7 (Required Payments) below.

3.    **Contributions (Section 3.01 and 3.02):**

No Contributions will be accepted unless they are in cash (or check or other form if we require). Except in the case of a "rollover Contribution," the total of such Contributions will not exceed $2,000 for any taxable year. A "rollover Contribution" is one permitted by Sections 402(c), 403(a)(4), 403(b)(8), or 408(d)(3) of the Code.

Amounts transferred to the Certificate from an individual retirement account or annuity contract which meets the requirements of Section 408 of the Code are not subject to the $2,000 limit.

If you make a Contribution which is an "eligible retirement plan rollover" as defined in Section 402(c) or 403(b)(8) of the Code, and you commingle such Contribution with other Contributions, you may not be able to roll over the eligible retirement plan Contributions and earnings to another qualified plan or Code Section 403(b) arrangement at a future date, unless the Code permits.

4.    **Death Benefits (Section 6.01):**

Under either of the following two circumstances, the death benefit under Section 6.01 of the Certificate will not be paid at your death before the Annuity Commencement Date and the coverage under the Certificate will continue if (1) you are married at the time of your death and the person named as beneficiary under Section 6.02 of your Certificate is your surviving spouse; and (2) your surviving spouse elects to become "Successor Annuitant and Owner" of your Certificate.

No. 2000ENIRAI-IM

Also, a death benefit will not be paid under Section 6.01 if the "Beneficiary Continuation Option" under Item 6 of this Endorsement is in effect.

5. **Beneficiary (Section 6.02). The third paragraph of the Certificate is replaced with the following:**

Any part of a death benefit payable under Section 6.01, for which there is no named beneficiary living at your death will be payable in a single sum to your surviving spouse, if any; if there is no surviving spouse, then to the children who survive you, in equal shares; if there are no children, then to your estate.

6. **Beneficiary Continuation Option:**

This Item 6 will apply only if you die before the Annuity Commencement Date, and the beneficiary named under Section 6.02 of the Certificate is an individual.

If there is more than one beneficiary, and any beneficiary is not an individual, then this Item 6 does not apply and the death benefit described in Section 6.01 of the Certificate is payable.

If this Item 6 applies and there is more than one beneficiary, the Annuity Account Value will be apportioned among your beneficiaries as you designate pursuant to Section 6.02 of the Certificate.

If you die after your "Required Beginning Date" for "Minimum Distribution" payments described below in Item 7, Subsection A of this Endorsement (Minimum Distribution Rules -- Required Payments During Your Life) and such required minimum distribution payments have not commenced under this Certificate, the death benefit under Section 6.01 will be paid in a lump sum and this Item 6 does not apply unless prior to your death you have notified us in accordance with our procedures then in effect that the beneficiary named pursuant to Section 6.02 of the Certificate is also the designated beneficiary for purposes of "Minimum Distribution Rules -- Required Payments During Your Life" described below in Item 7 of this Endorsement.

If the beneficiary qualifies to continues this Certificate, and receive the beneficiary's election within 60 days of receipt of proof of your death, the beneficiary may continue your Certificate pursuant to this Item 6 under the terms set forth in (a) through (h) below. Your Certificate may be continued by one or more beneficiaries (collectively, the "Continuation Beneficiary"). If there is more than one beneficiary, the election must be provided to us within 60 days by each beneficiary with respect to that beneficiary's portion of the Annuity Account Value. For any beneficiary who does not so timely elect, we will pay that beneficiary's share of the death benefit pursuant to Section 6.01 of the Certificate in a lump sum.

No. 2000ENIRAI-IM

a.  the Continuation Beneficiary will automatically become the Annuitant as defined in Section 1.01 of the Certificate with respect to that Continuation Beneficiary's portion of the Annuity Account Value.

b.  the Continuation Beneficiary will have the same right to transfer amounts among the Investment Options as the Annuitant.

c.  the Continuation Beneficiary cannot make any additional Contributions.

d.  distributions to the Continuation Beneficiary will be made in accordance with requirements described in Item 7, Subsection B of this Endorsement (Minimum Distribution Rules -- Required Payments After Death). If there is more than one beneficiary, and any Continuation Beneficiary requests payment pursuant to Item 7, Subsection B(1) of this Endorsement, then all Continuation Beneficiaries must agree to make this payment election. If all Continuation Beneficiaries cannot so agree, then we will instead make a complete distribution of your entire interest no later than December 31st of the calendar year that contains the fifth anniversary of your death. Further, where payment pursuant to Item 7, Subsection B(1) of this Endorsement is elected by all Continuation Beneficiaries, the Annuity Account Value apportioned to each Continuation Beneficiary is distributed based upon the life expectancy of the oldest of the beneficiaries designated under Section 6.02 of the Certificate, even if that individual does not elect to be a Continuation Beneficiary.

e.  the Continuation Beneficiary may withdraw the Annuity Account Value apportioned to such Continuation Beneficiary at any time; withdrawals made after we have received a Continuation Beneficiary's election to continue this Certificate are not subject to a withdrawal charge.

f.  upon the Continuation Beneficiary's death, we will make a lump sum payment (other payment options are not available) to the person designated by the deceased Continuation Beneficiary to receive that deceased Continuation Beneficiary's portion of the Annuity Account Value, if any remains.

g.  the Certificate cannot be assigned and must continue in your name for benefit of your Continuation Beneficiary.

h.  if a minimum income benefit pursuant to Section 7.08 of the Certificate and/or a minimum death benefit pursuant to Section 6.01 of the Certificate are in effect upon our receipt of proof of your death, the charges, if any, for such benefit(s) will no longer apply and the minimum income benefit and the minimum death benefit will no longer be in force.

No. 2000ENIRAI-IM

7.    **Required Payments:**

This Certificate is subject to these ''Required Payment'' or ''Minimum Distribution'' rules of Sections 408(b) and 401(a)(9) of the Code and the Treasury Regulations which apply.

A.    **Minimum Distribution Rules -- Required Payments During Your Life --** Your entire interest in this Certificate will be distributed or begin to be distributed no later than the first day of April following the calendar year in which you attain age 70 1/2 (''Required Beginning Date''). Your entire interest may be distributed, as you elect, over (a) your life, or the lives of you and your designated beneficiary, or (b) a period certain not extending beyond your life expectancy, or the joint and last survivor expectancy for you and your designated beneficiary. Distributions must be made in periodic payments at intervals of no longer than one year. In addition, payments must be either non-increasing or they may increase only as provided in Q & A F-3 of Section 1.401(a)(9)-1 of the Proposed Treasury Regulations, or any successor Regulation thereto.

All distributions made under this Certificate must be made in accordance with the requirements of Sections 408(b) and 401(a)(9) of the Code, including the incidental death benefit requirements of Section 401(a)(9)(G) of the Code, and applicable Treasury Regulations, including the minimum distribution incidental benefit requirements of Section 1.401(a)(9)-2 of the Proposed Treasury Regulations, or any successor Regulation thereto.

For purposes of determining the ''period certain'' referred to in the first paragraph of this Section, life expectancy is computed by use of the expected return multiples in Tables V and VI of Treasury Regulation Section 1.72-9. Unless you otherwise elect prior to the time distributions are required to begin, life expectancies will be recalculated annually. Such election will be irrevocable and will apply to all subsequent years. The life expectancy of a non-spouse beneficiary may not be recalculated. Instead, life expectancy will be calculated using the attained age of such beneficiary during the calendar year in which you attain age 70 1/2, and payments of subsequent years will be calculated based on such life expectancy reduced by one for each calendar year which has elapsed since the calendar year life expectancy was first calculated.

B.    **Minimum Distribution Rules -- Required Payments After Death -** If you die after distribution of your interest in this Certificate has begun, the remaining portion of such interest will continue to be distributed at least as rapidly as under the method of distribution being used prior to your death.

If you die before distribution of your interest in this Certificate begins, distribution of your entire interest will be completed no later than December 31 of the calendar year containing the fifth anniversary of your death, except to the

extent that an election is made to receive distributions after your death in accordance with the following alternate form of distribution in (1) or (2) below:

(1) If your interest is payable to a designated beneficiary, then your entire interest may be distributed over the life of, or over a period certain not greater than the life expectancy of, the designated beneficiary. Such distributions must commence on or before December 31 of the calendar year immediately following the calendar year of your death.

(2) If the designated beneficiary is your surviving spouse, the date that distributions are required to begin in accordance with (1) above shall not be earlier than the later of (a) December 31 of the calendar year immediately following the calendar year of your death or (b) December 31 of the calendar year in which you would have attained age 70 1/2.

If the designated beneficiary is your surviving spouse, and a Successor Annuitant and Owner option (described in Item 4 above of this Endorsement) is elected, the distribution of your interest need not be made until after your surviving spouse's death.

For purposes of determining the ''period certain'' referred to above, life expectancy is computed by use of the expected return multiples in Table V and VI of Treasury Regulation Section 1.72-9. For purposes of distributions beginning after your death, unless otherwise elected by the surviving spouse by the time distributions are required to begin, life expectancies will be recalculated annually. Such election will be irrevocable by the surviving spouse and will apply to all subsequent years. In the case of any other designated beneficiary, life expectancies will be calculated using the attained age of such beneficiary during the calendar year in which distributions are required to begin, pursuant to this Item 7, and payments for any subsequent calendar year will be calculated based on such life expectancy reduced by one for each calendar year which has elapsed since the calendar year life expectancy was first calculated.

Distributions under this Item 7 are considered to have begun if distributions are made because you have reached your Required Beginning Date, or if prior to the Required Beginning Date, distributions irrevocably commence to you over a period permitted and in any annuity form acceptable under Section 1.401(a)(9)-1 of the Proposed Treasury Regulations or any successor Regulation thereto.

8.    **Reports - Notices (Section 9.04):**

We will send you a report as of the end of each calendar year showing the status of the annuity and any other reports required by the Code or Treasury Regulations.

No. 2000ENIRAI-IM

9.    **Assignments (Section 9.05):**

Your rights under this Certificate may not be assigned, pledged or transferred except as permitted by law.  You may not name a new Owner, except as described in Item 4 or 6 of this Endorsement.

10.    **Termination of Certificate:**

If an annuity under the Certificate fails to qualify as an annuity under Section 408(b) of the Code, we will have the right to terminate the Certificate.  We may do so, upon receipt of notice of such fact, before the Annuity Commencement Date.  In that case, we will pay the Annuity Account Value less a deduction for the part which applies to any Federal income tax payable by you which would not have been payable with respect to an annuity which meets the terms of the Code.  However, we may also, at your request, transfer the Annuity Account Value to another annuity certificate issued by an affiliate, subsidiary or us.

**New York,**
**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer            Senior Vice President, Secretary and Associate General Counsel

No. 2000ENIRAI-IM

**ENDORSEMENT**
**APPLICABLE TO MARKET VALUE ADJUSTMENT TERMS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**The terms of this Endorsement contain a market value adjustment ("MVA") formula which may result in adjustments, positive or negative, in benefits. An MVA will not apply upon transfer to a new Guarantee Period or other Investment Option on the Expiration Date or pursuant to item 1 below.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    **Guaranteed Period Account**

We will specify one or more Guarantee Periods in the Guaranteed Period Account. For each such Guarantee Period, we guarantee to credit an interest rate (called the Guaranteed Rate). Interest will be credited daily to amounts in the Guaranteed Period Account. The duration of each Guarantee Period provided at any time and the Guaranteed Rate that applies to each Period will be furnished by us upon request. The Guarantee Period(s) and the Rate for each such Period you initially elect are shown in the Data pages.

You may elect one or more Guarantee Period(s), according to our rules then in effect. Contributions and transfers to be made to the Guaranteed Period Account as described in Section 3.01 will be allocated to the Guarantee Period(s) according to your election. Contributions and transfers into the Guaranteed Period Account will receive the Guaranteed Rate applicable to the elected Guarantee Period as of the Business Day we receive your Contribution or transfer request at our Processing Office. The amount held with respect to a given Guarantee Period is called the Guaranteed Period Amount which reflects Contributions and transfers made to the Guaranteed Period Account, plus interest at the Guaranteed Rate(s), minus any withdrawals, transfers and charges, if any, deducted from the Guaranteed Period Account.

The last day of a Guarantee Period is the Expiration Date. We will notify you at least 15 but not more than 45 days before the Expiration Date of each Period. You may elect one of the following three options effective at the Expiration Date, none of which will result in a market value adjustment:

(a)    to transfer the Guaranteed Period Amount into a Guarantee Period of any duration which we then offer;

(b)    to transfer the Guaranteed Period Amount to another Investment Option;

(c)    to make a withdrawal of the Guaranteed Period Amount (subject to any Withdrawal Charges which apply pursuant to Section 8.01).

No. 94ENMVAI

If no election is made on or prior to the Expiration Date, the Guaranteed Period Amount (without any market value adjustment) will be transferred into the Investment Option described in the Data pages. During the 30 days following the Expiration Date, the full Guaranteed Period Amount (less any withdrawals or transfers made or charges deducted during such 30 day period) may be transferred into a new Guarantee Period or other Investment Option. In no event may you elect a Guarantee Period which extends beyond the Annuity Commencement Date.

The ''Guaranteed Period Account'' is our Separate Account No. 46 that we use to account for amounts allocated to Guarantee Periods under this Certificate. All amounts allocated to a Guarantee Period, whether Contributions or transfers, become part of the Guaranteed Period Account.

2.    **Transfers, Withdrawals, Death and Annuity Benefits**

If you request, other than as described in item 1 above, a transfer to another Investment Option as described in Section 4.01 or a withdrawal as described in Section 5.01, any such transfer or withdrawal from a Guaranteed Period Amount will be subject to a market value adjustment described below. For this purpose, the Annuity Account Value in Separate Account No. 46 will be after the market value adjustment. The market value adjustment will be in addition to any charges which apply as described in Section 8.01.

In addition, amounts applied from a Guaranteed Period Amount to provide a death benefit as described in Section 6.01, an annuity as described in Section 7.02, or any other annuity form offered by us, will be subject to a market value adjustment, unless otherwise provided in the Data pages.

Payment or transfers from the Guaranteed Period Account may be deferred for up to six months while you are living.

3.    **Market Value Adjustment**

The market value adjustment with respect to each Guarantee Period that applies to you is determined as follows:

(a)    We determine the Guaranteed Period Amount that will be payable on the Expiration Date, using the Guaranteed Rate for such Guarantee Period.

(b)    We determine the period remaining in your Guarantee Period (based on the Business Day we receive your transaction request at our Processing Office or effective date for such determination) and convert it to fractional years based on a 365 day year. For example, three years and 12 days becomes 3.0329.

No. 94ENMVAI

(c)     We determine the current Guaranteed Rate which applies to new Contributions,  for the same class of Certificates as yours, under a Guarantee Period with the same Expiration Date as your Guarantee Period.  We add to such current Rate a percentage which is no greater than that shown in the Data pages.

(d)     We determine the present value of the Guaranteed Period Amount payable at the Expiration Date, using the period determined in (b) and the rate determined in (c).

(e)     We subtract the current Guaranteed Period Amount from the result in (d). The result is the Market Value Adjustment, which may be positive or negative, applicable to such Guarantee Period.

If we are not offering a Guarantee Period to which the ''current Guaranteed Rate'' would apply, we will use the Rate at the closest Expiration Date.  If we are no longer offering new Guarantee Periods, we will use a procedure for determining such current Rate that is stated in the Data pages or which we will develop and file with insurance supervisory official of the appropriate jurisdiction.

**4.      Reports and Notices**

We will report the values under this Endorsement with the reports sent out as described in Section 9.04.  Such report will include the Guaranteed Period Amount, market value adjustment, and Annuity Account Value in Separate Account No. 46.

No. 94ENMVAI

## THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

Effective immediately, Equitable hereby amends the **Endorsement Applicable to Market Value Adjustment Terms** Form No. 94ENMVAI as follows:

The following new section is added at the end of the Endorsement after **Item 4 Reports and Notices**:

**5.    Separate Account**

We have established Separate Account No. 46 and maintain it in accordance with the laws of New York State. Income, realized and unrealized gains and losses from the assets of the Separate Account are credited to or charged against it without regard to our other income, gains or losses. Assets are placed in this Separate Account to support the Certificate and other annuity contracts and certificates. The assets of a separate account are our property. If so stated in the Data pages, the portion of such assets equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct. We may transfer assets of a separate account, including assets of the Guaranteed Period Account, in excess of the reserves and other contract liabilities with respect to such account to another separate account or to our general account.

New York,

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer          Senior Vice President, Secretary and Associate General Counsel

No. 96ENMVAI

**AXA EQUITABLE LIFE INSURANCE COMPANY**

**NAME CHANGE ENDORSEMENT**

**Effective Date: September 7, 2004**

This endorsement is made part of the policy, contract or certificate as of its Effective Date. It should be attached to and kept with the policy, contract or certificate.

Wherever the name of The Equitable Life Assurance Society of the United States or the Equitable appears in the policy, contract or certificate, the name AXA Equitable Life Insurance Company is hereby substituted.

In all other respects, the terms and provisions of the policy, contract or certificate remain unchanged and in full force and effect.

Christopher M. Condron
Chairman, President and
Chief Executive Officer

Pauline Sherman
Senior Vice President,
Secretary and Associate
General Counsel

2003AXA-ELAS

1290 Avenue of the Americas, New York, New York 10104

918 So.2d 897, Morgan Keegan & Co., Inc. v. Cunningham, (Ala. 2005)                    **Page 1**

**\*897**  918 So.2d 897

Blue Sky L. Rep. P 74,539

Supreme Court of Alabama.

**MORGAN KEEGAN & COMPANY, INC.,**
**Regions Financial Corporation, and Jay**
**Higgenbotham**
v.
**Patricia CUNNINGHAM and Judge Preston**
**Cunningham III.**

**1031431.**
May 20, 2005.

Opinion Overruling Rehearing July 8, 2005.

**Background:**  Investors brought action against mutual fund company and registered representative to recover for alleged fraud, suppression, conversion, breach of contract, and violation of the Securities Act in connection with mistaken backup withholding of federal income taxes. The Circuit Court, Jefferson County, No. CV-02-7391, J. Scott Vowell, J., entered judgment on jury verdict awarding compensatory and punitive damages and attorney fees. Company and representative appealed.

**Holdings:**  The Supreme Court, Woodall, J., held that:

(1) investors were not entitled to punitive damages, and

(2) investors were entitled to attorney fees under the Act, even though they had sold their shares.

Affirmed in part, reversed in part, and remanded; application for rehearing overruled.

*On Application for Rehearing*

West Headnotes

[1] Damages ⟻91.5(1)

115 ----
  115V Exemplary Damages
    115k91.5 Grounds for Exemplary Damages
      115k91.5(1) In General.

The mere failure of an agent or employee to follow a manual or procedures outlined by the employer will not authorize an award of punitive damages.  Code 1975, § 6-11-20.

[2] Brokers ⟻38(7)

65 ----
  65IV Duties and Liability to Principal
    65k38 Actions for Negligence or Wrongful Acts of Broker
      65k38(7) Damages.

An award of punitive damages on mutual fund investors' claims against account representatives alleging fraudulent suppression and conversion required evidence that representatives deliberately suppressed from the investors the necessity of executing a new account form with the intention of depriving the investors of property due to backup federal income tax withholding or in known violation of law and investors' rights with circumstances of insult, contumely, or malice.  Code 1975, § 6-11-20.

[3] Brokers ⟻38(7)

65 ----
  65IV Duties and Liability to Principal
    65k38 Actions for Negligence or Wrongful Acts of Broker
      65k38(7) Damages.

Mutual fund account representatives' alleged conversion of investors' funds as result of mistaken backup withholding of federal income taxes and allegedly fraudulent suppression of the withholdings did not entitle investors to punitive damages; representative did not know that the company lacked a new account form which would have prevented the withholdings, the customary procedures were not followed because of a lack of communication between personnel in the new account area and the registered representatives, simple disobedience of the company manual was an inadequate basis for punitive damages, and the representatives lacked the requisite intent or knowledge. Code 1975, § 6-11-20.

[4] Fraud ⟻61

184 ----
  184II Actions
    184II(E) Damages
      184k61 Exemplary.

Mutual fund company's alleged fraud in transaction confirmation and year-end summary that failed to

DEFENDANT'S EXHIBIT

CASE NO.

EXHIBIT NO.  1

918 So.2d 897, Morgan Keegan & Co., Inc. v. Cunningham, (Ala. 2005)                    **Page 2**

report mistaken backup withholding of federal income taxes did not entitle investors to punitive damages; although the summary overstated the total value of the portfolio, it contained information for calculating account balance, indirectly revealed the withholdings, and would have placed even unsophisticated investors on inquiry notice of peculiar, ostensibly unauthorized, transactions, the transaction confirmation showed transfer of fewer than all shares from stock to money market fund, only the Internal Revenue Service (IRS) benefited from the withholdings, and the summary and confirmation did not show misrepresentation with the intention of depriving investors of property or rights or otherwise causing injury. Code 1975, § 6-11-20.

[5] Securities Regulation ☞309

   349B ----
      349BII State Regulation
      349BII(B) Civil Effects of Violations
      349Bk303 Actions
      349Bk309 Trial and Relief.

 Investors' attorney fees were part of their "damages" in suit under Securities Act, even though the investors had sold their mutual fund shares; the Act defined damages as the amount that would be recoverable upon a tender, and attorney fees were included in that amount whether or not the investors sold the security. Code 1975, § 8-6-19(a)(2).

[6] Statutes ☞211

   361 ----
      361VI Construction and Operation
      361VI(A) General Rules of Construction
      361k204 Statute as a Whole, and Intrinsic Aids to Construction
      361k211 Title, Headings, and Marginal Notes.

   [See headnote text below]

[6] Statutes ☞226

   361 ----
      361VI Construction and Operation
      361VI(A) General Rules of Construction
      361k226 Construction of Statutes Adopted from Other States or Countries.

 When a statute is based on a uniform act, courts assume that the legislature intended to adopt the construction placed on the act by its drafters; thus,

commentary to such a uniform act is highly persuasive unless erroneous or contrary to settled state policy.

[7] Appeal and Error ☞238(2)

   30 ----
      30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(B) Objections and Motions, and Rulings Thereon
      30k234 Necessity of Motion Presenting Objection
      30k238 As to Judgment, or Modification or Vacation of Judgment
      30k238(2) Motion for Judgment Notwithstanding Verdict.

   [See headnote text below]

[7] Appeal and Error ☞295

   30 ----
      30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(D) Motions for New Trial
      30k295 Review of Amount of Recovery or Relief Awarded.

 Challenge to sufficiency of evidence to support award of punitive damages could be raised for first time in postjudgment motion for judgment as matter of law, or, in alternative, remittitur of punitive damages or new trial.

[8] Appeal and Error ☞835(2)

   30 ----
      30XV Hearing
      30XV(B) Rehearing
      30k829 Rehearing
      30k835 Scope and Conduct
      30k835(2) Contentions Other Than Those Made on the Hearing.

 Investors were not entitled to appellate review on rehearing of claim that mutual fund company's refusal to return money after repeated demands was sufficient to sustain punitive-damages award, where claim was not made on original submission.

[9] Appeal and Error ☞835(2)

   30 ----

© 2007 Thomson/West. No claim to original U.S. Govt. works.

30XV Hearing
  30XV(B) Rehearing
    30k829 Rehearing
      30k835 Scope and Conduct
        30k835(2) Contentions Other Than Those
        Made on the Hearing.

The Supreme Court will not consider arguments made for the first time on rehearing.

**\*898** Stephen A. Rowe and Elizabeth R. Floyd of Adams & Reese, LLP /Lange Simpson, Birmingham, for appellants.

Lewis W. Page, Jr., and Will J. Parks III of Page Parks, LLC, Birmingham, for appellees.

WOODALL, Justice.

Morgan Keegan & Company, Inc., and Regions Financial Corporation (hereinafter referred to collectively as "Regions"), and Jay Higgenbotham, an investment officer of Regions, appeal from a judgment entered on a jury verdict, awarding $10,000 compensatory damages and $50,000 punitive damages in an action by Patricia Cunningham and her son, Judge Preston Cunningham III ("Preston"), against Regions and Higgenbotham for improperly withholding federal income taxes on their investment account. Regions explains the relationship between the corporate entities as follows:

"Regions Investment Company, Inc., merged with Morgan Keegan & Company, Inc., in April of 2001. Morgan Keegan & Company, Inc., was the surviving entity. Prior to the merger, Regions Financial Corporation was the parent company of Regions Investment Company, Inc. Upon the merger, Regions Financial Corporation became the parent company of the surviving entity, Morgan Keegan & Company, Inc."

Regions' brief, at 4 n. 1. We affirm in part, reverse in part, and remand.

**\*899** The facts underlying this dispute began with a discussion between Patricia Cunningham and Higgenbotham in the summer of 2000 regarding investment opportunities provided by Regions. Later, on September 5, 2000, Patricia Cunningham purchased 2,655.337 shares in a mutual fund managed by Regions, namely, a "Regions Aggressive Growth Fund--B" ("the growth fund"), for $50,000. (FN1) This purchase resulted in the opening of a

joint account in the names of Patricia and Preston. The Cunninghams' decision to open the joint account was communicated to Regions *by telephone.* Consequently, the Cunninghams did not sign any documents in connection with opening the account.

Procedures for the opening of accounts such as the Cunninghams' were set out in a manual entitled "Regions Investment Company, Inc., Compliance with Supervisory Procedures" ("the manual"). In particular, the manual stated, "Prior to the entry of an initial order, the registered representative must obtain a completely executed *New Account [Application] Form,* duly signed." (Emphasis added.) The "New Account Application Form" ("the new account form") contained a section that stated, in pertinent part:

"Certification.--Under penalties of perjury, I certify that

"1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me).

"2. *I am not subject to backup withholding,* and

"3. A copy of Form W-9 Instructions has been provided.

"Certification instructions.--You must cross out item (2) above if you have been notified by IRS that you are currently *subject to backup withholding* because of underreporting interest or dividends on your tax return."

(Emphasis added.)

Backup withholding tax has been explained as follows:

"[Backup withholding is] [t]ax withheld from investment income, such as interest and dividends, to ensure that tax is collected on the income. Banks and other organizations are required to report to the IRS all interest and dividend payments you received, along with your Social Security number or other taxpayer identification number. *If you don't give them correct reporting information for you, they are required to withhold 31 percent of your investment income.* The IRS may also require the bank or other organization to withhold tax if it determines you have underreported your investment income. If backup withholding is taken out of your earnings, it will show up as 'Federal income tax withheld' on the

© 2007 Thomson/West. No claim to original U.S. Govt. works.

Form 1099-INT or Form 1099-DIV that the bank sends you each January."

(On the date this opinion was released this information could be found at *Definitions of Tax Terms: B-C,* at www.bankrate.com /wsjr/itax/edit/ definitions/ definitions_taxes2.asp (on file in the office of the clerk of the Supreme Court)(emphasis added).)   The Cunninghams never completed or executed a new account form.

By December 2000, the value of the Cunninghams' investment had decreased to approximately $47,000. However, at that time, Higgenbotham learned that the growth fund was going to declare a 22 per cent *taxable gain* for the year 2000.  The gain was based on the performance of the growth fund in the *first* three quarters of   **\*900**  2000, that is, before the Cunninghams had purchased their shares of the growth fund.  Consequently, the Cunninghams were about to incur a taxable capital gain of approximately $10,000, even though the value of their shares had declined.

In December 2000, Higgenbotham informed the Cunninghams, and 10 to 20 other customers similarly situated, of their impending tax liability and advised them to transfer their investment temporarily from the growth fund to a "Regions treasury money market fund" ("the money market fund").  The Cunninghams accepted Higgenbotham's advice, and, on December 15, 2000, sold the 2,655.337 shares of the growth fund in order to transfer $46,627.72 from the growth fund to the money market fund.  However, because Regions did not have an executed new account form on record as a basis for avoiding backup withholding, that transaction triggered a computer-generated 31 percent backup-withholding payment of $14,454.59, which Regions sent to the Internal Revenue Service ("the IRS").

Regions sent the Cunninghams a transaction confirmation showing the sale of 1,832.183 shares of the growth fund and a transfer of the sales proceeds of $32,173.13 to the money market fund.   The remaining 823.154 shares of the growth fund were sold, and the proceeds of $14,454.59 were used to pay the backup withholding (hereinafter referred to as "the first withholding").

Inexplicably, the first withholding was followed five days later by a redundant second backup-withholding payment of $9,973.67 (calculated as follows: $46,627.72--$14,454.59 = $32,173.13 X 31%) ("the

second withholding").  It is undisputed that Regions received no compensation or gain from either withholding.  After the first withholding and the second withholding, approximately $22,000 remained in the Cunninghams' account.

Regions sent a four-page account statement to the Cunninghams for the year 2000 ("the year-end summary").  That statement purported to represent the "total portfolio" value as the sum of the "market value/market price" of three categories:   (1) $32,220.32 in a "Regions treasury money market fund";   (2) $11,532.39 in a "Regions aggressive growth fund";   and (3) $32,173.13 in a second "Regions treasury money market fund"; for a "total portfolio" value of $75,925.84.  It is undisputed that the statement was "misleading" and that the "true market value" of the portfolio was approximately $22,000.  However, in the "Transactions/Activity Detail" section, the year-end summary revealed that only $32,173.13 had been removed from the growth fund and placed in the money market fund.  (FN2)

The year-end summary also listed the second withholding as "Regions Aggressive Growth Fund 31% Withholding Non-Certified T[axpayer] I[dentification] N[umber]," in the amount of a $9,973.67 charge.  The second withholding appeared on the year-end summary as a negative cash transaction.  Moreover, it showed the net of the transactions for the year.  Specifically, it showed the "Total Amounts Credited" ($114,414.65), as opposed to the "Total Amounts Charged" ($92,146.80), for a net of $22,267.85 in the account.  Finally, two Form 1099 statements were sent to the Cunninghams in January 2001, each one describing one of the two withholding payments.

**\*901**   Regions sent the Cunninghams monthly statements on essentially the same format as the year-end summary.  However, after the merger of Regions Investment Company, Inc., and Morgan Keegan & Company, Inc., in April 2001, the*format* of the monthly statements changed.  The statement for the month of May 2001, for the first time, expressly showed a "bottom-line" "Market Value" of the money market fund.  The bottom line of the Cunninghams' account was  $22,378.45.   Subsequent monthly statements were similarly revealing.

In September or October 2001, Patricia "discovered" in a conversation with Andrew Fort, Higgenbotham's assistant, that her account balance was approximately $22,000, and she expressed concern.   Fort and

Higgenbotham investigated her inquiry and discovered the two withholding payments. They acknowledged that the payments had been erroneously made, but they told Patricia that Regions could not merely refund the money because it had already been sent to the IRS. They advised her to request a refund from the IRS on her tax return. Pursuant to the Cunninghams' requests of the IRS, the Cunninghams received tax refunds in the following two years totaling $24,856. (FN3) The Cunninghams sold their shares in the money market fund in October 2003.

Meanwhile, on December 10, 2002, the Cunninghams sued Regions and Higgenbotham. They averred that "the proceeds of their investments" were "wrongfully and without reason transferred to the U[nited] S[tates] government," and that they were "caused to report excessive amounts of taxable income," and that they "paid taxes on such amounts." The Cunninghams sought relief on claims of fraud, suppression, conversion, breach of contract, and violation of the Alabama Securities Act, Ala.Code 1975, § 8-6-1 *et seq.*

The case was tried to a jury in March 2004. At the close of all the evidence, Regions moved for a judgment as a matter of law ("JML"), challenging the sufficiency of the evidence as to all the claims. The jury returned a general verdict, awarding the Cunninghams $10,000 in compensatory damages. Additionally, it assessed $50,000 punitive damages against Regions. Regions and Higgenbotham filed a postjudgment motion for a JML, which, in the alternative, sought a remittitur of the punitive damages or a new trial. In that motion, Regions and Higgenbotham argued that the Cunninghams had failed to present substantial evidence of their claims and incorporated by reference the arguments presented in their prejudgment JML motion. The postjudgment motion specifically challenged the sufficiency of the evidence of conduct on the part of Regions that would support an award of punitive damages. The trial court denied that motion. Also, pursuant to a motion filed by the Cunninghams based on Ala.Code 1975, § 8-6-19(a)(2), the trial court awarded the Cunninghams' counsel "a fee and reimbursement of expenses in the amount of $46,766.53." Regions and Higgenbotham appealed.

On appeal, Regions and Higgenbotham *accept their liability for the compensatory* damages awarded by the jury. Regions' brief, at 28. However, Regions challenges the assessment of punitive damages against it, and Regions and Higgenbotham challenge the

award of an attorney fee.

### *I. Punitive Damages*

Regions contends that the evidence was insufficient to support any award of punitive **\*902** damages. Thus, it argues, the trial court erred "in not setting aside the award." Regions' brief, at 30. We agree.

"Punitive damages must be supported by *clear and convincing evidence* 'that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff.' § 6-11-20(a), Ala.Code 1975. Section 6-11-20(b) defines the terms 'fraud,' 'malice,' 'wantonness,' and 'oppression':

" '(1) Fraud. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was *gross, oppressive, or malicious* and committed with the *intention on the part of the defendant of thereby depriving a person or entity of property* or legal rights or otherwise causing injury.

" '(2) Malice. The intentional doing of a wrongful act without just cause or excuse, either:

" 'a. *With an intent to injure* the person or property of another person or entity, or

" 'b. Under such circumstances that the law will imply an evil intent.

" '(3) Wantonness. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others.

" '....

" '(5) Oppression. Subjecting a person to cruel and unjust hardship in *conscious disregard* of that person's rights.'

" ' "Gross" is defined as inexcusable, flagrant, or shameful.' *Talent Tree Personnel Services, Inc. v. Fleenor,* 703 So.2d 917, 924 (Ala.1997)."

*Ex parte Liberty Nat'l Life Ins. Co.,* 797 So.2d 457, 466-67 (Ala.2001) (emphasis added). " ' "[P]unitive damages [in an action for conversion] are justified when the evidence discloses the conversion to have been committed in known violation of law and of

© 2007 Thomson/West. No claim to original U.S. Govt. works.

918 So.2d 897, Morgan Keegan & Co., Inc. v. Cunningham, (Ala. 2005)                    **Page 6**

owner's rights, with circumstances of insult, or contumely, or malice." ' " *Industrial Techs., Inc. v. Jacobs Bank,* 872 So.2d 819, 826 (Ala.2003) (quoting *Roberson v. Ammons,* 477 So.2d 957, 961 (Ala.1985)).

"Clear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." Section 6-11-20(b)(4), Ala.Code 1975. "Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." *Id.*

The essence of the Cunninghams' claims is that Regions wrongfully caused, or effected, the two withholdings and then fraudulently suppressed the fact that the withholdings had occurred. In that connection, the Cunninghams state:

"The evidence ... showed a string of fraudulent and unjustified conduct, including *suppression by Higgenbotham of the danger of not getting a backup withholding certificate signed,* ... suppression that the first sale in the account would result in a backup withholding, suppression that the December 15 transactions resulted in backup withholding, *false and misleading statements in the confirmations on the December 15 transactions, [and] false statements and misleading statements in the account statements for December of 2000* that did not report the withholding transactions...."

**\*903**    Cunninghams' brief, at 29-30 (emphasis added).

[1] At the bottom of the Cunninghams' claims against Regions is the failure of Regions' "registered representatives," Higgenbotham and Fort, to ensure that the Cunninghams signed a new account form as required by the manual. It is axiomatic, however, that the mere failure of an agent or employee to follow a manual or procedures outlined by the employer will not authorize an award of punitive damages. Were it otherwise, punitive damages might be awarded on the basis of simple negligence, contrary to well-established Alabama law. *CP & B Enters., Inc. v. Mellert,* 762 So.2d 356, 362 (Ala.2000) (simple negligence will "not warrant an award of punitive damages"); *Tuscaloosa County v. Barnett,* 562 So.2d 166, 169 (Ala.1990);

*Montgomery City Lines v. Davis,* 261 Ala. 491, 494-95, 74 So.2d 923, 925-26 (1954); *Bradley v. Walker,* 207 Ala. 701, 703, 93 So. 634, 635 (1922); see also *Daniels v. Mead Coated Bd., Inc.,* 858 F.Supp. 1103, 1111 (M.D.Ala.1994) ("The failure to follow company policy may be prima facie evidence of negligence....").

[2][3] To warrant punitive damages under the suppression or conversion claim, the Cunninghams must present evidence indicating that Higgenbotham or Fort *deliberately suppressed* from the Cunninghams the necessity of executing a new account form, with the "*intention ... of thereby depriving* [the Cunninghams] of property," § 6-11-20(b)(1) (emphasis added), or " ' "in*known violation of law and of [the Cunninghams'] rights,* with circumstances of insult, or contumely, or malice." ' " *Jacobs Bank,* 872 So.2d at 826 (quoting *Roberson,* 477 So.2d at 961)(emphasis added). There is no clear and convincing evidence indicating that Higgenbotham or Fort possessed such intent or knowledge.

On the contrary, the Cunninghams concede that Higgenbotham did *not know* that Regions did not have a new account form on file for their account. Cunninghams' brief, at 11. The Cunninghams state that Regions *customarily* allowed "the operations New Account area to ... open[ ] mutual fund accounts without signed New Account Forms.... The practice was that the New Account area, not the Registered Representative, would mail, without documentation, the New Account Form to the new customer [for signature and return]." *Id.* The Cunninghams allege that they never received a new account form, but they also say that "Higgenbotham was *never advised* by the New Account Area that [their] form had not been received." *Id.* (emphasis added).

To be sure, *someone* at Regions--presumably someone in the new account area--knew that Regions had no new account form on file for the Cunninghams. However, the most the evidence shows is that Regions' *customary procedures* were not followed in this case because of a lack of communication between personnel in the new account area and the registered representatives, Higgenbotham and Fort. Indeed, the Cunninghams place the responsibility for the two withholdings squarely upon the shoulders of Higgenbotham and Fort. Specifically, they state: "The evidence showed that Regions ... failed miserably to conduct the most basic aspects of its business--to get a New Account Form

© 2007 Thomson/West. No claim to original U.S. Govt. works.

signed. The Manual placed that responsibility directly upon the Registered Representative[s]." Cunninghams' brief, at 37. It was that "*simple disobedience* to the Manual," the Cunninghams insist, that "caused [their] economic damage." *Id.* (emphasis added).

"[S]imple disobedience to the Manual," as we pointed out earlier in this opinion, although it arguably constitutes *substantial- ***904 evidence of negligence,* does not provide a basis for the punitive damages awarded in this case. Under the Cunninghams' theory of the case, the facts could not "produce in the mind of the trier of fact a *firm conviction* " as to the element of intent and deliberation required for a punitive-damages award, "and a *high probability* as to the correctness of that conclusion." Section 6-11-20(b)(4) (emphasis added). Thus, there was no basis for an award of punitive damages on the conversion and suppression claims.

[4] The Cunninghams' fraud claims fare no better. Those claims are based on the allegedly "false and misleading statements in the [transaction confirmation], [and] false statements and misleading statements in the [year-end summary] that did not report the withholding transactions." Cunninghams' brief, at 30. For those statements to form the basis of a punitive-damages award, there must have been clear and convincing evidence that the confirmation or the year-end summary contained a material fact Regions "intentional[ly] misrepresent[ed] ... with the intention ... of thereby depriving [the Cunninghams] of property or legal rights or otherwise causing injury." Section 6-11-20(b)(1).

Regions concedes that the year-end summary overstated the total value of the Cunninghams' portfolio. However, the year-end summary also accurately reflected the "Total Amounts Credited" and the "Total Amounts Charged," from which the balance of the account--$22,267.85--could be calculated. Moreover, the year-end summary revealed, albeit somewhat indirectly, both the first withholding and the second withholding. It showed that only $32,173.13 had been transferred to the money market fund from the growth fund, rather than the $46,627.72 the Cunninghams would have expected to have been transferred. Similarly, it showed the transfer of only 1,832.183 shares, rather than the 2,655.337 shares the Cunninghams would have expected to have been transferred. The year-end summary also specifically revealed that $9,973.67, the precise amount of the second withholding, had

been charged to the Cunninghams' account on December 19, 2000.

Although the year-end summary contained some confusing and inaccurate information, it, along with the Form 1099s, would have placed even unsophisticated investors on inquiry notice of peculiar, ostensibly unauthorized, transactions in their account. Thus, to the extent that, as the Cunninghams contend, intent to deceive may be evidenced by the year-end summary, the evidence is not clear and convincing.

Evidence of intent inferable from the *transaction confirmation* is no more convincing. The transaction confirmation shows the sale of 1,832.183 shares of "Regions Aggressive Growth Fund" stock at $17.56 per share, and the deposit of $32,173.13 in the "Regions treasury money market fund," when the sale of 2,655.337 shares and deposit of $46,627.72 was expected. Regions can hardly have anticipated that the unaccounted-for $14,454.59 would go unnoticed by the Cunninghams.

In that connection, the Cunninghams fail to state how the information omitted from, or misstated in, the transaction confirmation and the year-end summary*damaged them* or *benefited Regions.* They do not argue that they relied on the information to their detriment. Indeed, they do not explain the *relevancy* of the "false and misleading statements" of which they complain.

Moreover, it is undisputed that Regions received no fee or commission, either from the transfer of funds from the growth fund  ***905 to the money market fund or from the two withholdings that resulted from that transaction. The only entity that benefited from the withholdings was the IRS. Nor do the Cunninghams contend that Higgenbotham, Fort, or anyone else at Regions was motivated by malice or ill will. The absence of any articulable or plausible motive for the Cunninghams' claims of fraud, suppression, and conversion undercuts the basis for the punitive-damages award.

Because the award is not supported by clear and convincing evidence of conduct that would authorize a punitive-damages award, the trial court erred in denying Regions' postjudgment motion for a JML on that issue. To that extent, the judgment is reversed.

*II. Attorney Fee*

© 2007 Thomson/West. No claim to original U.S. Govt. works.

918 So.2d 897, Morgan Keegan & Co., Inc. v. Cunningham, (Ala. 2005)     **Page 8**

Regions contends that the trial court erred in awarding the Cunninghams an attorney fee, pursuant to § 8-6-19(a)(2). (FN4) It frames the issue as follows: "Under the facts of this case, the Alabama Securities Act does not provide a ground for an attorney's fee award." Regions' brief, at 53. Because Regions now "accepts its liability for compensatory damages as awarded by the jury," Regions' brief, at 28, is *necessarily* does not contend that it was entitled to a JML on the claims submitted to the jury. In other words, it does not contend that there was no substantial evidence to support those claims. Additionally, it states: "Regions is not challenging the jury's interpretation of the Act *for purposes of a violation.* It is challenging the court's interpretation of the Act for purposes of awarding attorney's fees." Reply brief, at 19 (emphasis added).

Similarly, Regions does not ask this Court to reverse the judgment and remand the cause for the entry of a JML on the Cunninghams' claims of breach of contract, conversion, fraud, suppression, and violation of the Alabama Securities Act. Instead, Regions specifically asks this Court only to "reverse the trial court's judgment entering the *punitive damages* verdict, reverse the trial court's denial of Regions' motion for a new trial or for *remittitur* and reverse the trial court's order granting the Cunninghams' motion for an award of *attorney fees.*" Regions' brief, at 67 (emphasis added). Regions does not contend that the claim alleging a violation of the Alabama Securities Act was a "bad count" that should not have gone to the jury, thereby necessitating a new trial under the rule established by *Aspinwall v. Gowens,* 405 So.2d 134 (Ala.1981). Consequently, we deem the statutory claim to be unchallenged "for purposes of a violation." Therefore, we limit our review to the legal issue whether the violation of the Alabama Securities Act supported an award of an attorney fee.

Section 8-6-19(a) provides, in pertinent part:

"(a) Any person who:

"(1) Sells or offers to sell a security in violation of any provision of this article or of any rule or order imposed under this article or of any condition imposed under this article, or

"(2) Sells or offers to sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order

to make the statements made ... not misleading, ...

"is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, **\*906** court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition."

Regions argues:

"The Alabama Securities Act permits *two specific forms of recovery* and then only in the alternative: *rescission* with interest, costs and attorneys' fees, *or,* 'if he no longer owns the security,' *damages.* ... At trial the Cunninghams no longer owned any of [the] securities involved in this case. Therefore, even assuming they established a violation of the Act, they could only recover 'damages,' and not rescission with interest and attorneys' fees. Under the clearly expressed, plain language of the Act, *attorneys' fees are not available when the buyer no longer owns the security.*"

Regions' brief, at 54-55 (emphasis added) (citations to the record omitted). In Regions' view, the Legislature's failure to *repeat* the attorney-fee provision after the "damages" clause is dispositive of the issue.

[5] The Cunninghams contend that "attorneys fees are included in 'the amount that would be recoverable upon a tender' ... *whether she has sold the security or not.*" Cunninghams' brief, at 40 (emphasis added). We agree with the Cunninghams.

[6] Section 8-6-19(a)(2) was modeled after the Uniform Securities Act§ 410(a)(2), 7C U.L.A. (1956), before the 1958 amendments to the Uniform Act. *Banton v. Hackney,* 557 So.2d 807, 826 (Ala.1989). "When a statute is based on a uniform act, we assume that the legislature 'intended to adopt the construction placed on the act by its drafters.' " *In re Estate of Dobert,* 192 Ariz. 248, 252, 963 P.2d 327, 331 (Ariz.Ct.App.1998) (quoting *State v. Sanchez,* 174 Ariz. 44, 47, 846 P.2d 857, 860 (Ariz.Ct.App.1993)). "Thus, commentary to such a uniform act is 'highly persuasive unless erroneous or

© 2007 Thomson/West. No claim to original U.S. Govt. works.

contrary to settled policy in this state.' " *Id.* See also *Universal Motors, Inc. v. Neary,* 984 P.2d 515, 517 (Alaska 1999); *In re Nocita,* 914 S.W.2d 358, 359 (Mo.1996); 2B Norman Singer, *Statutes and Statutory Construction* § 52:05 (6th ed.2000).

Before the 1958 amendment, § 410(a)(2) defined damages as " 'the amount that would be recoverable upon tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.' " 12A Joseph C. Long, *Blue Sky Law* § 9:15 (2004) (quoting pre-amendment § 410(a)(2)). Neither the original version nor the amended version of § 410(a)(2) repeated the attorney-fee provision after the "damages" clause. Nevertheless, the comments to the amended version point out that "[t]he measure of damages, when the plaintiff is *not in a position to tender back the security,* is the same under Clauses (1) and (2). It is designed to be the *substantial equivalent* of rescission." Uniform Securities Act § 410 (as amended), comment (emphasis added). See *White v. Sanders,* 650 F.2d 627, 631 (5th Cir.1981) (section 8-6-19(a) provides a "rescission-type remedy"); *Blue Sky Law,* supra, § 9:13 n. 11 ("If the security has been sold, then [§ 410] provides the investor with statutory rescissionary damages. The measure of these damages is the difference between the purchase price the investor paid for the security and the price at which it was sold, plus interest, attorneys' fees, and costs.").

**\*907** Moreover, when the Uniform Securities Act of 1956 was superseded by another uniform act in 1985, § 410(a)(2) was replaced by § 605(a), which *clearly answers* the question presented here. Specifically, § 605(a) provides, in pertinent part:

"*Upon tender* of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this State from the date of payment, costs, and *reasonable attorney's fees* as determined by the court, less the amount of income received on the security.... A purchaser who no longer owns the security may recover damages. Damages are the amount that would be recoverable *upon a tender less* the value of the security when the purchaser disposed of it, plus interest at the legal rate of this State from the date of disposition of the security, costs, and *reasonable attorney's fees* determined by the court."

Uniform Securities Act § 605(a), 7C U.L.A. (1985) (emphasis added). Section 605 thus *expressly states*

that purchasers, such as the Cunninghams, who have sold their securities at the time of trial, may, nevertheless, recover attorney fees in the same manner as purchasers who have retained their securities.

It is important to note that § 605(a) was "*not intended to alter significantly [the provisions of § 410(a)(2), which it superseded* ]." § 605, comment 1 (emphasis added). It is clear, therefore, that, although original § 410(a), like its Alabama counterpart, did not *reiterate* the attorney-fee clause after the "damages" clause, it did, nevertheless, permit the recovery of attorney fees by purchasers in the position of the Cunninghams. See *Blue Sky Law,* supra, § 9:13 n. 11.

We see no indication that the Alabama Legislature intended a result different from the one provided by the uniform acts. It did not intend to place purchasers on an unequal footing with respect to attorney fees, depending on whether they held their securities at the time of trial. We conclude, therefore, that the trial court did not err in awarding an attorney fee. (FN5)

### III. Summary

In summary, the trial court erred only in denying Regions' motion for a JML as to punitive damages. That portion of the judgment awarding punitive damages is, therefore, reversed and the cause is remanded for the entry of an appropriate order. In all other respects, the judgment is affirmed.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

NABERS, C.J., and SEE, LYONS, and PARKER, JJ., concur.

SMITH, J., recuses herself.

### On Application for Rehearing

WOODALL, Justice.

On application for rehearing, Patricia Cunningham and her son, Judge Preston Cunningham III, allege that this Court "flatly ignored [their] argument on a critical procedural reason to affirm." Rehearing application, at 1. We write further to address this criticism.

On original submission, the Cunninghams argued

918 So.2d 897, Morgan Keegan & Co., Inc. v. Cunningham, (Ala. 2005)                                    **Page 10**

that "the sufficiency of the evidence to support punitive damages [was] not reviewable because ... prior to the verdict, [Regions] never moved for a judgment as a matter of law on the basis that the evidence was insufficient to support *908. a punitive damage claim." Cunninghams' brief, at 27. In support of their argument, the Cunninghams cited *Industrial Technologies, Inc. v. Jacobs Bank,* 872 So.2d 819 (Ala.2003), for the proposition that an "argument on sufficiency of evidence of *compensatory* damages first raised in post-verdict motion for [judgment as a matter of law] is not reviewable." Cunninghams' brief, at 28 (emphasis added). While our opinion on original submission did not address the Cunninghams' procedural argument, this Court duly considered it and found the argument to be meritless.

[7] The Cunninghams argue that "there is no principled reason not to apply [the *Jacobs* holding]." Rehearing application, at 5. However, they overlook a critical distinction between *Jacobs* and this case. It is true that this Court, in *Jacobs,* held that the defendant had failed to preserve for review the issue of the sufficiency of the evidence of *compensatory* damages because that issue was raised for the first time in the defendant's posttrial motion. *Jacobs,* 872 So.2d at 825. However, this Court has held that "the issue of whether [an] award of *punitive* damages was supported by clear and convincing evidence [can be properly raised] in [a] postjudgment motion for [a judgment as a matter of law], or, in the alternative, a new trial or remittitur." *Sears, Roebuck & Co. v. Harris,* 630 So.2d 1018, 1032 (Ala.1993)(emphasis and alterations added). As mentioned in our opinion on original submission in this case, Regions filed a postjudgment motion for a judgment as a matter of law, which sought, in the alternative, a remittitur of the punitive damages or a new trial. That postjudgment motion, as we noted, specifically challenged the sufficiency of the evidence of conduct on the part of Regions that would support an award of punitive damages. Thus, it was appropriate for this

Court to consider Regions' contention that the evidence was insufficient to support any award of punitive damages.

[8][9] On rehearing, the Cunninghams, citing *Jacobs,* argue that Regions' refusal to return the money after repeated demands, standing alone, is sufficient to sustain the punitive-damages award. However, this argument was not made on original submission, and "[t]he well-settled rule of this Court precludes consideration of arguments made for the first time on rehearing." *Water Works & Sewer Bd. of Selma v. Randolph,* 833 So.2d 604, 608 (Ala.2002) (opinion on application for rehearing). Thus, the Cunninghams have presented nothing that warrants further review in this case.

APPLICATION OVERRULED.

NABERS, C.J., and SEE, LYONS, and PARKER, JJ., concur.

SMITH, J., recuses herself.

(FN1.) The money used to purchase the shares was the proceeds of a life insurance policy Patricia had collected upon the death of her husband, Judge Preston Cunningham, Jr.

(FN2.) That amount, of course, corresponded precisely with the amount remaining after the first withholding.

(FN3.) The amount withheld by Regions and forwarded to the IRS was $24,428.26 ($14,454.59 + $9,973.67 = $24,428.26).

(FN4.) Higgenbotham, through the same counsel and in the same brief, makes the same arguments as Regions in support of this contention.

(FN5.) Regions and Higgenbotham do not challenge the manner in which the fee was calculated.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

**DEFENDANT'S EXHIBIT**

CASE NO.

EXHIBIT NO. D

# Amended Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

Names of the Claimants
Douglas M. Cherry, Lance K. Dyess,
Ira J. Edmundson, Jimmy E. Jones,
Rachel McKinney, Linda J. Middleton and
Victor E. Stafford

Case Number:  05-03030

Name of the Respondent
*Raymond James Financial Services, Inc.*

Hearing Site: Birmingham, Alabama

Nature of the Dispute: Customer vs. Member.

## REPRESENTATION OF PARTIES

For Douglas M. Cherry ("Cherry"), Lance K. Dyess ("Dyess"), Ira J. Edmundson ("Edmundson"), Jimmy E. Jones ("Jones"), Rachel McKinney ("McKinney"), Linda J. Middleton ("Middleton") and Victor E. Stafford ("Stafford"), hereinafter collectively referred to as "Claimants": Richard S. Frankowski, Esq., Whatley Drake LLC, Birmingham, Alabama.

For *Raymond James Financial Services, Inc.*, hereinafter referred to as "Respondent": Luther M. Dorr, Esq. and Andrea Morgan Greene, Esq., Maynard, Cooper & Gale P.C., Birmingham, Alabama.

## CASE INFORMATION

Statement of Claim filed on or about:  June 13, 2005.
Claimant Cherry signed the Uniform Submission Agreement: January 27, 2005
Claimant Dyess signed the Uniform Submission Agreement: April 13, 2005
Claimant Edmundson signed the Uniform Submission Agreement: February 8, 2005
Claimant Jones signed the Uniform Submission Agreement: June 9, 2005
Claimant McKinney signed the Uniform Submission Agreement: April 7, 2005.
Claimant Middleton signed the Uniform Submission Agreement: May 18, 2005.
Claimant Stafford signed the Uniform Submission Agreement: May 5, 2005.
Statement of Answer filed by Respondent on or about:  September 16, 2005..
Motion to Sever filed by Respondent on or about: September 15, 2005.
Response to Motion to Sever filed on by Claimants or about: October 11, 2005.
Reply Brief in Support of its Motion to Sever filed by Respondent on or about: November 1, 2005.
Respondent signed the Uniform Submission Agreement: June 20, 2005.
Motion to Dismiss on Statute of Limitations Grounds filed by Respondent on or about: May 19, 2006.
Response to Motion to Dismiss on Statute of Limitations Grounds filed by Claimant s on or about: June 8, 2006.
Brief in Support of its Motion to Dismiss filed by Respondent on or about: July 6, 2006.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Amended Award    Page 2</u>

Motion to Amend the Statement of Answer filed by Respondent on or about: September 12, 2006.

## CASE SUMMARY

Claimants asserted the following causes of action: 1) breach of fiduciary duty; 2) breach of contract 3) common law fraud; 4) negligence; 5) negligent misrepresentation/omission; 6) failure to supervise and control; and, 7) violation of federal and state securities laws and NASD Rules of Fair Practice.. The causes of action relate to the purchase of various variable annuities including, but not limited to, AXA Equitable Accumulator, Putnam Allstate Advisor, Equitable Accumulator Rollover IRA, Scudder Destinations, Putnam Hartford Capital Manager and AIG Sun America Polaris II in Claimants' accounts.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

## RELIEF REQUESTED

Claimants requested compensatory damages in the amount of $2,000,000.00, professional costs and adverse tax consequences, disgorgement and restitution, lost opportunity costs and costs of this proceeding, attorney's fees and costs, pre and post-judgment interest, punitive damages, rescission and such other relief as this Panel deemed just and equitable.

Respondent requested that the Statement of Claim be denied in its entirety, that all costs be assessed against Claimants and an award of such other and further relief as this Panel deemed just and proper

## OTHER ISSUES CONSIDERED AND DECIDED

On November 8, 2005, the Panel issued an Order that denied Respondent's Motion to Sever and, on or about July 13, 2006, the Panel issued an Order that denied Respondent's Motion to Dismiss based on Statute of Limitations Grounds however, the Order stated that Respondent could renew the motion at any time during the final hearing.

Respondent's Motion to Amend the Statement of Answer was not ruled on and deemed moot by the Panel.

During the evidentiary hearing for this matter, Respondent renewed its Motion to Dismiss based on Statute of Limitations Grounds and also made a Motion for a Directed Verdict as to Claimants' fraud claims. Claimants requested and were granted the opportunity to respond to the documentation presented with oral argument on the two motions. Respondent was also given the opportunity to reply. The Panel denied the Motion for Directed Verdict as to Claimants' fraud claims and reserved ruling on the Motion to Dismiss Based on Statute of Limitations Grounds until the conclusion of the hearing. As part of the post hearing deliberations, the Panel considered the Motion to Dismiss Based on Statute of Limitations Grounds, the oral arguments and the supporting documents from all parties and denied the motion.

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Amended Award     Page 3</u>

Pursuant to the contract Claimants have with Respondent, the Panel determined that Florida law applies in this matter.

*NASD Dispute Resolution served the Panel's Award on October 26, 2006.  On or about December 13, 2006, the parties filed a Joint Motion to Modify the Arbitration Award to substitute the named Respondent in this matter from Raymond James & Associates with the correct entity, Raymond James Financial Services, Inc.   On or about December 20, 2006, the Panel issued an Order that granted the parties' post-award motion which resulted in the entry of this Amended Award.*

The parties have agreed that the Award in this matter may be entered in counterpart copies or that a signed handwritten Award may be entered.

### <u>AWARD</u>

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

Respondent is found liable for breach of fiduciary duty, breach of contract, common law fraud, negligence, negligent misrepresentation/omission, failure to supervise and control and violation of federal and state securities laws and NASD Rules of Fair Practice and shall pay to Claimants compensatory damages in the following amounts:

| | |
|---|---|
| 1) To Douglas Cherry | $124,000.00 |
| 2) To Lance K. Dyess | $ 52,000.00 |
| 3) To Ira J. Edmondson | $149,000.00 |
| 4) To Jimmy E. Jones | $ 51,000.00 |
| 5) To Rachel McKinney | $ 54,000.00 |
| 6) To Linda J. Middleton | $ 59,000.00 |
| 7) To Victor E. Stafford | $ 88,000.00 |

plus, interest on each amount at the statutory rate in the state of Florida per annum from the date of service of the Award until the date of payment.

Respondent is found liable and shall pay attorney's fees in the amount of $124,334.00 and costs in the amount of $26,946.05 pursuant to Florida Statutes, Chapter 517.211.

Any and all claims for relief not specifically addressed herein, including Claimants' request for punitive damages, are denied.

### <u>FEES</u>

Pursuant to the NASD Code of Arbitration Procedure (the "Code"), the following fees are assessed:

**<u>Filing Fees</u>**
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

NASD Dispute Resolution
Arbitration No. 05-03030
Amended Award    Page 4

Initial claim filing fee                                  = $ 500.00

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the
member firm that employed the associated person at the time of the events giving rise to the dispute.
Accordingly, Respondent is a party to this dispute and was a member of NASD at the time the
following fees were assessed:

| | |
|---|---|
| Member surcharge | = $ 2,800.00 |
| Pre-hearing process fee | = $   750.00 |
| Hearing process fee | = $ 5,000.00 |
| Total Member Fees | = $ 8,550.00 |

### Adjournment Fees

No requests for adjournments were filed in this matter.

### Three-Day Cancellation Fees
Fees apply when a hearing on the merits is postponed or settled within three business days before
the start of a scheduled hearing session:

No cancellation fees were assessed in this matter.

### Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary
injunction in court.  Parties in these cases are also assessed arbitrator travel expenses and costs
when an arbitrator is required to travel outside his or her hearing location and additional arbitrator
honoraria for the hearing for permanent injunction.  These fees, except the injunctive relief surcharge,
are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during this proceeding.

### Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted.  A session is any meeting between
the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four
(4) hours or less.  Fees associated with these proceedings are:

Four (4) Pre-hearing sessions with the Panel @ $1,200.00                    = $ 4,800.00
Pre-hearing conferences:  November 7, 2005        1 session
                          November 8, 2005        1 session
                          November 11, 2005       1 session
                          July 11, 2006           1 session

Eighteen (18) Hearing sessions with the Panel @ $1,200.00                    = $21,600.00
Hearing Dates:            October 2, 2006         2 sessions
                          October 3, 2006         2 sessions

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Amended Award    Page 5</u>

| | |
|---|---|
| October 4, 2006 | 2 sessions |
| October 5, 2006 | 2 sessions |
| October 6, 2006 | 2 sessions |
| October 9, 2006 | 2 sessions |
| October 10, 2006 | 2 sessions |
| October 11, 2006 | 2 sessions |
| October 12, 2006 | 2 sessions |

Total Forum Fees                                                                    = $26,400.00

The Panel has assessed $1,885.71 of the forum fees to Claimant Douglas Cherry.
The Panel has assessed $1,885.71 of the forum fees to Claimant Lance K. Dyess.
The Panel has assessed $1,885.71 of the forum fees to Claimant Ira J. Edmundson.
The Panel has assessed $1,885.71 of the forum fees to Claimant Jimmy E. Jones.
The Panel has assessed $1,885.71 of the forum fees to Claimant Rachel McKinney.
The Panel has assessed $1,885.71 of the forum fees to Claimant Linda J. Middleton.
The Panel has assessed $1,885.71 of the forum fees to Claimant Victor E. Stafford.
The Panel has assessed $13,200.03 of the forum fees to Respondent.

## Administrative Costs
Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services. These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative costs were incurred during this proceeding.

## Fee Summary

Claimants are jointly and severally liable for:

| | |
|---|---|
| Initial Filing Fee | = $  500.00 |
| Total Fees | = $  500.00 |
| Less payments | = $  500.00 |
| Balance Due NASD Dispute Resolution | = $    0.00 |

Claimant Cherry is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $1,885.71 |
| Balance Due NASD Dispute Resolution | = $    0.00 |

Claimant Dyess is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $1,885.71 |
| Balance Due NASD Dispute Resolution | = $    0.00 |

NASD Dispute Resolution
Arbitration No. 05-03030
Amended Award    Page 6

Claimant Edmondson is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $1,885.71 |
| Balance Due NASD Dispute Resolution | = $     0.00 |

Claimant Jones is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $1,885.71 |
| Balance Due NASD Dispute Resolution | = $     0.00 |

Claimant McKinney is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $1,885.71 |
| Balance Due NASD Dispute Resolution | = $     0.00 |

Claimant Middleton is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $1,885.71 |
| Balance Due NASD Dispute Resolution | = $     0.00 |

Claimant Stafford is solely liable for:

| | |
|---|---|
| Forum Fees | = $1,885.71 |
| Total Fees | = $1,885.71 |
| Less payments | = $1,885.71 |
| Balance Due NASD Dispute Resolution | = $     0.00 |

Respondent is solely liable for:

| | |
|---|---|
| Member Fees | = $  8,550.00 |
| Forum Fees | = $ 13,200.03 |
| Total Fees | = $ 21,750.03 |
| Less payments | = $ 21,750.03 |
| Balance Due NASD Dispute Resolution | = $     0.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

| | | |
|---|---|---|
| Helen E. Huyler, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Benjamin F. Richards, Jr. | - | Public Arbitrator |
| Robert E. Graves | - | Non-Public Arbitrator |

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Amended Award    Page 7</u>

**<u>Concurring Arbitrators' Signatures</u>**


_____/s/_____                              <u>12/22/06</u>_____
Helen E. Huyler, Esq.                                     Signature Date
Public Arbitrator, Presiding Chairperson


_____/s/_____                              <u>1/9/07</u>_____
Benjamin F. Richards, Jr.                                 Signature Date
Public Arbitrator


_____/s/_____                              <u>12/22/06</u>_____
Robert E. Graves                                          Signature Date
Non-Public Arbitrator


_____<u>1/9/07</u>_____
Date of Service (For NASD Dispute Resolution office use only)

Dec. 22. 2006 12:38PM                                      No. 4547   P. 8/8

NASD Dispute Resolution
Arbitration No. 05-03030
Amended Award    Page 7

**Concurring Arbitrators' Signatures**

_Helen E. Huyler_                                12-22-06
Helen E. Huyler, Esq.                            Signature Date
Public Arbitrator, Presiding Chairperson


_____                          _____
Benjamin F. Richards, Jr.                        Signature Date
Public Arbitrator


_____                          _____
Robert E. Graves                                 Signature Date
Non-Public Arbitrator


_____
Date of Service (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 05-03030
<u>Amended Award    Page 7</u>

**<u>Concurring Arbitrators' Signatures</u>**


_____                    **Signature Date**
Helen E. Huyler, Esq.
Public Arbitrator, Presiding Chairperson

*Benjamin F. Richards, Jr.*                 9 January 2007
_____                    **Signature Date**
Benjamin F. Richards, Jr.
Public Arbitrator


_____                    **Signature Date**
Robert E. Graves
Non-Public Arbitrator


_____
Date of Service (For NASD Dispute Resolution office use only)

21,750.03
    <u>Less payments</u>                                     = $
<u>21,750.03</u>
      Balance Due NASD Dispute Resolution                 = $
0.00

All balances are payable to NASD Dispute Resolution and are due upon receipt
pursuant to Rule 10330(g) of the Code.

## <u>ARBITRATION PANEL</u>

*Helen E. Huyler, Esq.*                  -                *Public Arbitrator,*
          *Presiding Chairperson*
*Benjamin F. Richards, Jr.*            -                *Public Arbitrator*
*Robert E. Graves*                      -                *Non-Public*
*Arbitrator*
### <u>Concurring Arbitrators' Signatures</u>

_____                    _____
Helen E. Huyler, Esq.                           Signature Date
Public Arbitrator, Presiding Chairperson


_____                    _____
Benjamin F. Richards, Jr.                      Signature Date
Public Arbitrator

                                                  *12/22/06*
Robert E. Graves                                Signature Date
Non-Public Arbitrator


_____
Date of Service (For NASD Dispute Resolution office use only)

DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO. E

September 12, 2006

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WAYLAND ADAMS, ET AL.                          CIVIL ACTION

VERSUS                                         NO. 06-2509 c/w
                                                   06-3042

SECURITIES AMERICA, INC.                       SECTION "A"(2)

<u>**ORDER AND REASONS**</u>

Before the Court is a **Motion to Confirm Arbitration Award (Rec. Doc. 10)** filed by

Plaintiffs in the master case, and a **Motion to Vacate or Modify Arbitration Award (Rec. Doc.**

**45 and Rec. Doc. 1 in case 06-3042)**, filed by Securities America, Inc. and David McFadden.

Both motions are opposed. The motions, set for hearing on August 23, 2006, are before the

Court on the briefs without oral argument. For the following reasons the **Motion to Confirm**

**Arbitration Award (Rec. Doc. 10) is GRANTED**. The **Motion to Vacate or Modify**

**Arbitration Award (Rec. Doc. 45 and Rec. Doc. 1 in case 06-3042) is DENIED**.

**I. BACKGROUND**

The Plaintiffs in the master case are retired plant workers who invested their retirement

savings with Securities America, Inc. ("Securities America"). David McFadden was the

representative who serviced Plaintiffs' Securities America accounts. The Plaintiffs filed suit in state court based on allegations that they lost the majority of their life savings due to the blatant self-dealing of Securities America and Mr. McFadden. Securities America demanded that they pursue their claims in arbitration as required by the Securities America customer agreement.

The Plaintiffs filed a Statement of Claim with the NASD-DR in July of 2003. The panel issued an award in favor of the Plaintiffs on May 15, 2006. The arbitration spanned approximately three years, and it involved ninety hearing days. The arbitration panel consisted of C. Ellis Henican, Jr., and Leonard J. Sullivan, who were the "public" arbitrators, and Michael F. Brown, the "industry" arbitrator. Mr. Brown replaced Richard Upton after Mr. Upton withdrew from the panel. The award includes $11,635,850 in compensatory damages, $4,654,374 in attorney's fees, $453,924.62 in costs, and approximately $3.5 million in punitive damages. With interest, the award totals approximately $22 million. The award included separate amounts for each plaintiff ranging from $144,112 to $1,364,205.

Plaintiffs filed this action against Securities America seeking to confirm the award. Securities America and Mr. McFadden filed a separate action, which has been consolidated with the Plaintiffs' action, seeking to vacate the award.

## II. DISCUSSION

Securities America and McFadden argue that the award should be vacated or modified for the following reasons: (1) "the award's assessment of punitive damages was in manifest disregard of the law and public policy"; (2) "the award's attorneys' fees were grossly excessive and in manifest disregard of the law and public policy"; (3) "one of the appointed arbitrators

2

failed to make required disclosures of material information that constituted an appearance of bias

and therefore evident partiality in violation of Securities America's and McFadden's right to due

process"; and (4) "the conduct of one of the arbitrators demonstrated evident partiality in

violation of Security America's and McFadden's right to due process." (Securities America and

McFadden's Memo In Support of Motion to Vacate or Modify, p. 2).

### *(1) Punitive Damages*

Securities America and McFadden argue that the punitive damage award must be vacated

because the arbitrators manifestly disregarded the law by awarding punitive damages. They

argue that Louisiana has a strong and well developed public policy that absent specific statutory

grounds punitive damages are not recoverable. They contend that none of the statutory bases for

punitive damages were present in the arbitration. Securities America and McFadden contend

that the panel imposed punitive damages for violations of the Louisiana Blue Sky law or general

tort theories, even though Louisiana law forbids such an award.

Further, Securities America and McFadden contend that the award should be vacated

because the panel failed to assess punitive damages on an individual basis as mandated by

several United States Supreme Court cases. They argue that despite being aware of the

applicable standards, the panel awarded punitive damages to every plaintiff in an amount equal

to 30.079 % of each plaintiff's compensatory damage award. They assert that the arbitrators

made no effort to apply the factors established by the Supreme Court for making an

individualized assessment and violated their constitutional rights by failing to do so.

In opposition, Plaintiffs contend that their entitlement to punitive damages was never

3

based on Louisiana law, but was always based on the inherent powers conferred on the panel in

the arbitration agreement and the NASD rules. Plaintiffs point out that the arbitration agreement

in this case required arbitration under the NASD rules. Plaintiffs argue that *Mastrobuono v.*

*Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995), allows arbitrators to award punitive damages

under the NASD rules as well as any damages authorized by the parties' agreement to arbitrate,

even if those damages would not be allowed under state substantive law.

Plaintiffs argue that even if Securities America and McFadden could establish that the

award was contrary to law, their manifest disregard claim still fails because they cannot show

that the arbitrators knew the award was contrary to law, and made the conscious decision to

disregard that law. They contend that they cited ample authority to the panel for the propriety of

a punitive damages award, and Securities America never attempted to directly refute the

*Mastrobuono* line of cases supporting the panel's inherent power to make such an award.

Plaintiffs also contend that the punitive damage awards were in fact made individually.

They argue that although each plaintiff was awarded approximately 30 percent of his or her

individual compensatory award, there is nothing alarming about calculating each plaintiff's

award this way given the common facts. They argue that each of the individuals was a victim of

the same fraudulent scheme, and the gravity of the harm varied in proportion to the magnitude of

the financial losses suffered. Plaintiffs suggest that, "given the egregious self-dealing at issue

here, and the lengths to which Securities America went to defend what is truly indefensible," the

award does not create substantial injustice or offend societal norms, but rather reflects

considerable restraint on the panel's part.

A district court's review of an arbitration award "is extraordinarily narrow." *Prestige Ford v. Ford Dealer Computer Services, Inc.*, 324 F.3d 391, 393 (5th Cir. 2003). Indeed, because courts "must remain exceedingly deferential to arbitration," vacatur of an arbitration award is permitted "only on very narrow grounds." *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380, 385 (5th Cir. 2004). The Federal Arbitration Act ("FAA") sets forth the limited statutory grounds for vacating an award. 9 U.S.C. § 1, *et seq.* The Fifth Circuit has adopted the "manifest disregard of the law" standard as a non-statutory ground for vacating an arbitration award. *Prestige Ford*, 324 F.3d at 395 (citing *Williams v. Cigna Financial Advisors, Inc.*, 197 F.3d 752, 759 (5th Cir. 1999)). It has established a two-step test that a party asserting "manifest disregard" must meet to have an award vacated. *Sarofim v. Trust Company of the West*, 440 F.3d 213, 217 (5th Cir. 2006) (citing *Williams*, 197 F.3d at 762). "First, where on the basis of the information available to the court it is not manifest that the arbitrators acted contrary to the applicable law, the award should be upheld." *Id.* "Second, where on the basis of the information available to the court it is manifest that the arbitrators acted contrary to the applicable law, the award should be upheld unless it would result in significant injustice, taking into account all the circumstances of the case, including powers of arbitrators to judge norms appropriate to the relations between parties." *Id.*

The arbitration agreements at issue in this case required the parties to arbitrate pursuant to the arbitration rules of the New York Stock Exchange, Inc. or National Association of Securities Dealers, Inc. Plaintiffs further note that the parties signed a uniform submission agreement, stating that the claims would be arbitrated "in accordance with the Constitution, By-

5

Laws, Rules, Regulations and/or Code of Arbitration Procedure of the sponsoring organization."

The parties arbitrated with the NASD-DR. The *Mastrobuono* Court noted that the NASD's Code

of Arbitration Procedure, while not containing a clear authorization of punitive damages, had a

damages provision which appeared broad enough to at least contemplate such a remedy. 514

U.S. at 59. Further, as Plaintiffs point out, other courts have noted that "[t]he NASD rules

clearly allow for the award of punitive damages." *See, e.g., Roubik v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 674 N.E.2d 35 (Ill. App. Ct. 1996). Additionally, the NASD Manual

provides: "Arbitrators may consider punitive damages as a remedy." Securities America and

McFadden have not suggested that the parties' agreement contained any express reference to

claims or exclusions for punitive damages. Based on the foregoing, this Court cannot conclude

that the panel manifestly disregarded the law in awarding punitive damages in this case.

Securities America and McFadden also suggest that public policy supports vacatur of the

punitive damages award. The Fifth Circuit "does recognize some circumstances in which a court

may refuse to enforce an arbitration award that is contrary to public policy." *Prestige Ford*, 324

F.3d at 396. It has been recognized that the public policy exception is a narrow one. *Id.* (citing

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29 (1987)). "A court's refusal to

enforce an award that is contrary to public policy is little more than 'a specific application of the

more general doctrine, rooted in the common law, that a court may refuse to enforce contracts

that violate law or public policy.'" *Misco*, 484 U.S. at 42. "[A]ny public policy used to vacate

an arbitration award must be 'explicit,' 'well defined,' and *'dominant.'*" *Id.* (quoting *W.R.*

*Grace & Co. v. Rubber Workers*, 461 U.S.757, 766 (1983) (emphasis added)). Securities

6

America and McFadden have not demonstrated that Louisiana's policy on punitive damages is grounds for vacatur of the award in light of the narrow public policy exception. Most importantly, they have not demonstrated that Louisiana's policy is "dominant" notwithstanding that the parties agreed to arbitrate according to the NASD rules, which permits the award of punitive damages.

Further, the Court finds no merit in Securities America and McFadden's contention that the panel failed to assess punitive damages on an individual basis. In the award, the panel listed a separate amount of punitive damages to be paid to each individual Plaintiff. (See Pla. Memo in Support of Motion to Confirm, Exh. 3, Award). The panel did not state its reasons for the amount of punitive damages it awarded to each Plaintiff. However, "'[a]rbitrators need not give reasons for their awards . . . . Uncertainty about arbitrators' reasoning cannot justify vacatur, for a court must resolve all doubts in favor of arbitration.'" *Brabham* , 376 F.3d at 385; *Sarofim*, 440 F.3d at 218.

While each Plaintiff was awarded punitive damages in the amount of approximately 30 percent of his or her individual compensatory award, this does not demonstrate that the arbitrators manifestly disregarded the law. The plaintiffs in this case, former plant workers, had similar grievances against Securities America and McFadden. Securities America and McFadden have not demonstrated that "clearly applicable law . . . dictates a contrary result" from that reached by the panel. *Brabham*, 376 F.3d at 385.

Finally, even if the Court were to find that the panel manifestly disregarded the law in awarding punitive damages, Securities America and McFadden would still have to demonstrate

7

that the award "would result in significant injustice, taking into account all the circumstances of the case, including powers of arbitrators to judge norms appropriate to the relations between parties." *Sarofim*, 440 F.3d at 217 (citing *Williams*, 197 F.3d at 762). Securities America and McFadden have not established how this requirement has been met.

For the foregoing reasons, the Court finds no basis for vacating the panel's award of punitive damages.

### (2) Attorney's Fees

Securities America and McFadden challenge the arbitration panel's award of attorney's fees as excessive and in manifest disregard of the law. Securities America and McFadden appear to recognize the arbitrators' purported basis for legal entitlement to the award under the Louisiana Blue Sky Law, La. R.S. 51:714(A), and La Civ. Code Art. 1958. However, they go on to assert that once it appears an attorney fee award is statutorily authorized, a court must inquire into the reasonableness of the attorneys' fees. Securities America and McFadden argue that the fees awarded are triple the "normal" hourly rate in the state of Louisiana and three times the amount requested by Plaintiffs. Therefore, they argue the attorney fees are clearly excessive and represent a "manifest disregard" of the law by the arbitrators.

In opposition, Plaintiffs argue the panel's award was sensible and factually appropriate given the contingency fee contract in place. They contend that under either the contractual fee approach or the lodestar approach, the panel's award is well-supported. Plaintiffs assert that the award is legally permissible under both the Louisiana Blue Sky Law and Louisiana contract fraud theory. Plaintiffs also contend that the reasonableness of the attorney's fee award is a

8

factual issue not a legal issue and therefore not properly subject to the "manifest disregard of the law" analysis.

Alternatively, even if the reasonableness of the attorney's fee award is a legal issue, and subjected to either the contingency fee approach or the lodestar approach, Plaintiffs contend the fees awarded are reasonable. They point to the numerous years and thousands of hours expended on this case which required 90 hearing days, the multiple expert witnesses, and hundreds of thousands of dollars in up-front out of pocket expenses. Plaintiffs argue that Defendants' continued references to normal hourly rates ignores the fact that this suit was litigated through a contingency fee contract arrangement.

This Court must evaluate the arbitrators' decision in awarding attorney's fees under a "manifest disregard of the law" standard. *Prestige Ford*, 324 F.3d at 395 (citing *Williams v. Cigna Financial Advisors, Inc.*, 197 F.3d 752, 759 (5th Cir. 1999)). In determining whether the arbitrators' award of attorney's fees in this case was in manifest disregard of the law, this Court refers to the Fifth Circuit Court of Appeals holding in *Prestige Ford v. Ford Dealer Computer Services*, namely, that a district court's review of an arbitration award is "extraordinarily narrow." 324 F.3d 391, 393 (5th Cir. 2003). Recently, the Fifth Circuit has refined the applicable "manifest disregard" standard, as noted above, adding strong language such as "manifest" and "significant injustice" to reinforce the notion that district courts exercise restraint when considering vacatur of an arbitration award. *Sarofim v. Trust Company of the West*, 440 F.3d 213, 217 (5th Cir. 2006) (citing *Williams*, 197 F.3d at 762).

In the instant case, this Court finds that the arbitrators did not exhibit a "manifest

9

disregard of the law" in the amount of attorney's fees awarded because the fee award is

reasonable. It is unclear from the record whether the arbitrators used the contingency fee

approach or the lodestar approach when assessing the attorney's fees. Nevertheless, there is

significant overlap between the factors underlying both methods. The record shows that

Plaintiffs submitted a two page affidavit to the panel with a request for a lodestar multiplier. The

record also shows the case lasted approximately three years, involved 90 days of hearings, and

multiple attorneys performing thousands of hours of work. In addition, there was a contingency

fee agreement with plaintiffs in the amount of 40% of the award. Based on the foregoing factors,

the attorney's fee award is reasonable and not in manifest disregard of the law.

### (3) Failure to Make Required Disclosures

Securities America and McFadden argue that arbitrator Michael Brown failed to make

required disclosures, providing grounds for vacatur. Specifically, Securities America and

McFadden argue that Brown failed to make required disclosures about his expert witness work

for claimants in other cases, some of which involved issues similar to those raised in the instant

matter, and some of which took place during the same time period as the arbitration in the instant

matter.[1]

---

[1] Securities America and McFadden raise many of the same arguments that they have previously raised in their memorandum in support of their application for leave to conduct limited discovery (Rec. Doc. 20), their supplemental memorandum and exhibits in support of their application for leave to conduct limited discovery (Rec. Doc. 25), and their reply brief in support of their application for leave to conduct limited discovery (Rec. Doc. 31). After considering the extensive briefing of the parties and the applicable law, the Court denied Securities America and McFadden's request for discovery regarding their allegation of failure to disclose and bias on the part of Mr. Brown. ( Rec. Doc. 37).

10

The Court has previously ruled that such allegations are insufficient to establish even a *prima facie* case that the award should be vacated. (Rec. Doc. 37). The Court will not repeat its reasoning. However, it will reiterate that Securities America and McFadden have not made any allegations that Brown has or had a relationship with anyone involved in this litigation. Moreover, as the non-public or industry arbitrator, Brown was required to have worked in the industry and have knowledge about the brokerage business.

Securities America and McFadden contend that evident partiality is proven by the failure to disclose facts that might create a reasonable impression of an arbitrator's partiality regardless of whether actual bias is established. They contend that Brown's alleged non-disclosure of his expert witness work at the outset thus constitutes evident partiality. However, the court in *University Commons-Urbana, Ltd.*, 304 F.3d 1331, 1339 (11th Cir. 2002), explained that the partiality alleged must be "direct, definite and capable of demonstration rather than remote, uncertain and speculative."

Further, while Brown may not have been as specific in disclosing his expert witness work as Securities America and McFadden would like, he did disclose during the arbitration that he had testified as an expert on behalf of other claimants in unrelated cases. The fact that this was not disclosed at the beginning of his appointment did not prevent Securities America and McFadden from making an objection when they did learn about the expert witness work. However, they chose not to do so, and now they ask this Court to discard an award reached after three years and ninety hearing days. A party "cannot stand by during arbitration, withholding certain arguments, then upon losing the arbitration, raise such arguments in federal court."

11

*Gateway Technologies, Inc. v. MCI Telecomm. Corp.*, 64 F.3d 993 (5th Cir. 1995).

Based on the foregoing, and for the reasons set forth in the Court's order regarding discovery (Rec. Doc. 37), the Court maintains its previous finding that Securities America and McFadden's contentions that Brown's failure to make required disclosures about his expert work do not present a *prima facie* case for vacatur.

### (4) Evident Partiality By the Arbitrators

Securities America and McFadden argue that C. Ellis Henican, Jr. breached his duty to act as a *neutral* arbitrator under NASD-DR's established standards by making remarks and engaging in conduct that demonstrated bias, hostility and prejudice against Securities America and McFadden. They contend that strictly maintaining neutrality is mandatory for a panel chair such as Henican. They argue that his disregard of his duty of neutrality establishes his evident partiality, warranting vacatur of the award.

In opposition, Plaintiffs contend that a review of the 40,000 plus pages of transcript documenting the 90 hearing days which occurred in this case clearly demonstrates the overall evenhandedness, patience, and engagement of the arbitration panel, and of its chairman, Ellis Henican. They contend that the applicable case law demonstrates that it is to be expected that during the course of an arbitration hearing that an arbitrator may develop an opinion and perhaps express it. They argue that in a case involving 90 days of testimony, it would be highly unusual if a party could not scroll through the transcript for a few incidents that demonstrate frustration directed toward one party or the other during the course of the proceeding.

"Absent some sort of overt misconduct, a disappointed party's perception of rudeness on

12

the part of an arbitrator is not the sort of 'evident partiality' contemplated by the Act as grounds

for vacating an award. . . . [I]t is not surprising that within the informal confines of an

arbitration proceeding, an unsuccessful party eventually may perceive the demeanor of an

arbitrator as less than satisfactory. Similarly, an arbitrator's legitimate efforts to move the

proceedings along expeditiously may be viewed as abrasive or disruptive to a disappointed party.

Nevertheless, such displeasure does not constitute grounds for vacating an arbitration award."

*Fairchild & Co., Inc. v. Richmond, F. & P.R. Co.*, 516 F. Supp. 1305, 1313 (D.D.C. 1981).

The Fifth Circuit has noted that arbitration "is a speedy and informal alternative to

litigation, and by its very nature, is intended to resolve disputes without confinement to many of

the procedural and evidentiary strictures that protect the integrity of formal trials." *Prestige*

*Ford*, 324 F.3d at 394. "Submission of disputes to arbitration always risks an accumulation of

procedural and evidentiary shortcuts that would properly frustrate counsel in a formal trial; but

because the advantages of arbitration are speed and informality, the arbitrator should be expected

to act affirmatively to simplify and expedite the proceedings before him." *Id.*

Securities America and McFadden contend Henican told McFadden that he did not

believe his testimony, in contravention of the requirement in the Arbitrator's Manual that care

should be exercised, particularly when questioning a witness, so that the arbitrator does not

indicate disbelief. They contend that Plaintiffs' counsel objected to an answer McFadden gave

on direct examination on the ground that the answer was general, and instead of ruling on the

objection, Henican made comments indicating his views about the accuracy of McFadden's

testimony and/or recollection. Securities American and McFadden suggest that Henican's

13

statements demonstrated partiality and pre-judgment of the case, contending that McFadden had just begun testifying. Securities America and McFadden also contend that Henican repeatedly interrupted the testimony of Securities America and McFadden's witnesses to summarily argue points or challenge their testimony without waiting for cross-examination.

Securities America and McFadden contend that Henican repeatedly blamed Securities America and McFadden for the length and duration of the hearing through comments such as "the problem is always with the Defendants getting their witnesses on time or interviewing their witnesses or they want more time for vacations and all of that. And I feel concerned about that. That concerns me." (Securities America and McFadden's Memo in Support of Motion to Vacate, p. 24 (citing Exh. 13, Transcript). They contend that Henican badgered counsel and blamed them for being involved in other trials or matters that required attention, and he expressed impatience and hostility with the witnesses that they chose in light of the condensed time frame they were forced to follow. They contend that changes were made to the hearing schedule to accommodate the arbitrators' vacation schedules, conflicts with other ongoing arbitration proceedings, the availability of Plaintiffs, and illnesses by other parties.[2]

Plaintiffs respond that Henican's comments occurred on the seventh day of McFadden's testimony, and day 60 of the proceedings overall. They contend that by this time in the trial, McFadden had repeatedly offered extremely implausible testimony about how he never made trades without first obtaining the customer's approval and about other conversations and events

---

[2] Securities American and McFadden argued at length about numerous other instances that they claim demonstrate bias by Henican. Those contentions are too numerous to recite here and the Court does not find them persuasive.

14

that he purportedly remembered that were not referenced in the voluminous documents, or were directly contradicted by them. Plaintiffs argue that by day 60, it was clear that McFadden had routinely made trades in the Plaintiffs' accounts without first checking with them. Plaintiffs contend that before the comments were made, McFadden spent much of the morning continuing to deny his alleged misconduct and supporting his testimony with his recollection of specific conversations he had had years earlier, but which he failed to document in any way.

This Court finds that Henican's comments do not constitute "evident partiality" and thus do not provide a basis to vacate the award, especially considering the comments in the contexts in which they were made. Henican's comments regarding the witnesses reflect an attempt "to act affirmatively to simplify and expedite the proceedings before him." *Id.* Further, his comments regarding Defendants' scheduling cannot be said to constitute bias sufficient to vacate the award. Plaintiffs cited various portions of the transcript which demonstrated that Securities America and McFadden and/or their counsel had numerous scheduling problems. Neither does Securities America and McFadden's contention that Henican allowed Plaintiffs' counsel to ask questions repeatedly about a judgment involving punitive damages against McFadden even though the judgment was almost 20 years old, had been obtained in violation of a bankruptcy and had been discharged, provide a basis for vacatur. Notably, it is far from clear any such questions were asked "repeatedly." Securities America and McFadden cite *one* page of the transcript in support of their contention. Moreover, even if they would have cited more than one page they have not explained how allowing such questioning qualifies as "evident partiality" sufficient to vacate the award.

Further, "[a]n arbitrator is not precluded from developing views regarding the merits of a dispute early in the proceedings, and an award will not be vacated because he expresses those views." *Spector v. Torenberg*, 852 F. Supp. 201, 209 (S.D.N.Y. 1994) (citing *Ballantine Books, Inc. v. Capital Distributing Co.*, 302 F.2d 17, 21 (2d Cir. 1962). An arbitrator's "gratuitous remarks about the merits" do not indicate any bias. *United Ind. Workers v. Cov't. of V.I.*, 987 F.2d 162, 172 (3d Cir. 1993). Thus, Henican's comments regarding McFadden's testimony or the alleged financial situations of some of the Plaintiffs are insufficient to vacate the award.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Confirm Arbitration Award (Rec. Doc. 10)** should be and is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the **Motion to Vacate or Modify Arbitration Award (Rec. Doc. 45 and Rec. Doc. 1 in case 06-3042)** should be and is hereby **DENIED**.

16

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

F I L E D

MAR 6 2000

CLERK
S. DISTRICT C
DIST. OF
..., A.

ROBERT MCDUFFIE,                    )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )    CIVIL ACTION 99-D-1023-N
                                    )
FRANKLIN LIFE INSURANCE CO.,        )
et al.,                             )
                                    )
        Defendants.                 )

```
┌─────────────────────────┐
│  DEFENDANT'S             │
│  EXHIBIT                 │
│                          │
│  CASE                    │
│  NO.                     │
│                          │
│  EXHIBIT     F           │
│  NO.                     │
└─────────────────────────┘
```

### MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff Robert McDuffie's ("Plaintiff") Motion To Remand ("Mot."), filed October 6, 1999. The Parties have filed briefs and evidentiary submissions in support of and in opposition to Plaintiff's Motion To Remand.[1] After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Plaintiff's Motion is due to be denied.

### I. REMAND STANDARD AND FRAUDULENT JOINDER

It is well-settled that a defendant, as the party removing an action to federal court, has the burden to establish federal jurisdiction.  See Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th Cir. 1996).  Removal of a case from state to federal court is

---

[1] When citing to certain pleadings in the record, the court will refer to the docket numbers assigned to those pleadings ("Doc. No.").

EOD ___3-6-00___

proper if the case could have been brought originally in federal court.  See 28 U.S.C. § 1441(a).  A federal district court has original jurisdiction over cases involving citizens of different states where the amount in controversy, exclusive of interest and costs, exceeds $75,000.  See 28 U.S.C. § 1332(a).  "Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity- every plaintiff must be diverse from every defendant."  Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1359 (11th Cir. 1996). Therefore, where the parties are diverse and the amount in controversy is sufficient, a defendant has the statutory right to remove an action from state to federal court.  See 28 U.S.C. § 1332(a).

However, as the Supreme Court has long recognized, diversity jurisdiction "cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy."  Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921).  Thus, when determining whether complete diversity exists, courts shall disregard the citizenship of fraudulently joined defendants.  See Tedder v. F.M.C. Corp., 590 F.2d 115, 117 (5th Cir. 1979).[2]

---

[2] In Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  See 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Joinder is fraudulent "when there is no possibility that the plaintiff can prove a cause of action against the resident defendant." <u>Triggs v. John Crump Toyota, Inc.</u>, 154 F.3d 1284, 1287 (11th Cir. 1998). As explained by the old Fifth Circuit,

> [t]here can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard. One or the other at least would be required before it could be said that there was no real intention to get a joint judgment and that there was no colorable ground for so claiming.

<u>See</u> <u>Parks v. New York Times Co.</u>, 308 F.2d 474, 478 (5th Cir. 1962). "If the only claims against a resident defendant are barred by the statute of limitations, then there 'is no possibility the plaintiff can establish a cause of action against the resident defendant.'" <u>Whitlock v. Jackson National Life Ins. Co.</u>, 32 F. Supp.2d 1286, 1290 (M.D. Ala. 1998) (quoting <u>Crowe v. Coleman</u>, 113 F.3d 1536, 1538 (11th Cir. 1997)).

Furthermore, in examining whether a joinder is fraudulent, the court "should resolve all questions of fact and controlling law in favor of the plaintiff and can consider any submitted affidavits and/or deposition transcripts." <u>See</u> <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989); <u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983).

3

## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

In approximately February 1987, Plaintiff purchased a life insurance policy through Defendant Franklin Life Insurance Co. ("Franklin Life"). (Compl. ¶¶ 5-6, 9.) Defendant Bernard Mathis ("Mathis"), an agent for Franklin Life, sold Plaintiff the policy. (Id.) Mathis allegedly represented to Plaintiff that, after paying premiums on the policy for ten years, the policy would no longer require out-of-pocket premium payments, and, thus, the premiums would "vanish."[3] (Id. ¶ 7; Doc. No. 10 at 11 & n.10; Doc. No. 12, Ex. A.) Plaintiff asserts that these statements were false and caused him to purchase the policy. (Compl. ¶¶ 9-10.)

On or about April 27, 1999, Plaintiff opted out of a class action styled Garst, et al. v. Franklin Life Ins Co. & American Franklin Life Ins. Co., Civ. A. No. 97-C-0074-S (N.D. Ala. 1997) ("Garst"). (Doc. No. 12 at 5, Exs. B & C; Doc. No. 13, Ex. A.)

_____

[3] This type of policy is referred to as a "vanishing premium" policy. See Williamson v. Indianapolis Life Ins. Co., 741 So. 2d 1057 (Ala. 1999). A "vanishing premium" policy is a policy

> where, after a certain number of premium payments have been made, the policy itself generates sufficient income through dividends and interest to pay any additional premiums. Stated differently, premiums paid in the initial years of a policy are supposed to pay for premiums in later years, so that future premiums "vanish."

Id. at 741 (Lyons, J., concurring in part and dissenting in part).

4

In the <u>Garst</u> action, prior to opting out, Plaintiff was an
unnamed member of a putative class of plaintiffs.  Subsequently,
on August 4, 1999, Plaintiff filed this action in the Circuit
Court of Bullock County, Alabama, against Franklin Life and
Mathis (collectively "Defendants").  (Compl. ¶¶ 2-3.)  Based on
Defendants' alleged false representations, Plaintiff brings
claims against Defendants for misrepresentation (Count 1),
fraudulent suppression (Counts 2 and 6), negligent or wanton
misrepresentation and/or suppression (Count 3), negligent hiring,
training and supervision (Count 4) and wanton hiring, training
and supervision (Count 5).  (<u>Id.</u> ¶¶ 14-36.)  Mathis is named as a
Defendant in Counts 1-3, while Franklin Life is named in all six
counts.  (<u>Id.</u>)

Plaintiff requests unspecified compensatory and punitive
damages.  (<u>Id.</u> at 4-7.)  Both Plaintiff and Mathis are citizens
of the State of Alabama, while Franklin Life is a foreign
corporation.  (<u>Id.</u> ¶¶ 1-3; Doc. No. 12 at 1.)  On September 8,
1999, Franklin Life filed a Notice Of Removal in the United
States District Court for the Middle District of Alabama.  (Doc.
No. 1.)  Mathis joined in the Notice of Removal.  (Doc. No. 2.)

### III.  DISCUSSION

Franklin Life contends that removal of this case from state
to federal court is proper because diversity-of-citizenship
jurisdiction exists pursuant to 28 U.S.C. § 1332(a).  As the

5

removing party, Franklin Life bears the burden of establishing that complete diversity exists between the Parties and that the amount in controversy, exclusive of interest and costs, exceeds $75,000.  See 28 U.S.C. § 1332(a); Diaz, 85 F.3d at 1505.

## A. Complete Diversity

Franklin Life acknowledges that, on the face of Plaintiff's Complaint, the requirement of diversity of citizenship does not exist because Mathis' citizenship is the same as Plaintiff's citizenship.  (Doc. No. 1 ¶ 3.)  However, Franklin Life asserts that Plaintiff has fraudulently joined Mathis in order to defeat diversity jurisdiction.  Namely, Franklin Life argues that the joinder of Mathis is fraudulent because any claim against him is barred by the two-year statute of limitations.  (Id. ¶¶ 7, 9; Doc. No. 10 at 2.)

According to Franklin Life, the statute of limitations began to run "no later than February 1997 and expired no later than February 1999, more than two years before [] Plaintiff filed this civil action" on August 4, 1999.[4]  (Doc. No. 10 at 14; Compl.

---

[4] In pinpointing February 1997 as the month the statute of limitations began to run, Franklin Life relies in part on the holding in Williamson v. Indianapolis Life Ins. Co., 741 So. 2d 1057 (Ala. 1999).  (Doc. No. 10 at 11 & n.10.)  There, the court addressed whether an individual who purchases a "'vanishing premium' insurance policy is precluded from pursuing fraud-based causes of action, on the basis that if he is required to make out-of-pocket premium payments, he will not be required to do so until some future date and, therefore, has presently suffered no damage."  Id. at 1060.

6

at 1.)  Thus, Franklin Life contends that, in determining whether

complete diversity exists under § 1332(a), the court must

disregard the citizenship of Mathis.

---

     In Williamson, the plaintiff purchased two life insurance
policies from an insurance agent in 1992.  The agent allegedly
represented that, after ten years, "the premiums would 'vanish.'"
Id.  The plaintiff sued after discovering that he "probably"
would have to continue paying premiums after ten years, which
would be the year 2002.  Id.  In holding that no justiciable
controversy existed, the Supreme Court stated that "[a]lthough
there are projections suggesting that the agent's alleged
representation was false, there is absolutely no way to know
whether this representation was true or false, until the end of
the year 2002."  Id.  For instance, if the plaintiff died prior
to the year 2002, "the insurer will pay the benefits called for
by the policies and [the plaintiff] will have received the full
benefit of what he claims to have bargained for.  There is no way
to prove that he will live beyond the year 2002."  Id.; see also
Stringfellow v. State Farm Life Ins. Co., 743 So. 2d 439, 440-441
(Ala. 1999) (relying on Williamson and holding that the
plaintiff's action for breach-of-contract and fraud, which was
based on an agent's representation that the premiums on the
plaintiff's life insurance policy would "vanish" after nine
years, was premature when filed because the nine years had not
yet run).  Thus, a "fraud-based cause of action [does] not accrue
until the insured is required to pay a premium beyond the time
for which he alleges he was told he would be required to pay."
Stringfellow, 743 So. 2d at 440.
     Here, in selling Plaintiff the policy in February 1987,
Mathis allegedly represented that, after ten years, the premiums
would "vanish."  (Compl. ¶ 7.)  Thus, Mathis purportedly
projected that Plaintiff's out-of-pocket payments would cease
around February 1997.  Based on Williamson, Franklin Life asserts
that Plaintiff's cause of action, if any, accrued no later than
February 1997.  That is, Franklin Life states that Plaintiff has
admitted "that he reviewed his pay stubs after the ten[-]year
period had expired in February of 1997 and knew that the vanish
date had passed and he was still paying premiums on his policy."
(Doc. No. 10 at 12.)  Therefore, Franklin Life asserts that
Plaintiff had notice "that any representation by [] Mathis that
the premium on Plaintiff's policy would vanish in ten years was
false."  (Id. at 13.)

In response, Plaintiff does not dispute that the applicable statute of limitations is two years. (Doc. No. 12 at 2; Compl. ¶ 10.) Likewise, Plaintiff agrees, and so argues, that "the statute of limitations in a vanishing premium case does not run until Plaintiff is past the vanish date." (Doc. No. 12 at 5.) However, Plaintiff asserts that, because he was a "class action 'opt out,'" the two-year statute of limitations as to his claims against Mathis was "tolled at the time of the filing of the original [class action] complaint." (Doc. No. 12 at 5.) Because "the original class complaint was filed on September 23, 1996," Plaintiff asserts that the statute of limitations was tolled from September 23, 1996 until August 4, 1999, the date he filed his Complaint in this action. (Doc. No. 12 at 5-6.) Thus, under Plaintiff's calculations, he commenced his claims against Mathis within the two-year statute of limitations. In support of his tolling argument, Plaintiff relies on <u>White v. Sims</u>, 470 So. 2d 1191, 1193 (Ala. 1985). (Doc. No. 12 at 5-6.)

In rebuttal, Franklin Life asserts that the filing of the <u>Garst</u> class action cannot toll the statute of limitations as to Plaintiff's claims against Mathis because Mathis was not a party to that class action. (Doc. No. 13 at 1; Doc. No. 21 at 1-7.) For the reasons that follow, the court agrees with Franklin Life and finds that the statute of limitations has expired on Plaintiff's claims asserted against Mathis.

8

As a threshold matter, because Franklin Life predicates jurisdiction on diversity, the court must look to state law as the source for the statute of limitations and tolling rules. See Cambridge Mutual Fire Ins. Co. v. City of Claxton, Ga., 720 F.2d 1230, 1232 (11th Cir. 1983) (holding that, in diversity cases, the statute of limitations period and toll provisions are governed by state law). As stated above, the Parties agree, and the court so finds, that the statute of limitations applicable to Plaintiff's claims against Mathis is two years. See Ala. Code §§ 6-2-3 & 6-2-38(1) (1993); Williams v. Norwest Fin. Alabama, Inc., 723 So. 2d 97, 104 (Ala. Civ. App. 1998) (Negligence and wantonness claims are subject to a two-year statute of limitations.); Casassa v. Liberty Life Ins., Co., 949 F. Supp. 825, 828 (M.D. Ala. 1996) (Under Alabama law, fraudulent misrepresentation and suppression claims are subject to a two-year statute of limitations.); Kelly v. Connecticut Mut. Life Ins. Co., 628 So. 2d 454, 458 (Ala. 1993) (Fraudulent representation claims are subject to a two-year statute of limitations.); see also Foremost Ins. Co. v. Parham, 693 So. 2d 409, 421-23 (Ala. 1997) (holding that the two-year statute of limitations on fraud claims accrues from the date on which a plaintiff knew or should have known of the alleged fraud).

Additionally, the court finds that, in the absence of tolling, Plaintiff's action against Mathis is barred by Alabama's

two-year statute of limitations.[5]  Namely, more than two years

transpired between February 1997 and the date Plaintiff filed his

Complaint against Mathis in August 1999.  Because Plaintiff's

action would otherwise be barred by the statute of limitations,

the court is presented with the question of whether an Alabama

state court could possibly find that Plaintiff's action against

Mathis was tolled from the date the <u>Garst</u> class action commenced

until the filing of Plaintiff's Complaint against him in this

action.

    In turning to tolling in the context of class actions, the

Supreme Court of Alabama has established the general rule that

the commencement of a class action tolls the applicable statute

of limitations as to all purported members of a class action

during the pendency of the class action.[6]  See <u>First Baptist</u>

<u>Church of Citronelle v. Citronelle-Mobile Gathering, Inc.</u>, 409

---

[5] Plaintiff does not refute this point.  That is, in
rebutting Franklin Life's argument that the statute of
limitations began to run on Plaintiff's claims against Mathis in
February 1997, Plaintiff states that, if Plaintiff was "not a
class action 'opt out,' this argument may have some merit."
(Doc. No. 12 at 5.)

[6] In examining whether the statute of limitations was tolled
under the facts before it, the Supreme Court of Alabama relied on
precedent from the Supreme Court of the United States.  See <u>First
Baptist</u>, 409 So. 2d at 729 (citing <u>United Airlines, Inc. v.
McDonald</u>, 432 U.S. 385 (1977) and <u>American Pipe & Construction
Co. v. Utah</u>, 414 U.S. 538 (1974)).  In so relying, the Supreme
Court of Alabama stated that "Rule 23 of the Alabama Rules of
Civil Procedure is identical to Rule 23 of the Federal Rules of
Civil Procedure.  Thus, federal authorities are persuasive when
interpreting the Alabama Rule, but they are not binding on this
Court."  <u>Id.</u> (internal citations omitted).

So. 2d 727, 728 (Ala. 1981); <u>White</u>, 470 So. 2d at 1193.  Based on
Alabama law, Plaintiff clearly falls within the general rule, as
there is no dispute that Plaintiff opted out of a putative
plaintiff class action.

However, the dispositive issue in this case is against whom
are Plaintiff's fraud-based claims tolled.  In <u>White</u>, the Supreme
Court of Alabama held that the commencement of a class action
tolls the statute of limitations as to all claims against
"putative members of [a] defendant class" until an independent
action is filed or until the denial of class certification,
whichever may occur first.  470 So. 2d at 1193.  The court finds
that Plaintiff's reliance on <u>White</u> is misplaced.  <u>White</u> is
distinguishable, because <u>White</u> addressed the tolling doctrine in
the context of a <u>defendant class action</u> involving a <u>class of
unnamed defendants</u>.  To the contrary, the <u>Garst</u> class action was
a lawsuit by a class of unnamed plaintiffs against two defendants
who were not named as part of a class.[7]  <u>Garst</u> did not involve a
<u>defendant class action</u>.  The defendants in <u>Garst</u> were sued
individually, not as representatives of an unnamed defendant
class.  Namely, the individual Defendants in <u>Garst</u> were Franklin
Life and American Franklin Life Ins. Co.  (Doc. No. 13, Ex. A.)
Mathis was not a named Defendant.  In other words, <u>White</u> involved

---

[7] The class action lawsuit at issue in <u>White</u> "sought to
establish a statewide class of plaintiffs against a statewide
class of defendants."  470 So. 2d at 1192.

both a plaintiff class action and a defendant class action, as opposed to <u>Garst</u>, which involved only a plaintiff class action.

Because Mathis was not a member in the <u>Garst</u> class action or even a potential unnamed member of a defendant class, the court finds that the <u>Garst</u> action cannot toll the statute of limitations with respect to any of Plaintiff's claims against him. <u>See</u> <u>Aserinsky v. Wyeth Laboratories, Inc.</u>, 1999 WL 554608, *2 (E.D. Penn. 1999) (finding that the non-diverse defendant was fraudulently joined because the state of limitations was not tolled by a class action in which the fraudulently joined party was not a defendant). To state it a different way, the commencement of a class action only tolls the statute of limitations as to claims against a defendant who is either specifically named as a defendant or is an unnamed member of a defendant class action.

Thus, the court finds that Plaintiff's action against Mathis is barred by the statute of limitations because Plaintiff's Complaint was filed on August 4, 1999, which is more than two years after February 1997.[8] As a result, the court finds that

---

[8] The court notes that Franklin Life also argues that, under the holding in <u>Foremost</u>, the statute of limitations on Plaintiff's claims against Mathis began to run in February 1987 when Plaintiff received a copy of his policy. <u>See</u> 693 So. 2d at 421; (Doc. No. 12 at 4-14; Doc. No. 1 ¶¶ 11-14.) Namely, Franklin Life argues that the terms of the policy placed Plaintiff on notice that the premiums would not vanish in ten years. Thus, according to Franklin Life, Plaintiff knew or should have known of Mathis' alleged misrepresentation in February 1987, and, thus, this date starts the running of the

Plaintiff has fraudulently joined Mathis in this action.  See
Whitlock, 32 F. Supp.2d at 1290 (Where the only claims against a
resident defendant are barred by the statute of limitations, "the
resident defendant is deemed to have been fraudulently joined.").
Therefore, the court must disregard Mathis' citizenship for
purposes of determining jurisdiction under 28 U.S.C. § 1332.  In
so doing, it is undisputed that the citizenship of Plaintiff is
diverse from the citizenship of Franklin Life.  (Doc. No. 12
at 1.)  Accordingly, the court finds that Franklin Life has
satisfied its burden of establishing that complete diversity
exists in this case.  See Diaz, 85 F.3d at 1505.


                    B. Amount In Controversy

     Franklin Life asserts that, based on the evidence it has
submitted and in light of the fact that Plaintiff claims
unspecified damages, "it is more likely than not that the
jurisdictional amount for diversity jurisdiction is met in this
case." (Not. ¶¶ 15-19.)  Plaintiff has not addressed Franklin
Life's argument in any of his pleadings.  For two reasons, the
court agrees with Franklin Life.

---

statute of limitations.  (Doc. No. 12 at 4-14.)  However, the
court need not address this argument because, even assuming that
the statute of limitations did not begin to run until ten years
later in February 1997, Plaintiff's claims against Mathis are
still untimely.

First, Plaintiff has not contested the amount-in-controversy requirement. In moving the court to remand this action to state court, Plaintiff only addresses Franklin Life's fraudulent joinder argument. The court deems Plaintiff's silence as a concession that he seeks more than $75,000 in punitive and compensatory damages. See Florida Municipal Power Agency v. Florida Power & Light Co., ___ F. Supp.2d ___, ___, 1999 WL 1054233, *15 (M.D. Fla. 1999) (finding that the party's failure to "specifically address" the opposing party's argument was "a concession as to its merits").

Second, even if Plaintiff had challenged this element of diversity jurisdiction, the court finds that Franklin Life has met its burden of establishing that the amount-in-controversy requirement is satisfied. "[W]here a plaintiff has made an unspecified demand for damages in state court," as here, "a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the [$75,000] jurisdictional requirement." Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1356-57 (11th Cir. 1996). In cases where a plaintiff has made such an unspecified damages demand, "a lower burden of proof is warranted because there is simply no estimate of damages to which a court may defer." Id. In deciding whether a removing defendant has satisfied its burden, the court may look to damages awarded in cases involving the same type of suit. See Bolling v. Union National Life Ins. Co., 900

14

F. Supp. 400, 404 (M.D. Ala. 1995); see also De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993).

Here, Plaintiff claims both compensatory and punitive damages. (Compl. at 4-7.) Franklin Life has submitted several decisions from Alabama courts where plaintiffs in fraud actions against insurance companies received compensatory and punitive damages greater than $75,000. (Doc. No. 1, Ex. C.) As in Bolling, the court finds that, "[b]ased on these cases, it is clear that in Alabama when a plaintiff seeks recovery for fraud against an insurance company and asks for punitive damages, the recovery, if the plaintiff prevails, may very well exceed [$75,000]." 900 F. Supp. at 405. Based on the foregoing, the court finds that Franklin Life has met its burden of establishing the amount-in-controversy requirement. See Diaz, 85 F.3d at 1505.


## C. Conclusion

In sum, the court finds that Franklin Life has demonstrated that the court has diversity jurisdiction in this case. See 28 U.S.C. § 1332(a); see also Diaz, 85 F.3d at 1505. First, there exists complete diversity of citizenship between Plaintiff and the only properly joined Defendant, Franklin Life. Second, the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, the court finds that it may properly exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

15

Accordingly, the court finds that Plaintiff's Motion To Remand is due to be denied.

## IV. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Plaintiff's Motion To Remand be and the same is hereby DENIED. A Rule 16 Scheduling Order will be forthcoming.

DONE this the 10th day of March, 2000.

_____
UNITED STATES DISTRICT JUDGE

[ **FILED** ]

MAR 2 7 2000

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| JEAN LEE WILDER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 99-D-1037-E |
| | ) |
| FRANKLIN LIFE INSURANCE CO., | ) |
| et al., | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff Jean Lee Wilder's ("Plaintiff")
Motion To Remand, filed October 8, 1999.  The Parties have filed
briefs and evidentiary submissions in support of and in opposition
to Plaintiff's Motion To Remand.[1]  After careful consideration of
the arguments of counsel, the relevant law, and the record as a
whole, the court finds that Plaintiff's Motion To Remand is due to
be denied.

## I. REMAND STANDARD AND FRAUDULENT JOINDER

It is well-settled that a defendant, as the party removing an
action to federal court, has the burden to establish federal
jurisdiction.  See Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th Cir.
1996).  Removal of a case from state to federal court is proper if
the case could have been brought originally in federal court.  See

---

[1] When citing to certain pleadings in the record, the court
will refer to the docket numbers assigned to those pleadings
("Doc. No.").

2.7

28 U.S.C. § 1441(a). A federal district court has original jurisdiction over cases involving citizens of different states where the amount in controversy, exclusive of interest and costs, exceeds $75,000. <u>See</u> 28 U.S.C. § 1332(a). "Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity-every plaintiff must be diverse from every defendant." <u>Tapscott v. MS Dealer Serv. Corp.</u>, 77 F.3d 1353, 1359 (11th Cir. 1996). Therefore, where the parties are diverse and the amount in controversy is sufficient, a defendant has the statutory right to remove an action from state to federal court. <u>See</u> 28 U.S.C. § 1332(a).

However, as the Supreme Court has long recognized, diversity jurisdiction "cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy." <u>Wilson v. Republic Iron & Steel Co.</u>, 257 U.S. 92, 97 (1921). Thus, when determining whether complete diversity exists, courts shall disregard the citizenship of fraudulently joined defendants. <u>See Tedder v. F.M.C. Corp.</u>, 590 F.2d 115, 117 (5th Cir. 1979).[2]

Joinder is fraudulent "when there is no possibility that the plaintiff can prove a cause of action against the resident

---

[2] In <u>Bonner v. City of Prichard</u>, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981. <u>See</u> 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

defendant." <u>Triggs v. John Crump Toyota, Inc.</u>, 154 F.3d 1284, 1287

(11th Cir. 1998). As explained by the old Fifth Circuit,

> [t]here can be no fraudulent joinder unless it be clear
> that there can be no recovery under the law of the state
> on the cause alleged, or on the facts in view of the law
> as they exist when the petition to remand is heard. One
> or the other at least would be required before it could
> be said that there was no real intention to get a joint
> judgment and that there was no colorable ground for so
> claiming.

See <u>Parks v. New York Times Co.</u>, 308 F.2d 474, 478 (5th Cir. 1962).

"If the only claims against a resident defendant are barred by the

statute of limitations, then there 'is no possibility the plaintiff

can establish a cause of action against the resident defendant.'"

<u>Whitlock v. Jackson National Life Ins. Co.</u>, 32 F. Supp.2d 1286,

1290 (M.D. Ala. 1998) (quoting <u>Crowe v. Coleman</u>, 113 F.3d 1536,

1538 (11th Cir. 1997)).

Furthermore, in examining whether a joinder is fraudulent, the

court "should resolve all questions of fact and controlling law in

favor of the plaintiff and can consider any submitted affidavits

and/or deposition transcripts." See <u>Cabalceta v. Standard Fruit

Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989); <u>Coker v. Amoco Oil Co.</u>,

709 F.2d 1433, 1440 (11th Cir. 1983).


## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On or about October 1, 1987, Plaintiff purchased a life

insurance policy through Defendant Franklin Life Insurance Co.

("Franklin Life"). (Compl. ¶¶ 5, 7.) Defendant William Jackson

3

McCaa ("McCaa"), an agent for Franklin Life, sold Plaintiff the policy. (Id.)  Plaintiff alleges that McCaa represented that Plaintiff "would only be required to pay premiums for a maximum of nine (9) years, and no future premiums would be required of her."[3] (Id. ¶ 6.)  Plaintiff asserts that these representations were false and caused Plaintiff to purchase the policy. (Id. ¶¶ 7-8.)

On or about April 19, 1999, Plaintiff opted out of a class action styled Garst, et al. v. Franklin Life Ins Co. & American Franklin Life Ins. Co., Civ. A. No. 97-C-0074-S (N.D. Ala. 1997) ("Garst"). (Doc. No. 12 at 5, Ex. B.)  In the Garst action, prior to opting out, Plaintiff was an unnamed member of a putative class of plaintiffs. (Doc. No. 14, Ex. A.)  Subsequently, on August 2, 1999, Plaintiff filed her Complaint in the Circuit Court of Montgomery County, Alabama, against Franklin Life and McCaa (collectively "Defendants"). (Compl. ¶¶ 2-3.)  Based on Defendants' alleged false statements, Plaintiff brings claims

---

[3] This type of policy is referred to as a "vanishing premium" policy. See Williamson v. Indianapolis Life Ins. Co., 741 So. 2d 1057 (Ala. 1999).  A "vanishing premium" policy is a policy

where, after a certain number of premium payments have been made, the policy itself generates sufficient income through dividends and interest to pay any additional premiums.  Stated differently, premiums paid in the initial years of a policy are supposed to pay for premiums in later years, so that future premiums "vanish."

Id. at 1062 (Lyons, J., concurring in part and dissenting in part).

against Defendants for misrepresentation (Count 1), fraudulent suppression (Counts 2 and 6), negligent or wanton misrepresentation and/or suppression (Count 3), negligent hiring, training and supervision (Count 4), and wanton hiring, training and supervision (Count 5).  (Id. ¶¶ 12-33.)  McCaa is named as a Defendant in Counts 1-3, while Franklin Life is named in all six counts.  (Id.)

Plaintiff requests unspecified compensatory and punitive damages.  (Id.)  Both Plaintiff and McCaa are citizens of the State of Alabama, while Franklin Life is a foreign corporation.  (Id. ¶¶ 1-3.)  On September 10, 1999, Franklin Life filed a Notice Of Removal.  McCaa joined in the Notice Of Removal.


## III. DISCUSSION

Franklin Life contends that removal of this case from state to federal court is proper because diversity-of-citizenship jurisdiction exists pursuant to 28 U.S.C. § 1332(a).  As the removing party, Franklin Life bears the burden of establishing that complete diversity exists between the Parties and that the amount in controversy, exclusive of interest and costs, exceeds $75,000. See 28 U.S.C. § 1332(a); Diaz, 85 F.3d at 1505.


## A. Complete Diversity

Franklin Life acknowledges that, on the face of Plaintiff's Complaint, the requirement of diversity of citizenship does not exist because McCaa's citizenship is the same as Plaintiff's

5

citizenship. (Doc. No. 1 ¶ 6.) However, Franklin Life asserts
that Plaintiff has fraudulently joined McCaa in order to defeat
diversity jurisdiction. Namely, Franklin Life argues that the
joinder of McCaa is fraudulent because any claim against him is
barred by the two-year statute of limitations. (Id. ¶¶ 7, 9; Doc.
No. 10 at 2-13.)

According to Franklin Life, the statute of limitations began
to run "no later than November 1996 and expired no later than
November 1998, more than two years before [] Plaintiff filed this
civil action" on August 2, 1999.[4] (Doc. No. 10 at 12-13; Compl.

---

[4] The court notes that, in pinpointing November 1996 as the
month and year in which the statute of limitations began to run
on Plaintiff's claims against McCaa, Franklin Life does not cite
Williamson v. Indianapolis Life Ins. Co., 741 So. 2d 1057 (Ala.
1999), but appears to rely on its holding. (Doc. No. 10
at 11-12.) In Williamson, the court addressed whether an
individual who purchases a "'vanishing premium' insurance policy
is precluded from pursuing fraud-based causes of action, on the
basis that if he is required to make out-of-pocket premium
payments, he will not be required to do so until some future date
and, therefore, has presently suffered no damage." Id. at 1060.
In Williamson, the plaintiff purchased two life insurance
policies from an insurance agent in 1992. The agent allegedly
represented that, after ten years, "the premiums would 'vanish.'"
Id. The plaintiff sued after discovering that he "probably"
would have to continue paying premiums after ten years, which
would be the year 2002. Id. In holding that no justiciable
controversy existed, the Supreme Court stated that "[a]lthough
there are projections suggesting that the agent's alleged
representation was false, there is absolutely no way to know
whether this representation was true or false, until the end of
the year 2002." Id. For instance, if the plaintiff died prior
to the year 2002, "the insurer will pay the benefits called for
by the policies and [the plaintiff] will have received the full
benefit of what he claims to have bargained for. There is no way
to prove that he will live beyond the year 2002." Id.; see also
Stringfellow v. State Farm Life Ins. Co., 743 So. 2d 439, 440-441
(Ala. 1999) (relying on Williamson and holding that the

at 1.)  Thus, Franklin Life contends that, in determining whether complete diversity exists under § 1332(a), the court must disregard the citizenship of McCaa.

In response, Plaintiff does not dispute that the applicable statute of limitations is two years.  (Doc. No. 12 at 2; Compl. ¶ 8.)  Likewise, Plaintiff agrees, and so argues, that under Williamson, supra n.4, "the statute of limitations in a vanishing premium case does not run until Plaintiff is past the vanish date." (Doc. No. 12 at 5.)  Thus, Plaintiff does not dispute that the vanish date in this case occurred in or around November 1996. However, Plaintiff asserts that, because she was a "class action 'opt out,'" the two-year statute of limitations as to her claims

---

plaintiff's action for breach-of-contract and fraud, which was based on an agent's representation that the premiums on the plaintiff's life insurance policy would "vanish" after nine years, was premature when filed because the nine years had not yet run).  Thus, a "fraud-based cause of action [does] not accrue until the insured is required to pay a premium beyond the time for which he alleges he was told he would be required to pay." Stringfellow, 743 So. 2d at 440.

Here, in selling Plaintiff the policy in October 1987, McCaa allegedly represented that, after nine years, the premiums would "vanish."  (Compl. ¶ 6.)  Thus, McCaa purportedly projected that Plaintiff's out-of-pocket payments would cease around November 1996.  Based on these facts, Franklin Life asserts that at the very least Plaintiff's cause of action against McCaa, if any, accrued no later than November 1996.  (Doc. No. 1 ¶¶ 11, 13.) That is, Franklin Life states that Plaintiff has admitted "that she reviewed her pay stubs after the nine[-]year period had expired in November of 1996 and knew that the vanish date had passed and she was still paying premiums on her policy."  (Doc. No. 10 at 11-12, citing Foremost Ins. Co. v. Parham, 693 So. 2d 409 (Ala. 1997).)  Therefore, Franklin Life asserts that Plaintiff had notice "that any representation by [] McCaa that the premium on Plaintiff's policy would vanish in nine years was false."  (Doc. No. 10 at 13.)

against McCaa was "tolled at the time of the filing of the original [class action] complaint." (Doc. No. 12 at 5.) According to Plaintiff, "the original class complaint was filed on September 23, 1996," and, thus, the statute of limitations was tolled from September 23, 1996 until August 2, 1999, the date she filed her Complaint in this action. (Doc. No. 12 at 5-6.) Thus, under Plaintiff's calculations, she commenced her action against McCaa within the two-year statute of limitations. In support of her tolling argument, Plaintiff relies on <u>White v. Sims</u>, 470 So. 2d 1191 (Ala. 1985). (Doc. No. 12 at 5-6.)

In rebuttal, Franklin Life asserts that the filing of the <u>Garst</u> class action cannot toll the statute of limitations as to Plaintiff's claims against McCaa because McCaa was not a party to that class action. (Doc. No. 14 at 1; Doc. No. 21 at 1-7.) For the reasons that follow, the court agrees with Franklin Life and finds that the statute of limitations has expired on Plaintiff's claims asserted against McCaa.

Before addressing Plaintiff's tolling argument, the court makes the following three findings. First, as a threshold matter, because Franklin Life predicates jurisdiction on diversity, the court finds that it must look to state law as the source for the statute of limitations and tolling rules. <u>See Cambridge Mutual Fire Ins. Co. v. City of Claxton, Ga.</u>, 720 F.2d 1230, 1232 (11th Cir. 1983) (holding that, in diversity cases, the statute of limitations period and toll provisions are governed by state law).

Second, as stated above, the Parties agree, and the court so finds, that the statute of limitations applicable to Plaintiff's claims against McCaa is two years.  See Ala. Code §§ 6-2-3 & 6-2-38(1) (1993); Williams v. Norwest Fin. Alabama, Inc., 723 So. 2d 97, 104 (Ala. Civ. App. 1998) (Negligence and wantonness claims are subject to a two-year statute of limitations.); Casassa v. Liberty Life Ins., Co., 949 F. Supp. 825, 828 (M.D. Ala. 1996) (Under Alabama law, fraudulent misrepresentation and suppression claims are subject to a two-year statute of limitations.); Kelly v. Connecticut Mut. Life Ins. Co., 628 So. 2d 454, 458 (Ala. 1993) (Fraudulent representation claims are subject to a two-year statute of limitations.); see also Foremost, 693 So. 2d at 421-23 (holding that the two-year statute of limitations on fraud claims accrues from the date on which a plaintiff knew or should have known of the alleged fraud).

Third, the court finds that, in the absence of tolling, Plaintiff's action against McCaa is barred by Alabama's two-year statute of limitations.[5]  Namely, more than two years transpired between November 1996 and the date Plaintiff filed her Complaint against McCaa in August 1999.  Because Plaintiff's action would otherwise be barred by the statute of limitations, the court is

---

[5] Plaintiff does not refute this point.  In rebutting Franklin Life's argument that the statute of limitations began to run on Plaintiff's claims against McCaa in November 1996, Plaintiff states that, if Plaintiff was "not a class action 'opt out,'" this argument may have some merit."  (Doc. No. 12 at 5.)

presented with the question of whether an Alabama state court could possibly find that Plaintiff's action against McCaa was tolled from the date the <u>Garst</u> class action commenced until the filing of Plaintiff's Complaint against him in this action.

In turning to tolling in the context of class actions, the Supreme Court of Alabama has established the general rule that the commencement of a class action tolls the applicable statute of limitations as to all purported members of a class action during the pendency of the class action.  <u>See</u> <u>First Baptist Church of Citronelle v. Citronelle-Mobile Gathering, Inc.</u>, 409 So. 2d 727, 728 (Ala. 1981)[6]; <u>White</u>, 470 So. 2d at 1193.  Based on Alabama law, Plaintiff clearly falls within the general rule, as there is no dispute that Plaintiff opted out of a putative plaintiff class action.  However, the dispositive issue in this case is against whom are Plaintiff's fraud-based claims tolled.

As stated above, in arguing that her claims against McCaa were tolled upon the commencement of the <u>Garst</u> class action, Plaintiff relies on <u>White</u>, 470 So. 2d at 1191.  For the reasons that follow,

----

[6] In examining whether the statute of limitations was tolled based on the facts before it, the Supreme Court of Alabama in <u>First Baptist</u> relied on precedent from the Supreme Court of the United States.  <u>See</u> 409 So. 2d at 729 (citing <u>United Airlines, Inc. v. McDonald</u>, 432 U.S. 385 (1977) and <u>American Pipe & Construction Co. v. Utah</u>, 414 U.S. 538 (1974)).  In so relying, the Supreme Court of Alabama stated that "Rule 23 of the Alabama Rules of Civil Procedure is identical to Rule 23 of the Federal Rules of Civil Procedure.  Thus, federal authorities are persuasive when interpreting the Alabama Rule, but they are not binding on this Court."  <u>Id.</u> (internal citations omitted).

10

the court finds that Plaintiff's reliance on <u>White</u> is misplaced.
In <u>White</u>, the relevant facts are as follows:

> On November 25, 1981, an action styled Mangum, et al. v.
> Eagerton, et al., was filed in the Circuit Court of
> Montgomery County, Alabama, Civil Action No. CV
> 81-1592-G.  This lawsuit sought to establish a statewide
> class of plaintiffs against a statewide class of
> defendants, challenging the method used to determine
> current use valuation of land for ad valorem tax purposes
> . . . .
>
> At the time of the filing of the Mangum case, no
> notice was sent to the plaintiffs' class of the pendency
> of the action, nor was any notification ever given.
> Subsequent to the filing of Mangum, and without any
> opposition of the parties, the case was placed on the
> administrative docket pending a decision by this Court in
> the case of Eagerton v. Williams, 433 So. 2d 436 (Ala.
> 1983).
>
> After the Eagerton decision was rendered, the trial
> court on June 15, 1983, placed the Mangum case back on
> the active docket and an order was entered certifying
> Mangum as a statewide plaintiffs' class.
>
> During the pendency of the Mangum case, the instant
> action, Sims v. White, was filed in the Circuit Court of
> Covington County, Alabama, on April 18, 1983.  The
> complaint in Sims sought identical relief as that sought
> in Mangum, except that Sims sought to assert a class
> action on behalf of owners of eligible Class III property
> situated within Covington County and sought relief
> limited to Covington County, Alabama.  This action was
> one of forty suits filed around the state seeking refund
> of taxes on the same grounds applicable to each county,
> on an individual basis.  On June 28, 1983, the Covington
> County Circuit Court granted certification of a class
> consisting of "all land owners in Covington County,
> Alabama owning an interest in eligible Class III property
> situated within the said county who applied for current
> use treatment for ad valorem tax purposes and who paid ad
> valorem taxes on their said property on or after November
> 23, 1979."
>
> The Mangum class was eventually decertified on May
> 2, 1984, after the trial court determined that it would

11

> be more appropriate to bring individual county actions
> rather than to maintain a statewide class action.
>
> On June 7, 1984, the Covington County taxpayer class
> in Sims filed a motion for summary judgment, which was
> granted on September 19, 1984.  The trial court found
> that the tax assessor in Covington County did not utilize
> values consistent with those set forth by this court in
> Eagerton v. Williams, supra.
>
> On appeal, defendants do not contest the validity of
> the method of valuation imposed on the property.
> Defendants' sole contention is that the trial court erred
> in ruling that the statute of limitations period was
> tolled by the filing of Mangum and continued tolled until
> the time of the filing of the instant complaint.  We
> disagree, and hereby affirm.

470 So. 2d at 1192 (internal footnote omitted).

The Supreme Court of Alabama rejected the defendants' argument

and held that the statute of limitations is tolled as to claims of

members of a putative plaintiff class against putative members of a

defendant class until an independent action is filed or until the

denial of class certification, whichever may occur first.  <u>Id.</u>

at 1193.  In so holding, the Supreme Court also found unpersuasive

the <u>White</u> defendants' additional argument that "the statute should

not be tolled as to them because they were not named members of the

defendant class in Magnum."[7]  <u>Id.</u>  In rejecting this argument, the

<u>White</u> court adopted the holding in <u>Appleton Electric Co. v. Graves</u>

<u>Truck Line, Inc.</u>, 635 F.2d 603 (7th Cir. 1980).  <u>See</u> <u>White</u>, 470 So.

---

[7] Specifically, the <u>White</u> defendants asserted that "the
limitations period is not tolled against unnamed defendants until
they are specifically named in the complaint, because otherwise
they would be required to defend against actions of which they
had no knowledge until after the statute had run."  <u>Id.</u>

12

2d at 1193.  As explained by the Supreme Court in <u>White</u>, the

<u>Appleton</u> court

> held that when a class action is instituted against a
> class of unnamed defendants, the statute is tolled as to
> all putative members of the defendant class.  Finding
> that due process was not offended by tolling the running
> of the limitations period even where a defendant had no
> notice until after the limitations period had run, the
> court stated, "A contrary rule would sound the death
> knell for suits brought against a defendant class,
> nullifying that part of Rule 23 that specifically
> authorizes such suits."

<u>Id.</u> (citing <u>Appleton</u>, 635 F.2d at 609-610).

<u>White</u> is distinguishable from the instant case, because <u>White</u>

addressed the tolling doctrine in the context of claims asserted

against defendants who previously were unnamed members in a

<u>defendant class action</u>.  <u>Garst</u>, however, did not involve a

<u>defendant class action</u>, only a plaintiff class action.  The

defendants in <u>Garst</u> were sued individually, not as representatives

of an unnamed defendant class.  Namely, the individual Defendants

in <u>Garst</u> were Franklin Life and American Franklin Life Ins. Co.

(Doc. No. 14, Ex. A.)  McCaa was not a Defendant in the <u>Garst</u>

action.  In other words, the underlying class action in <u>White</u>

involved both a plaintiff class action and a defendant class

action, as opposed to <u>Garst</u>, which involved only a plaintiff class

action.

Here, it is not disputed that Plaintiff was a member of a

putative class of plaintiffs in the <u>Garst</u> action.  Thus, under the

reasoning in <u>White</u>, the filing of the <u>Garst</u> action would toll her

claims against the defendants in the <u>Garst</u> action. Because McCaa
was neither a named Defendant in the <u>Garst</u> action nor a potential
unnamed member of a defendant class, the court finds that the <u>Garst</u>
action does not toll the statute of limitations with respect to any
of Plaintiff's claims against him. <u>See Aserinsky v. Wyeth
Laboratories, Inc.</u>, 1999 WL 554608, *2 (E.D. Penn. 1999) (finding
that the non-diverse defendant was fraudulently joined because the
statute of limitations was not tolled by a class action in which
the fraudulently joined party was not a defendant).

Thus, the court finds that Plaintiff's action against McCaa is
barred by the statute of limitations because Plaintiff's Complaint
was filed on August 2, 1999, which is more than two years after
November 1996. As a result, the court finds that Plaintiff has
fraudulently joined McCaa in this action. <u>See</u> <u>Whitlock</u>, 32 F.
Supp.2d at 1290 (Where the only claims against a resident defendant
are barred by the statute of limitations, "the resident defendant
is deemed to have been fraudulently joined."). Therefore, the
court must disregard McCaa's citizenship for purposes of
determining jurisdiction under 28 U.S.C. § 1332. In so doing, it
is undisputed that the citizenship of Plaintiff is diverse from the
citizenship of Franklin Life. (Doc. No. 12 at 1.) Accordingly,
the court finds that Franklin Life has satisfied its burden of
establishing that complete diversity exists in this case. <u>See</u>
<u>Diaz</u>, 85 F.3d at 1505.

14

### B. Amount In Controversy

Franklin Life asserts that, based on the evidence it has submitted and in light of the fact that Plaintiff claims unspecified damages, "it is more likely than not that the jurisdictional amount for diversity jurisdiction is met in this case." (Not. ¶¶ 15-19.) Plaintiff has not addressed Franklin Life's argument in any of her pleadings. For two reasons, the court agrees with Franklin Life.

First, Plaintiff has not contested the amount-in-controversy requirement. In moving the court to remand this action to state court, Plaintiff only addresses Franklin Life's fraudulent joinder argument. The court deems Plaintiff's silence as a concession that she seeks more than $75,000 in punitive and compensatory damages. See Florida Municipal Power Agency v. Florida Power & Light Co., 81 F. Supp.2d 1313, 1330 (M.D. Fla. 1999) (finding that the party's failure to "specifically address" the opposing party's argument was "a concession as to its merits").

Second, even if Plaintiff had challenged this element of diversity jurisdiction, the court finds that Franklin Life has met its burden of establishing that the amount-in-controversy requirement is satisfied. "[W]here a plaintiff has made an unspecified demand for damages in state court," as here, "a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the [$75,000] jurisdictional requirement." Tapscott, 77 F.3d

15

at 1356-57.  In deciding whether a removing defendant has satisfied its burden, the court may look to damages awarded in cases involving the same type of suit.  See Bolling v. Union National Life Ins. Co., 900 F. Supp. 400, 404 (M.D. Ala. 1995); see also De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993).

Here, Plaintiff claims both compensatory and punitive damages. (Compl. at 3-7.)  Franklin Life has submitted several decisions from Alabama courts where plaintiffs in fraud actions against insurance companies received compensatory and punitive damages greater than $75,000.  (Doc. No. 1, Ex. B.)  As in Bolling, the court finds that, "[b]ased on these cases, it is clear that in Alabama when a plaintiff seeks recovery for fraud against an insurance company and asks for punitive damages, the recovery, if the plaintiff prevails, may very well exceed [$75,000]."  900 F. Supp. at 405.  Based on the foregoing, the court finds that Franklin Life has met its burden of establishing the amount-in-controversy requirement.  See Diaz, 85 F.3d at 1505.


## C. Conclusion

In sum, the court finds that Franklin Life has demonstrated that the court has diversity jurisdiction in this case.  See 28 U.S.C. § 1332(a); see also Diaz, 85 F.3d at 1505.  First, there exists complete diversity of citizenship between Plaintiff and the only properly joined Defendant, Franklin Life.  Second, the amount in controversy exceeds $75,000, exclusive of interest and costs.

Therefore, the court finds that it may properly exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Accordingly, the court finds that Plaintiff's Motion To Remand is due to be denied.

### IV. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Plaintiff's Motion To Remand be and the same is hereby DENIED. A Rule 16 Scheduling Order will be forthcoming.

DONE this the 27th day of March, 2000.

UNITED STATES DISTRICT JUDGE

17

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FILED

FEB 24 2000

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

RUTH ANN GOREE,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )  CIVIL ACTION 99-D-986-N
                                   )
FRANKLIN LIFE INSURANCE CO.,       )
et al.,                            )
                                   )
        Defendants.                )

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff Ruth Ann Goree's ("Plaintiff")

Motion To Remand, filed September 30, 1999.  The Parties have

filed briefs and evidentiary submissions in support of and in

opposition to Plaintiff's Motion To Remand.[1]  After careful

consideration of the arguments of counsel, the relevant law, and

the record as a whole, the court finds that Plaintiff's Motion To

Remand is due to be denied.

## I. REMAND STANDARD AND FRAUDULENT JOINDER

It is well-settled that a defendant, as the party removing

an action to federal court, has the burden to establish federal

jurisdiction.  See Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th

Cir. 1996).  Removal of a case from state to federal court is

proper if the case could have been brought originally in federal

---

[1] When citing to certain pleadings in the record, the court
will refer to the docket numbers assigned to those pleadings
("Doc. No.").

**EOD** 4/24/00

court.  <u>See</u> 28 U.S.C. § 1441(a).  A federal district court has original jurisdiction over cases involving citizens of different states where the amount in controversy, exclusive of interest and costs, exceeds $75,000.  <u>See</u> 28 U.S.C. § 1332(a).  "Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity-every plaintiff must be diverse from every defendant." <u>Tapscott v. MS Dealer Serv. Corp.</u>, 77 F.3d 1353, 1359 (11th Cir. 1996), <u>abrogated on other grounds</u>, <u>Cohen v. Office Depot, Inc.</u>, 204 F.3d 1069 (11th Cir. 2000).  Therefore, where the parties are diverse and the amount in controversy is sufficient, a defendant has the statutory right to remove an action from state to federal court.  <u>See</u> 28 U.S.C. § 1332(a).

However, as the Supreme Court has long recognized, diversity jurisdiction "cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy."  <u>Wilson v. Republic Iron & Steel Co.</u>, 257 U.S. 92, 97 (1921).  Thus, when determining whether complete diversity exists, courts shall disregard the citizenship of fraudulently joined defendants.  <u>See</u> <u>Tedder v. F.M.C. Corp.</u>, 590 F.2d 115, 117 (5th Cir. 1979).[2]

---

[2] In <u>Bonner v. City of Prichard</u>, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  <u>See</u> 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

2

Joinder is fraudulent "when there is no possibility that the plaintiff can prove a cause of action against the resident defendant." Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998). As explained by the old Fifth Circuit,

> [t]here can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard. One or the other at least would be required before it could be said that there was no real intention to get a joint judgment and that there was no colorable ground for so claiming.

See Parks v. New York Times Co., 308 F.2d 474, 478 (5th Cir. 1962). "If the only claims against a resident defendant are barred by the statute of limitations, then there 'is no possibility the plaintiff can establish a cause of action against the resident defendant.'" Whitlock v. Jackson National Life Ins. Co., 32 F. Supp.2d 1286, 1290 (M.D. Ala. 1998) (quoting Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997)).

Furthermore, in examining whether a joinder is fraudulent, the court "should resolve all questions of fact and controlling law in favor of the plaintiff and can consider any submitted affidavits and/or deposition transcripts." See Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989); see also Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983).

3

## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On or about November 1, 1987, Plaintiff purchased a life insurance policy through Defendant Franklin Life Insurance Co. ("Franklin Life"). (Compl. ¶¶ 5, 7.) Defendant William Jackson McCaa ("McCaa"), an agent for Franklin Life, sold Plaintiff the policy. (Id.) Plaintiff alleges that McCaa represented that Plaintiff "would only be required to pay premiums for a maximum of nine (9) years, and no future premiums would be required of her."[3] (Id. ¶ 6.) Plaintiff asserts that these representations were false and caused Plaintiff to purchase the policy. (Id. ¶¶ 7-8.)

On or about April 19, 1999, Plaintiff opted out of a class action styled Garst, et al. v. Franklin Life Ins Co. & American Franklin Life Ins. Co., Civ. A. No. 97-C-0074-S (N.D. Ala. 1997) ("Garst"). (Doc. No. 14 at 5, Ex. B.) In the Garst action, prior to opting out, Plaintiff was an unnamed member of a

---

[3] This type of policy is referred to as a "vanishing premium" policy. See Williamson v. Indianapolis Life Ins. Co., 741 So. 2d 1057 (Ala. 1999). A "vanishing premium" policy is a policy

> where, after a certain number of premium payments have been made, the policy itself generates sufficient income through dividends and interest to pay any additional premiums. Stated differently, premiums paid in the initial years of a policy are supposed to pay for premiums in later years, so that future premiums "vanish."

Id. at 1062 (Lyons, J., concurring in part and dissenting in part).

putative class of plaintiffs.  (Doc. No. 23, Ex. A.)
Subsequently, on August 4, 1999, Plaintiff filed her Complaint in
the Circuit Court of Montgomery County, Alabama, against Franklin
Life and McCaa (collectively "Defendants").  (Compl. ¶¶ 2-3.)
Based on Defendants' alleged false statements, Plaintiff brings
claims against Defendants for misrepresentation (Count 1),
fraudulent suppression (Counts 2 and 6), negligent or wanton
misrepresentation and/or suppression (Count 3), negligent hiring,
training and supervision (Count 4), and wanton hiring, training
and supervision (Count 5).  (Id. ¶¶ 12-33.)  McCaa is named as a
Defendant in Counts 1-3, while Franklin Life is named in all six
counts.  (Id.)

     Plaintiff requests unspecified compensatory and punitive
damages.  (Id.)  Both Plaintiff and McCaa are citizens of the
State of Alabama, while Franklin Life is a foreign corporation.
(Id. ¶¶ 1-3.)  On September 3, 1999, Franklin Life filed a Notice
Of Removal.  (Doc. No. 1.)  McCaa joined in the Notice Of
Removal.  (Doc. No. 2.)


                        III.  DISCUSSION

     Franklin Life contends that removal of this case from state
to federal court is proper because diversity-of-citizenship
jurisdiction exists pursuant to 28 U.S.C. § 1332(a).  As the
removing party, Franklin Life bears the burden of establishing
that complete diversity exists between the Parties and that the

                                5

amount in controversy, exclusive of interest and costs, exceeds $75,000. <u>See</u> 28 U.S.C. § 1332(a); <u>Diaz</u>, 85 F.3d at 1505.

## A. Complete Diversity

Franklin Life acknowledges that, on the face of Plaintiff's Complaint, the requirement of diversity of citizenship does not exist because McCaa's citizenship is the same as Plaintiff's citizenship. (Doc. No. 1 ¶ 6.) However, Franklin Life asserts that Plaintiff has fraudulently joined McCaa in order to defeat diversity jurisdiction. Namely, Franklin Life argues that the joinder of McCaa is fraudulent because any claim against him is barred by the two-year statute of limitations. (<u>Id.</u> ¶¶ 7, 9; Doc. No. 12 at 2-13.)

According to Franklin Life, the statute of limitations began to run "no later than November 1996 and expired no later than November 1998, more than two years before [] Plaintiff filed this civil action" on August 4, 1999.[4] (Doc. No. 12 at 14; Compl.

---

[4] The court notes that, in pinpointing November 1996 as the month and year in which the statute of limitations began to run on Plaintiff's claims against McCaa, Franklin Life does not cite <u>Williamson v. Indianapolis Life Ins. Co.</u>, 741 So. 2d 1057 (Ala. 1999), but appears to rely on its holding. (Doc. No. 12 at 12.) In <u>Williamson</u>, the court addressed whether an individual who purchases a "'vanishing premium' insurance policy is precluded from pursuing fraud-based causes of action, on the basis that if he is required to make out-of-pocket premium payments, he will not be required to do so until some future date and, therefore, has presently suffered no damage." <u>Id.</u> at 1060.

In <u>Williamson</u>, the plaintiff purchased two life insurance policies from an insurance agent in 1992. The agent allegedly represented that, after ten years, "the premiums would 'vanish.'"

6

at 1.)  Thus, Franklin Life contends that, in determining whether complete diversity exists under § 1332(a), the court must disregard the citizenship of McCaa.

In response, Plaintiff does not dispute that the applicable statute of limitations is two years.  (Doc. No. 14 at 2; Compl.

_____

Id.  The plaintiff sued after discovering that he "probably" would have to continue paying premiums after ten years, which would be the year 2002.  Id.  In holding that no justiciable controversy existed, the Supreme Court stated that "[a]lthough there are projections suggesting that the agent's alleged representation was false, there is absolutely no way to know whether this representation was true or false, until the end of the year 2002."  Id.  For instance, if the plaintiff died prior to the year 2002, "the insurer will pay the benefits called for by the policies and [the plaintiff] will have received the full benefit of what he claims to have bargained for.  There is no way to prove that he will live beyond the year 2002."  Id.; see also Stringfellow v. State Farm Life Ins. Co., 743 So. 2d 439, 440-441 (Ala. 1999) (relying on Williamson and holding that the plaintiff's action for breach-of-contract and fraud, which was based on an agent's representation that the premiums on the plaintiff's life insurance policy would "vanish" after nine years, was premature when filed because the nine years had not yet run).  Thus, a "fraud-based cause of action [does] not accrue until the insured is required to pay a premium beyond the time for which he alleges he was told he would be required to pay."  Stringfellow, 743 So. 2d at 440.
Here, in selling Plaintiff the policy in November 1987, McCaa allegedly represented that, after nine years, the premiums would "vanish."  (Compl. ¶¶ 5-7.)  Thus, McCaa purportedly projected that Plaintiff's out-of-pocket payments would cease around November 1996.  Based on these facts, Franklin Life asserts that, at the very least, Plaintiff's cause of action against McCaa, if any, accrued no later than November 1996.  (Doc. No. 12 at 14.)  Specifically, Franklin Life points out that Plaintiff admitted "that she reviewed her pay stubs after the nine[-]year period had expired in November of 1996 and knew that the vanish date had passed and she was still paying premiums on her policy."  (Doc. No. 12 at 12-13, citing Foremost Ins. Co. v. Parham, 693 So. 2d 409 (Ala. 1997).)  Therefore, Franklin Life asserts that Plaintiff had notice "that any representation by [] McCaa that the premium on Plaintiff's policy would vanish in nine years was false."  (Doc. No. 12 at 13.)

7

¶ 8.)  Further, Plaintiff agrees, and so argues, that under Williamson, *supra* n.4, "the statute of limitations in a vanishing premium case does not run until Plaintiff is past the vanish date."  (Doc. No. 14 at 4.)  Thus, Plaintiff does not dispute that the vanish date in this case occurred in or around November 1996.  However, Plaintiff asserts that, because she was a "class action 'opt out,'" the two-year statute of limitations as to her claims against McCaa was "tolled at the time of the filing of the original [class action] complaint."  (Id. at 5.)  According to Plaintiff, "the original class complaint was filed on September 23, 1996," and, thus, the statute of limitations was tolled from September 23, 1996 until August 4, 1999, the date she filed her Complaint in this action.  (Id. at 5-6.)  Thus, under Plaintiff's calculations, she commenced her action against McCaa within the two-year statute of limitations.  In support of her tolling argument, Plaintiff relies on White v. Sims, 470 So. 2d 1191 (Ala. 1985).  (Id.; Doc. No. 20 at 1-6.)

In rebuttal, Franklin Life asserts that the filing of the Garst class action cannot toll the statute of limitations as to Plaintiff's claims against McCaa because McCaa was not a party to that class action.  (Doc. No. 21 at 1-7; Doc. No. 23 at 1-5.)  For the reasons that follow, the court agrees with Franklin Life and finds that the statute of limitations has expired on Plaintiff's claims asserted against McCaa.

8

Before addressing Plaintiff's tolling argument, the court makes the following three findings.  First, because Franklin Life predicates jurisdiction on diversity, the court finds that it must look to state law as the source for the statute of limitations and tolling rules.  See <u>Cambridge Mutual Fire Ins. Co. v. City of Claxton, Ga.</u>, 720 F.2d 1230, 1232 (11th Cir. 1983) (holding that, in diversity cases, the statute of limitations period and toll provisions are governed by state law).  Second, as stated above, the Parties agree, and the court so finds, that the statute of limitations applicable to Plaintiff's claims against McCaa is two years.  See Ala. Code §§ 6-2-3 & 6-2-38(1) (1993); <u>Williams v. Norwest Fin. Alabama, Inc.</u>, 723 So. 2d 97, 104 (Ala. Civ. App. 1998) (Negligence and wantonness claims are subject to a two-year statute of limitations.); <u>Casassa v. Liberty Life Ins., Co.</u>, 949 F. Supp. 825, 828 (M.D. Ala. 1996) (Under Alabama law, fraudulent misrepresentation and suppression claims are subject to a two-year statute of limitations.); <u>Kelly v. Connecticut Mut. Life Ins. Co.</u>, 628 So. 2d 454, 458 (Ala. 1993) (Fraudulent representation claims are subject to a two-year statute of limitations.); <u>see also</u> <u>Foremost</u>, 693 So. 2d at 421-23 (holding that the two-year statute of limitations on fraud claims accrues from the date on which a plaintiff knew or should have known of the alleged fraud).

Third, the court finds that, in the absence of tolling, Plaintiff's action against McCaa is barred by Alabama's two-year

9

statute of limitations.[5]  Namely, more than two years transpired
between November 1996 and the date Plaintiff filed her Complaint
against McCaa in August 1999.  Because Plaintiff's action would
otherwise be barred by the statute of limitations, the court is
presented with the question of whether an Alabama state court
could possibly find that Plaintiff's action against McCaa was
tolled during any period between the date the <u>Garst</u> class action
commenced and the filing of Plaintiff's Complaint against him in
this action.

Turning to the issue of tolling in the context of class
actions, the Supreme Court of Alabama has established the general
rule that the commencement of a class action tolls the applicable
statute of limitations as to all purported members of a class
action during the pendency of the class action.  See <u>First</u>
<u>Baptist Church of Citronelle v. Citronelle-Mobile Gathering,</u>
<u>Inc.</u>, 409 So. 2d 727, 728 (Ala. 1981)[6]; <u>White</u>, 470 So. 2d

---

[5] Plaintiff does not refute this point.  In rebutting
Franklin Life's argument that the statute of limitations began to
run on Plaintiff's claims against McCaa in 1996, Plaintiff states
that, if Plaintiff was "not a class action 'opt out,'" this
argument may have some merit."  (Doc. No. 14 at 5.)

[6] In examining whether the statute of limitations was tolled
in <u>First Baptist</u>, the Supreme Court of Alabama relied on
precedent from the Supreme Court of the United States.  See 409
So. 2d at 729 (citing <u>United Airlines, Inc. v. McDonald</u>, 432 U.S.
385 (1977) and <u>American Pipe & Construction Co. v. Utah</u>, 414 U.S.
538 (1974)).  The Supreme Court of Alabama stated that "Rule 23 of
the Alabama Rules of Civil Procedure is identical to Rule 23 of
the Federal Rules of Civil Procedure.  Thus, federal authorities
are persuasive when interpreting the Alabama Rule, but they are
not binding on this Court."  <u>Id.</u> (internal citations omitted).

10

at 1193.  Based on Alabama law, Plaintiff clearly falls within
the general rule, as there is no dispute that Plaintiff opted out
of a putative plaintiff class action.  However, the dispositive
issue in this case is against whom are Plaintiff's fraud-based
claims tolled.

As stated above, in arguing that her claims against McCaa
were tolled upon the commencement of the <u>Garst</u> class action,
Plaintiff relies on <u>White</u>, 470 So. 2d at 1191.  For the reasons
that follow, the court finds that Plaintiff's reliance on <u>White</u>
is misplaced.  In <u>White</u>, the relevant facts are as follows:

> On November 25, 1981, an action styled Mangum, et al.
> v. Eagerton, et al., was filed in the Circuit Court of
> Montgomery County, Alabama, Civil Action No. CV
> 81-1592-G.  This lawsuit sought to establish a
> statewide class of plaintiffs against a statewide class
> of defendants, challenging the method used to determine
> current use valuation of land for ad valorem tax
> purposes  . . . .
>
> At the time of the filing of the Mangum case, no
> notice was sent to the plaintiffs' class of the
> pendency of the action, nor was any notification ever
> given.  Subsequent to the filing of Mangum, and without
> any opposition of the parties, the case was placed on
> the administrative docket pending a decision by this
> Court in the case of Eagerton v. Williams, 433 So. 2d
> 436 (Ala. 1983).
>
> After the Eagerton decision was rendered, the
> trial court on June 15, 1983, placed the Mangum case
> back on the active docket and an order was entered
> certifying Mangum as a statewide plaintiffs' class.
>
> During the pendency of the Mangum case, the
> instant action, Sims v. White, was filed in the Circuit
> Court of Covington County, Alabama, on April 18, 1983.
> The complaint in Sims sought identical relief as that
> sought in Mangum, except that Sims sought to assert a
> class action on behalf of owners of eligible Class III

11

property situated within Covington County and sought
relief limited to Covington County, Alabama.  This
action was one of forty suits filed around the state
seeking refund of taxes on the same grounds applicable
to each county, on an individual basis.  On June 28,
1983, the Covington County Circuit Court granted
certification of a class consisting of "all land owners
in Covington County, Alabama owning an interest in
eligible Class III property situated within the said
county who applied for current use treatment for ad
valorem tax purposes and who paid ad valorem taxes on
their said property on or after November 23, 1979."

The Mangum class was eventually decertified on May
2, 1984, after the trial court determined that it would
be more appropriate to bring individual county actions
rather than to maintain a statewide class action.

On June 7, 1984, the Covington County taxpayer
class in Sims filed a motion for summary judgment,
which was granted on September 19, 1984.  The trial
court found that the tax assessor in Covington County
did not utilize values consistent with those set forth
by this court in Eagerton v. Williams, supra.

470 So. 2d at 1192 (internal footnote omitted).

In White, the defendants argued "that the trial court erred

in ruling that the statute of limitations period was tolled by

the filing of Mangum and continued tolled until the time of the

filing of the instant complaint."  Id. at 1192.  The Supreme

Court of Alabama rejected the defendants' argument and held that

the statute of limitations is tolled as to claims of members of a

putative plaintiff class against putative members of a defendant

class until an independent action is filed or until the denial of

class certification, whichever may occur first.  Id. at 1193.  In

so holding, the Supreme Court also found unpersuasive the White

defendants' additional argument that "the statute should not be

12

tolled as to them because they were not named members of the defendant class in Magnum."[7]  Id.  In rejecting this argument, the White court adopted the holding in Appleton Electric Co. v. Graves Truck Line, Inc., 635 F.2d 603 (7th Cir. 1980).  See White, 470 So. 2d at 1193.  As explained by the Supreme Court in White, the Appleton court

> held that when a class action is instituted against a class of unnamed defendants, the statute is tolled as to all putative members of the defendant class. Finding that due process was not offended by tolling the running of the limitations period even where a defendant had no notice until after the limitations period had run, the court stated, "A contrary rule would sound the death knell for suits brought against a defendant class, nullifying that part of Rule 23 that specifically authorizes such suits."

Id. (citing Appleton, 635 F.2d at 609-610).

White is distinguishable from the instant case, because White addressed the tolling doctrine in the context of claims asserted against defendants who previously were unnamed members in a defendant class action.  Garst, however, did not involve a defendant class action, only a plaintiff class action.  The defendants in Garst were sued individually, not as representatives of an unnamed defendant class.  Namely, the individual Defendants in Garst were Franklin Life and American

---

[7] Specifically, the White defendants asserted that "the limitations period is not tolled against unnamed defendants until they are specifically named in the complaint, because otherwise they would be required to defend against actions of which they had no knowledge until after the statute had run."  Id.

13

Franklin Life Ins. Co.  (Doc. No. 23, Ex. A.)  McCaa was not a Defendant in the <u>Garst</u> action.  In other words, the underlying class action in <u>White</u> involved both a plaintiff class action and a defendant class action, as opposed to <u>Garst</u>, which involved only a plaintiff class action.

Here, it is not disputed that Plaintiff was a member of a putative class of plaintiffs in the <u>Garst</u> action.  Thus, under the reasoning in <u>White</u>, the filing of the <u>Garst</u> action would toll her claims against the defendants in the <u>Garst</u> action.  Because McCaa was neither a named Defendant in the <u>Garst</u> action nor a potential unnamed member of a defendant class, the court finds that the <u>Garst</u> action does not toll the statute of limitations with respect to any of Plaintiff's claims against him.  <u>See</u> <u>Aserinsky v. Wyeth Laboratories, Inc.</u>, 1999 WL 554608, *2 (E.D. Penn. 1999) (finding that the non-diverse defendant was fraudulently joined because the statute of limitations was not tolled by a class action in which the fraudulently joined party was not a defendant).

Thus, the court finds that Plaintiff's action against McCaa is barred by the statute of limitations because Plaintiff's Complaint was filed on August 4, 1999, which is more than two years after November 1996.  As a result, the court finds that Plaintiff has fraudulently joined McCaa in this action.  <u>See</u> <u>Whitlock</u>, 32 F. Supp.2d at 1290 (Where the only claims against a

14

resident defendant are barred by the statute of limitations, "the resident defendant is deemed to have been fraudulently joined."). Therefore, the court must disregard McCaa's citizenship for purposes of determining jurisdiction under 28 U.S.C. § 1332.  In so doing, it is undisputed that the citizenship of Plaintiff is diverse from the citizenship of Franklin Life.  (Doc. No. 12 at 1; Compl. ¶¶ 1-3.)  Accordingly, the court finds that Franklin Life has satisfied its burden of establishing that complete diversity exists in this case.  See Diaz, 85 F.3d at 1505.

### B. Amount In Controversy

Franklin Life asserts that, based on the evidence it has submitted and because Plaintiff claims unspecified damages, "it is more likely than not that the jurisdictional amount for diversity jurisdiction is met in this case."  (Doc. No. 1 ¶¶ 15-19.)  Plaintiff has not addressed Franklin Life's argument in any of her pleadings.  For two reasons, the court agrees with Franklin Life.

First, Plaintiff has not contested the amount-in-controversy requirement.  In moving the court to remand this action to state court, Plaintiff only addresses Franklin Life's fraudulent joinder argument.  The court deems Plaintiff's silence as a concession that she seeks more than $75,000 in punitive and compensatory damages.  See Florida Municipal Power Agency v.

15

Florida Power & Light Co., 81 F. Supp.2d 1313, 1330 (M.D. Fla. 1999) (finding that the party's failure to "specifically address" the opposing party's argument was "a concession as to its merits").

Second, even if Plaintiff had challenged this element of diversity jurisdiction, the court finds that Franklin Life has met its burden of establishing that the amount-in-controversy requirement is satisfied. "[W]here a plaintiff has made an unspecified demand for damages in state court," as here, "a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the [$75,000] jurisdictional requirement." Tapscott, 77 F.3d at 1356-57. In deciding whether a removing defendant has satisfied its burden, the court may look to damages awarded in cases involving the same type of suit. See Bolling v. Union National Life Ins. Co., 900 F. Supp. 400, 404 (M.D. Ala. 1995); see also De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993).

Here, Plaintiff claims both compensatory and punitive damages. (Compl. at 3-6.) Franklin Life has submitted several decisions from Alabama courts where plaintiffs in fraud actions against insurance companies received compensatory and punitive damages greater than $75,000. (Doc. No. 1, Ex. C.) As in Bolling, the court finds that, "[b]ased on these cases, it is

16

clear that in Alabama when a plaintiff seeks recovery for fraud against an insurance company and asks for punitive damages, the recovery, if the plaintiff prevails, may very well exceed [$75,000]." 900 F. Supp. at 405. Based on the foregoing, the court finds that Franklin Life has met its burden of establishing the amount-in-controversy requirement. See Diaz, 85 F.3d at 1505.

### C. Conclusion

In sum, the court finds that Franklin Life has demonstrated that the court has diversity jurisdiction in this case. See 28 U.S.C. § 1332(a); see also Diaz, 85 F.3d at 1505. First, there exists complete diversity of citizenship between Plaintiff and the only properly joined Defendant, Franklin Life. Second, the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, the court finds that it may properly exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Accordingly, the court finds that Plaintiff's Motion To Remand is due to be denied.

### IV. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Plaintiff's Motion To Remand be and the same is hereby DENIED.

17

Contemporaneously herewith, the court is entering a Scheduling Order.

DONE this the 24ᵀᴴ day of April, 2000.


UNITED STATES DISTRICT JUDGE

18

[ **FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

APR 2 7 2000

CLERK

U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| CALVIN W. SAUNDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 99-D-1077-S |
| | ) | |
| FRANKLIN LIFE INSURANCE CO., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Plaintiff Calvin W. Saunder's

("Plaintiff") Motion To Remand ("Mot."), filed October 15, 1999.

The Parties have filed briefs and evidentiary submissions in

support of and in opposition to Plaintiff's Motion To Remand.[1]

After careful consideration of the arguments of counsel, the

relevant law, and the record as a whole, the court finds that

Plaintiff's Motion To Remand is due to be denied.


**I. REMAND STANDARD AND FRAUDULENT JOINDER**

It is well-settled that a defendant, as the party removing

an action to federal court, has the burden to establish federal

jurisdiction.  <u>See</u> <u>Diaz v. Sheppard</u>, 85 F.3d 1502, 1505 (11th

Cir. 1996).  Removal of a case from state to federal court is

proper if the case could have been brought originally in federal

_____

[1] When citing to certain pleadings in the record, the court
will refer to the docket numbers assigned to those pleadings
("Doc. No.").

$EOD$ $4/27/00$                                          $26$

court.  See 28 U.S.C. § 1441(a).  A federal district court has original jurisdiction over cases involving citizens of different states where the amount in controversy, exclusive of interest and costs, exceeds $75,000.  See 28 U.S.C. § 1332(a).  "Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity-every plaintiff must be diverse from every defendant."  Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1359 (11th Cir. 1996), abrogated on other grounds, Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000).  Therefore, where the parties are diverse and the amount in controversy is sufficient, a defendant has the statutory right to remove an action from state to federal court.  See 28 U.S.C. § 1332(a).

However, as the Supreme Court has long recognized, diversity jurisdiction "cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy."  Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921).  Thus, when determining whether complete diversity exists, courts shall disregard the citizenship of fraudulently joined defendants.  See Tedder v. F.M.C. Corp., 590 F.2d 115, 117 (5th Cir. 1979).[2]

---

[2] In Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  See 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Joinder is fraudulent "when there is no possibility that the plaintiff can prove a cause of action against the resident defendant." <u>Triggs v. John Crump Toyota, Inc.</u>, 154 F.3d 1284, 1287 (11th Cir. 1998). As explained by the old Fifth Circuit,

> [t]here can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard. One or the other at least would be required before it could be said that there was no real intention to get a joint judgment and that there was no colorable ground for so claiming.

See <u>Parks v. New York Times Co.</u>, 308 F.2d 474, 478 (5th Cir. 1962). "If the only claims against a resident defendant are barred by the statute of limitations, then there 'is no possibility the plaintiff can establish a cause of action against the resident defendant.'" <u>Whitlock v. Jackson National Life Ins. Co.</u>, 32 F. Supp.2d 1286, 1290 (M.D. Ala. 1998) (quoting <u>Crowe v. Coleman</u>, 113 F.3d 1536, 1538 (11th Cir. 1997)).

Furthermore, in examining whether a joinder is fraudulent, the court "should resolve all questions of fact and controlling law in favor of the plaintiff and can consider any submitted affidavits and/or deposition transcripts." <u>See</u> <u>Cabalceta v. Standard Fruit Co.</u>, 883 F.2d 1553, 1561 (11th Cir. 1989); <u>see also</u> <u>Coker v. Amoco Oil Co.</u>, 709 F.2d 1433, 1440 (11th Cir. 1983).

3

## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On or about June 19, 1989, Plaintiff purchased a life insurance policy through Defendant Franklin Life Insurance Co. ("Franklin Life"). (Compl. ¶¶ 5, 7.) Defendant Tommie E. Martin ("Martin"), an agent for Franklin Life, sold Plaintiff the policy. (Id.) Plaintiff alleges that Martin represented that Plaintiff "would only be required to pay premiums for a maximum of eight (8) years, and no future premiums would be required of her."[3] (Id. ¶ 6.) Plaintiff asserts that these representations were false and caused Plaintiff to purchase the policy. (Id. ¶¶ 7-8, 14.)

On or about April 19, 1999, Plaintiff opted out of a plaintiff class action styled Garst, et al. v. Franklin Life Ins Co. & American Franklin Life Ins. Co., Civ. A. No. 97-C-0074-S (N.D. Ala. 1997) ("Garst"). (Doc. No. 13 at 5, Ex. C.) Subsequently, on or about August 4, 1999, Plaintiff filed his

---

[3] This type of policy is referred to as a "vanishing premium" policy. See Williamson v. Indianapolis Life Ins. Co., 741 So. 2d 1057 (Ala. 1999). A "vanishing premium" policy is a policy

> where, after a certain number of premium payments have been made, the policy itself generates sufficient income through dividends and interest to pay any additional premiums. Stated differently, premiums paid in the initial years of a policy are supposed to pay for premiums in later years, so that future premiums "vanish."

Id. at 1062 (Lyons, J., concurring in part and dissenting in part).

4

Complaint in the Circuit Court of Henry County, Alabama, against Franklin Life and Martin (collectively "Defendants"). (Compl. ¶¶ 2-3; Doc. No. 1 ¶ 2.) Based on Defendants' alleged false statements, Plaintiff brings claims against Defendants for misrepresentation (Count 1), fraudulent suppression (Counts 2 and 6), negligent or wanton misrepresentation and/or suppression (Count 3), negligent hiring, training and supervision (Count 4), and wanton hiring, training and supervision (Count 5). (Id. ¶¶ 12-33.) Martin is named as a Defendant in Counts 1-3, while Franklin Life is named in all six counts. (Id.)

Plaintiff requests compensatory and punitive damages "in such an amount . . . as a jury deems reasonable and may award, plus costs." (Id. at 3-7.) Both Plaintiff and Martin are citizens of the State of Alabama, while Franklin Life is a foreign corporation. (Id. ¶¶ 1-3.) On September 15, 1999, Franklin Life filed a Notice Of Removal. (Doc. No. 1.) Martin joined in the Notice Of Removal. (Doc. No. 2.)

### III.  DISCUSSION

Franklin Life contends that removal of this case from state to federal court is proper because diversity-of-citizenship jurisdiction exists pursuant to 28 U.S.C. § 1332(a). As the removing party, Franklin Life bears the burden of establishing that complete diversity exists between the Parties and that the

amount in controversy exceeds $75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332(a); Diaz, 85 F.3d at 1505.

### A. Complete Diversity

Franklin Life acknowledges that, on the face of Plaintiff's Complaint, the requirement of diversity of citizenship does not exist because Martin's citizenship is the same as Plaintiff's citizenship.  (Doc. No. 1 ¶¶ 4-7.)  However, Franklin Life asserts that Plaintiff has fraudulently joined Martin in order to defeat diversity jurisdiction.  Namely, Franklin Life argues that the joinder of Martin is fraudulent because any claim against him is barred by the applicable two-year statute of limitations. (Id. ¶¶ 9-14; Doc. No. 11 at 1.)

According to Franklin Life, the statute of limitations began to run "at the latest when [Plaintiff] paid a premium in June 1997."  (Doc. No. 1 ¶¶ 3, 13.)  Thus, "[t]he statute of limitations for any fraud claim against Martin . . .accrued in June 1997 at the latest and expired in June 1999, before [] Plaintiff filed this civil action."  (Id.)  Thus, Franklin Life contends that, in determining whether complete diversity exists under § 1332(a), the court must disregard the citizenship of Martin, who has been fraudulently joined.

In response, Plaintiff does not dispute that the applicable statute of limitations is two years.  (Doc. No. 6 at 4; Compl. ¶ 8.)  Further, Plaintiff states that "the statute of limitations

6

in a vanishing premium case does not run until Plaintiff is past the vanish date." (Doc. No. 13 at 5, citing <u>Williamson</u>, *supra* n.3.) Because Martin represented that Plaintiff would only have to pay out-of-pocket premiums for eight years, Plaintiff does not dispute that the vanish date in this case occurred in or around June 1997. (<u>Id.</u> at 4.) However, Plaintiff disagrees with Franklin Life that the statute of limitations expired in June 1999. Namely, Plaintiff asserts that, because he was a "class action 'opt out,'" the two-year statute of limitations as to his claims against Martin was "tolled at the time of the filing of the original [class action] complaint." (<u>Id.</u> at 5.) According to Plaintiff, "the original class complaint was filed on September 23, 1996"; thus, Plaintiff asserts that the statute of limitations was tolled from September 23, 1996 until August 4, 1999, the date he filed his Complaint in this action. (<u>Id.</u> at 5-6.) Thus, under Plaintiff's calculations, he commenced his claims against Martin within the two-year statute of limitations. In support of his tolling argument, Plaintiff relies on <u>White v. Sims</u>, 470 So. 2d 1191, 1193 (Ala. 1985). (<u>Id.</u> at 5-6; Doc. No. 22 at 1-5.)

In rebuttal, Franklin Life asserts that the filing of the <u>Garst</u> class action cannot toll the statute of limitations as to Plaintiff's claims against Martin because Martin was not a party to that class action. (Doc. No. 15 at 1-7; Doc. No. 24 at 1-7.) For the reasons that follow, the court agrees with Franklin Life

and finds that the statute of limitations has expired on
Plaintiff's claims asserted against Martin.

### 1. *The Statute of Limitations*

The Parties agree and, the court so finds, that the statute
of limitations applicable to Plaintiff's claims in Counts 1, 2
and 3 against Martin is two years. See Ala. Code §§ 6-2-3 &
6-2-38(l) (1993); Williams v. Norwest Fin. Alabama, Inc., 723 So.
2d 97, 104 (Ala. Civ. App. 1998) (Negligence and wantonness
claims are subject to a two-year statute of limitations.);
Casassa v. Liberty Life Ins., Co., 949 F. Supp. 825, 828 (M.D.
Ala. 1996) (Under Alabama law, fraudulent misrepresentation and
suppression claims are subject to a two-year statute of
limitations.); Kelly v. Connecticut Mut. Life Ins. Co., 628 So.
2d 454, 458 (Ala. 1993) (Fraudulent representation claims are
subject to a two-year statute of limitations.); see also Foremost
Ins. Co. v. Parham, 693 So. 2d 409, 421-23 (Ala. 1997) (holding
that the two-year statute of limitations on fraud claims accrues
from the date on which a plaintiff knew or should have known of
the alleged fraud).

In fraud-based actions, the statute of limitations does not
begin to run until the claim accrues, that is, when the
fraudulent misrepresentation either was or should have been
discovered in the exercise of reasonable care. See Foremost Ins.
Co., 693 So. 2d at 420 (adopting the "reasonable reliance"

standard in fraud cases)[4]; see also Ala. Code § 6-2-3 (Supp. 1997).  Further, in Williamson, the Supreme Court of Alabama addressed when a cause of action accrues in fraud cases involving "vanishing premium" insurance policies.  741 So. 2d at 1060-61. There, the issue was whether an individual who purchases a "'vanishing premium' insurance policy is precluded from pursuing fraud-based causes of action, on the basis that if he is required to make out-of-pocket premium payments, he will not be required to do so until some future date and, therefore, has presently suffered no damage."  Id. at 1060.

In Williamson, the plaintiff purchased two life insurance policies from an insurance agent in 1992.  The agent allegedly

---

[4] In Foremost, the Supreme Court of Alabama explained as follows:

> The 'reasonable reliance' standard is, in our view, a more practicable standard that will allow the fact-finder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. In addition, a return to the 'reasonable reliance' standard will once again provide a mechanism, which was available before [Hickox v. Stover, 551 So. 2d 259 (Ala. 1989)], whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.

693 So. 2d at 421.  Thus, under Foremost, an insured has a duty to read his or her policy documents.  Id.

9

represented that, after ten years, "the premiums would 'vanish.'"
Id. The plaintiff sued after discovering that he "probably"
would have to continue paying premiums after ten years, which
would be the year 2002. Id. In holding that no justiciable
controversy existed, the Supreme Court stated that, "[a]lthough
there are projections suggesting that the agent's alleged
representation was false, there is absolutely no way to know
whether this representation was true or false, until the end of
the year 2002." Id. For instance, if the plaintiff died prior
to the year 2002, "the insurer will pay the benefits called for
by the policies and [the plaintiff] will have received the full
benefit of what he claims to have bargained for. There is no way
to prove that he will live beyond the year 2002." Id.; see also
Stringfellow v. State Farm Life Ins. Co., 743 So. 2d 439, 440-441
(Ala. 1999) (relying on Williamson and holding that the
plaintiff's action for breach-of-contract and fraud, which was
based on an agent's representation that the premiums on the
plaintiff's life insurance policy would "vanish" after nine
years, was premature when filed because the nine years had not
yet run). Thus, a "fraud-based cause of action [does] not accrue
until the insured is required to pay a premium beyond the time
for which he alleges he was told he would be required to pay."
Stringfellow, 743 So. 2d at 440.

Here, the facts are analogous to those in Williamson. In
selling Plaintiff the policy in June 1989, Martin allegedly

10

represented that, after eight years, the premiums would "vanish." (Compl. ¶¶ 5-7.)  Thus, Martin purportedly projected that Plaintiff's out-of-pocket payments would cease around June 1997. However, Plaintiff asserts that Martin's representation was false because, after eight years, Plaintiff still had to pay out-of-pocket premiums on his policy.  (Id. ¶ 14; Doc. No. 1 ¶ 13; Doc. No. 11 at 11.)  Based on these facts and the holding in Williamson, at the very latest, Plaintiff's cause of action against Martin, if any, accrued in June 1997 when Plaintiff paid a premium.

   2. *Class Actions and the Tolling of the Statute of Limitations*
      Because Plaintiff's cause of action, if any, accrued in June 1997, the court finds that, in the absence of tolling, Plaintiff's action against Martin is barred by Alabama's two-year statute of limitations.  Namely, more than two years transpired between June 1997 and the date Plaintiff filed his Complaint against Martin in August 1999.  Because Plaintiff's action would otherwise be barred by the statute of limitations, the court is presented with the question of whether an Alabama state court could possibly find that Plaintiff's action against Martin was tolled during any period between the date the Garst class action commenced and the filing of Plaintiff's Complaint against Martin in this action.  For the following reasons, the answer is "no."

11

Turning to the issue of tolling in the context of class actions, the Supreme Court of Alabama has established the general rule that the commencement of a class action tolls the applicable statute of limitations as to all purported members of a class action during the pendency of the class action.[5] See First Baptist Church of Citronelle v. Citronelle-Mobile Gathering, Inc., 409 So. 2d 727, 728 (Ala. 1981)[6]; White, 470 So. 2d at 1193. Based on Alabama law, Plaintiff clearly falls within the general rule, as there is no dispute that Plaintiff opted out of a putative plaintiff class action. However, the dispositive issue in this case is against whom are Plaintiff's fraud-based claims tolled.

As stated above, in arguing that his claims against Martin were tolled upon the commencement of the Garst class action, Plaintiff relies on White, 470 So. 2d at 1191. For the reasons that follow, the court finds that Plaintiff's reliance on White

---

[5] See Cambridge Mutual Fire Ins. Co. v. City of Claxton, Ga., 720 F.2d 1230, 1232 (11th Cir. 1983) (holding that, in diversity cases, whether a statute of limitations period is tolled is governed by state law).

[6] In examining whether the statute of limitations was tolled in First Baptist, the Supreme Court of Alabama relied on precedent from the Supreme Court of the United States. See 409 So. 2d at 729 (citing United Airlines, Inc. v. McDonald, 432 U.S. 385 (1977) and American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974)). The Supreme Court of Alabama stated that "Rule 23 of the Alabama Rules of Civil Procedure is identical to Rule 23 of the Federal Rules of Civil Procedure. Thus, federal authorities are persuasive when interpreting the Alabama Rule, but they are not binding on this Court." Id. (internal citations omitted).

12

is misplaced.   In <u>White</u>, the relevant facts are as follows:

On November 25, 1981, an action styled Mangum, et al.
v. Eagerton, et al., was filed in the Circuit Court of
Montgomery County, Alabama, Civil Action No. CV
81-1592-G.   This lawsuit sought to establish a
statewide class of plaintiffs against a statewide class
of defendants, challenging the method used to determine
current use valuation of land for ad valorem tax
purposes  . . . .

At the time of the filing of the Mangum case, no
notice was sent to the plaintiffs' class of the
pendency of the action, nor was any notification ever
given.   Subsequent to the filing of Mangum, and without
any opposition of the parties, the case was placed on
the administrative docket pending a decision by this
Court in the case of Eagerton v. Williams, 433 So. 2d
436 (Ala. 1983).

After the Eagerton decision was rendered, the
trial court on June 15, 1983, placed the Mangum case
back on the active docket and an order was entered
certifying Mangum as a statewide plaintiffs' class.

During the pendency of the Mangum case, the
instant action, Sims v. White, was filed in the Circuit
Court of Covington County, Alabama, on April 18, 1983.
The complaint in Sims sought identical relief as that
sought in Mangum, except that Sims sought to assert a
class action on behalf of owners of eligible Class III
property situated within Covington County and sought
relief limited to Covington County, Alabama.   This
action was one of forty suits filed around the state
seeking refund of taxes on the same grounds applicable
to each county, on an individual basis.   On June 28,
1983, the Covington County Circuit Court granted
certification of a class consisting of "all land owners
in Covington County, Alabama owning an interest in
eligible Class III property situated within the said
county who applied for current use treatment for ad
valorem tax purposes and who paid ad valorem taxes on
their said property on or after November 23, 1979."

The Mangum class was eventually decertified on May
2, 1984, after the trial court determined that it would
be more appropriate to bring individual county actions
rather than to maintain a statewide class action.

13

> On June 7, 1984, the Covington County taxpayer
> class in Sims filed a motion for summary judgment,
> which was granted on September 19, 1984.  The trial
> court found that the tax assessor in Covington County
> did not utilize values consistent with those set forth
> by this court in Eagerton v. Williams, supra.

470 So. 2d at 1192 (internal footnote omitted).

In White, the defendants argued "that the trial court erred in ruling that the statute of limitations period was tolled by the filing of Mangum and continued tolled until the time of the filing of the instant complaint." Id. at 1192.  The Supreme Court of Alabama rejected the defendants' argument and held that the statute of limitations is tolled as to claims of members of a putative plaintiff class against putative members of a defendant class until an independent action is filed or until the denial of class certification, whichever may occur first. Id. at 1193.  In so holding, the Supreme Court also found unpersuasive the White defendants' additional argument that "the statute should not be tolled as to them because they were not named members of the defendant class in Magnum."[7] Id.  In rejecting this argument, the White court adopted the holding in Appleton Electric Co. v. Graves Truck Line, Inc., 635 F.2d 603 (7th Cir. 1980).  See White, 470 So. 2d at 1193.  As explained by the Supreme Court in

---

[7] Specifically, the White defendants asserted that "the limitations period is not tolled against unnamed defendants until they are specifically named in the complaint, because otherwise they would be required to defend against actions of which they had no knowledge until after the statute had run." Id.

White, the Appleton court

> held that when a class action is instituted against a
> class of unnamed defendants, the statute is tolled as
> to all putative members of the defendant class.
> Finding that due process was not offended by tolling
> the running of the limitations period even where a
> defendant had no notice until after the limitations
> period had run, the court stated, "A contrary rule
> would sound the death knell for suits brought against a
> defendant class, nullifying that part of Rule 23 that
> specifically authorizes such suits."

Id. (citing Appleton, 635 F.2d at 609-610).

White is distinguishable from the instant case, because

White addressed the tolling doctrine in the context of claims

asserted against defendants who previously were unnamed members

in a defendant class action. Garst, however, did not involve a

defendant class action, only a plaintiff class action. The

defendants in Garst were sued individually, not as

representatives of an unnamed defendant class. Namely, the

individual Defendants in Garst were Franklin Life and American

Franklin Life Ins. Co. See Goree v. Franklin Life Ins. Co., et

al., Civ A. No. 99-D-986-N, at 13-14 (M.D. Ala. April 24, 2000).

Martin was not a Defendant in the Garst action. In other words,

the underlying class action in White involved both a plaintiff

class action and a defendant class action, as opposed to Garst,

which involved only a plaintiff class action.

Here, it is not disputed that Plaintiff was a member of a

putative class of plaintiffs in the Garst action. Thus, under

the reasoning in White, the filing of the Garst action would toll

15

his claims against the defendants in the <u>Garst</u> action.  Because
Martin was neither a named Defendant in the <u>Garst</u> action nor a
potential unnamed member of a defendant class, the court finds
that the <u>Garst</u> action does not toll the statute of limitations
with respect to any of Plaintiff's claims against him.  <u>See</u>
<u>Aserinsky v. Wyeth Laboratories, Inc.</u>, 1999 WL 554608, *2 (E.D.
Penn. 1999) (finding that the non-diverse defendant was
fraudulently joined because the statute of limitations was not
tolled by a class action in which the fraudulently joined party
was not a defendant).

Thus, the court finds that Plaintiff's action against Martin
is barred by the statute of limitations because Plaintiff's
Complaint was filed on August 4, 1999, which is more than two
years after June 1997.  As a result, the court finds that
Plaintiff has fraudulently joined Martin in this action.  <u>See</u>
<u>Whitlock</u>, 32 F. Supp.2d at 1290 (Where the only claims against a
resident defendant are barred by the statute of limitations, "the
resident defendant is deemed to have been fraudulently joined.").
Therefore, the court must disregard Martin's citizenship for
purposes of determining jurisdiction under 28 U.S.C. § 1332.  In
so doing, it is undisputed that the citizenship of Plaintiff is
diverse from the citizenship of Franklin Life.  (Doc. No. 1
¶¶ 4-5; Doc. No. 6 at 1-2; Compl. ¶¶ 1-3.)  Accordingly, the
court finds that Franklin Life has satisfied its burden of

16

establishing that complete diversity exists in this case.  <u>See</u>
<u>Diaz</u>, 85 F.3d at 1505.


### B. Amount In Controversy

Franklin Life asserts that, based on the evidence it has
submitted and because Plaintiff claims unspecified damages, "it
is more likely than not that the jurisdictional amount for
diversity jurisdiction is met in this case."  (Doc. No. 1 ¶ 19.)
Plaintiff has not addressed Franklin Life's argument in any of
his pleadings.  For two reasons, the court agrees with Franklin
Life.

First, Plaintiff has not contested the amount-in-controversy
requirement.  In moving the court to remand this action to state
court, Plaintiff only addresses Franklin Life's fraudulent
joinder argument.  The court deems Plaintiff's silence as a
concession that he seeks more than $75,000 in punitive and
compensatory damages.  <u>See Florida Municipal Power Agency v.</u>
<u>Florida Power & Light Co.</u>, 81 F. Supp.2d 1313, 1330 (M.D. Fla.
1999) (finding that the party's failure to "specifically address"
the opposing party's argument was "a concession as to its
merits").

Second, even if Plaintiff had challenged this element of
diversity jurisdiction, the court finds that Franklin Life has
met its burden of establishing that the amount-in-controversy

17

requirement is satisfied.  "[W]here a plaintiff has made an unspecified demand for damages in state court," as here, "a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the [$75,000] jurisdictional requirement."  Tapscott, 77 F.3d at 1356-57.  In deciding whether a removing defendant has satisfied its burden, the court may look to damages awarded in cases involving the same type of suit.  See Bolling v. Union National Life Ins. Co., 900 F. Supp. 400, 404 (M.D. Ala. 1995); see also De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993).

Here, Plaintiff claims both compensatory and punitive damages in unspecified amounts.  (Compl. at 3-6.)  Franklin Life has submitted several decisions from Alabama courts where plaintiffs in fraud actions against insurance companies received compensatory and punitive damages greater than $75,000.  (Doc. No. 1, Ex. B.)  As in Bolling, the court finds that, "[b]ased on these cases, it is clear that in Alabama when a plaintiff seeks recovery for fraud against an insurance company and asks for punitive damages, the recovery, if the plaintiff prevails, may very well exceed [$75,000]."  900 F. Supp. at 405.  Based on the foregoing, the court finds that Franklin Life has met its burden of establishing the amount-in-controversy requirement.  See Diaz, 85 F.3d at 1505.

18

### C. Conclusion

In sum, the court finds that Franklin Life has demonstrated that the court has diversity jurisdiction in this case. See 28 U.S.C. § 1332(a); see also Diaz, 85 F.3d at 1505. First, there exists complete diversity of citizenship between Plaintiff and the only properly joined Defendant, Franklin Life. Second, the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, the court finds that it may properly exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Accordingly, the court finds that Plaintiff's Motion To Remand is due to be denied.

### IV. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Plaintiff's Motion To Remand be and the same is hereby DENIED. Contemporaneously herewith, the court is entering a Scheduling Order.

DONE this the 27th day of April, 2000.

_____
UNITED STATES DISTRICT JUDGE

19

[FILED]

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JUN 3 0 2000

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

BETTY J. SMITH,                    )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )    CIVIL ACTION 99-D-1081-S
                                   )
FRANKLIN LIFE INSURANCE CO.,       )
et al.,                            )
                                   )
        Defendants.                )

MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff Betty J. Smith's ("Plaintiff")

Motion To Remand (Doc. No. 4), filed October 5, 1999.  The

Parties have filed briefs and evidentiary submissions in support

of and in opposition to Plaintiff's Motion.[1]  After careful

consideration of the arguments of counsel, the relevant law, and

the record as a whole, the court finds that Plaintiff's Motion To

Remand is due to be denied.


I. REMAND STANDARD AND FRAUDULENT JOINDER

It is well-settled that a defendant, as the party removing

an action to federal court, has the burden to establish federal

jurisdiction.  See Diaz v. Sheppard, 85 F.3d 1502, 1505 (11th

Cir. 1996).  Removal of a case from state to federal court is

---

[1] When citing to certain pleadings in the record, the court
will refer to the docket numbers assigned to those pleadings
("Doc. No.").

EOD _____ 6/30/2000

proper if the case could have been brought originally in federal court.  See 28 U.S.C. § 1441(a).  A federal district court has original jurisdiction over cases involving citizens of different states where the amount in controversy exceeds $75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332(a).  "Diversity jurisdiction under 28 U.S.C. § 1332 requires complete diversity-every plaintiff must be diverse from every defendant."  Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1359 (11th Cir. 1996), abrogated on other grounds, Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000).  Therefore, where the parties are diverse and the amount in controversy is sufficient, a defendant has the statutory right to remove an action from state to federal court. See 28 U.S.C. § 1332(a).

However, as the Supreme Court has long recognized, diversity jurisdiction "cannot be defeated by a fraudulent joinder of a residential defendant having no real connection to the controversy."  Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921).  Thus, when determining whether complete diversity exists, courts shall disregard the citizenship of fraudulently joined defendants.  See Tedder v. F.M.C. Corp., 590 F.2d 115, 117 (5th Cir. 1979).[2]

---

[2] In Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  See 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Joinder is fraudulent "when there is no possibility that the plaintiff can prove a cause of action against the resident defendant." Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287 (11th Cir. 1998). As explained by the old Fifth Circuit,

> [t]here can be no fraudulent joinder unless it be clear that there can be no recovery under the law of the state on the cause alleged, or on the facts in view of the law as they exist when the petition to remand is heard. One or the other at least would be required before it could be said that there was no real intention to get a joint judgment and that there was no colorable ground for so claiming.

Parks v. New York Times Co., 308 F.2d 474, 478 (5th Cir. 1962). For example, "[i]f the only claims against a resident defendant are barred by the statute of limitations, then there 'is no possibility the plaintiff can establish a cause of action against the resident defendant.'" Whitlock v. Jackson National Life Ins. Co., 32 F. Supp.2d 1286, 1290 (M.D. Ala. 1998) (quoting Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997)).

In examining whether a joinder is fraudulent, the court "should resolve all questions of fact and controlling law in favor of the plaintiff and can consider any submitted affidavits and/or deposition transcripts." Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989); see also Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983). "The removing party bears the [heavy] burden of proving [by clear and convincing evidence] that the joinder of the resident defendant was fraudulent." Cabalceta, 883 F.2d at 1561; see also Crowe, 113

3

F.3d at 1538 (stating that "[t]he burden of the removing party is a 'heavy one'"); Parks, 308 F.2d at 478 ("A claim that joinder is fraudulent must be asserted with particularity and supported by clear and convincing evidence.").

"'If there is *even a possibility* that a state court would find that the complaint states a cause of action against . . . the resident defendant[], the federal court must find that the joinder is proper and remand the case to the state court.'" Triggs, 154 F.3d at 1287 (quoting Coker, 709 F.2d at 1440-41 (emphasis added in Triggs)). "The plaintiff need not have a winning case against the allegedly fraudulent defendant; he [or she] need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate." Id. (emphasis in original).


## II. BACKGROUND[3]

This fraud and breach-of-contract action arises out of Plaintiff's purchase of two annuities and two life insurance policies from Defendant Franklin Life Insurance Company

---

[3] The court construes the facts in the light most favorable to Plaintiff, as required on a motion to remand. See Crowe, 113 F.3d at 1538. Additionally, the court notes that it allowed limited jurisdictional discovery in this case (Doc. No. 8), after which the Parties filed various documents, as well as excerpts from deposition testimony. In ruling on Plaintiff's Motion To Remand, the court has considered all of the evidence submitted by the Parties in support of and in opposition to said Motion.

4

("Franklin Life").  Defendant Tommie E. Martin ("Martin"), an
agent for Franklin Life, allegedly made false representations to
Plaintiff in 1980, 1982, 1984 and 1987, the years in which
Plaintiff purchased the annuities and policies at issue.  (Compl.
¶¶ 7-9.)  Her claims regarding each annuity and policy are
similar.  As explained further below, Plaintiff asserts that
Martin guaranteed that, if Plaintiff paid premiums until she
retired, thereafter she would receive a specific amount of income
every month in the form of dividends from each annuity and
policy.  (Id. ¶¶ 4, 7-9, 18-21, 28-35; Pl.'s Dep. at 102.)  Based
on Martin's explicit representations, Plaintiff purchased the
annuities and policies made subject of this lawsuit.  (Id.)
However, according to Plaintiff, Franklin Life has "now informed"
her that the amount of monthly income Martin told Plaintiff she
would receive will not be available upon her retirement.  (Pl.'s
Dep. at 27, 89, 92, 96-97, 100, 108-10, 121-22, 142.)

    Plaintiff, born May 13, 1939, has a bachelor's degree in
history and a master's degree in elementary education and school
administration.  (Id. at 171-72; Doc. No. 11, Ex. 2.)  After
turning 40, Plaintiff, a school teacher, began contemplating
saving income for her retirement.  (Pl.'s Dep. at 31.)  Thus, in
1980, when Martin told Plaintiff that Franklin Life's
"Presidential" annuity would "secure her long term financial
growth," she listened.  (Compl. ¶ 9; Doc. No. 11, Ex. 20; Pl.'s

Dep. at 55, 63, 67, 71-72.)

In explaining the terms of Franklin Life's "Presidential" annuity,[4] Martin provided Plaintiff with a "Summary Benefit Statement." (Doc. No. 11, Ex. 23; Pl.'s Dep. at 76-78.) Martin used this one-page, computer-generated document to demonstrate the cash value and monthly income the policy would generate for Plaintiff at retirement, depending upon whether Plaintiff paid premiums until age 60, age 62 or age 65. (Id. at 76-77, 84-86.) The section of the "Summary Benefit Statement" illustrating the accumulated monthly income is as follows:

Monthly Life Income With 10 Years Certain

| Age | Guaranteed Income | Additional Income*++ | Total Income*++ |
|-----|-----|-----|-----|
| 60 | $36.77 | $64.33 | $101.10 |
| 62 | 44.04 | 82.98 | 127.02 |
| 65 | 57.01 | 121.07 | 178.08 |

(Doc. No. 11, Ex. 23.[5])

As indicated above, the "additional income" and "total income" columns are followed by an asterisk (*) and two plus

---

[4] Henceforth, the court will refer to this annuity as the "1980 annuity."

[5] "Monthly Life Income With 10 Years Certain" means that, beginning at the ages specified above, Franklin Life will pay Plaintiff a monthly income until the time of her death. However, should Plaintiff die within the first 10 years of receiving monthly income payments, Franklin Life will make the payments to a designated beneficiary for the balance of the 10-year period.

signs (++). The asterisk directs the reader to a footnote at the bottom of the page, which reads, in part, as follows: "* Additional units on current participation basis included in above figures. Future additional units are not guaranteed and will depend on the company's experience. The illustrated additional units are also based upon the values of the contract." (Doc. No. 11, Ex. 23.) The two plus symbols (++) refer the reader to a separate footnote. This footnote states as follows: "++ Based on annuity income rates applicable to current contract settlements under tax-favored annuity provisions not guaranteed for future contract settlements." (Id.)

Using the aforementioned summary, Martin told Plaintiff that, if she paid premiums until age 60, she was "guaranteed" to receive a monthly income of $101.10, the figure designated in the "total income" column above. (Pl.'s Dep. at 85-86, 89.) Based upon Martin's representations, Plaintiff purchased the 1980 annuity. (Compl. ¶¶ 9, 14, 16.)

Two years later, in October 1982, Martin again approached Plaintiff and recommended that she purchase a life insurance policy through Franklin Life. Martin told Plaintiff that the life insurance policy would be "good" for Plaintiff because, like

7

her 1980 annuity, the life insurance policy[6] could serve as a "retirement plan." (Pl.'s Dep. at 25; Compl. ¶¶ 5, 7; Doc. No. 11, Ex. 2.) When soliciting Plaintiff, Martin presented her with a "Summary Of Benefits" for the 1982 policy. (Doc. No. 11, Ex. 3; Pl.'s Dep. at 29.) The "Summary Of Benefits" sets forth the cash value and monthly income available at ages 60 and 65, taking into account both "guaranteed income" and "additional income" from the sources indicated below:

|  | Age 60 | Age 65 |
|---|---|---|
| Total Lifetime Monthly Income** (10 Years Certain) | $234.11 | $489.29 |
| Guaranteed Income | $ 45.09 | $ 72.21 |
| Additional Income From: |  |  |
| Accumulated Dividends* | $ 77.98 | $205.04 |
| Annuity Settlement Privilege** | $111.04 | $212.04 |

(Doc. No. 11 at 3, Ex. 3; Pl.'s Dep. at 29.) The asterisks in the text are keyed to two footnotes, which provide in relevant part as follows:

> * Accumulated dividends and surplus interest on current tax-favored participation basis included in above figures. Future dividends and surplus interest are not guaranteed and will depend on the company's experience. . . .

> ** Income for life with a period of ten years certain. Based on annuity income rates applicable to current settlements of tax-favored policy contracts under annuity settlement privilege. Availability of income

---

[6] Henceforth, the court will refer to this policy as the "1982 policy."

8

rates in excess of policy contract provisions is not guaranteed for future policy contract settlements.

(Doc. No. 11, Ex. 3.)

According to Plaintiff, Martin promised Plaintiff that, as long as she paid premiums until the ages designated, she would receive the monthly income referenced in the "total" columns above.  Specifically, he guaranteed that, if Plaintiff paid premiums until age 60, she "would receive the sum of $234.11 per month for life, with ten years certain."  (Id. ¶ 7; Pl.'s Dep. at 29-31.)  Moreover, Martin stated that, if Plaintiff paid premiums an additional five years, "she would receive the sum of $489.29 in lifetime monthly income, with a ten year certain term."  (Compl. ¶ 7.)  Based on Martin's representations, Plaintiff purchased the 1982 policy so that she could receive "income upon retirement."  (Pl.'s Dep. at 25-26.)

In 1984, Martin sold Plaintiff a second annuity,[7] again representing that the annuity would "secure her long term financial growth."[8]  (Compl. ¶ 9; Doc. No. 11, Ex. 13; Pl.'s Dep. at 55, 63, 67, 71-72.)  At or near the time of purchase, Martin provided Plaintiff with a one-page "Summary Benefit Statement." (Id. at 67.)  Similar to the one Plaintiff received for her 1980

---

[7] Henceforth, the court will refer to this policy as the "1982 policy."

[8] Henceforth, the court will refer to this annuity as the "1984 annuity."

9

annuity, the "Summary Benefit Statement" illustrates the monthly incomes available under the 1984 annuity at ages 62, 65 and 70. It contains two columns, one labeled "guaranteed" income and the other labeled "total" income.  Martin told Plaintiff that the "total" column, below, represented the "guaranteed" monthly income Plaintiff could receive if Plaintiff paid premiums until the designated retirement ages:

| Retirement Age | Monthly Life Annuity Income With 10 Years Certain | |
|---|---|---|
| | Guaranteed | Total*++ |
| 62 | 78.74 | 258.52 |
| 65 | 106.72 | 384.86 |
| 70 | 168.41 | 731.86 |

(Doc. No. 11, Ex. 17; Pl.'s Dep. at 100, 103, 108-09.)  The asterisk (*) and plus signs (++) are accompanied by the following footnotes:

> * Total values are illustrated using the current interest rate of 11.25%.  This current interest rate is guaranteed through December 31, 1995 for payments received between October 1, 1984 and December 31, 1984. Continuance of the current interest rate beyond the dates indicated is not guaranteed.  Future interest rate guarantees will be established as defined in the contract.
>
> . . .
>
> ++ Based on annuity income rates applicable to current annuity purchase value settlements under tax-favored annuity settlement privilege (A.S.P.).  Availability of annuity income rates in excess of contract provisions is not guaranteed for future contract settlements.

(Doc. No. 11, Ex. 17.)

10

Subsequently, in August 1987, Martin told Plaintiff that she needed to purchase an additional life insurance policy in order "to take advantage of the income accumulation benefits on her retirement account at her retirement." (Compl. ¶ 8.) Martin provided Plaintiff with a one-page document, titled "Summary Of Your Franklin Life President's Plan."[9] (Pl.'s Dep. at 48-50; Doc. No. 11, Exs. 10, 11.) This summary contains an illustration of the annual retirement values at age 65. As with the other illustrations, it has a "guaranteed" column and a "total" column. (Doc. No. 11, Ex. 11.) The summary designates $499 as the "guaranteed" income Plaintiff would receive annually, beginning at age 65, and $1,428 as the "total" annual income. (Id.) The "total" column refers the reader to the following two footnotes designated as (A) and (B):

> (A) Dividends and surplus interest are included on current participation basis. Future dividends and surplus interest are not guaranteed and will depend on the company's experience. The illustrated dividends and surplus interest are also based upon the values of the policy. Policyowners who make policy loans or other withdrawals of policy values may receive dividends and surplus interest in lesser amounts than policy owners who do not make policy loans or other withdrawals.

---

[9] As discussed herein, each time Martin sold Plaintiff the annuities and policies at issue, he provided her with a one-page document summarizing the benefits of each. For simplicity, the court will refer to these documents as either "illustrations" or "summaries."

(B) Based on annuity income rates applicable to current
policy settlements under annuity settlement privilege.
Availability of annuity income rates in excess of
policy provisions not guaranteed for future policy
settlements.  Income is for 10 years certain and life
and is in lieu of taking the cash value in one lump
sum.

(Id.)

According to Plaintiff, Martin told her that she was

"guaranteed" to receive $1,428 per year, the figure in the

"total" column.  (Doc. No. 12 at 4.)  Relying on Martin's

representation, Plaintiff purchased the policy.[10]  (Compl. ¶¶ 8,

14, 16.)

Plaintiff avers that in 1998, prior to Plaintiff turning 60

years old, Franklin Life "informed" her that she would receive

less than the amounts represented by Martin as monthly income

from each annuity and policy.  (Compl. ¶¶ 15-16; Pl.'s Dep.

at 109-10.)  Based on the foregoing, Plaintiff commenced this

state-law action on or about August 5, 1999, by filing a

Complaint in the Circuit Court of Henry County, Alabama, against

Franklin Life and Martin (collectively "Defendants").  (Doc. No.

1, ¶ 1; Compl. at 1.)  Both Plaintiff and Martin are citizens of

the State of Alabama, while Franklin Life is a foreign

corporation.  (Id. ¶¶ 1-3.)

---

[10] Henceforth, the court will refer to this policy as the
"1987 policy."

12

Plaintiff's Complaint contains three counts.  In Count 1, she brings a fraudulent misrepresentation claim based upon Defendants' alleged false misrepresentations concerning the amount of income that her annuities and policies would generate. (Compl. ¶¶ 6-16.)  In Count 2, Plaintiff sets forth a fraudulent suppression claim.  Plaintiff avers that Defendants "were under a duty to disclose to Plaintiff" that her annuities and policies "would not provide the monthly income yield as represented to Plaintiff at the time of purchase."  (Id. ¶ 21.)

In Count 3, Plaintiff alleges a breach-of-contract claim. (Id. ¶¶ 28-35.)  Plaintiff asserts that, each of the four times Defendants sold Plaintiff the annuities and policies at issue, Defendants entered into a contract with her and subsequently breached each contract.  (Id.)  Plaintiff contends that Defendants "breached said contracts" because "Plaintiff did not and will never receive the benefit of the bargain she entered into with [] Defendants."  (Id. ¶ 34.)  According to Plaintiff, "[s]aid breaches were of a continuing nature in that Defendants . . . failed to ensure, year after year, that the [annuities and] policies made the basis of this litigation would perform as represented."  (Id.)  Plaintiff requests "compensatory and punitive damages in such sum as the jury may allow" and demands a trial by jury.  (Id. at 5, 7-9.)

On September 15, 1999, Franklin Life filed a Notice Of Removal.  (Doc. No. 1.)  Contending that the fraudulent joinder

13

exception to complete diversity applies to Plaintiff's claims against Martin, Franklin Life removed this case on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).   (Id.) Martin joined in the Notice Of Removal.   (Doc. No. 2.)   In response, Plaintiff filed the instant Motion To Remand on October 15, 1999.   (Doc. No. 4.)

### III. DISCUSSION

As stated above, Franklin Life contends that removal of this case from state to federal court is proper because diversity-of-citizenship jurisdiction exists pursuant to 28 U.S.C. § 1332(a). As the removing party, Franklin Life bears the burden of establishing that complete diversity exists between the Parties and that the amount in controversy exceeds $75,000, exclusive of interest and costs.   See 28 U.S.C. § 1332(a); Diaz, 85 F.3d at 1505.

### A. Complete Diversity

Franklin Life acknowledges that, on the face of Plaintiff's Complaint, the requirement of diversity of citizenship is not met because Martin's citizenship is the same as Plaintiff's citizenship.   However, Franklin Life asserts that Plaintiff has fraudulently joined Martin.   Referring to the principles of

14

fraudulent joinder,[11] Franklin Life contends that there is no possibility that Plaintiff can state a claim against Martin. Specifically, Franklin Life argues that the joinder of Martin is fraudulent because all claims against him are barred by the statute of limitations. Thus, Franklin Life contends, in determining whether complete diversity exists under § 1332(a), the court must disregard the citizenship of Martin. The court will address the timeliness of Plaintiff's fraud and breach-of-contract claims separately below.

### 1. Fraud

In her Complaint, Plaintiff alleges fraud, by both misrepresentation and suppression. (Compl. ¶¶ 6-27); see also ALA. CODE. §§ 6-5-101, 6-5-102 (1975).[12] The statute of limitations for fraud claims is two years. See ALA. CODE § 6-2-38(l) (1993)("All actions for injury to the person or rights of another not arising from contract and not specifically

---

[11] The court outlined these principles in Section I, *supra*.

[12] Section 6-5-101 of the Code of Alabama provides that "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." ALA. CODE § 6-5-101 (1975). Section 6-5-102 states that "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." ALA. CODE § 6-5-102 (1975).

15

enumerated in this section must be brought within two years.");
see also Casassa v. Liberty Life Ins., Co., 949 F. Supp. 825, 828
(M.D. Ala. 1996) (Under Alabama law, fraudulent misrepresentation
and suppression claims are subject to a two-year statute of
limitations.).  Under the discovery rule, the two-year period
does not begin to run "until the discovery by the aggrieved party
of the fact constituting the fraud." ALA. CODE § 6-2-3 (1993);
see also Foremost Ins. Co. v. Parham, 693 So. 2d 409, 421-23
(Ala. 1997) (holding that the two-year statute of limitations on
fraud claims accrues from the date on which a plaintiff knew or
should have known of the alleged fraud).

        Franklin Life states that Plaintiff's "only possibility for
avoiding the statute of limitations bar" on her fraud claims
against Martin "arising out the 1980, 1982, 1984 and 1987
transactions rests on the tolling or delayed accrual provision
for fraud-related claims." (Doc. No. 10 at 4.)  However,
Franklin Life argues that the reasoning in Foremost, supra, "has
foreclosed that possibility in this case." (Id. at 4-5.)
According to Franklin Life, "[m]ore than two years before filing
this civil action, Plaintiff received documents that contradicted
[Martin's] alleged oral misrepresentations." (Id. at 11.)  The
primary documents upon which Franklin Life relies are the one-
page summaries Martin provided to Plaintiff for each annuity and

life insurance policy.[13]  (Doc. No. 11, Exs. 3, 11, 17 & 23.)
Thus, Franklin Life contends that, upon receipt of these
illustrations, Plaintiff should have discovered any alleged
fraud.  Because it is undisputed that Plaintiff received the four
illustrations more than two years prior to filing this action,
Franklin Life contends that the statute of limitations commenced
and expired prior to Plaintiff bringing her action in 1999.
(Id.)

On the other hand, Plaintiff contends that the discovery
rule saves her claims.  See ALA. CODE § 6-2-3 (1993).  Contrary
to Franklin Life's assertion, Plaintiff states that "there is no
document or group of documents that reasonably put [] Plaintiff
on notice that [] Martin defrauded her."  (Doc. No. 12 at 5.)
According to Plaintiff, Franklin Life "make[s] a giant leap in
logic" by "presum[ing] that the documents available to
[Plaintiff] actually disclosed information that would have put a
reasonable person on notice that they [sic] had been defrauded
and that [Plaintiff], or any other reasonable person, understood

---

[13] The court notes that, pursuant to its Order entered
October 27, 1999 (Doc. No. 8), Franklin Life submitted to the
court a courtesy copy of Document Number 11, and therein
highlighted the terms in Exhibits 3, 11, 17 and 23, which
Franklin Life contends are inconsistent with Martin's oral
representations.  As discussed in Section II, supra, Exhibits 3,
11, 17 and 23 are the summaries of the benefits available under
Plaintiff's 1980 and 1984 annuities and 1982 and 1987 policies.
Further, the court notes that the portions of the summaries
recited by the court in Section II, supra, are the provisions
upon which Franklin Life relies.

17

this 'disclosed' information." (Id.)  Plaintiff asserts that the annuity and policy illustrations are "confusing" and that the terminology contained in those documents is not "simple" and "plain" as Franklin Life would have the court believe.  (Id. at 7.)  Moreover, Plaintiff argues that she is "not insurance literate" and "did not understand what [the terms] meant."  (Id. at 8; Pl.'s Dep. at 17, 154.)  Specifically, Plaintiff says that "there is a lot of stuff in those" insurance documents that she does not "understand."  (Pl.'s Dep. at 17.)  Accordingly, Plaintiff contends that she had to rely on Martin's representations in order to understand what she was purchasing. (Id.)

Plaintiff asserts that she was not put on notice of the fraud until July 20, 1998.[14]  (Compl. ¶ 15.)  Thus, Plaintiff avers that the statute of limitations on her fraud claims was tolled until that date.  Because Plaintiff filed her action in August 1999, Plaintiff claims that she timely commenced this

---

[14] The court notes that, regarding her 1987 policy, Plaintiff avers that she "was not put on notice of any fraud as to the amount of her retirement benefits until she received an update on her [1987] policy from Franklin [Life] in July, 1998." (Doc. No. 12 at 6.)  This update, according to Plaintiff, alerted her that, if she retired at age 65, "she would receive only $95.04 per month or $1,140.48 per year[,] rather than the $1,428 per year she was guaranteed in 1987 by [] Martin."  (Id. at 4; Doc. No. 11, Ex. 12.)  However, other than a general averment in the Complaint, the court notes that Plaintiff has not specified what event occurred in July 1998, which notified her that Martin defrauded her when he sold her the two annuities and the 1982 policy.

18

lawsuit within the two-year statute of limitations. For the reasons that follow, however, the court disagrees with Plaintiff.

When a plaintiff is deemed to have discovered the fraud is governed by the "reasonable reliance" standard.[15] Id. In Torres v. State Farm Fire & Casualty Co., the Supreme Court of Alabama explained the "reasonable reliance" standard as follows:

---

[15] The court notes that for 140 years the reasonable reliance standard governed in Alabama for purposes of determining when the statutory limitations period began to run in fraud actions. See Foremost, 693 So. 2d at 420. However, in 1989, the Supreme Court of Alabama changed the standard to "justifiable reliance." Hickox v. Stover, 551 So. 2d 259 (Ala. 1989). As noted in Foremost, a "tension" existed among the Justices on the Supreme Court of Alabama "ever since the 140-year-old standard for determining the reliance issue in fraud cases was changed in Hickox." 693 So. 2d at 420. However, Foremost put to rest that tension and returned to the reasonable reliance standard for actions commenced after March 14, 1997, the date Foremost was decided. See Brushwitz v. Ezell, ___ So. 2d ___, 2000 WL 46154, *5 (Ala., Jan. 21, 2000). As stated in Foremost:

> The 'reasonable reliance' standard is, in our view, a more practicable standard that will allow the fact-finder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties. In addition, a return to the 'reasonable reliance' standard will once again provide a mechanism, which was available before Hickox, whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.

693 So. 2d at 421.

19

Because it is the policy of courts not only to
discourage fraud but also to discourage negligence and
inattention to one's own interests, the right of
reliance comes with a concomitant duty on the part of
the plaintiffs to exercise some measure of precaution
to safeguard their interests.  In order to recover for
misrepresentation, the plaintiffs' reliance must,
therefore, have been reasonable under the
circumstances.  If the circumstances are such that a
reasonably prudent person who exercised ordinary care
would have discovered the true facts, the plaintiffs
should not recover.  <u>Bedwell Lumber Co. v. T & T
Corporation</u>, 386 So. 2d 413, 415 (Ala. 1980).  "If the
purchaser blindly trusts, where he should not, and
closes his eyes where ordinary diligence requires him
to see, he is willingly deceived, and the maxim
applies, 'volunti non fit injuria'."  <u>Munroe v.
Pritchett</u>, 16 Ala. 785, 789 (1849).

438 So. 2d 757, 758 (Ala. 1983).  Thus, under the reasonable

reliance standard, "where a party has reason to doubt the

representation or is informed of the truth before he acts, he has

no right to act thereon."  <u>Bedwell</u>, 386 So. 2d at 415; <u>see also</u>

<u>Patterson v. United Companies Lending Corp.</u>, 4 F. Supp.2d 1349,

1354 (M.D. Ala. 1998) (Under Alabama's reasonable reliance

standard, "[w]here one has knowledge of the falsity of a

representation or even reason to doubt the truth of a

representation . . ., reliance is not reasonable.").

Particularly relevant to this case is the Supreme Court of

Alabama's holding in <u>Foremost</u>.  In <u>Foremost</u>, the Supreme Court

held that, under the reasonable reliance standard, where an

insured is capable of understanding the policy and the policy

contains terms which contradict the agent's alleged

misrepresentations, the statute of limitations begins to run on

20

the date the insured receives the policy.  <u>See</u> 693 So. 2d at
421-422.  The statute of limitations commences, regardless of
whether the insured reads the policy.  <u>Id.</u>; <u>see also</u> <u>Ex parte</u>
<u>Caver</u>, 742 So. 2d 168, 172-73 (Ala. 1999) (stating that <u>Foremost</u>
"foreclosed the right of a person to blindly rely on an agent's
oral representations or silence to the exclusion of written
disclosures in a policy").  In short, the <u>Foremost</u> opinion
removes any doubt as to when the statute of limitations commences
in cases involving an insured who possesses documents saying one
thing, but who is told the opposite by the insurance agent.

Moreover, while <u>Foremost</u> focused on the contradictory terms
in the policy itself, a policy is not the only document that,
when received, can trigger the running of the statute of
limitations.  A plaintiff's receipt of any document which
contains terms giving a plaintiff reason to doubt the agent's
oral representations will commence the statute of limitations.
For example, courts have concluded that the statute of
limitations on fraud claims in Alabama is triggered by a
plaintiff's receipt of such documents as an annuity "service
form," <u>Whitlock</u>, 32 F. Supp.2d at 1292, and even a cover letter
from an insurance company regarding coverage.  <u>See</u> <u>Liberty Nat'l</u>
<u>Life Ins. Co. v. Parker</u>, 703 So. 2d 307, 308-309 (Ala. 1997).
The court now examines the facts of this case in light of the
foregoing principles.

21

Here, it is undisputed that, either at the time of purchase or shortly thereafter, Plaintiff received a one-page summary on each annuity and policy. (Pl.'s Dep. at 46, 67; Doc. No. 11, Exs. 3, 11, 17 & 23; Doc. No. 12 at 5.)  Further, it is undisputed that Plaintiff received these summaries more than two years prior to filing this lawsuit.  (Id.)  Based on these uncontested premises, the disputed issue for determination is whether the terms contained in the summaries should have given Plaintiff "reason to doubt" the validity of Martin's oral representations made at the time of sale.  Bedwell, 386 So. 2d at 415; see also Patterson, 4 F. Supp.2d at 1354.

Plaintiff asserts that the summaries did not provide sufficient notice that Martin's representations were false and that he had suppressed material information.  Thus, according to Plaintiff, she could not have discovered the fraud until 1998 when Franklin Life "informed" her that her annuities and policies would not perform as Martin had promised.  (Compl. ¶¶ 15-16.)  In contrast, Franklin Life argues that, upon receipt of each summary, Plaintiff had all the information she needed to ascertain Martin's alleged factual misrepresentations and fraudulent suppressions.  Accordingly, Franklin Life contends that the statute of limitations commenced on the dates Plaintiff received each summary.  The court agrees with Franklin Life.

For the reasons that follow, the court finds that the summaries, which Martin provided Plaintiff at or near the time of

22

sale, were intended to explain or "illustrate" the potential total income to which a policyholder would be entitled at either ages 60, 62 or 65. Namely, the court finds that it is clear that the figures in the "total" columns of each summary were not intended to be guarantees, but merely estimates. First, the court finds that an examination of the calculations in the columns labeled "guaranteed" and "total" would place a reasonable policyholder on notice of the falsity of Martin's representations. As stated, each summary contains at least two columns of figures, one labeled "guaranteed" income and one labeled "total" income. (Doc. No. 11, Exs. 3, 11, 17 & 23.) When Martin sold Plaintiff each annuity and policy, he told Plaintiff that, if she continued to pay premiums until retirement, the figures in the "total" columns constituted her "guaranteed" income upon retirement. (Doc. No. 12 at 6.) However, only one column in each summary is labeled "guaranteed," and the figure in that column is significantly lower than the figure in the "total" column.[16] Under the reasonable reliance standard, which merely requires that the document give a plaintiff "reason to doubt" the agent's representations, the fact that Martin's "guaranteed" figures did not comport with the

_____

[16] For example, the summary for the 1980 annuity indicates that, if Plaintiff paid premiums until age 60, the "guaranteed" monthly income at that age would be $36.77, as compared to a "total" monthly income of $101.10. (Doc. No. 11, Ex. 23.)

23

"guaranteed" figures in the summaries should have been a red flag to Plaintiff that Martin's statements were wrong.

Second, the court finds that the language in the footnotes renders dubious the truth of Martin's representations. The footnotes, immediately following the "total" columns in each summary, all contain similar language. In the 1980 annuity, the footnotes state that "[f]uture additional units *are not guaranteed* and will depend on the company's experience." (Doc. No. 11, Ex. 23 (emphasis supplied).) Further, the footnotes reveal that the "additional units" are merely "illustrat[ions]," not guarantees. (Id.) The 1984 annuity, in turn, clarifies that the "total value," that is, the figure in the "total" income column, is based upon an interest rate of 11.25% and that "[c]ontinuance" of this interest rate "is *not guaranteed*." (Doc. No. 11, Ex. 17 (emphasis supplied).) Additionally, the footnotes in both the 1982 and 1984 policies convey that the "[a]ccumulated dividends and surplus interest," which make up the "additional" income, "*are not guaranteed* and will depend on the company's experience." (Doc. No. 11, Exs. 3, 11 (emphasis supplied).)

The court finds that the language in the footnotes can only mean that the values stated in the "total" income columns are merely presentations of the hoped-for results; that is, estimates based upon contingencies, such as varying interest rates and

24

Franklin Life's future experience.  Because the "total" income in
each summary is dependent, in part, upon an indeterminate future
interest rate, it would be impossible for Martin, or anyone else,
to ascertain prior to the expiration of the terms allotted
therein what that "total" will be.  The only guaranty contained
in the summaries is the amount designated in the "guaranteed"
columns.  Based upon this language in the summaries, the court
finds that any amount above the "guaranteed" figure is merely an
approximate illustration.  In sum, based on the foregoing, the
court finds that the summaries should have "aroused suspicion
. . . in the mind of" Plaintiff that Martin's representations
were, in actuality, merely projections, not guarantees.  <u>Southern
Life & Health Insurance Co., v. Smith</u>, 518 So. 2d 77, 79 (Ala.
1987); <u>see also Foremost</u>, 693 So. 2d at 421-22.

However, seeking to avoid the statute of limitations bar,
Plaintiff argues generally that she is not "insurance literate"
and that the summaries consist of "complicated and unwieldy
language."  (Pl.'s Dep. at 17; Doc. No. 12 at 9.)  The court,
however, finds Plaintiff's argument untenable.  The court finds
that the terms are not so complicated that a college-educated
teacher could not detect the inconsistencies between Martin's
representations and the summaries.  Even under the more stringent
justifiable reliance standard articulated in <u>Hickox</u>, *supra* n.15,

25

where a literate, high-school educated plaintiff had received and
read an annual insurance report, the court rejected a similar
claim by the plaintiff's that the document was confusing.  See
Casassa, 949 F. Supp. at 827, 831.  The court found that,
regardless of any confusion, "[a] reasonable person would at
least have been alerted to the existence of a potential fraud."
Id. at 831.  Thus, the Casassa court concluded that the statute
of limitations commenced upon receipt of said report and expired
prior to the plaintiff filing his action.  Id.; see also McGowan
v. Chrysler Corp., 631 So. 2d 842, 845 (Ala. 1993) ("[I]t is the
knowledge of such facts that would have alerted a reasonable
person to the existence of a potential fraud, and not actual
knowledge of the fraud itself, that determines whether the
question of the tolling of the limitations period in a fraud case
can be decided as a matter of law.").  Here, the court finds
that, "[e]ven if a reasonable person would not understand the
particular intricacies of the alleged fraud based on a cursory
examination" of the summaries, a reasonable person could, after
such an examination, glean facts to realize that there may be
fraud.  949 F. Supp. at 830.  At the very least, the court finds
that the terms in the summaries rendered Martin's oral
representations ambiguous and the truth thereof questionable and,

26

thus, should have given Plaintiff reason to doubt Martin's statements.

Moreover, the court emphasizes that, under the reasonable reliance standard, Plaintiff has a duty "to exercise some measure of precaution to safeguard [her] interests." Torres, 438 So. 2d at 757. In light of the inconsistencies between the summaries and Martin's representations, the court finds that Plaintiff did not fulfill that duty. See Torres, 438 So. 2d at 759. Plaintiff never inquired about the information disclosed in the summaries. Indeed, she did not take action of any kind until she filed this lawsuit in August 1999. Accordingly, the court finds that Plaintiff's failure to inquire constitutes "a deliberate decision" by Plaintiff to "ignore" the clear terms contained in the summaries. Foremost, 693 So. 2d at 421; see also Oakwood Mobile Homes, Inc. v. Barger, 2000 WL 739596, *7 (Ala. June 9, 2000) (Because the falsity of the agent's "alleged misrepresentation" was "apparent on the face of the document itself," the plaintiff's "reliance" on the agent's oral representation "was not reasonable inasmuch as [the plaintiff] would have had to have closed his eyes to the truth to believe" the agent's representation.).

In sum, having considered "all of the circumstances" in this case, "including the mental capacity, educational background,

27

relative sophistication, and bargaining power of the parties,"
the court finds that Plaintiff unreasonably relied on Martin's
oral representations. <u>Foremost</u>, 693 So. 2d at 421. Plaintiff's
reliance was unreasonable because, as discussed above, the
summaries contain terms which should have given Plaintiff reason
to doubt Martin's representations. Thus, regarding Plaintiff's
specific fraud allegations as to each annuity and policy, the
court finds that the statute of limitations commenced on the
dates Plaintiff received the summaries on each. Because the
summaries were received more than two years prior to the date
Plaintiff filed this action, the court finds that Plaintiff's
fraud claims are untimely. Thus, the court concludes that no
possibility exists that Plaintiff can state a fraud claim against
Martin.[17]

### 2. Breach of Contract

In Count 3 of her Complaint, Plaintiff also brings a breach-
of-contract claim against Martin. (Compl. ¶¶ 28-35.) Franklin
Life contends that Plaintiff's breach-of-contract claim is barred

---

[17] In reaching this finding, the court in no way condones
the alleged deceitfulness of Martin's conduct in his business
dealings with Plaintiff. The court merely finds that Alabama
law, as applied to this case, does not allow Plaintiff any
recovery against him.

28

by the applicable statute of limitations.[18]    (Doc. No. 10 at 4

n.2.)    Plaintiff has not responded to Franklin Life's argument.

In moving the court to remand this action to state court,

Plaintiff only addresses Franklin Life's statute of limitations

defense pertaining to Plaintiff's fraud claims.    Therefore, the

court finds that Plaintiff's failure to address the timeliness of

her breach-of-contract claim constitutes a waiver of said claim.

Compare Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599

(11th Cir. 1995) (holding that the "onus is upon the parties to

formulate arguments; grounds alleged in the complaint but not

relied upon in summary judgment are deemed abandoned.").

    Alternatively, the court finds that Plaintiff's silence

constitutes a concession that her breach-of-contract claim is

barred by the statute of limitations.    See Florida Municipal

Power Agency v. Florida Power & Light Co., 81 F. Supp.2d 1313,

1330 (M.D. Fla. 1999) (finding that the party's failure to

"specifically address" the opposing party's argument was "a

concession as to its merits").

    Based on the foregoing, the court finds that no possibility

exists that Plaintiff can state a cause of action against Martin

---

    [18] In Alabama, the statute of limitations on a breach-of-
contract action is six years.   ALA. CODE § 6-2-34 (1975).   "The
statute of limitations on a contract action runs from the time a
breach occurs rather than from the time actual damage is
sustained."   Bass Pecan Co. v. Berga, 694 So. 2d 1311, 1315 (Ala.
1997) (citing AC, Inc. v. Baker, 622 So. 2d 331 (Ala. 1993)).

29

for breach of contract, as alleged in Count 3 of Plaintiff's
Complaint.


### B. Amount In Controversy

Franklin Life argues that, because Plaintiff asks for
punitive damages, it is more likely than not that Plaintiff will
obtain a jury verdict in excess of $75,000. (Doc. No. 1,
¶¶ 16-17.) In response, Plaintiff asserts that Franklin Life has
not submitted sufficient evidence to satisfy its burden of
proving that the amount in controversy is more than $75,000. For
the following reasons, the court agrees with Franklin Life.

In her Complaint, Plaintiff requests compensatory and
punitive damages "in such sum as the jury may allow." (Compl.
at 5, 7, 8.) "[W]here a plaintiff has made an unspecified demand
for damages in state court," as here, "a removing defendant must
prove by a preponderance of the evidence that the amount in
controversy more likely than not exceeds the [$75,000]
jurisdictional requirement." Tapscott, 77 F.3d at 1356-57. In
deciding whether a removing defendant has satisfied its burden,
the court may look to damages awarded in cases in the same
geographical area involving the same type of suit. See Bolling
v. Union National Life Ins. Co., 900 F. Supp. 400, 404 (M.D. Ala.

30

1995); <u>see also</u> <u>De Aguilar v. Boeing Co.</u>, 11 F.3d 55, 58 (5th Cir. 1993).

Franklin Life has cited 28 cases from Alabama courts where juries have awarded punitive damages against insurance companies in amounts greater than $75,000. (Doc. No. 11, Ex. D.) Many of the cases cited are based on an insured's fraud claims against an insurance company. (<u>Id.</u>) In particular, one of those cases, which involves a jury verdict out of the Circuit Court of Houston County, is from the same state judicial circuit from which this case was removed. (<u>Id.</u>); <u>see also</u> ALA. CODE § 12-11-2(20) (1995) (providing that the State Of Alabama's twentieth judicial circuit shall be composed of Henry and Houston counties). In that case, a jury returned a verdict in favor of the insured and against the insurance company and awarded $750,000 in punitive damages. (Doc. No. 11, Ex. D, at 4.) Moreover, Franklin Life has submitted an additional 28 cases from the Westlaw Jury Verdict Database for Alabama where juries have awarded punitive damages ranging from $80,000 to $580,000. (<u>Id.</u>, Ex. C.) Finally, Franklin Life has offered an Affidavit from George L. Priest ("Priest"), a professor at Yale Law School. (<u>Id.</u> 11, Ex. B.) Priest has researched Alabama jury verdicts, and, in particular, punitive damage awards against out-of-state insurance companies. (<u>Id.</u>) He concludes that "the average punitive damages verdict

31

affirmed against an out-of-state insurance company" by the
Supreme Court of Alabama is $1,785,070.  (Id.)

Based on the foregoing, the court finds that Franklin Life
has submitted evidence demonstrating that in Alabama, and in
particular in the area surrounding Henry County, "when a
plaintiff seeks recovery for fraud against an insurance company
and asks for punitive damages, the recovery, if the plaintiff
prevails, may very well exceed [$75,000]."  Bolling, 900 F. Supp.
at 405.  Accordingly, the court finds that Franklin Life has met
its burden of establishing the amount-in-controversy requirement
by a preponderance of the evidence.  See Diaz, 85 F.3d at 1505.


### IV. CONCLUSION

In sum, the court finds that Franklin Life has demonstrated
that the court has diversity jurisdiction over this case.  See 28
U.S.C. § 1332(a); see also Diaz, 85 F.3d at 1505.  First, the
court finds that Franklin Life has shown that there is no
possibility that Plaintiff can sustain a claim against Martin in
state court.  Because Martin, a non-diverse defendant, was
fraudulently joined, his citizenship must be disregarded.  With
respect to Plaintiff and the only properly joined Defendant,
Franklin Life, there exists complete diversity of citizenship.
Second, the court finds that Franklin Life has proven by a
preponderance of the evidence that the amount in controversy

exceeds $75,000, exclusive of interest and costs.  Therefore, the court finds that it may exercise jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  Consequently, the court finds that Plaintiff's Motion To Remand is due to be denied and that Martin is due to be dismissed as a defendant.

### V. ORDER

Accordingly, it is CONSIDERED and ORDERED that Plaintiff's Motion To Remand be and the same is hereby DENIED and that Defendant Tommie E. Martin be and the same is hereby DISMISSED as a defendant in this action.

A Uniform Scheduling Order is being entered contemporaneously herewith.

DONE this the 30th day of June, 2000.

UNITED STATES DISTRICT JUDGE

33

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602004225
Cashier ID: brobinso
Transaction Date: 03/07/2008
Payer Name: MAYNARD COOPER AND GALE
------------------------------------
CIVIL FILING FEE
 For: MAYNARD COOPER AND GALE
 Case/Party: D-ALM-1-08-CV-000164-001
 Amount:          $350.00
------------------------------------
CHECK
 Check/Money Order Num: 1083813
 Amt Tendered:  $350.00
------------------------------------
Total Due:        $350.00
Total Tendered: $350.00
Change Amt:       $0.00